UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PACIFIC LIFE INSURANCE COMPANY
and PACIFIC LIFE & ANNUITY
COMPANY,

                              Plaintiffs,

          - against -

US BANK NATIONAL ASSOCIATION and
BANK OF AMERICA, N.A.,

                              Defendants.

**MEMORANDUM
OPINION & ORDER**

16 Civ. 555 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          This action arises from Plaintiffs' purchase of more than $900 million worth of

residential mortgage-backed securities certificates, for which Defendants U.S. Bank National

Association and Bank of America, N.A. served as trustees.  Defendants each moved to dismiss

Plaintiffs' Amended Complaint in its entirety.  In a previous order, the Court granted

Defendants' motions in part and denied them in part.  The purpose of this memorandum opinion

is to explain the reasons for the Court's decision.

# BACKGROUND[1]

## I.     FACTS

### A.     Mortgage Securitization

          Residential mortgage-backed securities ("RMBS") are financial products

collateralized by residential mortgages.  Securitization is the process through which thousands of

---

[1]  The Court draws the following facts from the Amended Complaint, and accepts them as true
for purposes of addressing the Defendants' motions to dismiss.  See Kassner v. 2nd Ave.
Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).

individual mortgages are pooled together into discrete trusts, which then issue securities to investors in the form of certificates.  (Am. Cmplt. (Dkt. No. 116) ¶¶ 27-28)  As part of the securitization process, a "sponsor" or "seller" first acquires multiple mortgage loans from a mortgage "originator."  (Id. ¶ 28)  The sponsor then sells a group of these loans – known as a "loan pool" – to a "depositor," which is often a special-purpose affiliate of the sponsor.  (Id. ¶¶ 27-28)  The depositor conveys the loan pool to a "trustee," which holds the loan pool in trust under a "pooling and servicing agreement" ("PSA").  (Id. ¶ 29)

The PSA establishes "tranches" of the loan pool by risk level.  (Id. ¶¶ 29, 32)  The senior tranches contain mortgages with lower risk and lower interest rates, while the more junior tranches contain mortgages with greater risk and higher interest rates.  (Id. ¶ 32)  The trustee sells certificates representing these tranches to underwriters, who then sell the certificates to investors (who are known as "certificateholders").  (Id. ¶¶ 29, 39)

Pursuant to the PSA for each RMBS trust, a "servicer" is appointed to manage the collection of payments on the underlying mortgage loans, monitor delinquent borrowers, foreclose on defaulted loans, monitor compliance with representations and warranties regarding loan origination, track mortgage documentation, and manage and sell foreclosed properties.  (Id. ¶ 30)  Servicers also provide trustees with data about the underlying mortgage loans, which trustees then deliver in monthly remittance reports to certificate holders.  (Id. ¶ 31)  In some cases, the PSAs provide that servicers' activities are to be overseen by a "master servicer."  (See, e.g., id. ¶ 63)

### B.   __The Covered Trusts__

This case concerns thirty-two RMBS trusts created between 2004 and 2007 (the "Covered Trusts").  (Id. ¶¶ 4-5; Am. Cmplt., Ex. A (Dkt. No. 116-1) at 1-4)[2]  Ten of these trusts were sponsored by Washington Mutual Bank or Washington Mutual Mortgage Securities Corp (the "WaMu Trusts").[3]  Eight trusts were sponsored by CitiMortgage, Inc., Citigroup Global Markets Realty Corp., or CSE Mortgage LLC.[4]  Five trusts were sponsored by J.P. Morgan Acquisition Corp. or Chase Home Finance LLC.[5]  Two trusts were sponsored by DLJ Mortgage

---

[2]  Citations to page numbers of docketed material correspond to the pagination generated by this District's Electronic Case Files ("ECF") system.

[3]  The full names and short titles of the ten WaMu Trusts are:  WaMu Mortgage Pass-Through Certificates, Series 2006-AR2 ("WAMU 2006-AR2"); WaMu Mortgage Pass-Through Certificates, Series 2006-AR8 ("WAMU 2006-AR8"); WaMu Mortgage Pass-Through Certificates, Series 2006-AR16 ("WAMU 2006-AR16"); WaMu Mortgage Pass-Through Certificates, Series 2006-AR18 ("WAMU 2006-AR18"); WaMu Mortgage Pass-Through Certificates, Series 2007-HY1 ("WAMU 2007-HY1"); WaMu Mortgage Pass-Through Certificates, Series 2007-HY2 ("WAMU 2007-HY2"); WaMu Mortgage Pass-Through Certificates, Series 2007-HY3 ("WAMU 2007-HY3"); WaMu Mortgage Pass-Through Certificates, Series 2007-HY4 ("WAMU 2007-HY4"); WaMu Mortgage Pass-Through Certificates, Series 2007-HY7 ("WAMU 2007-HY7"); and Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-4 ("WMALT 2007-4").  (Am. Cmplt., Ex. A (Dkt. No. 116-1) at 3-4)

[4]  The full names and short titles of these eight trusts are:  CitiMortgage Alternative Loan Trust, Series 2007-A1 ("CMALT 2007-A1"); CitiMortgage Alternative Loan Trust, Series 2007-A4 ("CMALT 2007-A4"); CitiMortgage Alternative Loan Trust, Series 2007-A5 ("CMALT 2007-A5"); CitiMortgage Alternative Loan Trust, Series 2007-A6 ("CMALT 2007-A6"); Citigroup Mortgage Loan Trust Inc., Mortgage Pass-Through Certificates, Series 2005-7 ("CMLTI 2005-7"); Citigroup Mortgage Loan Trust 2006-4 ("CMLTI 2006-4"); Citigroup Mortgage Loan Trust 2006-AR1 ("CMLTI 2006-AR1"); and Citigroup Mortgage Loan Trust 2007-AR5 ("CMLTI 2007-AR5").  (Am. Cmplt., Ex. A (Dkt. No. 116-1) at 1-2)

[5]  The full names and short titles of these five trusts are:  ChaseFlex Trust Series 2006-1 ("CFLX 2006-1"); J.P. Morgan Alternative Loan Trust 2006-S2 ("JPALT 2006-S2"); J.P. Morgan Alternative Loan Trust 2006-S4 ("JPALT 2006-S4"); J.P. Morgan Trust 2005-A7 ("JPMMT 2005-A7"); and J.P. Morgan Trust 2007-A4 ("JPMMT 2007-A4").  (Am. Cmplt., Ex. A (Dkt. No. 116-1) at 1-2)

Capital, Inc.[6]  The following entities each sponsored one of the remaining seven trusts:  Bank of

America, N.A.; EMC Mortgage Corp.; Goldman Sachs Mortgage Co. (the "Goldman Trust");

UBS Real Estate Securities Inc.; Morgan Stanley Mortgage Capital, Inc. (the "Morgan Stanley

Trust"); Taylor, Bean & Whitaker Mortgage Corp.; and Wells Fargo Bank, N.A.[7]  (Am. Cmplt.

(Dkt. No. 116) ¶ 5; Am. Cmplt., Ex. A (Dkt. No. 116-1) at 1-4)

    Plaintiff Pacific Life Insurance Company is an insurance company incorporated in

Nebraska with its principal place of business in Newport Beach, California.  (Am. Cmplt. (Dkt.

No. 116) ¶ 19)  Plaintiff Pacific Life & Annuity Company is an insurance company incorporated

in Arizona with its principal place of business in Newport Beach, California.  (Id. ¶ 20)

Plaintiffs purchased RMBS certificates issued by the Covered Trusts with an original face value

of approximately $900 million.  (Id. ¶ 6)  Plaintiffs sold approximately $400 million worth of the

certificates between 2011 and 2014 but kept the rest.  (Id.; Am. Cmplt., Ex. B (Dkt. No. 116-2)

at 1)

    Defendant U.S. Bank National Association ("U.S. Bank") is the current trustee for

all thirty-two Covered Trusts.  (Am. Cmplt. (Dkt. No. 116) ¶ 22)  Defendant Bank of America,

N.A. ("BOA," and together with U.S. Bank, "Defendants" or "Trustees") served as the trustee

for eleven of the Covered Trusts – the ten WaMu Trusts and the Morgan Stanley Trust – from

---

[6]  The full names and short titles of these two trusts are:  Adjustable Rate Mortgage 2005-10 ("ARMT 2005-10"); and CSFB Mortgage-Backed Pass-Through Certificates, Series 2004-8 ("CSFB 2004-8").  (Am. Cmplt., Ex. A (Dkt. No. 116-1) at 1-2)

[7]  The respective full names and short titles of these trusts are:  Banc of America Funding 2007-D Trust ("BAFC 2007-D"); Bear Stearns ARM Trust 2005-7 ("BSARM 2005-7"); GSR Mortgage Loan Trust 2006-AR1 ("GSR 2006-AR1"); MASTR Asset Backed Securities Trust 2006-AB1 ("MABS 2006-AB1"); Morgan Stanley Mortgage Loan Trust 2006-7 ("MSM 2006-7"); TBW Mortgage-Backed Trust 2006-6 ("TBW 2006-6"); and Wells Fargo Mortgage Backed Securities 2006-AR1 Trust ("WFMBS 2006-AR1").  (Am. Cmplt., Ex. A (Dkt. No. 116-1) at 1-4)

October 2007 to December 2010, at which point U.S. Bank succeeded BOA as trustee for those trusts.  (Id. ¶ 21)

### C.    Defendants' Duties as Trustees

Defendants' duties and obligations as RMBS trustees are set forth in the PSAs governing the Covered Trusts, as well as in applicable state and federal law.[8]  (Id. ¶ 10)  Because each of the Covered Trusts is governed by a different PSA or comparable governing agreement, Defendants' duties differ somewhat on a trust-by-trust basis.  Nonetheless, because many of the PSAs share the same or substantially similar provisions, the Amended Complaint sets forth several broad categories of duties that the PSAs allegedly impose on Defendants.

### 1.    The Duty to Take Physical Possession of Complete Mortgage Files and Enforce Related Repurchase Obligations

According to Plaintiffs, under the PSAs, Defendants are "required to take physical possession of the mortgage loans and the accompanying mortgage files for the exclusive use and benefit of all current and future [c]ertificateholders."  (Id. ¶ 41 (citing Am. Cmplt., Ex. C ("PSA Provisions") (Dkt. No. 116-3) § II))  A complete mortgage file includes, inter alia:  (1) "[t]he original [endorsed] [m]ortgage [n]ote"; (2) "the original recorded [m]ortgage"; (3) records of the original assignment of the mortgage and "all intervening assignments evidencing a complete chain of assignment"; and (4) originals of any document modifying a mortgage loan.  (Id. ¶ 42 (citing PSA Provisions (Dkt. No. 116-3) § III) (emphasis omitted))

---

[8]  The Goldman Trust is governed by a "Master Servicing and Trust Agreement" rather than a PSA.  (Id. ¶ 10 n.4)  Two other Covered Trusts (BSARM 2005-7 and CMLTI 2006-AR1, or the "Indenture Trusts") are governed by "Indentures" rather than PSAs.  (Id.)  Unless otherwise noted, the term "PSAs" in this opinion references the PSAs, the Goldman Trust Master Servicing and Trust Agreement, and the Indentures.

Plaintiffs allege that "Defendants had a contractual and common law obligation under the PSAs to review each of the mortgage files for the mortgage loans and certify that the documentation for each of the loans was accurate and complete."  (Id. ¶ 44)  As part of this certification process, the PSAs require Defendants to initially certify that they have "received and reviewed the two key documents for the mortgage loan":  (1) "the original mortgage note with a complete chain of endorsements from the [o]riginator to . . . the trustee[]"; and (2) "a duly executed assignment of mortgage."  (Id. ¶¶ 45-46 (citing PSA Provisions (Dkt. No. 116-3) § IV)) After a designated period, Defendants must then issue a final certification that (1) attests to the completeness of the received mortgage files; and (2) specifically identifies any incomplete files in a "document exception report."  (Id. ¶ 47 (citing PSA Provisions (Dkt. No. 116-3) § V); id. ¶ 48)

The PSAs also impose certain duties on Defendants when they discover defects in mortgage files.  For example, the Goldman Trust PSA provides that, "[u]pon discovering or recei[ving] notice" of "any defective or missing document" in a mortgage file, the trustee must "promptly request that [the] [s]eller cure such defect" and, "if such [s]eller does not cure such defect . . . in all material respects [within a specified period]," enforce the seller's obligation to repurchase the underlying loans pursuant to the applicable mortgage loan purchase agreement. (Id. ¶ 48 (emphasis omitted) (citing PSA Provisions (Dkt. No. 116-3) § VI))

### 2.    The Duty to Provide Notice of Breaches of Representations and Warranties and to Enforce Related Repurchase Obligations

In their mortgage loan purchase agreements with Defendants and in the PSAs, the sponsors and originators of the Covered Trusts (the "Sponsors" and "Originators," respectively) made certain representations and warranties regarding the mortgage loans held by the Covered Trusts.  (Id. ¶ 51)  If Defendants become aware of breaches of these representations and

warranties – for instance, if Defendants learn that the mortgage loans held by the Covered Trusts are not of the quality represented by the Sponsors or Originators – this knowledge triggers certain obligations under the PSAs.  (Id.)

The scope of Defendants' obligations upon discovering such breaches differs from trust to trust.  For example, certain PSAs require Defendants to provide "prompt written notice" of the breach to the other parties to the PSA.  (Id. ¶¶ 52-53 (citing PSA Provisions (Dkt. No. 116-3) § VI))  Some PSAs also "explicitly provide that Defendants shall enforce the responsible parties' repurchase obligations" upon discovering breaches of representations and warranties.  (Id. ¶ 54)  Other PSAs do not expressly require Defendants to enforce such repurchase obligations, but instead provide that the trustee "will be reimbursed for its expenses incurred enforcing the repurchase obligation" or assign to the trustee certain "managerial functions in the repurchase protocol, such as extending the [period in which the relevant party may cure the breach]."  (Id.)

### 3. The Duty to Address Servicers' and Master Servicers' Failure to Meet Prudent Servicing Standards

Under the PSAs, the servicers and master servicers of the Covered Trusts (the "Servicers" and "Master Servicers," respectively) are largely tasked with the day-to-day management of the mortgage loans making up those trusts.  (See id. ¶¶ 30-31)  Plaintiffs allege, however, that the PSAs require Defendants to ensure that the Servicers and Master Servicers carry out their servicing duties in a prudent manner.  If Defendants discover that the Servicers or Master Servicers have breached their servicing duties under the PSAs, Defendants must provide notice to the relevant servicer or master servicer of the breach.  (Id. ¶¶ 55-56 (citing PSA Provisions (Dkt. No. 116-3) §§ X, XIV))

4.      **The Duty to Act Prudently Upon an Event of Default**

In addition to the duties described above, Plaintiffs claim that the PSAs prescribe

certain heightened duties for Defendants upon an "Event of Default."  (Id. ¶ 61)

While the definition of Event of Default differs among the PSAs, as a general

matter, an Event of Default is an uncured breach of obligations by one of the parties involved in

the securitization process – typically the Servicers or the Master Servicers.  For example, the

PSA for WAMU 2006-AR8 provides that an Event of Default includes:

> [F]ailure on the part of the [s]ervicer to duly observe or perform in any material
> respect any . . . of the covenants or agreements on the part of the [s]ervicer
> contained in the [RMBS certificates] or this [a]greement which continues
> unremedied for a period of 60 days after the date on which written notice of such
> failure, requiring the same to be remedied, shall have been given to the [s]ervicer
> by the [t]rustee, or to the [s]ervicer and [t]rustee by [certain certificate holders].

(Id. ¶ 62)  Other PSAs similarly provide that an uncured breach by the Master Servicers ripens

into an Event of Default.[9]  (Id. ¶ 63)

Plaintiffs allege that, under the PSAs and applicable state and federal law,

Defendants "owed a fiduciary duty to" certificate holders like Plaintiffs following an Event of

Default.  For example, the PSA for WAMU 2006-AR8 provides that

> [i]n case of an Event of Default hereunder . . . the [t]rustee shall . . . use the same
> degree of care and skill in its exercise as a prudent person would exercise or use
> under the circumstances in the conduct of such person's own affairs.

(Id. ¶ 61; see also PSA Provisions (Dkt. No. 116-3) § VII)  Likewise, the Trust Indenture Act of

1939 (the "TIA") "provides that upon the occurrence of a 'default' the indenture trustee . . . must

---

[9]  The Indentures define Event of Default to include uncured defaults by "[i]ssuers" (Id. ¶ 64
(citing PSA Provisions (Dkt. No. 116-3) § X)), which are entities that own mortgage loans and
enter into servicing agreements with, among others, an indenture trustee and a servicer or master
servicer.  See BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank,
Nat'l Ass'n, 247 F. Supp. 3d 377, 384-85 (S.D.N.Y. 2017) (describing the difference between a
"PSA Trust" and an "Indenture Trust").

use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs."  (Id. ¶ 66 (citing 15 U.S.C. § 77ooo(c))  And Plaintiffs claim that New York's Streit Act, N.Y. Real Prop. Law § 124 et seq., imposes similar "prudent person" obligations on an indenture trustee following an Event of Default.  (Id. ¶ 67)

The PSAs do not elaborate on what steps a "prudent trustee" must take.  However, Plaintiffs claim that "a prudent trustee would . . . exercise[] all of its rights under the PSA, including . . . ensur[ing] that defaulted loans that [are] eligible for repurchase . . . due to representation and warranty violations or because they [are] missing documentation [are] put back to the responsible parties."  (Id. ¶ 69)  Plaintiffs also claim that a prudent trustee would exercise all rights available under the PSAs to remedy servicer breaches that ripen into Events of Default – including, if necessary, terminating the servicer.  (See id. ¶¶ 69, 80-81)

### 5.    The Duty to Provide Accurate Remittance Reports and Certifications Under Regulation AB

In addition to the duties discussed above, "[c]ertain of the PSAs require Defendants to forward to rating agencies and to make available to [c]ertificateholders monthly remittance reports describing the performance of underlying loans."  (Id. ¶ 73)  Under item 1121 of Securities and Exchange Commission Regulation AB ("Regulation AB"), 17 C.F.R. § 229.1121, such remittance reports "must disclose '[m]aterial breaches of pool asset representations or warranties or transaction covenants.'"  (Id. ¶ 74 (quoting 17 C.F.R. § 229.1121(a)(12)))

In addition, to the extent that RMBS trustees engage in any servicing functions, Regulation AB requires such trustees to certify in a Form 10-K filed a year after each RMBS transaction that, inter alia, remittance reports provided to certificate holders comply with SEC

rules.  (Id. ¶ 75 (citing 17 C.F.R. § 229.1122(d)(3)(i)(C)))  Plaintiffs allege that, "for all

post-2005 Covered Trusts," "[e]ither the [t]rustee, or the [c]ustodian who acts for the [t]rustee,

was required to make such [Form 10-K] certifications."  (Id.)

### 6.      The Duty to Exercise Due Care and to Avoid Conflicts of Interest

Finally, in addition to the specific duties discussed above, Plaintiffs allege that

Defendants have a "non-waivable duty to exercise due care in the performance of ministerial acts

required to be undertaken in the course of the administration of the [Covered Trusts]."  (Id. ¶ 84;

see also PSA Provisions (Dkt. No. 116-3) § VII)

Moreover, Plaintiffs allege that – independent of the PSAs – Defendants have "an

absolute duty to avoid conflicts of interest and a duty of undivided loyalty to trust investors."

(Id. ¶ 85)

### D.      Defendants' Alleged Breaches of their Trustee Duties

Plaintiffs claim that Defendants breached their trustee duties under the PSAs in

several ways.

### 1.      Breach of Pre-Event of Default Duties Concerning
### Sponsor and Originator Representation and Warranty Breaches

Plaintiffs allege that – even before any Event of Default had occurred –

Defendants breached their duties under the PSAs by not providing adequate notice "when

Sponsors or Originators breached representation and warranty provisions" in the PSAs.  (Id.

¶ 86)  Plaintiffs claim that the Sponsors and Originators warranted that the mortgage loans in the

Covered Trusts complied with the Sponsors' and Originators' underwriting standards.  (Id. ¶ 89

(citing the mortgage loan purchase agreement for WAMU 2006-AR8))  But "[i]n reality, during

the 2005-2007 time period, the Sponsors and Originators regularly disregarded their

underwriting guidelines and the representations and warranties made to securitization trusts."

(Id. ¶ 86)  Plaintiffs further allege that "Defendants knew that the Sponsors and Originators regularly disregarded their underwriting guidelines and representations and warranties made to securitization trusts," yet Defendants did not (1) provide notice of these representation and warranty breaches to the relevant Sponsors or Originators; and (2) demand that the relevant Sponsors or Originators repurchase the deficient mortgage loans.  (Id. ¶ 91)

Plaintiffs claim that Defendants learned of these representation and warranty breaches through a variety of channels.  For example, Plaintiffs claim that Defendants received direct notice of the breaches, alleging that, "[u]pon information and belief, Defendants discovered breaches of representations and warranties in the Covered Trusts when they received notices of representation and warranty breaches and other defaults specifically for numerous of the Covered Trusts."  (Id.)

Plaintiffs also allege that Defendants received indirect notice of representation and warranty breaches.  "For example, while serving as trustee for various RMBS trusts [other than the Covered Trusts], [Defendants] were presented with a large number of defaulted loans that were originated by the Sponsors and Originators here[,] and foreclosures were commenced often in [Defendants'] names."  (Id. ¶¶ 93-96)  In their role as trustees for RMBS trusts other than the Covered Trusts, "Defendants also commenced repurchase actions against Sponsors or Originators at issue here" – including "at the direction of certain certificateholders" other than Plaintiffs.  (Id. ¶¶ 97-98)  In short, Plaintiffs claim that Defendants learned of "widespread uncured breaches of representations and warranties" by the Sponsors and Originators through

Defendants' interactions with and repurchase actions against those same Sponsors and Originators outside the context of the Covered Trusts.  (Id. ¶ 99)

Plaintiffs next allege that Defendants "received written notice of systemic, widespread Sponsor [representation and warranty] breaches from monoline insurers."[10]  (Id. ¶ 102)  According to Plaintiffs, many RMBS trusts like the Covered Trusts were insured by monoline insurers, and those insurers discovered representation and warranty breaches.  (Id. ¶¶ 103-04)  The insurers provided notice of these breaches to the RMBS trustees and, in many cases, also instituted their own lawsuits against the Sponsors and Originators.  (Id. ¶¶ 103-04)  The Amended Complaint does not allege that monoline insurers provided notice to Defendants or initiated lawsuits based any representation and warranty breaches specific to the Covered Trusts.  However, Plaintiffs allege that "[m]onoline insurers have filed many complaints" against the Sponsors and Originators in connection with other RMBS trusts.  (Id.; see also id. ¶¶ 105-06 (listing various insurer lawsuits))  Accordingly, through the public filings in these lawsuits detailing systemic underwriting failures by the Sponsors and Originators, "Defendants discovered that these same defective underwriting and securitization practices applied equally to the Covered Trusts containing loans originated and securitized by these same Originators and Sponsors."  (Id. ¶ 108)

Finally, Plaintiffs allege that "Defendants were also aware, beginning in 2009 or 2010, of facts that began to emerge publicly [demonstrating] . . . that the Sponsors and Originators – and, indeed, Defendants themselves . . . – had regularly included loans in securitizations that did not comply with applicable underwriting guidelines, made predatory

---

[10]  "Monoline insurance is a form of credit enhancement that involves purchasing insurance to cover losses from any defaults."  (Id.)

loans[,] and failed to meet state and federal lending guidelines."  (Id. ¶ 109)  The Amended

Complaint and an attached exhibit set forth lengthy factual allegations demonstrating that the

Sponsors and Originators "have been the subject of numerous investigations and lawsuits

alleging systemic abandonment of underwriting guidelines in the pursuit of profits."  (Id. ¶ 110;

Am. Cmplt., Ex. F. ("Public Reporting Allegations") (Dkt. No. 116-6))  Plaintiffs allege that

Defendants "were aware of these reports, investigations[,] and lawsuits," and "had access to non-

public information regarding the Covered Trusts that would have confirmed [that] the

widespread representation and warranty violations . . . affected the Covered Trusts if Defendants

had not been willfully blind or had conducted even a limited investigation."  (Am. Cmplt. (Dkt.

No. 116) ¶ 112)

### 2.    Breach of Pre-Event of Default Duties Concerning Defective Mortgage Files

Plaintiffs also claim that Defendants violated their pre-Event of Default duties

under the PSAs by not remedying defects in the mortgage files in their possession.  (Id. ¶ 99)

Plaintiffs allege that Defendants' knowledge of these mortgage file deficiencies is

demonstrated by:  (1) the fact that either Defendants or custodians operating on their behalf

identified such deficiencies in "exception reports" for the Covered Trusts; and (2) the fact that

information about widespread mortgage file defects was publicly available, as with information

regarding widespread representation and warranty breaches.  (Id. ¶¶ 101, 112-13)

### 3.    Breach of Post-Event of Default Duty to Act Prudently

Plaintiffs next allege that Defendants "have repeatedly breached their duty to

prudently exercise available remedies after Events of Default throughout the life of the Covered

Trusts."  (Id. ¶ 118)

Although Plaintiffs recognize that, under the PSAs, certain breaches do not ripen

into Events of Default until the Trustees provide the breaching party with "formal notice and an

opportunity to cure," Plaintiffs contend that Defendants "cannot escape their duty of prudence by

failing to provide the required notice."  (Id. ¶ 117)  According to Plaintiffs, because Defendants

"were aware (or would have been aware if they had carried out their duties)" of (1) Sponsor or

Originator representation and warranty breaches; and (2) breaches by the Servicers and Master

Servicers of their servicing obligations, the fact that Defendants did not provide the Sponsors,

Originators, or servicers with formal notice does not relieve Defendants of their duty to act

prudently.  (Id.)

Plaintiffs allege that the Trustees did not act prudently in connection with Events

of Default arising from (1) deficient mortgage files; (2) representation and warranty breaches; (3)

false certifications by the Servicers and Master Servicers that they were performing their

servicing obligations; (4) overcharging by the Servicers and Master Servicers; and (5) conduct

specific to the two Indenture Trusts.  (Id. ¶¶ 119-43)

According to Plaintiffs, following these various Events of Default, Defendants

should have "(i) taken action against the Master Servicers or Servicers; (ii) taken steps to require

the Sponsors or Originators to repurchase or substitute the loans; and (iii) notified

[c]ertificateholders of the Master Servicers' or Servicers' defaults and the breaches of the representation and warranty provisions." (Id. ¶ 116)  Because Defendants did not take these steps, they did not act as prudent trustees with respect to the Covered Trusts.  (Id.)

> **4.  False Certifications and Remittance Reports Under Regulation AB**

Plaintiffs next claim that Defendants made materially false statements in Form 10-K certifications and remittance reports provided to certificate holders pursuant to Regulation AB.

As to the certifications, Plaintiffs claim that – at least as to certain Covered Trusts – Defendants falsely certified in Form 10-K filings that "all servicing requirements had been met, that there were no breaches of representations and warranties, that the underlying properties securing the loans held by the Covered Trust had been maintained as required by the relevant transaction agreements, and that pool assets and related documents were safeguarded."  (Id. ¶ 144)  Plaintiffs allege that "[t]hese filings were false and misleading" because they did not disclose:  (1) "the Sponsors' widespread failure to transfer complete mortgage files to the Covered Trusts"; and (2) "the Sponsors' and Originators' many breaches of representations and warranties regarding the underwriting of the mortgage loans."  (Id.)

With respect to the remittance reports, Plaintiffs claim that Defendants did not disclose to certificate holders "the Sponsors', Originators', Servicers' and Master Servicers' numerous breaches" of representations and warranties and servicing obligations under the PSAs. (Id. ¶ 145)

> **5.  Breach of the Implied Covenant of Good Faith and Fair Dealing**

In addition to Defendants' alleged violations of specific duties under the PSAs, Plaintiffs contend that Defendants actions generally "deprived Plaintiffs of the fruits of their

contracts in violation of the implied covenant of good faith and fair dealing." (Id. ¶ 163)

Plaintiffs complain that Defendants "have engaged in an elaborate charade whereby they

assumed all rights to enforce remedies on behalf of investors, such as Plaintiffs, in the Covered

Trusts, but abdicated all responsibility to enforce such rights." (Id. ¶ 161)  As an example of

Defendants' bad faith, Plaintiffs claim that Defendants "actively sought to preclude or hinder the

delivery of notices of . . . breaches" that, inter alia, would have ripened into Events of Default,

"because [Defendants] did not want to receive enhanced duties and shed light on their own

participation in the same type of breaches or jeopardize lucrative client relationships." (Id.

¶ 163)

      **6.**      **Conflicts of Interest**

Finally, Plaintiffs allege that Defendants had numerous conflicts of interest that

violated their duties as RMBS trustees.

Citing news reports and publicly filed lawsuits against Defendants, Plaintiffs

allege that "Defendants, as originators for other RMBS trusts, sold billions of dollars of loans,

many of which materially breached representations and warranties." (Id. ¶ 178)  "[B]ecause

Defendants themselves faced enormous repurchase liability for loans sold in breach of

representations and warranties, including loans in RMBS trusts sponsored by the same Sponsors

of the Covered Trusts, Defendants were disincentivized to take any action to address breaches

and defaults in the Covered Trusts." (Id.)

      **E.**      **Injury to Plaintiffs**

As a result of Defendants' alleged breaches of their trustee duties, Plaintiffs claim

that they have suffered over $150 million in damages. (Id. ¶ 179)  Plaintiffs contend that, if

Defendants had, inter alia, required Sponsors and Originators to repurchase defective loans that

were contained in the Covered Trusts:  (1) the RMBS certificates still in Plaintiffs' possession "would have retained their market value"; and (2) as to the certificates Plaintiffs have sold, "Plaintiffs would have been able to sell [those] certificates at a higher price."  (Id. ¶ 180)

## II.   <u>PROCEDURAL HISTORY</u>

Plaintiffs filed this action in the United States District Court for the Southern District of Ohio, but the case was later transferred to this District "in the interest of convenience and fairness," pursuant to 28 U.S.C. § 1404(a).  (Transfer Order (Dkt. No. 30) at 14)  Thereafter, Plaintiffs filed an Amended Complaint, which asserts seven claims against Defendants.  (See Am. Cmplt. (Dkt. No. 116) ¶¶ 185-229)

In their first claim, Plaintiffs allege that Defendants violated the TIA in three ways.[11]  Plaintiffs maintain that Defendants violated Section 315(b) of the TIA, 15 U.S.C. § 77ooo(b), by not investigating and notifying Plaintiffs of "defaults" related to the Covered Trusts.  (Id. ¶ 189)  Plaintiffs claim that Defendants violated Section 315(c) of the TIA, 15 U.S.C. § 77ooo(c), by not prudently exercising their powers as trustees following those defaults.  (Id. ¶ 190)  And Plaintiffs contend that Defendants violated Section 316(b) of the TIA, 15 U.S.C. § 77ppp(b), by "impair[ing] the ability of the trusts, and consequently [Plaintiffs], to receive payment in connection with defective mortgage loans."  (Id. ¶ 191)

In their second claim, Plaintiffs contend that Defendants breached their obligations under the PSAs and, in doing so, harmed Plaintiffs, who are "intended third party beneficiaries under the PSAs."  (Id. ¶¶ 197-200)  Based on the trustee duties discussed above,

---

[11]  While "acknowledg[ing] that the . . . Second Circuit has held that the TIA does not apply to RMBS [trusts] similar to certain of the [Covered Trusts]," Plaintiffs assert their TIA claims "to the extent there are any further developments in the law and for purposes of preserving any rights on appeal."  (Id. at 81 n.14)

17

Plaintiffs allege that Defendants breached the PSAs by not (1) "tak[ing] steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation"; (2) "investigat[ing] and giv[ing] notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once [Defendants] discovered [such] breaches"; (3) "mak[ing] prudent decisions concerning the exercise of appropriate remedies following Events of Default"; (4) "provid[ing] notice of, and tak[ing] steps to remedy, the Master Servicers' and Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs"; (5) "render[ing] accurate reports under Regulation AB"; (6) "enforc[ing] repurchase obligations of the Sponsors and/or Originators"; and (7) protect[ing] the interest of the beneficiaries of the Covered Trusts."  (Id. ¶ 198)

In their third, fourth, and fifth claims, Plaintiffs assert that Defendants committed tortious conduct in connection with their oversight of the Covered Trusts.  Largely repeating the factual allegations underlying their breach of contract claims, Plaintiffs allege that Defendants (1) "breached their fiduciary obligations;" (2) "performed or failed to perform their responsibilities in a grossly inadequate and negligent manner"; and (3) "negligently breached their duty to provide [accurate and timely information regarding the mortgage loans and mortgage files] to Plaintiffs."  (Id. ¶¶ 203-16)  Plaintiffs further allege that Defendants breached

their "extra-contractual duties to perform ministerial acts with due care and undivided loyalty, and to avoid conflicts of interest."  (Id.  ¶ 208)

In their sixth claim, Plaintiffs assert that Defendants violated New York's Streit Act.  In support of this claim, Plaintiffs allege the same seven theories of liability offered in support of their breach of contract claims.  (Id. ¶¶ 217-24)

Finally, Plaintiffs allege that, by engaging in "the conduct described [in the rest of the Amended Complaint], Defendants breached their duty of good faith and fair dealing under the PSAs."  (Id. ¶¶ 225-27)

U.S. Bank and BOA moved to dismiss the Amended Complaint, and in a previous order, this Court granted in part and denied in part their motions.  (Sept. 30, 2019 Order (Dkt. No. 159))  As noted above, the purpose of this memorandum opinion and order is to explain the Court's reasoning.[12]

## DISCUSSION

## I.   MOTION TO DISMISS STANDARD

Defendants contend that the Amended Complaint must be dismissed because (1) several of Plaintiffs' claims are time-barred; and (2) in any event, Plaintiffs fail to state a claim as to any of the seven causes of action in the Amended Complaint.  (U.S. Bank Br. (Dkt. No. 127) at 7-10; BOA Br. (Dkt. No. 133) at 9-11)  Both of these issues are governed by the standard generally applicable to a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  See Cangemi v. United States, 13 F.4th 115, 134 (2d Cir. 2021) ("[T]he law is clear that '[w]here the

---

[12]  Since the Court issued its short order decision, the parties have submitted numerous letters citing supplemental authority.  (See Dkt. Nos. 160-61, 167-71, 173, 175, 179-83, 193-94, 197-202, 207-11)  Where relevant, the Court addresses the arguments made in these letters.  The parties' supplemental authority does not alter the determinations set forth in the Court's previous order, however.

dates in a complaint show that an action is barred by a statute of limitations,' a motion to dismiss based on the statute of limitations is properly treated as one under Rule 12(b)(6) rather than Rule 12(b)(1)." (quoting <u>Ghartey v. St. John's Queens Hosp.</u>, 869 F.2d 160, 162 (2d Cir. 1989)).

   To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," <u>Kassner</u>, 496 F.3d at 237 (citing <u>Dougherty v. Town of N. Hempstead Bd. Of Zoning Appeals</u>, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." <u>Id.</u> (citing <u>Fernandez v. Chertoff</u>, 471 F.3d 45, 51 (2d Cir. 2006)).

   A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." <u>Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.</u>, 507 F.3d 117, 121 (2d Cir. 2007) (citing <u>Twombly</u>, 550 U.S. at 554-55).

   "In deciding [a motion to dismiss], the Court can consider documents referenced in the complaint and documents that are in the plaintiff['s] possession or that the plaintiff[] knew of and relied on in bringing suit." <u>Cowan v. Ernest Codelia, P.C.</u>, No. 98 Civ. 5548 (JGK), 2001 WL 856606, at *1 (S.D.N.Y. July 30, 2011). "A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." <u>Sira v. Morton</u>, 380 F.3d 57, 67 (2d Cir. 2004) (citations omitted). "The Court may also properly consider

documents or information contained in defendant's motion papers if the plaintiff has knowledge or possession of the material and relied on it in drafting the complaint." Korova Milk Bar of White Plains, Inc. v. PRE Props., LLC, No. 11 Civ. 3327 (ER), 2013 WL 417406, at *6 (S.D.N.Y. Feb. 4, 2013) (citing Hoy v. Inc. Vill. of Bayville, 765 F. Supp. 2d 158, 163 (E.D.N.Y. 2011)).  Finally, "[t]he court may also take judicial notice of matters of public record, such as pleadings and court orders from prior litigation between the parties." Reisner v. Stoller, 51 F. Supp. 2d 430, 440 (S.D.N.Y. 1999) (citations omitted).

## II.   WHETHER PLAINTIFFS' CLAIMS ARE TIME-BARRED

U.S. Bank argues that many of Plaintiffs' breach of contract claims, as well as their "negligence-based" tort claims, are untimely under the applicable statute of limitations. (U.S. Bank Br. (Dkt. No. 127) at 34-36)  Based on facts specific to BOA – as the predecessor trustee to eleven of the Covered Trusts – BOA argues that all of Plaintiffs' claims against it are time-barred.  (BOA Br. (Dkt. No. 133) at 11-21)

### A.   Choice of Law

As noted earlier, this case was transferred to this District pursuant to 28 U.S.C. § 1404(a).  Accordingly, the first step in addressing the timeliness of Plaintiffs' claims is to determine which state's statute of limitations applies to those claims.

U.S. Bank argues that Ohio law applies in determining the applicable statute of limitations, because (1) this case was transferred from the Southern District of Ohio; and (2) U.S. Bank does not dispute that it was subject to personal jurisdiction in Ohio.  (U.S. Bank Br. (Dkt. No. 127) at 34-35)  BOA argues, however, that New York law governs the issue of which state's statute of limitations applies to Plaintiffs' claims against BOA, because BOA is not subject to personal jurisdiction in Ohio.  (BOA Br. (Dkt. No. 133) at 20-21)  Plaintiffs, for their part,

contend that Ohio law should apply in determining the statute of limitations for their claims against both Defendants.  (Pltf. Opp. (Dkt. No. 138) at 33-34; Pltf. Opp. (Dkt. No. 140) at 25-28)

### 1.   <u>Applicable Law</u>

#### a.   <u>Choice of Law Following a Transfer</u>

After a case has been transferred pursuant to 28 U.S.C. § 1404(a), "'the transferee court must follow the choice-of-law rules that prevailed in the transferor court.'"  <u>Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.</u>, 414 F.3d 325, 333 (2d Cir. 2005) (quoting <u>Ferens v. John Deere Co.</u>, 494 U.S. 516, 519 (1990)); <u>accord</u> <u>Valley Juice Ltd. v. Evian Waters of Fr., Inc.</u>, 87 F.3d 604, 607 (2d Cir. 1996) ("[W]here . . . a case is transferred from one federal jurisdiction to another at the behest of the defendant pursuant to 28 U.S.C. § 1404, 'a transferee court applies the substantive state law, including choice-of-law rules, of the jurisdiction in which the action was filed.").  However, "[w]hen the action could not have been maintained in the transferor court, the applicable law, including choice of law rules, is the state law of the transferee court."  <u>Mopex, Inc. v. AMEX, LLC</u>, No. 02 Civ. 1656 (SAS), 2002 WL 342522, at *4 (S.D.N.Y. Mar. 5, 2002).  The "most common" application of this exception is "where the transferor court lacked personal jurisdiction over the defendant."  <u>Id.</u> at *5.

#### b.   <u>Personal Jurisdiction in Ohio</u>

The Southern District of Ohio court did not decide whether it had personal jurisdiction over Defendants.  (<u>See</u> Transfer Order (Dkt. No. 30))  Accordingly, this Court must make that determination.  <u>See</u>, <u>e.g.</u>, <u>Commerzbank AG v. U.S. Bank Nat'l Ass'n</u>, 277 F. Supp. 3d 483, 490 (S.D.N.Y. 2017) ("<u>Commerzbank I</u>") (determining whether transferor court had

personal jurisdiction over the defendants, where the transferor court had not made that determination).[13]

        "[I]n order for an Ohio court to have jurisdiction over a non-resident defendant, the defendant must be (1) subject to long-arm jurisdiction under one of the enumerated bases of jurisdiction in Ohio's long-arm statute and (2) jurisdiction must accord with [d]ue [p]rocess. Conn v. Zakharov, 667 F.3d 705, 713 (6th Cir. 2012) (emphasis in original) (citing Kauffman Racing Equip., L.L.C. v. Roberts, 930 N.E.2d 784, 790 (Ohio 2010); Goldstein v. Christiansen, 638 N.E.2d 541, 543 (Ohio 1994); and U.S. Sprint Commc'ns Co. v. Mr. K's Foods, Inc., 624 N.E.2d 1048, 1051 (Ohio 1994)).

        Ohio's long-arm statute, Ohio Rev. Code § 2307.382, permits Ohio courts to exercise personal jurisdiction over a non-resident defendant who "acts directly or by an agent[] as to a cause of action arising from," inter alia, the defendant's "[t]ransacting any business in [Ohio]"; "[c]ausing tortious injury by an act or omission in [Ohio]"; or "[c]ausing tortious injury in [Ohio] by an act or omission outside [Ohio] if the [defendant] regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in [Ohio]."  Ohio Rev. Code § 2307.382(A).[14]

---

[13]  Although none of the parties has suggested that the personal jurisdiction inquiry would be different if this Court were to apply case law from the Second Circuit rather than from the Sixth Circuit, this Court will apply Sixth Circuit case law in determining whether the Southern District of Ohio court had personal jurisdiction over Defendants.  See Smith v. Railworks Corp., No. 10 Civ. 3980 (JPO), 2012 WL 752048, at *6 (S.D.N.Y. Mar. 6, 2012) (holding that – other than in the context of a multi-district litigation – the case law of the circuit in which the transferor court sits governs whether the transferor court had personal jurisdiction over defendants).

[14]  Ohio's long-arm statute was recently amended to permit the exercise of general jurisdiction over non-resident defendants.  Prior to the amendment, the statute required that personal jurisdiction be premised on one or more criteria listed in Section 2307.382(A).  See Premier Property Sales Ltd. v. Gospel Ministries Int'l, Inc., 539 F. Supp. 3d 822, 827 n.2 (W.D. Ohio

Under the Due Process Clause, a defendant must have sufficient "'minimum contact[s]' with the forum state so that finding personal jurisdiction does not 'offend traditional notions of fair play and substantial justice.'"  Conn, 667 F.3d at 712 (quoting Third Nat'l Bank v. WEDGE Grp., Inc., 882 F.2d 1087, 1089 (6th Cir. 1989)).  There are two types of personal jurisdiction:  general and specific.  Id. at 712-13.  For general jurisdiction to exist over a corporate entity, "the corporation must be incorporated there, operate its principal place of business in the state, or have such 'continuous and systematic' contacts [with the state] that the corporation is 'essentially at home[]' [in the state]."  IDS Pub. Corp. v. Reiss Profile Europe, B.V., No. 16 Civ. 535, 2017 WL 4217156, at *5 (S.D. Ohio Sept. 9, 2017) (quoting Daimler AG v. Bauman, 517 U.S. 117, 138-39 (2014)).

As to the exercise of specific jurisdiction, courts in the Sixth Circuit use the following three-part test:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state.  Second, the cause of action must arise from the defendant's activities there.  Finally, the acts of the defendant or consequences caused by the defendant must have substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

Conn, 667 F.3d at 713 (quoting Bird v. Parsons, 289 F.3d 865, 874 (6th Cir. 2002)).

---

2021) (citing 2020 Ohio Laws 44).  This amendment does not affect the Court's personal jurisdiction analysis here, however, because Plaintiffs do not contend that either Defendant is a non-resident who is nonetheless subject to general jurisdiction in Ohio.  Plaintiffs instead argue that BOA – which unlike U.S. Bank is a non-resident of Ohio – is subject to specific personal jurisdiction in Ohio.  (Pltf. Opp. (Dkt. No. 140) at 26-28)  Accordingly, and notwithstanding the amendment to Ohio's long-arm statute, Plaintiffs "must still demonstrate [that] their claim[s] arose from one of the enumerated factors [set forth in Section 2307.382(A)]."  Premier Property, 539 F. Supp. 3d at 827 n.2.

2.      **Analysis**

a.      **Choice of Law as to U.S. Bank**

Because Plaintiffs and U.S. Bank agree that Ohio's choice-of-law rules govern the

statute of limitations for Plaintiff's claims against U.S. Bank (see U.S. Bank Br. (Dkt. No. 127)

at 34-35; Pltf. Opp. (Dkt. No. 138) at 33-34), this Court will apply Ohio law in making

timeliness determinations as to those claims.  See, e.g., Nunes v. Cable News Network, Inc., 520

F. Supp. 3d 549, 554 (S.D.N.Y. 2021) (where the parties "[did] not dispute" which choice-of-law

rules applied, applying the choice of law rules of the state in which the transferor court sat).

b.      **Choice of Law as to BOA**

BOA argues that Ohio's choice-of-law rules do not apply to Plaintiffs' claims

against it, because the Southern District of Ohio court lacked personal jurisdiction over BOA.

(BOA Br. (Dkt. No. 133) at 20-21)  BOA argues that because (1) its principal place of business

is not in Ohio; and (2) Plaintiff's claims against BOA have no connection with Ohio, due process

precluded the Ohio district court from exercising general or specific personal jurisdiction over

BOA.[15]  Plaintiffs respond by arguing that BOA was subject to specific personal jurisdiction in

---

[15]  BOA does not address the applicability of Ohio's long-arm statute to Plaintiffs' claims against
BOA.  Plaintiffs do not explicitly address the long-arm statute, but argue that personal
jurisdiction over BOA exists because of BOA's business contacts with Ohio.  Accordingly, the
Court understand Plaintiffs to be arguing that personal jurisdiction exists under that portion of
Ohio's long-arm statute that provides for jurisdiction where a defendant "[t]ransact[s] any
business in [Ohio]."  Ohio Rev. Code § 2307.382(A)(1); accord W. & S. Life Ins. Co. v.
Deutsche Bank Nat. Trust Co., No. A1501580, 2015 WL 9998236, at *2-3 (Ohio Ct. Com. Pl.
Nov. 5, 2015) (holding that RMBS trustees were subject to long-arm jurisdiction in Ohio based
on § 2307.382(A)(1)).  In any event, because BOA has not disputed that the exercise of personal
jurisdiction is appropriate under Ohio's long-arm statute, the Court need only address the due
process issue.  See, e.g., Mesa Indus, Inc. v. Charter Indus. Supply, Inc., 22 Civ. 160, 2022 WL
3082031, at *6 (S.D. Ohio Aug. 3, 2022) (because defendants did not "contest application of
Ohio's long-arm statute" and merely argued that jurisdiction in Ohio "would violate the Due
Process Clause," it was sufficient for plaintiff to show that "the [c]ourt's exercise of specific
jurisdiction over the [d]efendants comports with due process").

Ohio, because BOA's "business dealings [in Ohio with respect to the Covered Trusts] constitute purposeful minimum contacts with Ohio."  (Pltf. Opp. (Dkt. No. 140) at 27)

In the Complaint and Amended Complaint (see Am. Cmplt. (Dkt. No. 116) ¶ 26 n.5), Plaintiffs contend that personal jurisdiction exists over BOA in the Southern District of Ohio because (1) "[t]he Covered Trusts are backed in part by loans made to borrowers in Ohio and mortgages on properties located in Ohio"; and (2) "Defendants, or a servicing agent on their behalf," undertook actions in Ohio related to those mortgages, including "delivering mortgage assignments for recording in the relevant Ohio public offices for real property records, ensuring Ohio loan modifications comply with the PSAs, instituting foreclosure actions in Ohio, taking title of [foreclosed Ohio properties], and performing Ohio bankruptcy-related duties for the benefit of . . . [c]ertificateholders."  (Cmplt. (Dkt. No. 1) ¶ 23)  In their briefing, Plaintiffs cite two cases in which courts have held that BOA is subject to specific personal jurisdiction in Ohio based on its role as trustee for RMBS trusts containing loans originating in Ohio.  (Pltf. Opp. (Dkt. No. 140) at 26-27 (citing Commerzbank I, 277 F. Supp. 3d at 490; W. & S. Life Ins. Co. v. Deutsche Bank Nat. Trust Co., No. A1501580, 2015 WL 9998236, at *4-16 (Ohio Ct. Com. Pl. Nov. 5, 2015)))

BOA argues that the Ohio-based mortgages in the Covered Trusts cannot serve as a basis for exercising personal jurisdiction over BOA because (1) "23,898 of the 23,915 mortgages backing the trusts on which Plaintiffs are suing BOA are on properties outside Ohio"; and (2) the mortgage-related activities that Plaintiffs describe in the Complaint were undertaken by "the servicer – a separate, unaffiliated entity" – and not by BOA.  (BOA Br. (Dkt. No. 133) at 21 (emphasis in original))  BOA also argues that Plaintiffs' reliance on Commerzbank I and

W. & S. Life Ins. Co. is misplaced, because "those decisions . . . erred in attributing the contacts

of third parties – servicers – to the trustees."  (BOA Reply (Dkt. No. 136) at 8 n.2)

       As to BOA's first argument, contacts with other states have no bearing on

whether sufficient minimum contacts are present in the forum jurisdiction; a defendant may be

subject to specific personal jurisdiction in multiple states based on the same course of conduct,

so long as its contacts with each of those states satisfies due process.  Accordingly, the fact that

only a small fraction of the mortgage loans in the Covered Trusts were purchased in Ohio does

not impact the personal jurisdiction analysis.  The inquiry instead turns on whether Plaintiffs

have adequately alleged that BOA or its agents took action with respect to those mortgages in

Ohio.  (See Cmplt. (Dkt. No. 1) ¶ 23)

       As to BOA's claim that Plaintiffs only allege that "a separate, unaffiliated entity"

took action with respect to mortgages in the Covered Trusts in Ohio (BOA Br. (Dkt. No. 133)

at 21), BOA misapprehends Plaintiffs' allegations.  Plaintiffs do not allege that servicers

independently undertook mortgage-related activities in Ohio with respect to the Covered Trusts.

Plaintiffs instead allege that "Defendants, or a servicing agent on their behalf," took steps related

to the Ohio-based mortgages, such as instituting foreclosure actions in Ohio.  (Cmplt. (Dkt.

No. 1) ¶ 23 (emphasis added))  BOA does not contend – nor could it – that courts may not

exercise personal jurisdiction over a corporate defendant based on the actions of its agents.  See,

e.g., Walden v. Fiore, 571 U.S. 277, 285 (2014) (noting that "physical entry into the [forum]

[s]tate – either by the defendant . . . or through an agent . . . is certainly a relevant contact" for

purposes of the due process inquiry (emphasis added)); Kroger Co. v. Dornbos, 408 F.2d 813,

816 (6th Cir. 1969) (holding that the actions of an agent can be attributed to the principal for

purposes of establishing sufficient "minimum contacts" with the forum state).  And for purposes

of a motion to dismiss, this Court must accept as true Plaintiffs' allegations that – even if BOA itself did not undertake mortgage-related activities related to the Covered Trusts in Ohio – a servicer did so "on [its] behalf." (Cmplt. (Dkt. No. 1) ¶ 23); see Kassner, 496 F.3d at 237.

This Court also rejects BOA's argument that Commerzbank I and W. & S. Life Ins. Co. improperly attribute "the contacts of third parties" to BOA in holding that personal jurisdiction over BOA exists in Ohio. (BOA Reply (Dkt. No. 136) at 8 n.2) To the contrary, Commerzbank I expressly holds that "the causes of action asserted [in that case] arise from [BOA] or its agents" – not unrelated third parties – "transacting business in Ohio." Commerzbank I, 277 F. Supp. 3d at 490. And in W. & S. Life Ins. Co., the court conducted a detailed analysis of the PSAs at issue and concluded that the servicers of the RMBS trusts served as agents of the trustees, such that their actions could be attributed to the trustees for purposes of determining BOA's contacts with Ohio. W. & S. Life Ins. Co., 2015 WL 9998236, at *2-4, *6-10.

The Court concludes that Plaintiffs' allegations are sufficient to establish specific personal jurisdiction over BOA in Ohio. As Plaintiffs allege, either BOA or a servicer acting as BOA's agent "deliver[ed] mortgage assignments for recording in the relevant Ohio public offices, deliver[ed] mortgage assignments for recording in the relevant Ohio public offices for real property records, ensur[ed] Ohio loan modifications compl[ied] with the PSAs, [and] institute[d] foreclosure actions in Ohio." (Cmplt. (Dkt. No. 1) ¶ 23) These actions demonstrate that (1) BOA purposefully availed itself of the privilege of transacting business in Ohio; (2) Plaintiffs' causes of action against BOA – which stem from BOA's administration of the Covered Trusts, including its action or inaction with respect to underlying mortgage loans in Ohio – arise from BOA's contacts with Ohio; and (3) it would have been reasonable for the

28

Southern District of Ohio court to exercise personal jurisdiction over BOA.  See Conn, 667 F.3d at 713.  Accordingly, as with U.S. Bank, this Court will apply Ohio law in determining the applicable statute of limitations for Plaintiffs' claims against BOA.

### B.        Whether Plaintiffs' Claims Are Timely

#### 1.        Claims Against U.S. Bank

U.S. Bank argues that many of Plaintiffs' breach of contract claims – as well as their negligence, gross negligence, and negligent misrepresentation claims – are time-barred under the applicable statute of limitations.[16]  (U.S. Bank Br. (Dkt. No. 127) at 35-36)

At the time this action was filed, the statute of limitations for a breach of contract claim in Ohio was eight years, Ohio Rev. Code § 2305.06 (2012), while negligence and breach of fiduciary duty claims were – and are still – subject to a four-year limitations period.  Id. § 2305.09.  Ohio also has a "borrowing statute," however.  At the time this action was filed, the borrowing statute provided as follows:

> No civil action that is based upon a cause of action that accrued in any other state, territory, district, or foreign jurisdiction may be commenced and maintained in this state if the period of limitation that applies to that action under the laws of that other state, territory, district, or foreign jurisdiction has expired or the period of limitation that applies to that action under the laws of this state has expired.

Id. § 2305.03(B) (2016).[17]  This statute "prevents a litigant from gaining the benefit of an Ohio

---

[16]  U.S. Bank does not argue that Plaintiffs' claims under the Streit Act and the TIA, or for breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing, are time-barred.  (See U.S. Bank Br. (Dkt. No. 127) at 34-36)

[17]  In a supplemental letter, Plaintiffs state that in 2021 the Ohio legislature amended Ohio's statute of limitations for breach of contract claims (shortening it from eight years to six) and Ohio's borrowing statute so that it applies only to tort claims, and not to breach of contract claims.  According to Plaintiffs, the borrowing statute amendment applies retroactively to April 7, 2005.  (Pltf. Mar. 8, 2022 Ltr. (Dkt. No. 197) at 1-2 & n.1); see Ohio Rev. Code §§ 2305.03(B), 2305.06 (2021); Ohio S.B. 13, 134th Gen. Assem. (2021).  However, Article II, Section 28 of the Ohio Constitution "prohibits the [Ohio legislature] from passing retroactive laws that, when apply, act to impair vested rights."  State v. LaSalle, 772 N.E.2d 1172, 1174-75

statute of limitations when the state where the cause of action accrued has a shorter statute of limitations."[18]   Taylor v. First Resolution Invest. Corp., 72 N.E.3d 573, 585 (Ohio 2016).

Although Plaintiffs and U.S. Bank dispute whether Plaintiffs' claims "accrued in any other state" within the meaning of Ohio's borrowing statute, they agree that – if the borrowing statute applies – the Ohio Supreme Court's decision in Taylor governs the issue of where Plaintiffs' claims accrued.  (See U.S. Bank Br. (Dkt. No. 127) at 35; Pltf. Opp. (Dkt. No. 138) at 34 n.123)

U.S. Bank argues that, under Taylor, "[t]o decide where a claim accrued, Ohio courts look to the location 'where [the plaintiff] suffered its loss.'"  (U.S. Bank Br. (Dkt. No. 127) at 35 (quoting Taylor, 72 N.E.3d at 586))  Because "Plaintiffs are corporations," U.S.

---

(2002).  And Ohio courts have interpreted fully matured statute of limitations defenses as vested rights protected by Article II, Section 28 of the Ohio Constitution.  See O'Stricker v. Jim Walter Corp., 447 N.E.2d 727, 729 (1983) ("[T]he [Ohio] legislature has the power to increase the period of time necessary to constitute a limitation, and also to make it applicable to existing causes of action, provided such change is made before the cause of action is extinguished under the pre-existing statute of limitations." (quotation marks and citation omitted)); Pelunis v. G.M. & M., 456 N.E.2d 1232, 1233 (Ohio Ct. App. 8th Dist. 1982) ("[W]here a cause of action has become barred by the running of a period of limitations, the defendant acquires a vested right in the bar to the suit.").  As discussed below – prior to the 2021 amendment to the borrowing statute – some of Plaintiffs' breach of contract claims had expired.  Accordingly, pursuant to Article II, Section 28 of the Ohio Constitution, this Court must look to the version of Ohio's borrowing statute in effect prior to the 2021 amendment in determining whether Plaintiffs' breach of contract claims are time-barred.

[18]  Citing to Commerzbank I, 277 F. Supp. 3d at 490-91, Plaintiffs argue that Ohio's borrowing statute does not apply here, because the court in that case – while applying Ohio law to plaintiffs' claims – "did not apply Ohio's borrowing statute and only applied the Ohio limitations period." (Pltf. Opp. (Dkt. No. 138) at 34)  But in Commerzbank I – unlike here – the trustee defendants (which included U.S. Bank) did not bring Ohio's borrowing statute to the court's attention – likely because all defendants argued for the application of New York law.  See Commerzbank AG v. U.S. Bank Nat'l Ass'n, 16 Civ. 4569, Joint Def. MTD Br., Dkt. No. 89, at 48 & n.21 (Nov. 9, 2016).  Given that Ohio law governs the statute of limitations for Plaintiffs' claims, this Court cannot ignore Ohio's borrowing statute.  The fact that the parties in an unrelated case chose not to address the borrowing statute is irrelevant here.

Bank argues that Plaintiffs "suffered [their] loss where they have their principal place of business, . . . which is in California."  (Id.)

Plaintiffs respond that <u>Taylor</u> requires this Court to "examine[] where the significant acts that give rise to the cause of action occurred."  (Pltf. Opp. (Dkt. No. 138) at 34 n.123)  Because "the significant acts were [U.S. Bank's] mismanagement and malfeasance relating to managing the [Covered Trusts]," Plaintiffs argue that their claims accrued "at [U.S. Bank's] center of operations in Minnesota."  (Id.)

In <u>Taylor</u>, the Ohio Supreme Court considered the appropriate statute of limitations for an action brought by a debt collector against a defaulting credit card holder.  <u>See</u> <u>Taylor</u>, 72 N.E.3d at 585.  The cardholder – who lived in Ohio – signed the credit card agreement in Ohio.  <u>Id.</u>  The credit card company was headquartered in Delaware, and the cardholder sent her signed agreement and all credit card payments to the company's Delaware office.  <u>Id.</u>  The <u>Taylor</u> court concluded that, under Ohio's borrowing statute, the debt collector's cause of action "accrued in Delaware, which is where the debt was to be paid and where [the credit card company] suffered its loss."  <u>Id.</u> at 586.  In reaching this conclusion, the Ohio Supreme Court surveyed case law from states with borrowing statutes similar to Ohio's, such as New York's, and noted that where "'the claimed injury is an economic one, the cause of action typically accrues where the plaintiff resides and sustains the economic impact of the loss.'"  <u>Id.</u> at 587 (quoting <u>Portfolio Recovery Assocs., L.L.C. v. King</u>, 14 N.Y.3d 410, 416 (2010)) (additional quotation marks and citation omitted)).  The <u>Taylor</u> court also expressly rejected the argument that the debt collector's claim accrued in "the location where the cardholder made the decision to not make [her] payment" – that is, the location where significant acts giving rise to the debt collector's claim occurred.  <u>Id.</u> at 587.

Applying <u>Taylor</u> and Ohio's borrowing statute here, this Court concludes that the

statute of limitations from California – the jurisdiction in which Plaintiffs suffered their loss – is

the applicable statute of limitations.[19]  <u>See</u> <u>Commerzbank AG v. U.S. Bank Nat'l Ass'n</u>, 457 F.

Supp. 3d 233, 245 (S.D.N.Y. 2020) ("To determine the jurisdiction in which Commerzbank's

claims arose, Ohio courts look to 'where the plaintiff resides and sustains the economic impact of

the loss.'" (quoting <u>Taylor</u>, 72 N.E.3d at 587)).[20]

In California, the statute of limitations for breach of contract is four years, <u>see</u>

Cal. Code Civ. P. § 337(a), and begins to run "at the time of the breach of contract, . . .

regardless of whether any damage is apparent or whether the injured party is aware of his right to

sue." <u>Perez-Encinas v. AmerUS Life Ins. Co.</u>, 468 F. Supp. 2d 1127, 1134 (N.D. Cal. 2006).

---

[19]  Plaintiffs argue that where claims accrued is a fact-bound inquiry that cannot be determined on a motion to dismiss.  (Pltf. Opp. (Dkt. No 138) at 34 n.123)  This argument is not persuasive. Unlike Plaintiffs' proposed "significant acts" test for claim accrual, where Plaintiffs suffered their alleged economic loss is a fact that is easily ascertained.  <u>See</u> <u>Taylor</u>, 72 N.E.2d at 586-87 (citing cases from other jurisdictions in which courts determined where claims accrued on motions to dismiss).

In a supplemental submission, Plaintiffs cite to <u>Nat'l Collegiate Student Loan Trust-1 v. Payne</u>, No. 18AP-973, 2020 WL 3545732 (Ohio Ct. App., 10th Dist. June 30, 2020).  According to Plaintiffs, in that case the court "applies the most significant relationship test – not a place of injury test – to determine where a claim accrues under Ohio's borrowing statute."  (Pltf. Nov. 12, 2020 Ltr. (Dkt. No. 193) at 3; <u>see also</u> <u>id.</u> at 4 n.7 (citing cases from lower Ohio courts that purportedly apply "the most significant relationship test"))  In <u>Taylor</u>, however, the Ohio Supreme Court applied a place of injury test and rejected alternative tests for determining where a claim accrues under Ohio's borrowing statute.  <u>See</u> <u>Taylor</u>, 72 N.E.2d at 586 (looking to where the debt was to be paid and where the credit card company "suffered its loss").  <u>Payne</u> and other case law from Ohio's lower courts is not persuasive in light of the clear precedent from Ohio's highest court.  <u>See</u> <u>Fabozzi v. Lexington Ins. Co.</u>, 601 F.3d 88, 92 (2d Cir. 2010) ("Where lower state courts appear to have misconstrued or ignored binding precedent, [federal courts sitting in diversity] are obliged to follow the [decisions of the highest state court].").

[20]  Given New York's analogous borrowing statute, <u>see</u> N.Y. C.P.L.R. § 202, even if BOA were not subject to personal jurisdiction in Ohio, the result would be the same:  New York's choice-of-law rules would apply to Plaintiff's claims against BOA, and under New York's borrowing statute, this Court would apply the statute of limitations from the state in which Plaintiffs' claims accrued – <u>i.e.</u>, California.

Negligence and negligent misrepresentation claims are subject to a two-year statute of limitations.  See Dougherty v. Bank of Am., N.A., 177 F. Supp. 3d 1230, 1244 (E.D. Cal. 2016) (citing Ventura Cnty. Nat'l Bank v. Macker, 49 Cal. App. 4th 1528, 1531 (2d Dist. 1997); Cal. Civ. P. Code § 339(1)).

U.S. Bank argues that Plaintiffs' breach of contract claims are time-barred as to five of the Covered Trusts, because Plaintiffs sold all of their certificates from those trusts by June 11, 2011, and did not initiate this lawsuit until June 24, 2015.  (U.S. Bank Br. (Dkt. No. 127) at 35) [21]  U.S. Bank further argues that Plaintiffs' breach of contract claims as to all of the Covered Trusts are time-barred to the extent that they are "premised on alleged breaches that occurred more than four years before Plaintiffs filed suit."  (Id.) [22]

Plaintiffs respond that – as a result of earlier-filed class actions – the statute of limitations is tolled for claims related to four of the Covered Trusts in which they sold their interests on June 1, 2011. [23]  Plaintiffs also argue that they have alleged "continuous breaches" by Defendants as to the trusts in which Plaintiffs still hold interests, which presents a question of fact not suitable for resolution at the motion to dismiss stage.  (Pltf. Opp. (Dkt. No. 138) at 35)

---

[21]  The five trusts cited by U.S. Bank are:  ARMT 2005-10, CMALT 2007-A4, JPALT 2006-S2, WAMU 2006-AR2, and WMALT 2007-4.  (Am. Cmplt., Ex. B (Dkt. No. 116-2))

[22]  According to U.S. Bank, breach claims premised on the following duties are time-barred: (1) the duty to take physical possession of mortgage documents; (2) the duty to review the mortgage files; (3) the duty to make accurate representations in the certifications; (4) the duty to notify others of master servicers' failure to give notice of document deficiencies; (5) the duty to enforce putback rights based on document deficiencies; and (6) certain Regulation AB duties. U.S. Bank reasons that those alleged breaches would have occurred at or about the time the Covered Trusts "closed in 2004 through 2007."  (U.S. Bank Br. (Dkt. No. 127) at 35-36 (citing Am. Cmplt. ¶¶ 12, 41, 44, 75, 84))

[23]  Those trusts are:  ARMT 2005-10, CMALT 2007-A4, WAMU 2006-AR2, and WMALT 2007-4.  (Pltf. Opp. (Dkt. No. 138) at 36)  Plaintiffs do not contend that any claims were filed in an earlier class action related to JPALT 2006-S2.

With respect to Plaintiffs' class action tolling argument, U.S. Bank contends that this Court must look to California law to determine whether tolling applies, and that Plaintiffs' claims are not tolled because "California does not recognize cross-jurisdictional tolling." (U.S. Bank Reply (Dkt. No. 129) at 21) U.S. Bank is correct that, under Ohio's borrowing statute, this Court must apply California law in determining whether class action tolling applies. See Graham v. Ferguson, 593 F.2d 764, 765-66 (6th Cir. 1979) (holding that, where the purpose of a borrowing statute is "to prevent persons from forum shopping for favorable limitations periods," a court must consider "the whole law of [the applicable state]," including that state's tolling doctrines); Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc., 852 F. Supp. 2d 925, 932 (S.D. Ohio 2012) (explaining that the purpose of Ohio's borrowing statute is "to prevent forum shopping by a plaintiff whose claims have otherwise expired").

California law regarding cross-jurisdictional tolling is unsettled. U.S. Bank relies on Hatfield v. Halifax PLC, 564 F.3d 1177 (9th Cir. 2009) – which in turn cites Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1025 (9th Cir. 2008) – for the proposition that California does not recognize cross-jurisdictional "American Pipe" tolling. (See U.S. Bank Reply (Dkt. No. 129) at 21); Hatfield, 564 F.3d at 1187 ("The Clemens panel, applying California law, refused to allow American Pipe tolling in a case where a plaintiff sought to use a class action filed in one jurisdiction to toll an action later filed in another[.]"); see also American Pipe & Constr. Co. v. Utah, 414 U.S. 538, 552-53 (1974) (setting forth traditional class action tolling doctrine under federal law). But in Hatfield, the Ninth Circuit concludes that California would recognize cross-jurisdictional class action tolling for California residents based on California's "equitable tolling doctrine," which the Hatfield court regarded as distinct from the American Pipe tolling doctrine. See Hatfield, 564 F.3d at 1189 ("[E]very indication is that California would at least apply

34

equitable tolling to claims made by its own residents.").  Because Plaintiffs are residents of California (see Am. Cmplt. (Dkt. No. 116) ¶¶ 19-20), Hatfield suggests that cross-jurisdictional class action tolling is available to them.

Since Hatfield, however, the California Supreme Court has "implicitly call[ed] into question the continued correctness of Hatfield's distinction between American Pipe tolling and California's equitable tolling doctrine. . . ."  Bush v. Vaco Tech. Servs., LLC, No. 17 Civ. 5605 (BLF), 2019 WL 3290654, at *9 (N.D. Cal. July 22, 2019); see Fierro v. Landry's Rest., 237 Cal. Rptr. 3d 597 (mem.) (Cal. Aug. 29, 2018) (remanding case involving equitable tolling for Court of Appeals to consider U.S. Supreme Court precedent involving American Pipe tolling); Fierro v. Landry's Rest. Inc., 32 Cal. App. 5th 276, 285, 295 (4th Dist. 2019) (on remand, equating California's equitable tolling doctrine with American Pipe tolling); see also Asberry v. Money Store, 18 Civ. 1291 (ODW), 2019 WL 2270217, at *3 (C.D. Cal. May 28, 2019) ("The court in Fierro appears to adopt American Pipe tolling as the exclusive tolling principle for class action tolling under California law.").

In sum, the law concerning cross-jurisdictional class action tolling is in flux in California, and the California Supreme Court has not issued a decision that definitively addresses the issue.  In such circumstances, this Court is required to predict how California's highest court would rule.  See Michalski v. Home Depot, Inc., 225 F.3d 113, 116 (2d Cir. 2000) ("Absent law from a state's highest court, a federal court sitting in diversity has to predict how the state court would resolve an ambiguity in state law.").

Confronted with this same issue, one court in this District has concluded that – in light of California's transition to a unified class action tolling doctrine – "California would favor cross-jurisdictional tolling as to resident plaintiffs."  In re LIBOR-Based Fin. Instr. Antitrust

Litig., 11 MDL 2262 (NRB), 2015 WL 4634541, at *132 (S.D.N.Y. Aug. 4, 2015) ("LIBOR").

This Court agrees.

In concluding that California does not recognize cross-jurisdictional tolling, the Clemens court cited "California's interest in managing its own judicial system." Clemens, 534 F.3d at 1025. But a refusal to recognize cross-jurisdictional tolling may encourage more "placeholder" individual lawsuits in California by plaintiffs seeking to preserve their claims, thereby defeating the efficiency interest cited in Clemens. See Bermudez Chavez v. Occidental Chem. Corp., 35 N.Y.3d 492, 504 (2020) (explaining that a rule prohibiting cross-jurisdictional tolling "would promote putative class members to initiate parallel individual claims in New York and other jurisdictions nearing expiration of the statute of limitations"); Dow Chem. Corp. v. Blanco, 67 A.3d 392 (Del. 2013) ("Cross-jurisdictional tolling . . . discourages duplicative litigation of cases within the jurisdiction of [Delaware] courts. If members of a putative class cannot rely on the class tolling exception to toll the statute of limitations, they will be forced to file 'placeholder' lawsuits to preserve their claims."); Stevens v. Novartis Pharmaceuticals Corp., 247 P.3d 244, 256 (Mont. 2010) ("We suspect that a greater burden on the court system will be imposed by not adopting [cross-jurisdictional tolling], as plaintiffs would be required to file protective individual suits in Montana courts to avoid limitations defenses, while otherwise relying on a pending class action suit filed elsewhere.") (emphasis in original); Vaccariello v. Smith & Nephew Richards, Inc., 763 N.E.2d, 383 (2002) (noting that a ruling that cross-jurisdictional tolling is not available under Ohio law "would encourage all potential plaintiffs in

Ohio who might be part of a class that is seeking certification in a federal class action to file suit individually in Ohio courts.").[24]

Moreover, the California Supreme Court has endorsed class action tolling with respect to class actions filed in California federal court. See Addison v. State of California, 21 Cal. 3d 313, 315 (1978) ("the filing of an action in [a California] United States District Court suspends the running of the . . . limitations period . . . within which suits must be brought . . . in state courts"). Given that class action tolling applies across state and federal jurisdictions within California, there appears to be no principled reason for declining to apply the doctrine to federal class actions filed outside of California.

The Court concludes that the California Supreme Court will likely recognize cross-jurisdictional class action tolling.

Having concluded that cross-jurisdictional class action tolling is the law of California, this Court finds that Plaintiffs' breach of contract claims against U.S. Bank with respect to ARMT 2005-10, CMALT 2007-A4, WAMU 2006-AR2, and WMALT 2007-4 are timely. Although Plaintiffs sold their certificates from these Covered Trusts on June 1, 2011, they have identified class actions involving those trusts that toll California's four-year statute of limitations period for at least one month, which is all that is necessary to render their claims timely as to those trusts. (See Pltf. Opp. (Dkt. No. 138) at 35-36)[25]

---

[24] In attempting to predict whether the California Supreme Court will recognize cross-jurisdictional tolling, this Court may consider "relevant case law from other jurisdictions on the same or analogous issues." Michalski, 225 F.3d at 116.

[25] For ARMT 2005-10, CMALT 2007-A4, and WMALT 2007-4, Plaintiffs assert that class actions filed in Blackrock Allocation Target Shares:  Series S Portfolio v. U.S. Bank Nat'l Ass'n, No. 14 Civ. 941 (KFB) (S.D.N.Y.); and Blackrock Capital Portfolio (FI) v. U.S. Bank Nat'l Ass'n, No. 652204/2015 (Sup. Ct. N.Y. Cnty.) tolled their claims for five months and 29 days. (Pltf. Opp. (Dkt. No. 138) at 36)  For WAMU 2006-AR2, Plaintiffs assert that the class action filed in Policemen's Annuity & Ben. Fund of Chi. v. Bank of Am., N.A., 12 Civ. 2865 (KBF)

As to JPALT 2006-S2, the Court concludes that Plaintiffs' breach of contract claims are time-barred.  Plaintiffs do not contend that a class action tolled the statute of limitations for that trust, and it is undisputed that Plaintiffs sold their certificates from that trust on June 1, 2011.  Any claims regarding that trust therefore accrued, at the latest, on June 1, 2011 – more than four years before this action was filed.  Accordingly, Plaintiffs' breach of contract claims against U.S. Bank with respect to JPALT 2006-S2 is dismissed as time-barred.

As to the trusts for which Plaintiffs have not sold their certificates, U.S. Bank does not address Plaintiffs' argument that Defendants committed "continuous breaches" – even after the dates the Covered Trusts purportedly closed.  (See Pltf. Opp. (Dkt. No. 138) at 35; U.S. Bank Reply (Dkt. No. 129) at 20-21)  Although Plaintiffs do not cite specific paragraphs of the Amended Complaint in support of their "continuous breaches" argument, U.S. Bank bears the burden of demonstrating that Plaintiffs' claims are untimely, and that "it is clear on the face of the complaint that the statute of limitations has run."  Fargas v. Cincinnati Mach., LLC, 986 F. Supp. 2d 420, 427 (S.D.N.Y. 2013) (citing, inter alia, Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008).  Accordingly, Plaintiffs' remaining breach of contract claims against U.S. Bank will not be dismissed as time-barred.

Finally, U.S. Bank argues that Plaintiffs' negligent misrepresentation claims are time-barred under California's two-year limitations period, because they are "based on 'misrepresentations' that occurred at or around the time of closing in 2004 through 2007."  (U.S. Bank Br. (Dkt. No. 127) at 36)  U.S. Bank also argues that Plaintiffs' "throw-away negligence

---

(S.D.N.Y.) tolled their claims for two years, 11 months, and one day by.  (Pltf. Opp. (Dkt. No. 138) at 35-36)  U.S. Bank has not disputed Plaintiffs' tolling calculations (see U.S. Bank Reply (Dkt. No. 129) at 20-21), and this Court will apply those calculations to Plaintiffs' claims against U.S. Bank.

and gross-negligence claims . . . are likewise untimely to the extent based on events before June

2013." (Id.). But it is not apparent from the face of the Amended Complaint that Plaintiffs'

negligent misrepresentation claims are based solely on misrepresentations that occurred at or

around the time the Covered Trusts closed. (See Am. Cmplt. (Dkt. No. 116) ¶ 211 (alleging that

Defendants "had unique and special knowledge regarding," inter alia "whether the Master

Servicers or Servicers had failed to perform their duties under the PSAs" – failures that could

plausibly have taken place after closing); id. ¶ 215 (alleging that Defendants "negligently

breached their duty to provide . . . information to Plaintiffs [arising from Defendants expertise

and superior knowledge]"). As for Plaintiffs' negligence claims, it is U.S. Bank's burden to

demonstrate that those claims are based entirely on events that took place before June 2013. It

has not done so. And as to U.S. Bank's argument that this Court should limit the scope of those

claims to conduct that took place after June 2013, courts have rejected that approach in similar

cases. See, e.g., Ambac Assur. Corp. v. U.S. Bank Nat'l Ass'n, 328 F. Supp. 3d 141, 164

(S.D.N.Y. 2018) ("At this stage in the proceedings, this Court need not give the claims in the

case a haircut by trimming off [each] time-barred allegation[]." (quotation marks and citation

omitted). Accordingly, U.S. Bank's motion to dismiss Plaintiffs' negligence-based claims is

denied to the extent it is based on the statute of limitations.

### 2.   Plaintiffs' Claims Against BOA

#### a.   Effect of Choice of Law Clauses in PSAs

BOA argues that – even if Ohio choice of law rules apply – either New York or

Delaware law provides the applicable statute of limitations for purposes of Plaintiffs' claims

against BOA, because the PSAs' choice-of-law provisions reference the laws of those

jurisdictions. (BOA Br. (Dkt. No. 133) at 12-14) Under Ohio law, however, "a choice of law

provision will not be interpreted to cover statutes of limitations" "[a]bsent an express statement

of intent."  Phelps v. McClellan, 30 F.3d 658, 662 (6th Cir. 1994); see also Midland Funding,

L.L.C. v. Paras, No. 93442, 2010 WL 323426, at *2 (Ohio Ct. App., 8th Dist. Jan. 28, 2010)

(ruling that Ohio's statute of limitations applied, even though the parties' agreement provided for

the application of Virginia law, because "there was no express statement in the agreement that

the parties intended Virginia's statute of limitations to apply").

> BOA argues, however, that the PSAs for the WaMu Trusts and the Morgan

Stanley Trust expressly select Delaware and New York statutes of limitations, because these

PSAs state that Delaware or New York law will govern the "obligations, rights[,] and remedies

of the parties."  (BOA Br. (Dkt. No. 133) at 12 (citing Donohue Decl., Ex. 2 ("WaMu PSA

Excerpts") (Dkt. No. 134-2) at 31-32 (excerpting Section 10.05 of the PSAs for the WaMu

Trusts and the Morgan Stanley Trust, all of which contain identical choice of law provisions)))[26]

BOA argues that, because the Ohio Supreme Court  has held that "statutes of limitations are

remedial in nature," Schoenrade v. Tracy, 658 N.E.2d 247, 248 (1996) (quotation marks and

citation omitted), this Court should interpret the PSAs' reference to "remedies" as a reference to

statutes of limitations.  (BOA Br. (Dkt. No. 133) at 13-14)  This argument is not persuasive.

> Schoenrade addresses the retroactive application of new statutes, not choice of

law clauses in contracts.  And nothing in that opinion indicates that a reference to "remedies" in

a choice of law provision should be understood as a reference to the chosen state's statute of

limitations.  Indeed, Ohio courts – and federal courts interpreting Ohio law – have required a far

---

[26]  This Court may consider these excerpts from the PSAs because (1) they are integral to the
allegations in the Amended Complaint; and (2) Plaintiffs do not dispute their authenticity.  See,
e.g., DiFolco v. MSNBC Cable L.L.C., 662 F.3d 104, 111 (2d Cir. 2010) (documents that are
"integral" to the complaint may be considered when there is no dispute as to their authenticity,
accuracy, or relevance).

more explicit reference to statutes of limitations in order to overcome the typical presumption against applying choice of law clauses to statutes of limitations.  See, e.g., Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc., 852 F. Supp. 2d 925, 932 (S.D. Ohio 2012) (applying Ohio statute of limitations because "[t]he contracts at issue contain no express statement that the parties intended to be bound by the statutes of limitations of any particular state"); Dudek v. Thomas & Thomas Attorneys & Counselors at Law, LLC, 702 F. Supp. 2d 826, 835 (N.D. Ohio 2010) (applying Ohio statute of limitations because the parties' agreement "[did] not contain an express statement that the parties intended to include New Hampshire's statute of limitations in the choice of law provision"); Godwin v. Real Estate Inv. Mgmt., Inc., No. 00 Civ. 1402, 2001 WL 1681122, at *4 (S.D. Ohio Aug. 21, 2001) (although parties "agreed that the promissory note was 'to be governed by the laws of the State of Tennessee,'" this provision "did not expressly provide that Tennessee's statute of limitations would apply"; accordingly, Ohio statute of limitations governed); Boulder Cap. Grp., Inc. v. Lawson, No. 2014-CA-58, 2014 WL 7463062, at *3 (Ohio Ct. App., 2d Dist. Dec. 30, 2014) (applying Ohio statute of limitations because "the parties' lease agreement does not expressly state that Colorado's statute of limitations applies").

In sum, BOA's argument that this Court should apply New York or Delaware statutes of limitations to Plaintiffs' claims – based on the choice-of-law provisions in the PSAs – is not persuasive.  This Court will look to Ohio law in determining the appropriate statute of limitations for Plaintiffs' claims against BOA.

## b.   <u>Application of California Statutes of Limitations</u>

As discussed above – because Ohio has a borrowing statute – California law

governs the statutes of limitations applicable to Plaintiffs' claims against BOA.[27]   BOA argues

that all of Plaintiffs' claims against BOA are time-barred.   (BOA Br. (Dkt. No. 133) at 14 & n.6)

As discussed above, the California statute of limitations for breach of contract is

four years from the time of the breach, <u>see</u> <u>Perez-Encinas</u>, 468 F. Supp. 2d at 1134, and the

statute of limitations for negligence and negligent misrepresentation actions is two years.

<u>See</u> <u>Dougherty</u>, 177 F. Supp. 3d at 1244.   Plaintiffs' claims for breach of the implied covenant of

good faith and fair dealing are subject to a four-year statute of limitations, because those claims

sound in contract rather than in tort.   (<u>See</u> Am. Cmplt. (Dkt. No. 116) ¶ 226 (alleging that

Defendants breached the covenant of good faith and fair dealing because they deprived Plaintiffs

of "receiv[ing] the benefits and protections provided for under the PSAs")); <u>Love v. Fire Ins.</u>

<u>Exch.</u>, 221 Cal. App. 3d 1136, 1144 n.4 (4th Dist. 1990) (holding that plaintiffs' breach of

contract claim and "claim for breach of the covenant of good faith and fair dealing" are subject

to the same statute of limitations, because the implied covenant claim "rests on the implied

contractual promise").

The California statute of limitations for breach of fiduciary duty is "three years or

four years, depending on whether the breach is fraudulent or nonfraudulent."   <u>Am. Master Lease</u>

<u>LLC v. Idanta Partners, Ltd.</u>, 225 Cal. App. 4th 1451, 1479 (2d Dist. 2014); <u>William L. Lyon &</u>

---

[27]   Citing <u>Taylor</u>, 72 N.E.3d, Plaintiffs argue that – under Ohio's borrowing statute – Illinois law
should apply, "because BOA administered the trusts in Illinois."   (Pltf. Opp. (Dkt. No. 140) at 26
n.58)   As discussed above, however, what matters under <u>Taylor</u> is where Plaintiffs suffered their
losses, not where the conduct giving rise to their claims took place.   Because Plaintiffs suffered
their economic losses in California, that is where Plaintiffs' claims accrued for purposes of
Ohio's borrowing statute.

Assoc., Inc. v. Sup. Ct., 204 Cal. App. 4th 1294, 1312 (3d Dist. 2012) ("Breach of fiduciary duty not amounting to fraud or constructive fraud is subject to the four-year 'catch-all statute' of Code of Civil Procedure section 343."). Here, Plaintiffs' breach of fiduciary duty claims are not premised on fraud. (See Am. Cmplt. (Dkt. No. 116) ¶¶ 13, 61, 203-06) Accordingly, the applicable statute of limitations is four years.

Plaintiffs' remaining claims are subject to a four-year statute of limitations, either because they fall under California's "catch-all" statute, or because they arise out of the PSAs and are analogous to breach of contract claims. See Cal. Code Civ. P. § 343 (establishing a four-year statute of limitations for "[a]n action for relief not hereinbefore provided for").

BOA argues that all of Plaintiffs' claims relating to the Morgan Stanley Trust (MSM 2006-7) are time-barred, because BOA resigned as trustee for this trust on October 31, 2008, and this action was not filed until June 24, 2015. (BOA Br. (Dkt. No. 133) at 20; see also Miller Decl., Ex. A (Dkt. No. 135-1) at 2)[28] Plaintiffs do not dispute this point. (See Pltf. Opp. (Dkt. No. 140) at 26 n.55) Accordingly, Plaintiffs' claims against BOA related to the Morgan Stanley Trust are time-barred and will be dismissed.

As to the accrual date for Plaintiff's claims arising from the WaMu Trusts, the parties agree that those claims accrued as against BOA no later than December 31, 2010, because that is when U.S. Bank succeeded BOA as trustee. (See Pltf. Opp. (Dkt. No. 140) at 28-29; BOA Reply (Dkt. No. 136) at 10; see also Am. Cmplt. (Dkt. No. 116) ¶¶ 21, 38) Plaintiffs nonetheless

---

[28]  BOA's "Revised Notice of Resignation" establishes that BOA resigned as trustee on October 31, 2008. (See id.) This Court may consider the notice of resignation because it is integral to the allegations in the Amended Complaint, and because Plaintiffs do not dispute its authenticity. See DiFolco, 662 F.3d at 111.

argue that their claims related to the WaMu Trusts were tolled due to the "discovery rule" and class action tolling.  (Pltf. Opp. (Dkt. No. 140) at 28-29)[29]

Under California's "discovery rule," a cause of action accrues when the "'plaintiff either (1) actually discovered his injury and its negligent cause or (2) could have discovered injury and cause through the exercise of reasonable diligence.'"  Apr. Enter., Inc. v. KTTV, 147 Cal. App. 3d 805, 826-27 (2d Dist. 1983) (quoting Leaf v. City of San Mateo, 104 Cal. App. 3d 398, 407 (1st Dist. 1980)).  The discovery rule applies to breaches of contract that are "committed in secret and, moreover, where the harm flowing from those breaches will not be reasonably discoverable by plaintiffs until a future time."  Id. at 832; see also NBC Universal Media, LLC v. Superior Court, 225 Cal. App. 4th 1222, 1232-34 (2d Dist. 2014).  California's discovery rule is also generally applicable to breach of fiduciary duty claims, see Apr. Enter., 147 Cal. App. 3d at 827, and to negligence claims, see William L. Lyon & Assocs., 204 Cal. App. 4th at 1313.

California's discovery rule "does not[, however,] operate to delay accrual of a cause of action 'beyond the point at which their factual basis became accessible to plaintiff to the same degree as it was accessible to every other member of the public.'"  NBC Universal, 225

---

[29] Plaintiffs also suggest that their claims against BOA were tolled because of BOA's fraudulent concealment.  (See Pltf. Opp. (Dkt. No. 140) at 29)  As discussed above, however, none of Plaintiffs' claims sound in fraud.  Under California law, "[w]hen a plaintiff relies on a theory of fraudulent concealment . . . to save a cause of action that otherwise appears on its face to be time-barred, [plaintiff] must specifically plead facts which, if proved, would support the theory." Mills v. Forestex Co., 108 Cal. App. 4th 625, 641 (5th Dist. 2003).  To meet this standard, "the complaint must show:  (1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put him on inquiry."  Baker v. Beech Aircraft Corp., 39 Cal. App. 3d 315, 321 (4th Dist. 1974).  Because the Amended Complaint does not contain the factual allegations necessary to plead fraudulent concealment, Plaintiffs' claims against BOA will not be found tolled on that basis.

Cal. App. 4th at 1234 (citing <u>Shively v. Bozanich</u>, 31 Cal. 4th 1230, 1253 (2003)).  "[T]he

[statute of] limitations period begins once the plaintiff 'has notice or information of

circumstances to put a reasonable person on inquiry.'"  <u>Jolly v. Eli Lilly & Co.</u>, 44 Cal. 3d 1103,

1110 -11 (1988) (quoting <u>Gutierrez v. Mofid</u>, 39 Cal. 3d 892, 896-97 (1985)).  "'Once the

plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide

whether to file suit or sit on her rights.  So long as a suspicion exists, . . . the plaintiff must go

find the facts; she cannot wait for the facts to find her.'"  <u>Pedersen v. Greenpoint Mortgage

Funding, Inc.</u>, 900 F. Supp. 2d 1071, 1080 (E.D. Cal. 2012) (quoting <u>Jolly</u>, 44 Cal. 3d at 1111);

<u>see</u> <u>also</u> <u>Fox v. Ethicon Endo-Surgery, Inc.</u>, 35 Cal. 4th 797, 807 (2005) ("Under the discovery

rule, suspicion of one or more of the elements of a cause of action, coupled with knowledge of

any remaining elements, will generally trigger the statute of limitations period."); <u>NBC

Universal</u>, 225 Cal. App. 4th at 1235 ("[P]ublic disclosure to even a limited audience is sufficient

to preclude a plaintiff from arguing that the breach and injury were secretive and difficult to

detect." (citing <u>Hebrew Acad. of S.F. v. Goldman</u>, 42 Cal. 4th 883, 888, 895 (2007))).

   Here, the Amended Complaint alleges that – as early as February 5, 2009 –

publicly filed lawsuits and public reporting put Defendants on notice of "pervasive and systemic

breaches of representations and warranties in the Covered Trusts."  (Am. Cmplt. ¶¶ 97, 109, 111;

<u>see</u> <u>also</u> Public Reporting Allegations (Dkt. No. 116-6) ¶ 27 (lawsuit filed May 15, 2009))  This

same publicly available information also put Plaintiffs on notice – as of February 5, 2009 – of

these alleged breaches.  Accordingly, Plaintiffs' allegations preclude them from using

California's discovery rule to toll the statute of limitations beyond February 5, 2009.

   As to class action tolling, BOA argues that it does not apply to claims arising

from WMALT 2007-4, because no claims were asserted against BOA in the class action

involving that trust.  (BOA Reply (Dkt. No. 136) at 12); see Blackrock Core Bond Portfolio v. U.S. Bank Nat'l Ass'n, 165 F. Supp. 3d 80, 83-90 (S.D.N.Y. 2016) (describing claims and parties).  BOA further argues that, even if class action tolling applied, Plaintiffs' claims relating to WMALT 2007-4 would be tolled for only five months and 29 days, and that Plaintiffs' claims would still be time-barred.  (BOA Reply (Dkt. No. 136) at 12 n.9; see also Pltf. Opp. (Dkt. No. 138) at 36 (arguing that claims related to WMALT 2007-4 were tolled for five months and 29 days))  The Court agrees that – even if Plaintiffs' claims related to WMALT 2007-4 were tolled for five months and 29 days – those claims would still be time-barred.  Accordingly, BOA's motion to dismiss will be granted as to Plaintiffs' claims arising from WMALT 2007-4.

As to several of the remaining WaMu Trusts, BOA argues that class action tolling does not apply – or should be limited in scope – because plaintiffs' claims in the relevant class action were dismissed for lack of standing.  (BOA Reply (Dkt. No. 136) at 11-13); see Policemen's Annuity & Benefit Fund of Chi. v. Bank of Am., N.A., 907 F. Supp. 2d 536, 546 (S.D.N.Y. 2012) ("Policemen's") (holding that the representative class plaintiff "only ha[d] standing as to the five [t]rusts in which it purchased certificates," and no others).

While at least one court in this District has concluded that class action tolling "should not apply where the plaintiff that brought the dismissed claim was found by the court to lack standing," N.J. Carpenters Health Fund v. DLJ Mortg. Cap., Inc., No 08 Civ. 5653 (PAC), 2010 WL 6508190, at *2 (S.D.N.Y. Dec. 15, 2010), the weight of authority in this Circuit holds that class action tolling applies even where a class action is dismissed for lack of standing.  See, e.g., Pacific Life Ins. Co. v. Bank of N.Y. Mellon, No. 17 Civ. 1388 (KPF), 2018 WL 1382105, at * (S.D.N.Y. May 16, 2018) ("This Court sides with its sister courts that have applied American Pipe tolling to putative class members even where the class representative was found

to lack standing."); In re Wachovia Equity Secs. Litig, 753 F. Supp. 2d 326, 372 (S.D.N.Y. 2011)

("Because the additional Plaintiffs should not be punished for their failure to anticipate or timely

remedy the standing deficiencies of the original . . . Complaint, the Court applies the American

Pipe tolling doctrine and concludes that the claims of the additional Plaintiffs are not time-

barred."); In re Initial Public Offering Secs. Litig., No. , 2004 WL 3015304, at *5 (S.D.N.Y.

Dec. 27, 2004) ("I find that tolling the applicable statute of limitations . . . where class counsel

mistakenly believed that Baum had standing to assert his claims, and no prejudice to the

defendants will result from allowing the substitution of qualified lead plaintiffs, best satisfies the

goals of American Pipe.").

      The California Supreme Court has not addressed this issue,[30] and the only

California court that has addressed the question has held that class action tolling applies even

where the plaintiffs in a class action are found to lack standing.  See Fed. Home Loan Bank of

S.F. v. Deutsche Bank Sec. Inc., No. CGC-10-497839, 2014 Cal. Super. LEXIS 21288, at *19

(Cal. Super. Ct. Oct. 15, 2014) ("This Court agrees with [Plaintiff's] assertion that 'the doctrine

of class action tolling would be eviscerated if class members were required to determine at the

moment the class action is filed whether the named plaintiff has standing to represent them.'").

      This Court concludes that class action tolling applies to Plaintiffs' claims based

on the Policemen's class action, notwithstanding the dismissal for lack of standing in that case.

Based on this tolling, the Court further concludes that all of Plaintiffs' claims against BOA

relating to the remaining WaMu Trusts are timely.[31]

---

[30]  The California Supreme Court has held, however, that class action tolling applies where a
federal court presiding over a class action dismisses the federal claims and declines to exercise
supplemental jurisdiction over parallel state law claims.  See Addison, 21 Cal. 3d at 319.

[31]  BOA argues that, even if class action tolling is applied, all of Plaintiffs' claims with respect to
WAMU 2007-HY3 are time-barred.  (BOA Reply (Dkt. No. 136) at 13 n.14)  But BOA's

Finally, BOA argues that, even if class action tolling preserves some of Plaintiffs'

claims, claims related to breaches of certain pre-Event of Default duties are nonetheless

untimely.  (BOA Reply (Dkt. No.  136) at 13 n.7, 14 n.7; see also BOA Br. (Dkt. No. 133) at 15-

16)  This argument is premised on the notion that these claims would have accrued on or shortly

after the Covered Trusts closed.  (See BOA Br. (Dkt. No. 133) at 15-16)

As discussed above in connection with Plaintiffs' claims against U.S. Bank,

however, Plaintiffs claim that "continuing" breaches occurred even after the closing of the

---

argument on this point is premised on the mistaken notion that all claims in Policemen's related
to that trust were abandoned on January 17, 2014.  (See id., Ex. A-1 (Dkt. No. 136-1) at 3 n.7)
In fact, only one of the named plaintiffs in Policemen's dropped its claims related to WAMU
2007-HY3 at that time.  See Policemen's, 12 Civ. 2865 (KBF), Dkt. No. 165-1 at 1 n.1 (stating
that "Plaintiff [Public Employees Retirement System of Mississippi] [was] no longer bringing
claims relating to . . . WaMu 2007-HY3"); id. at 2 (stating that other named plaintiffs had
purchased certificates relating to that trust, and apparently were continuing to pursue their
claims).

BOA further argues that Plaintiffs' claims as to WAMU 2006-AR2, WAMU 2006-AR18, and
WAMU 2007-HY7 are time-barred even after application of class action tolling.  (See BOA
Reply, Ex. A-2 (Dkt. No. 136-1) at 4 (column identifying whether "class action tolling [could]
avoid time bar for any claims"))  But BOA's calculations improperly truncate the period of time
Plaintiffs' claims related to those trusts were tolled, because BOA's calculations are premised on
the dismissal for lack of standing in Policemen's.  The Court therefore rejects BOA's tolling
calculations and finds that Plaintiffs' claims against these trusts were tolled during the entire
period that Policemen's was pending.

BOA also argues that, at most, Policemen's tolls the statutes of limitations by 1,035 days, and
not the 1,065 days calculated by Plaintiffs, because Plaintiffs opted out of the class settlement
approximately one month before final judgment in that action.  (See BOA Reply, Ex. A-1 (Dkt.
No. 136-1) at 3 n.8)  This Court need not resolve the thirty-day discrepancy between the parties'
calculations, however, because the thirty-day period does not impact the timeliness of any of
Plaintiffs' claims.

Finally, while the Court acknowledges that Plaintiffs' negligent misrepresentation and
negligence claims are subject to a two-year statute of limitations under California law,
(see Dougherty, 177 F. Supp. 3d at 1244), these claims nonetheless appear to be timely.
Assuming that these negligence-based claims accrued, at the latest, by December 31, 2010 (see
BOA Reply, Ex. A-1 (Dkt. No. 136-1) at 2 n.1 (stating that "BOA's December 2010 resignation"
triggered the running of the statute of limitations), Policemen's would toll Plaintiffs' negligence-
based claims for at least two years before this action was filed.

Covered Trusts.  (Pltf. Opp. (Dkt. No. 140) at 28 n.65)  BOA responds that (1) "this argument fails as to document review-related claims, because the PSAs prescribed specific times by which review duties were to be completed"; and (2) "this argument fails as to [representation and warranty claims] because Plaintiffs do not allege how BOA could have continued to breach and cause injury after the bar date for filing repurchase claims in the FDIC's WaMu receivership." (BOA Reply (Dkt. No. 136) at 13-14 n.15)

Based on the Amended Complaint, this Court cannot determine as a matter of law that Plaintiffs' claims based on pre-Event of Default document review and representation and warranty breaches are time-barred.  See Staehr, 547 F.3d at 425.  As an initial matter, BOA's argument requires this Court to determine the applicable closing date for each of the WaMu Trusts and for the Morgan Stanley Trust – dates that are not pled in the Amended Complaint or identified by the parties.  Although both U.S. Bank and BOA refer repeatedly to the Covered Trusts closing between 2004 and 2007, the Amended Complaint does not define the term "Closing Date" as it applies to each trust.  (See, e.g., Am. Cmplt. (Dkt. No. 116) ¶ 5 (stating only that "[t]he Covered Trusts were created to facilitate RMBS transactions introduced to investors from 2004 to 2007")  Moreover, although BOA argues that the date of the "FDIC's WaMu receivership" is the latest possible accrual date for Plaintiffs' claims with respect to the WaMu Trusts (BOA Br. (Dkt. No. 133) at 16; BOA Reply (Dkt. No. 136) at 13-14 n.15), this argument appears to be drawn from Plaintiffs' allegation that "[o]n September 25, 2008, . . . federal regulators closed WaMu."  (Public Reporting Allegations (Dkt. No. 116-6) ¶ 246; see also BOA Reply, Ex. A-1 (Dkt. No. 136-1) at 2 n.2 (asserting that the statute of limitations for pre-Event of Default claims began to run on the "December 2008 bar date for claims against WaMu in the FDIC receivership"))  There is not enough detail in the Amended Complaint's allegations to

permit this Court to conclude, as a matter of law, that BOA could not have taken any action whatsoever with respect to representation and warranty breaches after September 25, 2008.

In sum, there are factual issues that preclude dismissing Plaintiffs' pre-Event of Default claims as time-barred.  See, e.g., Pacific Life Ins. Co. v. Bank of N.Y. Mellon, 2018 WL 1382105, at *7 ("Because Plaintiffs have raised the specter of ongoing breaches, the Court is unable to determine as a matter of law that Plaintiffs have failed to allege discovery of breaches that occurred during the limitations period").

## IV.    BREACH OF CONTRACT CLAIMS

Defendants raise a number of arguments in support of their motions to dismiss Plaintiffs' breach of contract claims.[32]

As to breach of contract claims premised on pre-Event of Default duties arising from representation and warranty breaches, Defendants contend that (1) Plaintiffs have not adequately alleged that Defendants "discovered loan-specific breaches" – which is required to trigger such duties; and (2) for certain trusts, the PSAs do not impose pre-Event of Default duties on Defendants.  (U.S. Bank Br. (Dkt. No. 127) at 14-19; BOA Br. (Dkt. No. 133) at 24-31)  To the extent that Plaintiffs' pre-Event of Default breach claims are based on (1) missing or defective mortgage files; (2) servicer or master servicer breaches; and (3) Regulation AB, Defendants argue that these claims "are also based on duties [Defendants] did not have."  (U.S. Bank Br. (Dkt. No. 127) at 8; see also BOA Br. (Dkt. No. 133) at 22-24)

---

[32]  Unlike Defendants' arguments as to timeliness – which are specific to each Defendant – BOA has joined U.S. Bank's briefing as it pertains to U.S. Bank's remaining arguments for dismissal. (See BOA Br. (Dkt. No. 133) at 9, 38)  Accordingly, this Court has considered the arguments raised in U.S. Bank's brief as to both Defendants, insofar as those arguments apply to Covered Trusts for which BOA served as trustee.

To the extent that Plaintiffs' breach claims are based on post-Event of Default duties, Defendants argue that (1) "Plaintiffs fail to allege an [Event of Default], which by definition cannot occur unless the servicer or master servicer receives notice of breach and an opportunity to cure"; and (2) as with Plaintiffs' pre-Event of Default claims, "Plaintiffs fail to allege that [Defendants] had actual notice or received written notice of such [Events of Default]." (U.S. Bank Br. (Dkt. No. 127) at 8; see also BOA Br. (Dkt. No. 133) at 31-35)

As to Plaintiffs' breach of contract claims relating to six of the Covered Trusts – ARMT 2005-10 § 12.07, BAFC 2007-D § 11.03, CSFB 2004-8 § 12.07, GSR 2006-AR1 § 13.03, MABS 2006-AB1 § 11.08, and TBW 2006-6 § 11.08 (Kane Decl. Ex. 15 (Dkt. No. 139-15)) – Defendants argue that "no-action clauses" in those trusts' PSAs "prohibit Plaintiffs from pursuing legal action relating to the [PSAs] unless they provide written notice of an [Event of Default] to a specified party, assemble a specified percentage of [certificate holders], demand that a specified deal party sue, and offer indemnification for the suit." (U.S. Bank Br. (Dkt. No. 127) at 9) Because Plaintiffs do not allege that they complied with these no-action clauses, Defendants argue that Plaintiffs' claims relating to those six trusts must be dismissed. (Id.)

Finally, BOA argues that "Plaintiffs do not explain how or on what basis they purport to bring contract claims related to certificates they no longer hold." (BOA Br. (Dkt. No. 133) at 35) According to BOA, Plaintiffs' failure to plead facts demonstrating that "they have standing to assert contract claims relating to the sold certificates provides an independent basis for dismissal as to those certificates." (Id. at 36)

A.    **Pre-Event of Default Breach Claims**

1.    **Claims Based on Pre-Event of Default Duties**
       **Relating to Representation and Warranty Breaches**

a.    **Discovery of Representation and Warranty Breaches**

Defendants contend that Plaintiffs' breach of contract claims relating to

representation and warranty breaches must be dismissed, because Plaintiffs have not adequately

alleged that Defendants "discovered or received written notice of loan-specific breaches of

representations and warranties" for each of the Covered Trusts.  (U.S. Bank Br. (Dkt. No. 127)

at 14)  According to Defendants, under the PSAs, they have "a duty to give notice or to enforce

putback obligations, if at all, only upon 'discovery' of specific [representation and warranty]

breaches as to specific loans."  (Id. (citing § 2.03(a) of the CMLTI 2005-7 PSA (Dkt. No. 128-7)

as an example)

Plaintiffs respond that, at the motion to dismiss stage, they are not required to

allege loan-specific breaches of representations and warranties.  (Pltf. Opp. (Dkt. No. 138) at 11-

12)  And while Plaintiffs do not dispute that – in the context of representation and warranty

breaches – the PSAs only impose pre-Event of Default duties upon Defendants' "discovery" of

such breaches, Plaintiffs contend that the Amended Complaint adequately alleges that

Defendants became aware of representation and warranty breaches through a variety of channels.

(Id. at 12-13)

As to whether Plaintiffs are required to plead loan-specific breaches, "[c]ourts in

this District have roundly rejected" a loan-specific pleading standard, "recognizing that

[p]laintiffs do not need to refer to breaches of particular representations and warranties at the

pleading stage."  Blackrock Allocation Target Shares: Series S Portfolio v. Bank of N.Y. Mellon,

180 F. Supp. 3d 246, 158 (S.D.N.Y. 2016) ("BlackRock/Mellon"); see also Commerzbank I, 277

52

F. Supp. 3d at 494 ("The Trustees' insistence that the Complaint must allege their knowledge of 'any specific breaches as to any specific loans' has been roundly rejected by other courts in this District.") (emphasis in original); BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n, 247 F. Supp. 3d 377, 394 (S.D.N.Y. 2017) ("BlackRock/Wells Fargo") ("Plaintiffs need not allege loan-specific breaches at [the motion to dismiss] stage."); Royal Park Inv. SA/NV v. Bank of N.Y. Mellon, 14 Civ. 6502 (GHW), 2016 WL 899320, at *4 (S.D.N.Y. Mar. 2, 2016) ("Royal Park/Mellon") ("[T]his argument is not valid in the procedural posture of a motion to dismiss, where the Court is evaluating the sufficiency of the pleadings, not the ultimate proof to be presented to a finder of fact.").[33]  Requiring plaintiffs to plead representation and warranty breaches on a loan-by-loan basis would "import a heightened pleading requirement into the RMBS context," instead of the applicable standard under Twombly and Iqbal, which merely requires "plaintiffs [to] plead[] 'factual content that allows the

---

[33]  The parties cite only to New York law in addressing the merits of Plaintiffs' breach of contract claims.  (See U.S. Bank Br. (Dkt. No. 127) at 14-31; Pltf. Opp. (Dkt. No. 138) at 9-29; BOA Br. (Dkt. No. 133) at 22-36; Pltf. Opp. (Dkt. No. 140) at 12-23))  Given the parties' reliance on New York law, this Court will apply New York law in addressing Plaintiffs' breach of contract claims.  See, e.g., Motorola Credit Corp. v. Uzan, 388 F.3d 39, 61 (2d Cir. 2004) ("Here, the parties' briefs assume that New York law controls the issue, and such 'implied consent . . . is sufficient to establish choice of law.'" (quoting Krumme v. WestPoint Stevens, Inc., 238 F.3d 133, 138 (2d Cir. 2000))); Arakelian v. Omnicare, Inc., 735 F. Supp. 2d 22, 30 n.5 (S.D.N.Y. 2010) ("Inasmuch as [plaintiff] relies on New York law, and [defendant] does not object to the applicability of New York law, the Court is entitled [to] apply New York law to the breach of contract claim."); Quanta Lines Ins. Co. v. Investors Capital Corp., No. 06 Civ. 4624 (PLK), 2009 WL 4884096, at *7 (S.D.N.Y. Dec. 17, 2009) ("[Defendant] has waived its choice of law argument by applying New York law in support of its claims throughout its briefing . . . .").  Moreover, courts need only engage in a choice of law analysis where the parties contend that there is an actual conflict between the laws in the relevant jurisdictions.  See, e.g., Melnick v. Adelson-Melnick, 346 F. Supp. 2d 499, 506 n.39 (S.D.N.Y. 2004) ("As the parties have relied exclusively on New York cases and neither has referred to the law of Connecticut or any other state, much less shown that any such law differs from the law of New York, the Court applies New York law.").  Here, no party has suggested that the interpretation of the PSAs would be different under the law of a state other than New York.

court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"

Royal Park/HSBC, 109 F. Supp. 3d at 601 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678

(2009)).[34]

Here, Plaintiffs allege that "during the 2005-2007 time period, the Sponsors and

Originators regularly disregarded their underwriting guidelines" in contravention of

representations and warranties that the Sponsors and Originators made in connection with the

Covered Trusts.  (Am. Cmplt. (Dkt. No. 116) ¶¶ 86-89)  The Amended Complaint also contains

numerous factual allegations demonstrating that the Sponsors and Originators engaged in

"widespread, systemic abandonment of underwriting guidelines."  (Id. ¶ 109; see id. ¶¶ 94-112;

see also Public Reporting Allegations (Dkt. No. 116-6) (detailing public reporting about, and

investigations into, the Sponsors' and Originators' widespread abandonment of underwriting

guidelines))  These allegations "raise a plausible inference that there were in fact breaches of the

[Sponsors' and Originators'] representations and warranties with respect to the loans included in

the trusts at issue."  Royal Park/HSBC, 109 F. Supp. 3d at 602.

---

[34]  Defendants contend that, in Retirement Board of the Policemen's Annuity & Benefit Fund of
the City of Chicago v. Bank of New York Mellon, 775 F.3d 154 (2d Cir. 2014) ("Policemen's
Annuity"), the Second Circuit held that "loan-specific proof [is] required."  (U.S. Bank Br. (Dkt.
No. 127) at 14)  But as several courts in this District have explained in rejecting this argument, in
that case, the Second Circuit merely stated that the defendant's "alleged misconduct must be
proved loan-by-loan and trust-by-trust."  Policemen's Annuity, 775 F.3d at 162 (emphasis
added).  Moreover, the Second Circuit was discussing this issue in the context of determining
whether named plaintiffs adequately represented the interests of absent class members – not in
the context of assessing the sufficiency of a complaint.  See Royal Park/HSBC, 109 F. Supp. 3d
at 601 (declining to extend Policemen's Annuity to require loan-specific pleading); see also
Commerce Bank v. Bank of N.Y. Mellon, 141 A.D.3d, 413 (N.Y. App. Div. 1st Dep't 2016)
("[T]here is persuasive authority that [Policemen's Annuity] does not apply to the sufficiency of
allegations on a motion to dismiss for failure to state a claim.").  Accordingly, Policemen's
Annuity is inapplicable here.

The Amended Complaint also contains ample factual allegations demonstrating that Defendants were aware of the Sellers' and Originators' underwriting failures, including that (1) Defendants received actual notice of representation and warranty breaches "for numerous of the Covered Trusts" (Am. Cmplt. (Dkt. No. 116) ¶ 91); (2) Defendants "were presented with a large number of defaulted loans that were originated by the Sponsors and Originators here[,] and foreclosures were commenced often in [Defendants'] names" (id. ¶¶ 93-96); (3) Defendants "commenced repurchase actions against Sponsors or Originators at issue here," outside the context of the Covered Trusts (id. ¶¶ 97-98); (4) Defendants "received written notice of systemic, widespread Sponsor [representation and warranty] breaches from monoline insurers" (id. ¶¶ 102-06); and (5) there was widespread public reporting and litigation – some of which directly involved Defendants – concerning the Sponsors' and Originators' breaches (id. ¶¶ 109-10; Public Reporting Allegations (Dkt. No. 116-6))  As numerous courts in this District have concluded when confronted with similar arguments, these allegations are sufficient to defeat a motion to dismiss.  See, e.g., Commerzbank I, 277 F. Supp. 3d at 495 (addressing nearly identical allegations; noting that such allegations, "though generalized to the industry" rather than specific to the trusts at issue, "are nevertheless specific enough to establish that the Trustees had sufficient knowledge to act"); Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co., 172 F. Supp. 3d 700, 713 (S.D.N.Y. 2016) ("Phoenix Light/Deutsche Bank") ("[P]laintiffs can survive a motion to dismiss by alleging massive breaches of representations and warranties and by referring to the mortgage industry's practices of ignoring underwriting guidelines and engaging in predatory lending."); BlackRock/Mellon, 180 F. Supp. 3d at 259 ("The Complaint alleges that [the defendant trustee] discovered and knew of Sellers' breaches of representations and warranties through, among other warning signs, high default rates, . . . credit ratings declines

. . . , losses . . . , and government and newspapers reports about the abandonment of underwriting standards . . . .  Courts in this District have held that substantially similar allegations raise a plausible inference of a trustee's actual knowledge of breaches of representations and warranties." (collecting cases)).[35]

Defendants attempt to distinguish these cases by arguing that "[n]one of those decisions . . . had to tackle the particular issue here – that Plaintiffs' own allegations acknowledge the need for a forensic investigation to discover loan-specific breaches, an investigation Plaintiffs do not allege occurred for the trusts at issue."  (U.S. Bank Br. (Dkt. No. 127) at 18; see also Adler Decl., Ex. L (Dkt. No. 128-12) (chart cataloguing "Amended Complaint References to Forensic Loan Level Review or Forensic Analysis of Loan Files for

---

[35]  See also Nat'l Credit Union Admin. Bd. v. Deutsche Bank Nat'l Tr. Co., 410 F. Supp. 3d 662 (S.D.N.Y. 2019) ("NCUAB") ("At least 13 decisions by 10 judges in the Southern District of New York have allowed similar breach of contract claims against RMBS trustees to proceed; no decision is to the contrary." (collecting cases)).

BOA argues that Plaintiffs have not plausibly alleged that BOA had "actual knowledge" of representation and warranty breaches – which is the level of notice required to trigger pre-Event of Default duties under the PSAs for the WaMu Trusts.  (BOA Br. (Dkt. No. 133) at 25)  At this stage, however, "[a] plaintiff is not required to plead the specific actual knowledge of a defendant with respect to the particular deficiencies of a particular loan."  Phoenix Light/Deutsche Bank, 172 F. Supp. 3d at 713; see also Pac. Life Ins. Co., 2018 WL 1382105, at *10 (explaining that, although the plaintiffs' allegations "[did] not prove that Responsible Officers at Defendant had received written notice, such proof is not required at the pleading stage, particularly where – as here – the information may well be uniquely in the possession of defendants" (quotation marks and citation omitted)).

BOA also argues that much of the public reporting that Plaintiffs cite in the Amended Complaint took place after U.S. Bank succeeded BOA as trustee, so this reporting cannot plausibly indicate BOA's actual knowledge of breaches.  (BOA Br. (Dkt. No. 133) at 26-27)  As discussed above, however, this public reporting is only one of several avenues by which Plaintiffs claim that Defendants gained knowledge of representation and warranty breaches.  This Court concludes that – even setting aside the public reporting allegations – Plaintiffs' "allegations raise a plausible inference of a trustee's actual knowledge of breaches of representations and warranties."  BlackRock/Mellon, 180 F. Supp. 3d at 259.

Trusts Not At Issue in This Case"))  But this argument mischaracterizes both Plaintiffs'

allegations in the Amended Complaint and the above-cited cases.

The Amended Complaint enumerates various ways in which Defendants could or

should have discovered Sponsor and Originator representation and warranty breaches – including

forensic investigation – but it does not "acknowledge the need for a forensic investigation" to

discover such breaches.  And while paragraphs 90 to 115 of the Amended Complaint cite several

forensic reviews that Defendants and other entities conducted (see, e.g., Am. Cmplt. (Dkt. No.

116) ¶ 98 (alleging that U.S. Bank conducted "a forensic review . . . [which] revealed that an

astonishing . . . 93% of the sampled loans did not comply with the [Sponsor or Originator's]

representations and warranties" (quotation marks and citations omitted)); id. ¶¶ 104-06 (alleging

that "[m]onoline insurers have filed many complaints against Sponsors and Originators of the

Covered Trusts" and conducted forensic reviews revealing various representation and warranty

breaches); id. ¶ 110 (alleging that other lawsuits against the Sponsors and Originators "contain

detailed information based on forensic reviews of individual loans" which "evidence . . . [that]

the relevant Originators and Sponsors breached the associated representations and warranties");

see also Adler Decl., Ex. L (Dkt. No. 128-12) (listing Plaintiffs' other references to "forensic

reviews")), the Amended Complaint does not allege or suggest that a forensic review of the loans

is the exclusive means by which Defendants discovered representation and warranty breaches.

To the contrary, Plaintiffs assert that Defendants learned of such breaches through, inter alia,

actual "notices of representations and warranty breaches and other defaults specifically for

numerous of the Covered Trusts."  (Am. Cmplt. (Dkt. No. 116) ¶ 91)[36]

---

[36]  Defendants cherry pick mentions of forensic reviews or investigations in Exhibits F and G to
the Amended Complaint, which list numerous representation and warranty breaches by the
Sponsors and Originators.  (Compare Adler Decl., Ex. L (Dkt. No. 128-12) (listing ten references

Moreover, the cases cited above do not suggest that a forensic investigation is a prerequisite for finding that a plaintiff has adequately alleged a defendant's knowledge.  Indeed, these cases hold that a plaintiff need not plead the sort of loan-specific breaches that a forensic review requirement would necessarily impose.  In Commerzbank I, for example, the complaint alleged that lawsuits against sponsors and originators had "provided a detailed forensic review of each loan's deficiencies."  Commerzbank I, 277 F. Supp. 3d at 494.  The complaint did not allege, however, that defendants had conducted that type of forensic review, see id. ("The Trustees had received notice from monoline insurers [who] . . . themselves filed lawsuits [which] . . . provided a detailed forensic review of each loan's deficiencies."), and the absence of such allegations did not render the complaint's allegations concerning the defendants' knowledge implausible.  See id. at 495 ([A]llegations, . . . generalized to the industry, . . . 'of high default rates, staggering economic losses, and widespread investigations into RMBS securitization are sufficient to allow the court to draw the reasonable inference that [representations and warranties] were breached on a loan-by-loan basis.'" (quoting Royal Park Inv. SA/NV v. Deutsche Bank Nat'l Tr. Co., 14 Civ. 4394 (AJN), 2016 WL 439020, at *5-6 (S.D.N.Y. Feb. 3, 2016) ("Royal Park/Deutsche Bank"))).

In sum, the Amended Complaint's scattered references to forensic analysis do not make its allegations regarding Defendants' knowledge any less plausible.  Holding otherwise would effectively impose the loan-specific pleading requirement that has been squarely rejected

---

in Exhibit F and one reference in Exhibit G) with Am. Cmplt. Exs. F & G (Dkt. Nos. 116-6, 116-7) (containing 288 and 137 paragraphs alleging various representation and warranty breaches by Sponsors and Originators respectively)  In short, the Amended Complaint's limited references to forensic investigations do not constitute a concession that a forensic investigation was necessary before representation and warranty breaches could be detected.

by courts in this District.[37]  The Court concludes that Plaintiffs have plausibly alleged that

(1) representation and warranty breaches occurred with respect to the Covered Trusts; and

(2) Defendants became aware of those breaches.

> **b.      Whether Representation and Warranty Breaches Triggered
> Pre-Event of Default Duties Under the PSAs**

Defendants next argue that – even if Plaintiffs have adequately alleged

Defendants' awareness of representation and warranty breaches as to certain of the Covered

Trusts – this knowledge does not trigger the duties Plaintiffs allege.  (U.S. Bank Br. (Dkt. No.

127) at 18-19)

---

[37]  Defendants also cite Commerce Bank v. Bank of N.Y. Mellon, 141 A.D.3d 413 (1st Dep't 2016), in support of their argument that Plaintiffs' allegations concerning Defendants' knowledge of representation and warranty breaches are inadequate.  (U.S. Bank Br. (Dkt. No. 127) at 16, 18)  As several courts in this District have found, however, the limited analysis in Commerce Bank is not persuasive in light of other authority.  See, e.g., Nat'l Credit Union Admin. Bd., 410 F. Supp. 3d at 683 ("While Commerce Bank throws a wrench into the uniform authority in this district, the Court finds that the three-page opinion is simply not enough and not sufficiently specific to overcome the weight and reasoning of the aforementioned authority."); BlackRock/Wells Fargo, 247 F. Supp. 3d at 391-92 ("That court said only that the Commerce Bank plaintiffs 'do not allege that defendant discovered breaches of such representations and warranties.'  . . . The court did not explain what precisely it found lacking.  This Court cannot therefore determine precisely where the Commerce Bank court would draw a line; the insufficiency of the allegations in that case do not preclude the Court from finding the far more robust allegations in this case to be sufficient." (quoting Commerce Bank, 141 A.D.3d at 414) (emphasis in original)).

Moreover, since Commerce Bank, the First Department has twice affirmed decisions denying motions to dismiss pre-Event of Default claims similar to those asserted here.  In so ruling, the First Department has emphasized that plaintiffs are not required to plead loan-specific knowledge of breaches.  See Blackrock Balanced Capital Portfolio (FI) v. U.S. Bank Nat'l Ass'n, 165 A.D.3d 526, 527 (N.Y. App. Div. 1st Dep't 2018) ("As to the pre-Event of Default breach of contract claims, U.S. Bank's argument that the complaint fails to allege loan specific breaches by each of the relevant sellers is unavailing at this stage of the litigation."); Fixed Income Shares: Series M v. Citibank, N.A., 157 A.D.3d 541, 542 (N.Y. App. Div. 1st Dep't 2018) ("[P]laintiffs were not required to allege that defendant had actual knowledge of a loan-specific breach [of representations and warranties].").  Accordingly, Defendants' broad reading of Commerce Bank is not persuasive.

U.S. Bank first argues that "Plaintiffs' claim that the trustee breached a duty 'to provide notice to all parties' of [representation and warranty] breaches" must be dismissed as to JPALT 2006-S2, JPALT 2006-S4, and JPMMT 2007-A4 (U.S. Bank Br. (Dkt. No. 127) at 18 (citing Am. Cmplt. (Dkt. No. 116) ¶ 52)),  because those trusts do not require U.S. Bank "to provide notices of breaches of representations and warranties."  (Am. Cmplt. (Dkt. No. 116) ¶ 52 n.7); see U.S. Bank Br. (Dkt. No. 127) at 18)  Plaintiffs do not dispute this point.  (Pltf. Opp. (Dkt. No. 138) at 16)  Accordingly, Plaintiffs' breach of contract claims against U.S. Bank are dismissed to the extent they are based on an alleged failure to provide notice of representation and warranty breaches related to JPALT 2006-S2, JPALT 2006-S4, and JPMMT 2007-A4.

U.S. Bank further argues that the notice and enforcement obligations for TBW 2006-6 were never triggered.  (U.S. Bank. Br. (Dkt. No. 127) at 18)  The PSA for that trust, in relevant part, provides as follows:

> Upon discovery by any of the Depositor, the Certificate Insurer, the Transferor, the Master Servicer, the Trust Administrator or the Custodian of a breach or a representation or warranty made by the Transferor pursuant to this Section 2.03 that materially and adversely affects the interests of the Certificateholders or the Certificate Insurer in any Mortgage Loan, the party discovering such breach shall give prompt notice thereof to the other parties and the Trustee.  Notwithstanding the foregoing, a breach which causes a Mortgage Loan not to constitute a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code will be deemed automatically to materially and adversely affect the interests of the Certificateholders in such Mortgage Loan.  Upon receiving notice of a breach, the Trustee shall in turn notify the Transferor of such breach.  The Trustee shall enforce the obligations of the Transferor in accordance with this Section 2.03 to correct or cure any such breach of a representation or warranty made herein, and if the Transferor fails to correct or cure the defect within such period, and such defect materially and adversely affects the interests of the Certificateholders or the Certificate Insurer in the related Mortgage Loan, the Trustee shall enforce the Transferor's obligations hereunder to (i) purchase such Mortgage Loan at the Purchase Price or (ii) substitute for the related Mortgage Loan an Eligible Substitute Mortgage Loan.

(Adler Decl., Ex. M (Dkt. No. 128-13) § 2.03)

U.S. Bank argues that, under this provision, its notice and enforcement obligations are triggered only by notice of a breach from "the Depositor, the Certificate Insurer, the Transferor, the Master Servicer, the Trust Administrator or the Custodian."  (Id.; see U.S. Bank Br. (Dkt. No. 127) at 18)  While the PSA language quoted in the paragraph above clearly imposes a notice obligation on "the Depositor, the Certificate Insurer, the Transferor, the Master Servicer, the Trust Administrator or the Custodian" should they discover a breach, and separate notice and enforcement obligations on the Trustee "[u]pon receiving notice of a breach" (Adler Decl., Ex. M (Dkt. No. 128-13) § 2.03),  U.S. Bank has not demonstrated as a matter of law that it had no notice and enforcement obligations if the notice of breach it received was from a party other than the "the Depositor, the Certificate Insurer, the Transferor, the Master Servicer, the Trust Administrator or the Custodian."  The Amended Complaint alleges that Defendants received written notice of systemic representation and warranty breaches "from monoline insurers," "the Association of Mortgage Investors," and "institutional investors."  (See Am. Cmplt. (Dkt. No. 116) ¶¶ 102, 128-29)  At this stage of the proceedings, these allegations are sufficient.  Accordingly, U.S. Bank's motion to dismiss Plaintiffs' pre-Event of Default representation and warranty breach claim as to TBW 2006-6 is denied.

Defendants next argue that "Plaintiffs' claim that the trustee breached an alleged duty to enforce repurchase rights" following representation and warranty breaches must be dismissed as to nineteen trusts.  (U.S. Bank Br. (Dkt. No. 127) at 18 (citing Am. Cmplt. (Dkt. No. 116) ¶ 112))  According to Defendants, for the ten WaMu Trusts, the trustee has no such duty, because that duty is explicitly assigned to another party.  (Id. at 19 (citing Adler Decl., Ex.

Q (Dkt. No. 128-17)); BOA Br. (Dkt. No. 133) at 22-24)  As for the nine other trusts,[38] U.S.

Bank argues that because (1) the trust documents do not specify "which party has the

enforcement duty"; and (2) the trustee is only required to undertake "duties specifically assigned

to it," Plaintiffs' allegations with respect to those trusts are insufficient.  (U.S. Bank Br. (Dkt.

No. 127) at 19)

        Plaintiffs do not dispute that the PSAs for the WaMu Trusts (the "WaMu PSAs")

assign the duty to enforce repurchase rights to the servicer, and not to the trustee.  Plaintiffs

argue, however, that their breach of contract claims should not be dismissed as to these ten trusts

because the WaMu PSAs provide that (1) Defendants are to be "reimburse[d] . . . for [the]

expenses of enforcement"; and (2) "enforcement of substitution or repurchase is the sole remedy

for certificateholders and the trustee on their behalf."  (Pltf. Opp. (Dkt. No. 138) at 17 (citing

Kane Decl. Ex 5 (Dkt. No. 139-5))

        In this regard, the WaMu PSAs provide as follows:

> It is understood and agreed that the obligation of (a) a Seller, pursuant to Section
> 2.4 of the Mortgage Loan Purchase Agreement, to repurchase or substitute for any
> Mortgage Loan as to which a defect in a constituent document exists, or (b) of a
> Seller or the Company, as applicable, pursuant to Section 3.3 of the Mortgage
> Loan Purchase Agreement or Section 2.8 hereof, to repurchase or substitute for
> any Mortgage Loan as to which a breach has occurred and is continuing, shall
> constitute the sole remedy respecting such defect or breach available to the Trust
> or the Holders of the REMIC interests or the Certificates issued hereunder or the
> Trustee on behalf of such Holders.

(Kane Decl. Ex 5 (Dkt. No. 139-5) at 42, 44, 46, 48, 50, 52, 54-55, 57, 59)  Plaintiffs also argue

that Defendants' enforcement obligation as to the WaMu Trusts arises from the fact that the WaMu

---

[38]  The nine trusts cited by U.S. Bank are:  ARMT 2005-10, BSARM 2005-7, CFLX 2006-1,
CMALT 2007-A1, CMALT 2007-A4, CMALT 2007-A5, CMALT 2007-A6, CMLTI 2006-
AR1, and CSFB 2004-8.  (See U.S. Bank Br. (Dkt. No. 127) at 19 (citing Adler Decl., Ex. R
(Dkt. No. 128-18))

PSAs "demand [that] the trustee act in [the] certificateholders['] interests at all times" (Pltf. Opp. (Dkt. No. 138) at 18), and "require the trustees to act in good faith."  (Pltf. Opp. (Dkt. No. 140) at 15; see also Am. Cmplt. (Dkt. No. 116) ¶ 54 ("[T]he WaMu Trusts required that the Trustee 'shall at all times be acting on behalf of the Trust or the Certificateholders.'"))  Finally, Plaintiffs argue that, when "the servicer and the seller are the same . . . , the enforcement obligation belongs to the trustee."  (Pltf. Opp. (Dkt. No. 140) at 12 (emphasis in original)); see also Pltf. Opp. (Dkt. No. 138) at 18; Am. Cmplt. (Dkt. No. 116) ¶ 54 ("In the WaMu Trusts, the Trustee becomes the enforcer of the repurchase protocol when the Seller is the Servicer, which was the case for the WaMu Trusts. . . . This makes sense because the party required to repurchase non-compliant loans should not be the party enforcing the repurchase protocol."))

Each of the WaMu PSAs provides that, prior to an Event of Default, (1) "the duties and obligations of the [t]rustee shall be determined solely by express provisions of [the PSA]"; (2) "[t]he [t]rustee . . . shall [not] be liable except for the performance of such duties and obligations as are specifically set forth in [the PSA]"; and (3) "no implied covenants or obligations shall be read into [the PSA] against the [t]rustee."  (WaMu PSA Excerpts (Dkt. No. 134-2) at 21-23)  As other courts in this District have concluded when construing similar language, these provisions preclude breach of contract claims based on any pre-Event of Default duties that are not expressly assigned to the trustee.  See, e.g., BlackRock/Wells Fargo, 247 F. Supp. 3d at 398 ("Before a trustee discovers an [Event of Default], a trustee has no duties other than its contractual duties, and any cause of action for breach of implied duties cannot stand." (quotation marks and citation omitted); Phoenix Light SF Ltd. v. Bank of N.Y. Mellon, 14 Civ. 10104 (VEC), 2015 WL 5710645, at *9 (S.D.N.Y. Sept. 29, 2015) ("Phoenix Light/Mellon") ("Under the PSA and Indentures, prior to the Trustee having knowledge of an Event of Default,

the Trustee had <u>no</u> duties other than its contractual duties.  That being the case, any cause of action for breach of implied duties cannot stand.") (emphasis in original).[39]

       This Court cannot infer that Defendants had a duty to enforce repurchase rights under the WaMu PSAs.  As an initial matter, the WaMu PSAs do not provide that Defendants are to be "reimburse[d] . . . for [the] expenses of enforcement."  Moreover, this Court cannot infer an enforcement obligation merely because the WaMu PSAs provide that enforcement is the sole remedy available to certificate holders.  (See Kane Decl. Ex 5 (Dkt. No. 139-5) at 42, 44, 46, 48, 50, 52, 54-55, 57, 59)  Similarly, this Court cannot find that Defendants had a duty to enforce repurchase rights merely because they were required to act in good faith and in the certificate holders' interests.[40]  The plain language of the PSAs precludes claims based on pre-Event of Default duties except where those duties are expressly imposed on Defendants, and the WaMu PSAs do not expressly assign enforcement duties to the trustee.[41]

---

[39] <u>See also</u> <u>W. & S. Life Ins. Co. v. U.S. Bank Nat'l Ass'n</u>, 209 A.D.3d 6, 14 (N.Y. App. Div., 1st Dep't Aug. 9, 2022) ("Prior to an [Event of Default], the trustee's duties are limited to those specifically set forth in the PSA.  Therefore, if the 'trustee's duties included the obligation to require [the seller] to substitute or repurchase mortgage loans, those duties would [need to be] specifically set forth in the PSA.'" (quoting <u>W. & S. Life Ins. Co. v. Bank of N.Y. Mellon</u>, 129 N.E.3d 1085, 1093-94 (Ohio Ct. App., 1st Dist. 2019)) (second and third alterations in original).

[40] <u>See</u> <u>Commerzbank II</u>, 457 F. Supp. 3d at 258 ("The PSAs are complicated and intricate agreements that impose numerous obligations.  Engrafting a generalized good faith obligation that creates additional undefined duties is a bridge too far.").

[41] Plaintiffs cite to <u>Royal Park/Deutsche Bank</u>, 2016 WL 439020, at *5-6, in support of their argument that Defendants had an enforcement duty with respect to the WaMu Trusts.  (See Pltf. Opp. (Dkt. No. 140) at 15)  But the PSA provisions at issue in that case provide that "'the [t]rustee[] <u>shall</u> <u>enforce</u> the obligations of the [s]eller'" to cure representation and warranty breaches or repurchase loans.  <u>Royal Park/Deutsche Bank</u>, 2016 WL 439020, at *5 n.2 (emphasis added).  Plaintiffs do not contend that the WaMu PSAs contain an analogous provision expressly assigning repurchase duties to Defendants.  Accordingly, <u>Royal Park/Deutsche Bank</u> is not persuasive here.

In a recent supplemental letter, Plaintiffs cite <u>IKB Int'l, S.A. v. Wells Fargo Bank, N.A.</u>, 208 A.D.3d 423 (1st Dep't 2022).  (See Pltf. Sept. 14, 2022 Ltr. (Dkt. No. 210) at 1-2)  Plaintiffs argue that, in <u>IKB</u>, the court imposed pre-Event of Default repurchase obligations on a trustee

As to Plaintiffs' contention that Defendants had a duty to enforce repurchase obligations when "the servicer and the seller are the same" (Pltf. Opp. (Dkt. No. 140) at 12), this argument is likewise foreclosed by the plain language of the WaMu PSAs.  Plaintiffs base their argument on Section 2.09 of the WaMu PSAs (see id.), which provides in relevant part as follows:

> The Servicer shall promptly notify the applicable Seller of [a representation and warranty] breach and take appropriate steps on behalf of the Trust to enforce such Seller's obligation, pursuant to Section 3.3 of the Mortgage Loan Purchase Agreement, to cure such breach in all material respects or repurchase or substitute for the affected Mortgage Loan or Mortgage Loans or any property acquired in

even though the PSA did not contain express language assigning repurchase duties to the trustee. (Id. at 2)  But as the dissenting judge in IKB observed, see IKB, 208 A.D3d at 431 (Singh, J., dissenting in part) ("The majority concedes that it is not following our precedent in [W. & S. Life Ins. Co. v. U.S. Bank N.A., 209 AD.3d 6 (1st Dep't 2022)]"), the majority's opinion is at odds with First Department precedent holding that, "[p]rior to an [Event of Default], the trustee's duties are limited to those specifically set forth in the PSA."  W. & S. Life Ins. Co, 209 A.D.3d at 13.  Given (1) the conflicting First Department decisions, and (2) the fact that the New York Court of Appeals has not addressed this issue, this Court is not bound to follow the reasoning of the majority in IKB.  See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 739 F.3d 45, 48 (2d Cir. 2013).  This Court will instead rely on the First Department's reasoning in W. & S. Life Ins. Co., in which the court held that trustees have no pre-Event of Default duties that are not expressly set forth in the PSAs.  See W. & S. Life Ins. Co., 209 A.D.3d at 13; see also Commerzbank II, 457 F. Supp. 3d at 258.

Finally, Plaintiffs argue that any ambiguities in the PSAs must be "strictly construed against Defendants."  (Pltf. Opp. (Dkt. No. 140) at 11; Pltf. Opp. (Dkt. No. 138) at 10-11 (citing, inter alia, McCarthy v. Am. Int'l Grp., Inc., 283 F.3d 121, 124, 127 (2d Cir. 2002)))  But Plaintiffs do not identify any purported "ambiguities" in the PSAs with respect to Defendants' duties, rendering the doctrine of contra preferentem inapplicable here.  See Schering Corp. v. Home Ins. Co., 712 F.2d 4, 10 n.2 (2d Cir. 1983) ("[C]ontra preferentem is used only as a matter of last resort, after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument.")  Moreover, the doctrine does not apply to "arm's length transactions agreed to by sophisticated parties represented by counsel."  U.S. Bank Nat'l Ass'n v. UBS Real Estate Sec. Inc., 205 F. Supp. 3d 386, 414 (S.D.N.Y. 2016) (citing Matter of Riconda, 90 N.Y.2d 733, 740 (1997))  Given that there is no dispute that the purchase of RMBS certificates at issue here was a commercial transaction between sophisticated parties, "[t]here is no basis in the record before this Court to construe the PSAs against their drafters."  Id.; see also W. & S. Life Ins. Co., 209 A.D.3d at 14 ("[W]e need not reach plaintiffs' contra preferentem argument because it is inapplicable to sophisticated parties such as plaintiffs. . . . More importantly, even if there were an ambiguity, any inconsistencies between a general provision . . . and a specific provision . . . , would be resolved in favor of the specific provision . . . .").

respect thereof, in accordance with and subject to the time limitations set forth in Section 3.3; . . . If a Seller is the Servicer, then the Trustee <u>may, but shall not be obligated to</u> (or if so directed by Certificateholders holding Certificates [of a specified amount], then the Trustee shall), give the notification to such Seller and, if applicable, require the repurchase or substitution . . . .

(Kane Decl., Ex. 5 (Dkt. No. 139-5) at 47, 49, 51, 53, 55, 57-58 (emphasis added); <u>see also</u> WaMu PSA Excerpts (Dkt. No. 134-2) at 10-12)  This provision makes clear that – if the seller and the servicer are the same – the trustee "may, but shall not be obligated to" enforce repurchase obligations – unless a certain percentage of certificate holders have directed the trustee to do so, which Plaintiffs do not allege here.  (<u>Id.</u>)  Accordingly, the WaMu PSAs do not impose a duty on Defendants to enforce repurchase obligations, and Defendants' alleged failure in this regard could not have breached those PSAs.[42]

In sum, Defendants' motions to dismiss Plaintiffs' breach of contract claims are granted to the extent Plaintiffs' breach claims are premised on Defendants' failure to enforce repurchase rights prior to an Event of Default for the WaMu Trusts.

As for the nine PSAs that U.S. Bank argues do not specify which party is obligated to enforce repurchase rights, the relevant provision – which is substantially the same in all nine PSAs – is as follows:

Upon discovery by any of the parties hereto of a breach of a representation or warranty made pursuant to Section 2.03(b) that materially and adversely affects the interests of the Certificateholders in any Mortgage Loan, the party discovering such breach shall give prompt notice thereof to the other parties.  Each Seller hereby covenants that within 90 days of the earlier of its discovery or its receipt of written notice from any party of a breach of any representation or warranty made by it pursuant to Section 2.03(b) which materially and adversely affects the interests of the Certificateholders in any Mortgage Loan sold by the related Seller to the Trust, it shall cure such breach in all material respects, and if such breach is

---

[42] Section 2.09 of the PSA for WMALT 2007-4 does not address circumstances in which the servicer and seller are the same.  Accordingly, Plaintiffs' argument also fails with respect to that trust.  (<u>See</u> Kane Decl., Ex. 5 (Dkt. No. 139-5) at 60-61; WaMu PSA Excerpts (Dkt. No. 134-2) at 13; Adler Decl., Ex. Q (Dkt. No. 128-17) at 30-31)

not so cured, shall, (i) if such 90-day period expires prior to the second anniversary of the Closing Date, remove such Mortgage Loan (a "Deleted Mortgage Loan") from the Trust Fund and substitute in its place a Qualified Substitute Mortgage Loan, in the manner and subject to the conditions set forth in this Section; or (ii) repurchase the affected Mortgage Loan or Mortgage Loans at the Purchase Price in the manner set forth below. . . .

(Adler Decl., Ex. R (Dkt. No. 128-18) at 2 (quoting Section 2.03(c) of the PSA for CSFB 2004-8); see also id. at 5-7, 10, 18-19, 21-22, 25-26, 29-30, 33-34, 37 (relevant excerpts of remaining eight PSAs))  These provisions, while imposing an express notice obligation on U.S. Bank, contain no express repurchase obligation.  They instead impose the repurchase obligation on the breaching seller, and do not explicitly state that the trustee is required to take any additional steps to enforce that repurchase obligation beyond providing the seller with notice of the breach.  Accordingly, U.S. Bank's motion to dismiss Plaintiffs' breach of contract claims are granted to the extent that they are premised on Defendants' failure to enforce repurchase rights prior to an Event of Default for the nine trusts identified in Dkt. No. 128-18.[43]

---

[43]  Plaintiffs contend that U.S. Bank's argument with respect to these nine trusts "has been rejected" by another court in this District.  (Pltf. Opp. (Dkt. No. 138) at 17 n.42 (citing BlackRock/Wells Fargo, 247 F. Supp. 3d at 394))  But the PSA provisions at issue in that case are not identified; the court simply states that, "[a]t this stage, Plaintiffs are not required to specify precisely when, and precisely on what basis, Defendant breached each of its contractual obligations."  BlackRock/Wells Fargo, 247 F. Supp. 3d at 394.  Given the specific PSA provisions identified by U.S. Bank in the instant case – which demonstrate that the trustee does not have express pre-Event of Default repurchase obligations as to these nine trusts – BlackRock/Wells Fargo is not on point as to this issue.

Plaintiffs also argue that, for the Indenture Trusts (BSARM 2005-7 and CMLTI 2006-AR1), U.S. Bank "explicitly is charged with enforcement duties for . . . breaches of [representations and warranties] pursuant to the mortgage loan and purchase agreement."  (Pltf. Opp. (Dkt. No. 138) at 17 (citing Kane Decl., Ex. 5 (Dkt. No. 139-5))  But the provisions cited by Plaintiffs are substantially the same as the provisions discussed above.  As discussed above, these provisions only impose a notice obligation on U.S. Bank, and do not impose additional enforcement duties following discovery of representation and warranty breaches.  (See Kane Decl., Ex. 5 (Dkt. No. 139-5) at 5-6 (providing that "the party discovering the breach shall give prompt written notice of the breach to the other parties," but that "[t]he Seller . . . shall cure the breach . . . or . . . shall

As to five additional trusts,[44] U.S. Bank concedes that the PSAs impose pre-Event of Default repurchase obligations on the trustee following discovery of representation and warranty breaches.  (U.S. Bank Br. (Dkt. No. 127) at 19)  U.S. Bank argues that Plaintiffs' claims based on U.S. Bank's failure to enforce repurchase rights must nonetheless be dismissed, however, "because U.S. Bank's enforcement duty arises only upon receipt of written notice of a failure to cure, which Plaintiffs do not allege."  (Id.)  Plaintiffs disagree with U.S. Bank's interpretation of the trust agreements but argue, in any event, that "whether [U.S. Bank] received notice depends on facts in the exclusive possession of [U.S. Bank] and [thus is an issue] not suitable for resolution at the pleading stage."  (Pltf. Opp. (Dkt. No. 138) at 17)

This Court agrees as to the latter point.  As previously discussed, Plaintiffs have adequately alleged that U.S. Bank was aware of representation and warranty breaches with respect to the Covered Trusts.  Because any written notices of the Sellers and Originators' failure to cure those breaches would be in U.S. Bank's possession, Plaintiffs' allegations with respect to the five trusts identified in Dkt. No. 128-19 suffice at this stage.  See, e.g., BlackRock/Wells Fargo, 247 F. Supp. 3d at 390 (where "information is uniquely in the possession of defendants . . . plaintiffs satisfy their pleading burden where their allegations raise a reasonable expectation that discovery will reveal evidence proving their claim" (quotation marks, alterations, and citations omitted)).

---

purchase the Mortgage Loan") (emphasis added); id. at 21 (providing that "the Indenture Trustee shall promptly notify Citigroup Global Markets Realty Corp. of such finding and of Citigroup Global Markets Realty Corp.'s obligation to cure such defect or repurchase or substitute for the related Mortgage Loan") (emphasis added))  Accordingly, Plaintiffs' attempt to distinguish the two Indenture Trusts is not persuasive.

[44]  The five trusts cited by U.S. Bank are:  BAFC 2007-D, JPALT 2006-S2, JPALT 2006-S4, JPMMT 2007-A4, and WFMBS 2006-AR1.  (Adler Decl., Ex. S (Dkt. No. 128-19) at 3)

###### 2.   Claims Based on Pre-Event of Default Duties
###### Relating to Missing or Defective Documents

U.S. Bank contends that Plaintiffs' claims based on pre-Event of Default duties

relating to missing or defective documents fail as to the WaMu Trusts and the Morgan Stanley

Trust, because U.S. Bank did not become trustee for those trusts until 2008 or 2011, after those

trusts had closed and after the duties regarding missing or defective documents had terminated.

(U.S. Bank Br. (Dkt. No. 127) at 20)  Plaintiffs counter that U.S. Bank "had a continuing duty to

provide notice of defects and missing documents."  (Pltf. Opp. (Dkt. No. 138) at 18 (citing Kane

Decl., Ex. 5 (Dkt. No. 139-5))

While U.S. Bank is correct that – under the WaMu PSAs and the PSA for the

Morgan Stanley Trust – certain trustee duties pertaining to mortgage documentation must be

completed shortly after closing (see, e.g., Kane Decl., Ex. 5 (Dkt. No. 139-5) at 40 (under the

WAMU 2006-AR2 PSA, "[t]he Trustee shall review (or cause the Initial Custodian to review)

each Mortgage File within 45 days after the Closing Date")), U.S. Bank has not established that

all of the trustee's duties pertaining to defective mortgage files terminated before it became

trustee of the WaMu Trusts and the Morgan Stanley Trust.  Section 2.07 of the WaMu PSAs

provides – without any time limitation – that "[i]f the Trustee finds any document or documents

required to be included in the Mortgage File for a Mortgage Loan pursuant to the definition of

'Mortgage File' not to have been executed and received, the Trustee shall promptly so notify the

Servicer."  (Kane Decl., Ex. 5 (Dkt. No. 139-5) at 41-42, 44, 47, 49, 51, 53, 55, 57, 60

(identifying identical provision in each of the WaMu PSAs))  And the PSA for the Morgan

Stanley Trust likewise requires the trustee to "promptly notify the Depositor and the Seller or the

related Originator, as applicable, in writing of [any discovered] nonconforming or missing

document" in a mortgage file – again without time limitation.  (Id. at 37-38)  Accordingly, U.S.

Bank's motion to dismiss will be denied to the extent it is premised on the argument that the trustee's duties regarding defective mortgage files had terminated before BOA succeeded as trustee.

Defendants also argue that the PSAs impose "no duty to 'take physical possession'" of mortgage files.  (U.S. Bank Br. (Dkt. No. 127) at 20 (quoting Am. Cmplt. (Dkt. No. 116) ¶¶ 41, 84))  Plaintiffs do not dispute that the trustee has no obligation to "take physical possession" of mortgage files; they merely argue that the trustee has the duty "to review the mortgage files and notify of nonconforming or missing documents."  (Pltf. Opp. (Dkt. No. 128) at 19)  Accordingly, to the extent that Plaintiffs' breach of contract claims are premised on a duty to take physical possession of mortgage files, those claims are dismissed.

U.S. Bank next argues that, as to fifteen trusts, the trustee has no "duty to review mortgage files and prepare exception reports," because "the PSAs [give] those responsibilities to a custodian, not the trustee." [45]  (U.S. Bank Br. (Dkt. No. 127) at 20 (citing Adler Decl., Ex. U (Dkt. Nos. 128-21, 128-22))  Plaintiffs respond that – because "the custodian acts 'on the trustee's behalf,' or for the 'benefit of the trustee'" – U.S. Bank cannot escape liability for its alleged violation of this duty.  (Pltf. Opp. (Dkt. No. 138) at 19)  In support of this argument, however, Plaintiffs cite to the PSA for WAMU 2006-AR8, and not to the PSAs for the fifteen trusts identified by U.S. Bank.  In the relevant provisions for those fifteen trusts, only the custodian is tasked with reviewing mortgage files and preparing exception reports.  (See Adler

---

[45]  While U.S. Bank makes this argument "for at least 14 trusts" (U.S. Bank Br. (Dkt. No. 127) at 20), it has cited the relevant PSA provisions from the following fifteen trusts:  CSFB 2004-8, BSARM 2005-7, CFLX 2006-1, CMALT 2007-A1, CMALT 2007-A4, CMALT 2007-A5, CMALT 2007-A6, CMLTI 2006-AR1, GSR 2006-AR1, JPALT 2006-S2, JPALT 2006-S4, JPMMT 2005-A7, JPMMT 2007-A4, MABS 2006-AB1, and WFMBS 2006-AR1.  (See Adler Decl., Ex. T (Dkt. No. 128-20) at 4-6); Adler Decl., Ex. U-1 (Dkt. No. 128-21) at 4).  Accordingly, the Court addresses U.S. Bank's argument as it pertains to these fifteen trusts.

Decl., Ex. T (Dkt. No. 128-20) at 4-6; Adler Decl., Ex. U-1 (Dkt. No. 128-21) at 6-7, 10-11, 13,

17, 24; Adler Decl., Ex. U-2 (Dkt. No. 128-22) at 6, 15-17, 19-20, 22-23, 25, 28, 30-31, 33-34)

Plaintiffs have not cited any language showing that the trustee can be held liable for the actions

(or lack of action) of a custodian with respect to reviewing mortgage files and preparing

exception reports.  Accordingly, U.S. Bank's motion to dismiss is, on this point, granted.  See

Royal Park/HSBC, 109 F. Supp. 3d at 608 ("With respect to document obligations, most . . . of

the claims fail because the relevant contractual language states that these obligations belong to

the Custodian, and not [the trustee].").

   To the extent that Plaintiffs' breach of contract claims are premised on a "duty to

enforce repurchase rights for loans with defective documentation," Defendants argue that these

claims fail as to twenty-one trusts,[46] because Defendants had no such duty.  (U.S. Bank Br. (Dkt.

No. 127) at 21 (citing Adler Decl., Ex. V-1 (Dkt. No. 128-23)); BOA Br. (Dkt. No. 133) at 22-

24)  In response, Plaintiffs argue that "for all of these trusts, the trusts reimburse [Defendants] for

out-of-pocket expenses reasonably incurred to enforce repurchase or substitution obligations

and/or designate repurchase and substitution as the sole remedy available to the trustee on behalf

of certificateholders."[47]  (Pltf. Opp. (Dkt. No. 138) at 19)  For the reasons stated above in

---

[46]  The twenty-one trusts cited by Defendants are:  the ARMT 2005-10, CFLX 2006-1, CMALT
2007-A1, CMALT 2007-A4, CMALT 2007-A5, CMALT 2007-A6, CMLTI 2006-AR1, CSFB
2004-8, MABS 2006-AB1, TBW 2006-6, WFMBS 2006-AR1, and the ten WaMu Trusts.  (See
Adler Decl., Ex. V-1 (Dkt. No. 128-23) at 4)

[47]  As with their representation and warranty breach claims, Plaintiffs also argue that, under the
WaMu PSAs, the trustee has a duty to enforce repurchase obligations when "the servicer and the
seller are the same."  (Pltf. Opp. (Dkt. No. 140) at 12)  But this argument fails for the same
reason it failed in connection with Plaintiffs' representation and warranty claims:  Section 2.07
of the WaMu PSAs provides that, "[i]f a Seller is the Servicer, then the Trustee may, but shall
not be obligated to" enforce repurchase obligations relating to defective documents – unless the
trustee is directed to enforce those obligations by a certain percentage of certificateholders.
(Kane Decl., Ex. 5 (Dkt. No. 139-5) at 40-45, 47, 49, 51, 53, 55; WaMu PSA Excerpts (Dkt. No.
134-2) at 5-12) (emphasis added)  Because Plaintiffs have not alleged that the certificate holders

connection with Plaintiffs' representation and warranty breach claims, these arguments are not
persuasive.  Accordingly, to the extent that Plaintiffs' breach of contract claims are premised on
a "duty to enforce repurchase rights for loans with defective documentation" (see U.S. Bank Br.
(Dkt. No. 127) at 21), Defendants' motions to dismiss are granted as to the twenty-one trusts
identified in Dkt. No. 128-23.[48]

### 3.      Claims Based on Pre-Event of Default Duties <u>Relating to Servicer and Master Servicer Breaches</u>

Defendants argue that Plaintiffs' breach of contract claims premised on
Defendants' "fail[ure] to give notice of master servicers' and servicers' breaches" must be
dismissed as to twenty-two trusts,[49] because the PSAs for those trusts place no such duty on the
trustee.  (U.S. Bank Br. (Dkt. No. 127) at 21 (citing Adler Decl., Ex. X (Dkt. No. 128-26))

---

directed Defendants to enforce repurchase obligations, they cannot rely on Section 2.07 to create
an enforcement duty for the trustee.

Moreover, as discussed earlier, Section 2.07 of the PSA for WMALT 2007-4 does not address
circumstances in which the servicer and seller are the same.  Accordingly, Plaintiffs' argument
also fails with respect to that trust as well.  (See Kane Decl., Ex. 5 (Dkt. No. 139-5) at 60-61;
WaMu PSA Excerpts (Dkt. No. 134-2) at 9; Adler Decl., Ex. V-2 (Dkt. No. 128-24) at 33-34)

[48]  As to two of the twenty-one trusts – MABS 2006-AB1 and TBW 2006-6 – Plaintiffs contend
that U.S. Bank was obligated to enforce repurchase rights as part of its "enforcement duty for
[representation and warranty] breaches," because "incomplete mortgage files or missing
documents are also breaches of [representations and warranties] under the [mortgage loan
purchase agreements]."  (Pltf. Opp. (Dkt. No. 138) at 20)  While Plaintiffs are correct that U.S.
Bank has an explicit enforcement duty with respect to representation and warranty breaches for
those two trusts (see Kane Decl., Ex. 5 (Dkt. No. 139-5) at 36, 39), the representations and
warranties cited by Plaintiffs do not relate to the completeness of mortgage files.  (See Kane
Decl., Ex. 8 (MABS 2006-AB1 Representations and Warranties) (Dkt. No. 139-8) at 3
(representing that "the Seller had good title to the Mortgage Loans and the Mortgage Loans were
subject to no offsets, defenses or counterclaims"); Kane Decl., Ex. 9 (TBW 2006-6
Representations and Warranties) (Dkt. No. 139-9) at 3 (same))  Accordingly, Plaintiffs' claims
with respect to these two trusts are not distinguishable from their claims with respect to the
remaining nineteen trusts identified by Defendants.

[49]  The twenty-two trusts cited by Defendants are:  ARMT 2005-10, BSARM 2005-7, CFLX
2006-1, CMALT 2007-A1, CMALT 2007-A4, CMALT 2007-A5, CMALT 2007-A6, CSFB

Plaintiffs respond that "[i]n 10 of these trusts, [U.S. Bank] was required to provide notice of nascent [Events of Default]," including servicer or master servicer breaches. (Pltf. Opp. (Dkt. No. 138) at 27 & n.92)  But the ten trusts identified by Plaintiffs are the ten trusts for which Defendants do not dispute that they had a notice duty with respect to servicer and master servicer breaches.[50]

Plaintiffs further contend that, "in many of [the twenty-two] trusts, [U.S. Bank] was required to provide notice to certificateholders of [Events of Default] or servicer terminations."  (Id. at 26)  Plaintiffs do not specify the trusts that is true for, however, nor do they explain how a notice requirement for Events of Default and servicer terminations suggests that Defendants were required to provide notice of pre-Event of Default servicer breaches. Accordingly, to the extent that Plaintiffs' breach of contract claims are premised on Defendants' failure to provide notice of pre-Event of Default servicer or master servicer breaches, those claims will be dismissed as to the twenty-two trusts listed in Dkt. No. 128-26.

As to the remaining ten trusts,[51] Defendants' arguments in support of dismissal are not persuasive.  Defendants first argue that "Plaintiffs cannot claim that [Defendants] failed to give notice of master servicers' failure to enforce repurchase rights for [representation and warranty] breaches or missing documents, because the master servicer had no enforcement duty

---

2004-8, GSR 2006-AR1, MABS 2006-AB1, TBW 2006-6, WFMBS 2006-AR1, and the ten WaMu Trusts.  (Adler Decl., Ex. X (Dkt. No. 128-26) at 2)

[50]  (Compare Pltf. Opp. (Dkt. No. 138) at 27 n.92 (listing BAFC 2007-D; CMLTI 2005-7; CMLTI 2006-4; CMLTI 2006-AR1; CMLTI 2007-AR5; JPALT 2006-S2; JPALT 2006-S4; JPMMT 2005-A7; JPMMT 2007-A4; and MSM 2006-7), with Adler Decl., Ex. X (Dkt. No. 128-26) at 2 (listing different set of twenty-two trusts))

[51]  The ten trusts not listed in Dkt. No. 128-26 are:  BAFC 2007-D, CMLTI 2005-7, CMLTI 2006-4, CMLTI 2006-AR1, CMLTI 2007-AR5, JPALT 2006-S2, JPALT 2006-S4, JPMMT 2005-A7, JPMMT 2007-A4, and MSM 2006-7.

that it could have breached." (U.S. Bank Br. (Dkt. No. 127) at 21 (citing Adler Decl., Ex. Y (Dkt. No. 128-27))  But Plaintiffs' allegations do not rely on the Servicers' or Master Servicers' enforcement duties.  Rather, Plaintiffs complain that Defendants breached their obligation to "provide notice of, and take steps to remedy, the Master Servicers' and Servicers' <u>failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs</u>." (Am. Cmplt. (Dkt. No. 116) ¶ 198(d) (emphasis added))

The same analysis applies to Defendants' argument that – as to six trusts – "the master servicer . . . had no duty to give notice" of representation and warranty breaches or missing documents.  (U.S. Bank Br. (Dkt. No. 127) at 21-22 (citing Adler Decl., Ex. Y (Dkt. No. 128-27))  Again, Plaintiffs allege that Defendants breached the PSAs by not remedying or providing notice of the Servicers' and Master Servicers' failure to perform "their obligations under the PSAs."  (Am. Cmplt. (Dkt. No. 116) ¶ 198(d))  Defendants' argument that the master servicer was not obligated to give notice of representation and warranty breaches and missing documents thus has no bearing on Plaintiffs' claims.

U.S. Bank further argues that – as to four trusts – "Plaintiffs do not allege that U.S. Bank <u>knew</u> the master servicer failed to give notice of [representation and warranty] breaches for the same reason that Plaintiffs do not allege that U.S. Bank discovered these breaches."  (U.S. Bank Br. (Dkt. No. 127) at 22 (emphasis in original))  As with Plaintiffs' allegations that U.S. Bank was aware of representation and warranty breaches, however, Plaintiffs have adequately alleged that U.S. Bank was aware of servicer breaches – in part because Plaintiffs allege that Defendants were aware that the Servicers "robo-signed the documentation required to foreclose" on defaulted mortgage loans, which was a "breach[] of the applicable prudent servicing standards."  (Am. Cmplt. (Dkt. No. 116) ¶ 124; <u>see also</u> <u>id.</u> ¶ 116

(alleging that "Defendants learned that the Master Servicers or Servicers failed to provide notice

of numerous breaches of representation and warranty provisions as required under the PSAs");

id. ¶ 121 ("Defendants and the entities disclosed to be Sponsors, Servicers[,] and Master

Servicers of the Covered Trusts have been implicated in numerous governmental reports, court

orders, and press reports regarding servicing misconduct and the massive cover[-]up of the

failure to deliver documentation concerning securitized mortgage loans known as the 'robo-

signing' scandal.")  These allegations suffice at this stage.  See, e.g., Commerzbank I, 277 F.

Supp. 3d at 492 (denying motion to dismiss breach of contract claims based on the defendants'

alleged failure to provide notice of servicing breaches, in part because of nearly identical

allegations regarding robo-signing).[52]

Accordingly, Defendants' motions to dismiss Plaintiffs' pre-Event of Default

claims based on Servicer and Master Servicer breaches are denied as to the ten trusts not listed in

Dkt. No. 128-26.

---

[52]  U.S. Bank also contends that "for six of the ten trusts, Plaintiffs do not allege the required
master servicer breach, . . . let alone that U.S. Bank had actual knowledge of it."  (U.S. Bank Br.
(Dkt. No. 127) at 22 (emphasis in original))  As discussed above, however, Plaintiffs have
adequately alleged that the Servicers and Master Servicers did not comply with prudent servicing
standards, including by participating in "robo-signing."  At this stage of this litigation, Plaintiffs
are not required to identify precisely how those Servicers and Master Servicers breached their
obligations on a loan-by-loan basis.  See, e.g., BlackRock/Wells Fargo, 247 F. Supp. 3d at 394
("Plaintiffs need not allege loan-specific breaches at this stage[.]")

U.S. Bank also argues that, "[t]o the extent Plaintiffs allege that U.S. Bank failed to give notice
of master servicers' failure to notify other parties about missing documents, that claim is
untimely," since U.S. Bank's failure to provide notice "occurred at or a certain time after the
trusts' closing."  (U.S. Bank Br. (Dkt. No. 127) at 22 n.8)  But U.S. Bank does not cite any
language from the PSAs supporting this argument and – as discussed above with respect to
Defendants' timeliness arguments – has not provided the Court with the relevant language
indicating the precise date on which the relevant trusts closed.  Accordingly, U.S. Bank has not
demonstrated that Plaintiffs' claims are necessarily time-barred.

### 4.      Claims Based on Regulation AB Violations

Defendants next argue that Plaintiffs' claims premised on alleged violations of Regulation AB must be dismissed, because "Plaintiffs admit that [Regulation AB] applies to trustees only 'to the extent [they] engage in servicing functions[,]' . . . [y]et Plaintiffs . . . make no more than a conclusory allegation that 'Defendants' were 'involved in "servicing functions.""[53] (U.S. Bank Br. (Dkt. No. 127) at 24 (quoting Am. Cmplt. (Dkt. No. 116) ¶¶ 75, 144 n.12))  In response, Plaintiffs abandon their Regulation AB claims as to all trusts except those four trusts for which Defendants served as custodians.[54] (Pltf. Opp. (Dkt. No. 138) at 29) Accordingly, Plaintiffs' Regulation AB claims are dismissed as to all trusts except BAFC 2007-D, ARMT 2005-10, CSFB 2004-8, and MSM 2006-7.

Defendants argue that "[Regulation AB] does not apply to two of [the four remaining] trusts, because they closed before January 1, 2006." (U.S. Bank Reply (Dkt. No. 129) at 14)[55]  While it appears from the Amended Complaint that Plaintiffs do not intend to bring Regulation AB claims for trusts that closed before January 1, 2006 (see Am. Cmplt. (Dkt. No. 116) ¶¶ 75, 144), no party has explained which trusts closed before January 1, 2006.

---

[53]  Defendants also argue that "Plaintiffs fail to allege [that Defendants] knew the reports [required to be made under Regulation AB] were false," because "Plaintiffs do not adequately allege [that Defendants] knew about alleged sponsor and servicer breaches."  (U.S. Bank Br. (Dkt. No. 127) at 24)  As discussed above, however, Plaintiffs have adequately alleged Defendants' awareness of servicer breaches of representations and warranties.

[54]  The four trusts cited by Plaintiffs are:  BAFC 2007-D, ARMT 2005-10, CSFB 2004-8, and MSM 2006-7.  (Pltf. Opp. (Dkt. No. 138) at 29 nn.102-103)

Defendants appear to concede that Regulation AB applies to the four trusts for which they served as custodians.  (See U.S. Bank Reply (Dkt. No. 129) at 14 (referring to Defendants' "obligations" under Regulation AB as to the four remaining trusts)

[55]  Regulation AB applies only to "registered offering of asset-backed securities commencing with an initial bona fide offer after December 31, 2005."  Asset-Backed Securities, 70 Fed. Reg. 1506-01 (Jan. 7, 2005).

Accordingly, as to the four remaining trusts, Defendants' motion to dismiss cannot be granted on this basis.

Finally, insofar as Plaintiffs' Regulation AB claims as to the remaining four trusts are based on omissions from "monthly remittance reports" provided to investors (see Am. Cmplt. (Dkt. No. 116) ¶¶ 73-74), Defendants argue that the PSAs for these four trusts impose "no duties [on the trustee] with respect to remittance reports." (U.S. Bank Br. (Dkt. No. 127) at 24)[56]  In response, Plaintiffs abandon their Regulation AB claims to the extent they are premised on remittance reports. (See Pltf. Opp. (Dkt. No. 138) at 29)  Accordingly, to the extent that Plaintiffs' remaining Regulation AB claims as to the four trusts are premised on remittance reports, they are dismissed.[57]

## B.   Plaintiffs' Post-Event of Default Claims

To the extent that Plaintiffs' breach of contract claims are premised on Defendants' failure to perform post-Event of Default duties, Defendants contend that Plaintiffs have not adequately pled (1) the existence of Events of Default, as defined in the PSAs; or (2)

---

[56]  U.S. Bank has listed "22 trusts" for which this is the case. (See id.; see also Am. Cmplt. (Dkt. No. 116) ¶ 73 n.9)  The remaining four trusts are part of this group. (See Am. Cmplt. (Dkt. No. 116) ¶ 73 n.9 (listing the "Credit Suisse, BOA, [and] Morgan Stanley . . . Trusts"); id. ¶ 35(F)-(G) (the "Credit Suisse Trust[s]" are ARMT 2005-10 and CSFB 2004-8); id. ¶ 5, Ex. A (the "BOA Trust" is BAFC 2007-D, and the "Morgan Stanley Trust" is MSM 2006-7))

[57]  In its reply, U.S. Bank argues for the first time – and without citing any case law or applicable language from Regulation AB – that "Plaintiffs misunderstand U.S. Bank's obligations" under Regulation AB, and that "U.S. Bank had no duty [under Regulation AB] to report sponsor or originator breaches" or to "certify servicers had complied with their contractual duties." (U.S. Bank Reply (Dkt. No. 129) at 14)  Because U.S. Bank's arguments on this point are presented for the first time in reply, they will not be considered in connection with the instant motion to dismiss. See Bertuglia v. City of New York, 839 F. Supp. 2d 703, 737 (S.D.N.Y. 2012) ("[A]rguments raised for the first time in reply should not be considered, because the plaintiffs [have] no opportunity to respond to those new arguments."); see also ABN Amro Verzekeringen BV v. Geologistics Ams., Inc., 485 F.3d 85, 97 n.12 (2d Cir. 2007) ("We decline to consider an argument raised for the first time in a reply brief.").

that Defendants received written notice or had actual knowledge of those Events of Default sufficient to trigger heightened trustee duties.  (U.S. Bank Br. (Dkt. No. 127) at 25; BOA Br. (Dkt. No. 133) at 31)

### 1.        Whether Plaintiffs Have Pled Events of Default

#### a.        The Prevention Doctrine

Under the majority of the PSAs, an Event of Default requires three elements: (1) a material breach by a servicer, master servicer, or depositor; (2) notice to the servicer, master servicer, or depositor of the breach; and (3) the servicer's, master servicer's, or depositor's failure to cure the breach within a specified time period.  (See, e.g., Adler Decl., Ex. F ("ARMT 2005-10 PSA Excerpts") (Dkt. No. 128-6) § 8.01(b)) (defining "Events of Default"); WaMu PSA Excerpts (Dkt. No. 134-2) at 16-20 (defining "Events of Default" for the WaMu Trusts))[58]  In the Amended Complaint, Plaintiffs acknowledge that "certain Events of Default require formal notice and an opportunity to cure," and Plaintiffs have not alleged that Defendants provided the requisite notice here.  (See Am. Cmplt. (Dkt. No. 116) ¶ 117)  Plaintiffs invoke the so-called "prevention doctrine" in support of their post-Event of Default claims, however, arguing that Defendants "cannot escape their duty of prudence by failing to provide the required notice."  (Id.; see Pltf. Opp. (Dkt. No. 138) at 24)

Under New York law, "[t]he prevention doctrine . . . provides that 'a party may not insist upon performance of a condition precedent when its nonperformance has been caused by the party [it]self.'"  Commerzbank I, 277 F. Supp. 3d at 491 (quoting Bank of N.Y. v. Tyco Int'l Grp., S.A., 545 F. Supp. 2d 312, 324 n.81 (S.D.N.Y. 2008)); see also Young v. Hunter, 6 N.Y. 203, 207 (1852) ("It is a well settled and salutary rule that a party cannot insist upon a

---

[58]  As discussed below, the Indenture Trusts define Events of Default differently.

condition precedent, when its non-performance has been caused by himself.").  Numerous courts

in this District have applied the prevention doctrine to uphold post-Event of Default claims

against RMBS trustees where plaintiffs have not alleged that the trustees provided the requisite

notice under the PSAs.  See Pac. Life Ins. Co., 2018 WL 1382105, at *10; Commerzbank I, 277

F. Supp. 3d at 491-92; Phoenix Light/Deutsche Bank, 172 F. Supp. 3d at 715; Fixed Income

Shares:  Series M v. Citibank N.A., 130 F. Supp. 3d 842, 855 (S.D.N.Y. 2015); Royal

Park/HSBC, 109 F. Supp. 3d at 605; Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n,

291 F.R.D. 47, 70 (S.D.N.Y. 2013), abrogated on other grounds by Policemen's Annuity, 775

F.3d 154 (2d Cir. 2014).

   As to twenty-six of the trusts at issue here, however, Defendants argue that the

prevention doctrine does not apply.[59]  According to Defendants, "under a trio of recent

controlling decisions from the First Department, the prevention doctrine does not apply here."

(BOA Jan. 17, 2019 Ltr. (Dkt. No. 150) at 1 (citing BlackRock/U.S. Bank, 165 A.D.3d at 527 ;

Fixed Income, 157 A.D.3d at 542-43; Commerce Bank, 141 A.D.3d at 415-16; see also U.S.

Bank Br. (Dkt. No. 127) at 26-27; BOA Br. (Dkt. No. 133) at 32)

   While the First Department did not apply the prevention doctrine in the cases

Defendants cite, these rulings were premised on the absence of allegations that the RMBS

trustees had engaged in conduct that hindered the occurrence of Events of Default.  In these

actions, plaintiffs relied solely on the trustees' failure to provide a notice to cure.  See

BlackRock/U.S. Bank, 165 A.D.3d at 527 ("A defendant's failure to send a notice to cure to the

---

[59]  Defendants concede that the prevention doctrine applies to six of the Covered Trusts:  BAFC 2007-D, JPALT 2006-S2, JPALT 2006-S4, JPMMT 2005-A7, JPMMT 2007-A4, and MSM 2006-7.  (See U.S. Bank Br. (Dkt. No. 127) at 26-27 (citing Adler Decl., Ex. CC (Dkt. No. 128-32))

servicers is not 'active conduct' within the meaning of the prevention doctrine."); Fixed Income, 157 A.D.3d at 542 ("Defendant's failure to send a notice to cure to the servicers is not 'active conduct.'").[60]

      Here, by contrast, Plaintiffs have alleged that Defendants "actively sought to preclude or hinder the delivery of notices . . . that would have triggered . . . Events of Default" (Am. Cmplt. (Dkt. No. 116) ¶ 163), including by accepting and relying upon servicers' annual certifications that Defendants knew to be false (see id. (Dkt. No. 116) ¶¶ 132-34) and allowing foreclosures to proceed with "robo-signed . . . documentation," which constituted "breaches of the applicable prudent servicing standards." (Id. ¶ 124)  Allegations of such active conduct were not present in the First Department decisions cited by Defendants, and satisfy Plaintiffs' burden of pleading that the prevention doctrine applies.  See Pac. Life Ins. Co., 2018 WL 1382105, at *10 (finding prevention doctrine applicable where plaintiffs "alleged that Defendant actively delayed Events of Default by, inter alia, filing false trustee certifications . . . , accepting 'servicer certifications it knew to be false' . . . , and allowing foreclosures to proceed 'using forged and robo-signed documents'"); Pac. Life Ins. Co. v. Bank of N.Y. Mellon, 17 Civ. 1388 (KPF), 2018 WL 1871174, at *1 (S.D.N.Y. Apr. 17, 2018) (on motion for reconsideration, distinguishing Fixed Income on the grounds that "the Court explicitly found that Plaintiffs had alleged active frustration of other parties' ability to provide notice").[61]

---

[60]  The Commerce Bank court did not expressly consider the prevention doctrine.  The court instead concluded that "a notice of events that, with time, might ripen into Events of Default" did not constitute "a notice of an Event of Default."  Commerce Bank, 141 A.D.3d at 415.

[61]  Defendants criticize the analysis in the two Pacific Life cases cited above, arguing that "'accepting certifications' and 'allowing foreclosures' are merely '[p]assive acquiescence,' which is 'not an act of prevention or hindrance.'"  (U.S. Bank Reply (Dkt. No. 129) at 16 (quoting Amies v. Wesnofske, 255 N.Y. 156, 165 (1931))  But Defendants' acceptance and reliance on false servicer certifications, as well as their association with foreclosure proceedings – which were "commenced often in the Trustees' names" (Am. Cmplt. (Dkt. No. 116) ¶ 93) –

Defendants also argue that <u>In re Bankers Trust</u>, 450 F.3d 121 (2d Cir. 2006), precludes application of the prevention doctrine here. But <u>Bankers Trust</u> simply "stands for the proposition that the prevention doctrine applies where the party seeking to rely on the non-existence of a condition precedent (i) had a duty to bring about the condition precedent or (ii) actively frustrated its occurrence." <u>Pac. Life Ins. Co.</u>, 2018 WL 1382105, at *10. As explained above, Plaintiffs have adequately alleged Defendants' active frustration of the occurrence of Events of Default. Accordingly, application of the prevention doctrine here is consistent with <u>Bankers Trust</u>. <u>See id.</u> ("<u>Bankers Trust</u> requires that this Court apply the prevention doctrine."); <u>Phoenix Light/Deutsche Bank</u>, 172 F. Supp. 3d at 715 n.5 ("[E]ven without a contractual requirement to give notice, the prevention doctrine would apply to a party who insists on the performance of a condition precedent when the non-performance is caused by the party itself. . . . This approach is consistent with the decision of the Court of Appeals in [<u>Bankers Trust</u>]").[62]

_____

constitute more active conduct than the mere failure to provide notice cited in <u>BlackRock/U.S. Bank</u> and <u>Fixed Income</u>. In any event, at this stage, Plaintiffs need only "'raise a reasonable expectation that discovery will reveal evidence proving their claim.'" <u>Pac. Life Ins. Co.</u>, 2018 WL 1382105, at *9 (quoting <u>BlackRock/Wells Fargo</u>, 247 F. Supp. 3d at 390). Plaintiffs' allegations are sufficient to raise a reasonable expectation that discovery will reveal specific instances in which Defendants actively hindered delivery of the notices necessary to trigger Events of Default.

[62] Defendants also argue that (1) "Plaintiffs fail to allege causation[,] because investors themselves could have given the required notice"; and (2) <u>Bankers Trust</u> stands for the proposition that "causation is a separate element" of the prevention doctrine. (U.S. Bank Reply (Dkt. No. 129) at 17 (citing <u>Bankers Tr.</u>, 450 F.3d at 129); <u>see also</u> U.S. Bank Br. (Dkt. No. 127) at 27 (arguing that "for many of the trusts," certificate holders could have sent notice of Events of Default)) But <u>Bankers Trust</u> does not hold that – where another party could have performed the act that is a condition precedent – this circumstance somehow precludes application of the prevention doctrine. The <u>Bankers Trust</u> court found that – even if the trustee had been aware of the defaults that could have led it to transmit the required notices – it would not have issued the notices, because the trustee's "corporate trust committee had determined that it was not in the best interest of indenture security holders to receive notice of default." <u>Bankers Trust</u>, 450 F.3d at 129. Accordingly, <u>Bankers Trust</u> involved a causation issue not present here. Moreover, the

In sum, Defendants' motions to dismiss are denied to the extent they are premised on Plaintiffs' failure to allege that Defendants provided the notice required to trigger Events of Default.[63]

---

Bankers Trust causation issue raised by Defendants here has been expressly rejected.  See Okla. Police Pension & Ret. Sys., 291 F.R.D. at 70-71 (citing Bankers Trust; noting that "the defendant conceded [at oral argument] that it was not aware of any case in which the failure of the alleged wrongdoer to give notice was excused when the alleged wrongdoer's failures prevented at least one way of satisfying the precondition"), abrogated on other grounds by Policemen's Annuity, 775 F.3d 154 (2d Cir. 2014).

Bakal v. U.S. Bank Nat'l Ass'n, 747 F. App'x 32 (2d Cir. 2019) – cited by Defendants (Def. Jan. 17, 2019 Ltr. (Dkt. No. 150) at 1-3 (citing Bakal, 747 F. App'x at 35-36)) – is not to the contrary. In that case, the Second Circuit affirmed the dismissal of post-Event of Default claims in a case brought against RMBS trustees.  See Bakal, 747 F. Appp'x at 34, 38.  Defendants argue that the Second Circuit's decision necessarily precludes application of the prevention doctrine here. (Def. Jan. 17, 2019 Ltr. (Dkt. No. 150) at 2-3)  As another court in this District has explained in rejecting this same argument, however, "[i]n addition to the fact that the Bakal decision was made in a summary order and that the portion cited by [defendant] was not its holding, the Bakal panel did not mention the prevention doctrine nor engage with the [relevant] First Department cases."  NCUAB, 410 F. Supp. 3d at 685 n.13.  Accordingly, this Court does not read Bakal as rejecting application of the prevention doctrine to allegations of the sort pled in the Amended Complaint.

[63]  Because the Court concludes that the prevention doctrine applies to Plaintiffs' claims as to all of the Covered Trusts, it does not address Plaintiffs' alternative arguments regarding "automatic [Events of Default]" that arise even without the requisite notice from Defendants.  (See, e.g., Pltf. Opp. (Dkt. No. 138) at 21)

**b.**      **Events of Default Based on Servicer Certifications**

U.S. Bank argues that, as to seven trusts,[64] Plaintiffs have not adequately alleged

Events of Default based on "servicers' failure to provide 'a conforming certification.'"  (U.S.

Bank Br. (Dkt. No. 127) at 27 (quoting Am. Cmplt. (Dkt. No. 116) ¶ 133)

As to three of these trusts,[65] U.S. Bank argues that such certification of an Event

of Default could not have occurred because "the servicer has a specified period within which to

cure before the breach ripens into an [Event of Default]."  (Id.)  But Plaintiffs do not allege that

any Servicers ever cured a defective certification – nor does U.S. Bank contend that any servicer

ever cured a defective certification.  Accordingly, the existence of a cure period does not impact

Plaintiffs' claims.

As to JPMMT 2007-A4, U.S. Bank argues that "a certification-failure [Event of

Default] does not trigger any post-[Event of Default] duties."  (Id. (citing Adler Decl., Ex. EE

("JPMMT 2007-A4 PSA Excerpts") (Dkt. No. 128-34) § 6.14))  But U.S. Bank does not explain

what provision in the excerpted PSA it relies upon in making this argument.  Absent

specification of the language in the PSA that relieves the trustee of such post-Event of Default

duties, this Court cannot dismiss post-Event of Default claims as to JPMMT 2007-A4.[66]

With respect to all seven trusts, U.S. Bank argues that "Plaintiffs fail to plead that

a servicer breached the duty to furnish 'conforming certifications' in the first place," because

---

[64]  The seven trusts listed by U.S. Bank are:  BAFC 2007-D, CMLTI 2006-4, CMLTI 2007-AR5, JPMMT 2007-A4, MABS 2006-AB1, TBW 2006-6, and WFMBS 2006-AR1.  (Adler Decl., Ex. A (Dkt. No. 128-1) at 6-7)

[65]  U.S. Bank does not identify the three trusts, but lists the PSA for CMLTI 2006-4 as an example.  (See id. (citing Adler Decl., Ex. DD (Dkt. No. 128-33) §§ 7.01, 3.19))

[66]  To the extent that U.S. Bank is referring to the trustee's duties following an Event of Default under clause "(x)," U.S. Bank has not provided the Court with the contractual language necessary to address its argument.  While Section 6.14 of that PSA appears to relieve the trustee of certain post-Event of Default duties based on an "Event of Default set forth in clause (x)"

"[a] certification is 'conforming' where it states the servicer 'fulfilled all of its obligations under' the agreements," and "Plaintiffs do not allege servicer certifications lacked the mandated statement."  (Id. at 27-28)  In support of this argument, U.S. Bank cites House of Europe Funding I, Ltd. v. Wells Fargo Bank, N.A., No. 13 Civ. 519 (RJS), 2014 WL 1383703, at *4 n.5 (S.D.N.Y. Mar. 31, 2014), but that case is inapposite.

In House of Europe, the court held that the applicable indenture did not impose on the trustee "a contractual duty to double-check the truth of the matters stated in certifications"; the indenture only "impose[d] an obligation to check certifications for compliance with form requirements."  Id.  Here, by contrast, Plaintiffs allege that U.S. Bank was aware that the servicer certifications were false, because it knew that "the Servicers were not in fact meeting their obligations under the PSAs and the certifications failed to disclose numerous representations and warranty violations."  (Am. Cmplt. (Dkt. No. 116) ¶ 134)  U.S. Bank's interpretation of the PSAs is also implausible in that it would impose no certification responsibilities on a servicer other than to send a statement to the trustee reporting that it had "fulfilled all of its obligations" – without regard to whether the servicer had in fact fulfilled those obligations.  Absent citation to

_____

(JPMMT 2007-A4 PSA Excerpts (Dkt. No. 128-34) at 6), clause (x), in turn, defines an Event of Default to include "[a]ny failure by the Master Servicer to comply with the provisions of Article XI."  (Id. at 5)  U.S. Bank has not provided the Court with Article XI of the JPMMT 2007-A4 PSA.  Accordingly, the Court cannot determine whether that portion of the PSA refers to servicer certifications.  In any event, Section 6.14 imposes a notice duty on the trustee for any Event of Default where "a Responsible Officer of the Trustee . . . [has] actual knowledge" of the Event of Default.  (Id. at 6)  It is therefore incorrect to assert that a certification Event of Default cannot trigger any post-Event of Default trustee duties.

84

specific PSA language indicating that the parties intended as much, the Court cannot adopt the implausible interpretation of the PSAs advanced by U.S. Bank.

In sum, because U.S. Bank has not identified any specific language in the PSAs demonstrating that false servicer certifications cannot trigger Events of Default, U.S. Bank's motion to dismiss on this point is denied.

### c.      Events of Default Based on Master Servicer Breaches

As to ten trusts,[67] Defendants argue that the requisite breach for an Event of Default is a master servicer breach, and that Plaintiffs have not adequately pled such a breach, because they "do not explain how any particular master servicer failed to supervise a servicer or how that led to servicer breaches."  (U.S. Bank Br. (Dkt. No. 127) at 28) (emphasis in original)) As explained above, however, Plaintiffs are not required to allege servicer breaches on a loan-specific level at this stage; rather, Plaintiffs "satisfy their pleading burden where their allegations raise a reasonable expectation that discovery will reveal evidence proving their claim[s]." BlackRock/Wells Fargo, 247 F. Supp. 3d at 390, 394 (quotation marks, alterations, and citations omitted).

The Amended Complaint alleges that "Master Servicers have engaged in a variety of schemes to overcharge borrowers in default in violation of their contractual duties to prudently service the loans."  (Am. Cmplt. (Dkt. No. 116) ¶ 136)  According to the Amended Complaint, "Master Servicers have cheated borrowers and the Covered Trusts after default by, inter alia, charging improper and excessive fees . . . , failing to properly oversee third-party vendors and procuring insurance policies for properties that were already insured."  (Id. ¶ 137)  "The Trustees

---

[67]  The ten trusts cited by Defendants are:  BAFC 2007-D, GSR 2006-AR1, JPALT 2006-S2, JPALT 2006-S4, JPMMT 2005-A7, JPMMT 2007-A4, MABS 2006-AB1, MSM 2006-7, TBW 2006-6, and WFMBS 2006-AR1.  (Adler Decl., Ex. FF (Dkt. No. 128-35) at 3)

were aware of these servicing scams, which have been the subject of high profile government investigations, lawsuits and press coverage[,] . . . [but] failed to act prudently to protect Certificateholders. . . ."  (Id. ¶ 139)  These allegations suffice at this stage.  See Commerzbank I, 277 F. Supp. 3d at 492-93; Royal Park/BNYM, 2016 WL 899320, at *6.

### d.    Depositor Events of Default

Defendants next argue that, as to the ten WaMu Trusts, Plaintiffs have not adequately alleged that Events of Default occurred with respect to depositors' delivery of incomplete mortgage files, because "the PSAs impose only a delivery obligation . . . , not an obligation to ensure that the files are complete."  (U.S. Bank Br. (Dkt. No. 127) at 28 (citing Am. Cmplt. (Dkt. No. 116) ¶¶ 39, 125) (emphasis in original))  But the relevant portion of the WaMu PSAs – Section 2.05 – requires delivery of "Mortgage Files" (see Kane Decl., Ex. 6 ("WAMU 2006-AR8 PSA Excerpts") (Dkt. No. 139-6) at 31-32) – a term that is defined in the PSAs to require specific documents for each loan.  (See id. at 15-16)  Accordingly, a "Mortgage File" is necessarily a complete file, and Defendants point to no specific language in the PSAs suggesting otherwise.

Defendants also argue that, in any event, a depositor breach based on incomplete mortgage files "could not ripen into an [Event of Default], because the depositor had no duty to cure mortgage-file defects."  (U.S. Bank Br. (Dkt. No. 127) at 28)  But even if some party other than the depositor has the duty to cure defective mortgage files, this does not mean that the depositor's initial delivery failure cannot give rise to an Event of Default when that other party does not cure the defect.  Indeed, Plaintiffs allege that "Section 7.01(c)(i) of the WaMu PSA[s] provides that an Event of Default . . . occurs if the Depositor . . . fails to perform its obligations under the PSA and such breach is not remedied within 60 days['] notice of the breach."  (Am.

Cmplt. (Dkt. No. 116) ¶ 125)  Defendants do not address this allegation, and they cite no contradictory language from the PSAs.[68]  Accordingly, the Court concludes that Plaintiffs have adequately pled depositor Events of Default.

### e.    Indenture Events of Default

For the Indenture Trusts, two types of Events of Default may occur.  As with the other Covered Trusts, an Event of Default under the applicable servicing agreement ("Servicing Event of Default") occurs when (1) the master servicer breaches its obligations under the servicing agreement; (2) notice of that breach is provided to the master servicer; and (3) the master servicer does not cure the breach within a specified time period.  (See Adler Decl., Ex. D (Dkt. No. 128-4) at 4-5 (definition of "Master Servicer Events of Default" under the BSARM 2005-7 Sale and Servicing Agreement); id., Ex. K (Dkt. No. 128-11) at 4-6 (same, as to the CMLTI 2006-AR1 Servicing Agreement))  An Event of Default under the Indentures ("Indenture Event of Default") occurs when (1) the issuer breaches its obligations; (2) the issuer is provided with notice of such a breach; and (3) the issuer does not cure the breach within a specified time period.  (See Adler Decl., Ex. E (Dkt. No. 128-5) at 14-15 (definition of "Event of Default" under the BSARM 2005-7 Indenture); id., Ex. J (Dkt. No. 128-10) at 13 (same, as to the CMLTI 2006-AR1 Indenture))

U.S. Bank argues that "Plaintiffs' claims for breach of post-[Event of Default] prudent-person obligations fail as to the two [I]ndenture [T]rusts because Plaintiffs do not allege

---

[68]  Defendants also do not address Plaintiffs' argument that, under the WaMu PSAs, "the Depositor warrants repurchase of loans with defective or missing documentation."  (Pltf. Opp. (Dkt. No. 138) at 23 (citing WAMU 2006-AR8 PSA Excerpts (Dkt. No. 139-6) § 2.08)  This representation undermines Defendants' argument that depositors have no duty whatsoever with respect to defective mortgage files under the WaMu PSAs.

an Indenture [Event of Default], the only [Event of Default] that triggers the trustee's prudent-person duties under the Indentures."  (U.S. Bank Br. (Dkt. No. 127) at 28)

Plaintiffs contend that they have pled Indenture Events of Default.  According to Plaintiffs, "the [I]ndentures . . . define an [Event of Default] as the issuer's failure to cure a breached covenant within a specified period of time after notice by the trustee," and one such covenant is the issuer's duty "to preserve and defend the trust estate and rights of the certificateholders to the trust estate."  (Pltf. Opp. (Dkt. No. 138) at 24 (citing Adler Decl., Ex. E (Dkt. No. 128-5) at 4 ("Section 3.04" of the BSARM 2005-7 Indenture, entitled "Protection of Trust Estate")); see also Am. Cmplt. (Dkt. No. 116) ¶ 64 (alleging that issuers "have broad duties to protect the trust estate")  In the Amended Complaint, Plaintiffs allege that the issuers breached this duty by "fail[ing] to protect the trust assets by ensuring that the mortgages were properly transferred to the trusts."  (Am. Cmplt. (Dkt. No. 116) ¶ 143)

U.S. Bank contends that "the issuers have no such duty" to ensure that mortgages are properly transferred to the trusts.  (U.S. Bank Br. (Dkt. No. 127) at 29)  Therefore, the issuers' failure to do so cannot give rise to Events of Default under the Indentures.  (Id.)

As to the duties of issuers, the Indentures provide as follows:

The Issuer will from time to time prepare, execute and deliver all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments, and will take such other action necessary or advisable to:

(i)     maintain or preserve the lien and security interest (and the priority thereof) of this Indenture or carry out more effectively the purposes hereof;

(ii)    perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture;

(iii)   cause the Issuer or the Indenture Trustee to enforce any of the rights to the Mortgage Loans; or

> > (iv)   preserve and defend title to the Trust Estate and the rights of the
> > Indenture Trustee and the Noteholders in such Trust estate against
> > the claims of all persons and parties.

(Adler Decl., Ex. E (Dkt. No. 128-5) at 4 (Section 3.04 of the BSARM 2005-7 Indenture);

see also Am. Cmplt., Ex. C (Dkt. No. 116-3) at 117 (substantively identical provision in Section

CMLTI 2006-AR1 Indenture))  Accordingly – and contrary to U.S. Bank's argument – the

Indentures impose broad responsibilities on the issuers, including the duty to "take such . . .

action necessary or advisable to . . . cause the Issuer or the Indenture Trustee to enforce any of

the rights to the Mortgage Loans."  (Adler Decl., Ex. E (Dkt. No. 128-5) at 4)  Given this broad

language, Defendants have not demonstrated as a matter of law that the Indentures do not require

the issuers to "ensur[e] that the mortgages [are] properly transferred to the trusts."  (Am. Cmplt.

(Dkt. No. 116) ¶ 143)

> Because (1) Plaintiffs have plausibly alleged that the issuers breached covenants

under the Indentures by, inter alia, not properly transferring mortgages to the trusts; and (2) U.S.

Bank has not disputed that issuer breaches give rise to Indenture Events of Default, this Court

concludes that the Amended Complaint adequately alleges Indenture Events of Default.

### f.   BOA's Argument Regarding
### Document-Based Events of Default

> As to the WaMu Trusts, BOA argues that Plaintiffs have not pled Events of

Default stemming from missing mortgage file documents.  According to BOA, "[t]he WaMu

PSAs do not impose on the servicer an unqualified obligation to obtain cures, repurchases, or

substitutions."  (BOA Br. (Dkt. No. 133) at 33)  BOA further argues that, under the mortgage

loan purchase agreements, the cure period for certain mortgage file defects "can go on

perpetually with communications occurring exclusively between the seller and the servicer – not

the trustee."  (Id. at 34)  BOA also argues that – even if servicers were "not pursuing repurchases

on each and every loan with a missing document" – this would not mean that Events of Default had occurred, because (1) servicers' only duty with respect to missing documents was "to take 'appropriate steps' to address document exceptions," and; (2) Events of Default require that servicers "fail[] to 'perform [their duties] in any material respect.'"  (Id. (quoting Donohue Decl., Ex. 1 (Dkt. No. 134-1) §§ 2.07, 7.01(a)(ii)) (emphasis in BOA Br.))

BOA's arguments are not persuasive.  While it may be hypothetically possible under the WaMu mortgage loan purchase agreements for sellers to indefinitely extend the period in which they can cure document deficiencies, no party has suggested that this is what happened in the case of the Covered Trusts.  To the contrary, Plaintiffs allege that – upon discovering document deficiencies – the Servicers simply "robo-signed the documentation required to foreclose" rather than taking any prudent alternative steps.  (Am. Cmplt. (Dkt. No. 116) ¶ 124) Thus, even if it would have been permissible for the Servicers and sellers to extend cure periods, that is not what Plaintiffs have alleged actually occurred here.

As for BOA's argument that Servicers were only required to take "appropriate steps" to address document exceptions, this argument presents a fact issue that cannot be resolved on the pleadings.  Having said that, BOA has cited no language in the PSAs or the mortgage loan purchase agreements suggesting that the Servicers alleged conduct here – i.e., "fabricat[ing] the documents necessary to foreclose rather than caus[ing] the Sponsor, Depositor[,] or Originator to repurchase or substitute the affected loan" (id. ¶ 124) – was appropriate or materially compliant with the Servicers' obligations.

In sum, the Court concludes that Plaintiffs have adequately alleged document-based Events of Default under the WaMu PSAs.

## 2.     <u>Whether Plaintiffs Have Pled Defendants' Knowledge of Events of Default</u>

Defendants contend that, even if Plaintiffs have pled the existence of Events of Default, they have not adequately pled that Defendants had notice of those Events of Default. Defendants claim that, "[a]ny post-[Event of Default] obligations arise only when, depending on the PSA, a Responsible Officer or the trustee received written notice or had actual knowledge of the [Event of Default]," and "[t]he Amended Complaint comes nowhere near pleading these prerequisites."  (U.S. Bank Br. (Dkt. No. 127) at 29 (citing Adler Decl., Exs. GG-1, GG-2, GG-3 (Dkt. Nos. 128-36, 128-37, 128-38))  Defendants have ignored the well-pled allegations showing their actual knowledge of Events of Default, however.

Plaintiffs allege that Defendants were aware of Events of Default based on, <u>inter alia,</u> (1) Defendants' knowledge that servicers were engaged in "schemes to overcharge borrowers in default in violation of [the servicers'] contractual duties to prudently service the loans" (Am. Cmplt. (Dkt. No. 116) ¶ 136); (2) Defendants' awareness that servicers did not take adequate steps to address deficient mortgage files (<u>id.</u> ¶ 124); (3) Defendants' involvement in foreclosure proceedings, which revealed that servicers had forged documents (<u>id.</u> ¶¶ 121, 124, Ex. G); (4) a July 21, 2011 letter from the Association of Mortgage Investors to "JPMorgan and major RMBS trustees" setting forth "publicly available evidence demonstrating that . . . loan originators had systemically breached representations and warranties . . . , and that the parties servicing loans . . . had systemically breached their obligations under applicable servicing agreements" (<u>id.</u> ¶ 128); and (5) a December 15, 2011 notice from "a group of institutional investors" informing U.S. Bank of "numerous defaults by the Servicers, Sponsor[s] and

Originators."[69]  (Id. ¶ 129)  As other courts in this District have repeatedly held, such allegations

suffice to establish actual knowledge of Events of Default.[70]  See Commerzbank I, 277 F. Supp.

3d at 493 ("The Trustees' 'attempt to apply a heightened pleading standard to allegations

concerning actual knowledge is inappropriate at this stage.'" (quoting Royal Park/Mellon, 2016

WL 899320, at *6); see also Pac. Life Ins. Co., 2018 WL 1382105, at *9-10; Phoenix

Light/Deutsche Bank, 172 F. Supp. 3d at 715; Royal Park/HSBC, 109 F. Supp. 3d at 606.

Defendants argue, however, that these decisions ignore (or predate) the First

Department's decision in Commerce Bank, in which the court concludes that plaintiffs have not

sufficiently alleged the defendant trustee's knowledge of Events of Default.  Commerce Bank,

141 A.D.3d at 414-415.  But like other courts in this District that have rejected this same

argument, this Court concludes that the allegations in the Amended Complaint are "far more

robust" than in Commerce Bank.  Commerzbank I, 277 F. Supp. 3d at 493.

---

[69]  Because BOA was not the trustee when the 2011 notices were sent, its knowledge cannot be
inferred from these notices.  Setting aside the 2011 notices, however, Plaintiffs' remaining
allegations raise a plausible inference that BOA was actually aware of Events of Default.

Moreover, to the extent that Plaintiffs' claims are premised on Events of Default stemming from
issuer or depositor breaches, Plaintiffs have adequately alleged Defendants' knowledge of those
Events of Default based on, inter alia, Defendant's awareness that the issuers and depositors had
not delivered complete mortgage files.  (See, e.g., Am. Cmplt. (Dkt. No. 116) ¶ 119
("Defendants knew of numerous instances where they did not receive the original mortgage note
with all intervening endorsements that showed a complete chain of endorsement from the
Originator to the Sponsor or Depositor. . . ."); id. ¶ 125 (alleging that Defendants were aware of
depositor breaches based on receipt of "the final exception report[s]" for the WaMu Trusts))

[70]  Moreover, although the Amended Complaint does not specifically allege that one of
Defendants' "Responsible Officers" received written notice of an Event of Default, "the well-
pleaded allegations create a reasonable expectation that discovery will produce evidence of such
notice."  Pac. Life Ins. Co., 2018 WL 1382105, at *9.  At this stage, Plaintiffs are not required to
"prove that Responsible Officers at Defendant[s] had received written notice, . . . particularly
where – as here – the information may well be 'uniquely in the possession of [D]efendants.'"  Id.
at *10 (quoting Phoenix Light/Deutsche Bank, 172 F. Supp. 3d at 713).

In Commerce Bank, the First Department concluded that plaintiffs had not adequately pled that the trustee had received "written notice" of Events of Default, where the only notice cited by plaintiffs was a letter from a non-party informing the trustee of "events that, with time, might ripen into Events of Default." Commerce Bank, 141 A.D.3d at 415. The First Department further noted that an earlier settlement had "rendered [that] letter inoperative, i.e., as if never sent." Id.

Here, however, Plaintiffs do not rely merely on a theory of written notice. Plaintiffs also allege that Defendants had "actual knowledge" of Events of Default. (See, e.g., Am. Cmplt. (Dkt. No. 116) ¶¶ 134, 139) And Defendants do not dispute that actual knowledge of Events of Default can trigger post-Event of Default duties under the PSAs. (See U.S. Bank Br. (Dkt. No. 127) at 29 ("Any post-[Event of Default] obligations arise only when . . . a Responsible Officer or the trustee received written notice or had actual knowledge of an [Event of Default]." (citing Adler Decl., Ex. GG-1, GG-2, GG-3 (Dkt. No. 128-36, 138-37, 138-38))); BOA Br. (Dkt. No. 133) at 35 ("Plaintiffs also have not alleged that [BOA] had the requisite 'actual knowledge' or 'written notice' that an [Event of Default], with all [of] its elements, had occurred.")

Moreover, Plaintiffs' notice allegations are materially indistinguishable from those in other cases in this District that have survived motions to dismiss. Compare Commerzbank I, 277 F. Supp. 3d at 493 (citing a "letter[] sent by the Association of Mortgage Investors, detail[ing] a bevy of abuses in the mortgage servicing industry and warn[ing] the Trustees that they 'cannot be negligent in ascertaining the pertinent facts regarding the underlying collateral,'" as well as "letters[] sent by investors in trusts over which the Trustees served the same role [that] provided notice of relevant facts regarding numerous defaults by

93

servicers, sponsors, and originators"), with (Am. Cmplt. (Dkt. No. 116) ¶¶ 128-129); see also

Pac. Life Ins. Co., 2018 WL 1382105, at *9-10.[71]  In sum, Commerce Bank does not alter this

Court's conclusion that Plaintiffs have adequately alleged Defendants' knowledge of Events of

Default.

To the extent that Plaintiffs' breach of contract claims are premised on

Defendants' failure to perform post-Event of Default duties, Defendants' motions to dismiss are

denied.

### C.    Impact of No-Action Clauses

U.S. Bank argues that, as to six trusts,[72] all of Plaintiffs' breach of contract claims

"must be dismissed for failure to allege compliance with the PSAs' no-action clauses."  (U.S.

Bank Br. (Dkt. No. 127) at 31)  According to U.S. Bank, "[t]hese clauses bar Plaintiffs from

pursuing legal action relating to the agreement unless they provide written notice of an [Event of

Default] to a specified party, assemble support of a specified percentage of holders, demand that

a specified deal party initiate the suit, and offer indemnifications."  (Id.)

Cruden v. Bank of New York, 957 F.2d 961 (2d Cir. 1992) precludes application

of the no-action clauses here, however.  In Cruden, the Second Circuit held that the no-action

clause in that case did not bar suits by debenture holders against indenture trustees, "as it would

be absurd to require the debenture holders to ask the [t]rustee to sue itself."  Cruden, 957 F.2d at

968; see also Quadrant Structured Prods. Co. v. Vertin, 23 N.Y.3d 549, 566 (2014) ("There are

---

[71]  See also NCUAB, 410 F. Supp. 3d at 684 (noting that, in Commerce Bank, plaintiff's argument that defendant had knowledge of Events of Default was premised on a letter from a nonparty; "[h]ere, NCUA has pled more avenues through which Deutsche Bank likely received notice of EODs.")

[72]  The six trusts cited by U.S. Bank are:  ARMT 2005-10, BAFC 2007-D, CSFB 2004-8, GSR 2006-AR1, MABS 2006-AB1, and TBW 2006-6.  (Adler Decl., Ex. JJ (Dkt. No. 128-41) at 3)

claims which, by law, cannot be prohibited by a no-action clause, most notably claims against the trustee." (citing Cruden, 957 F.2d at 968)).

U.S. Bank argues, however, that the logic of Cruden does not apply to the six trusts at issue, because "for these six trusts the securities administrator or trust administrator is a demand party," as opposed to the trustee.  (U.S. Bank Br. (Dkt. No. 127) at 31)  But for all six of these trusts, the securities or trust administrator is also a master servicer.  (See Pltf. Opp. (Dkt. No. 138) at 28)[73]  And the Amended Complaint alleges that Events of Default occurred due to breaches by master servicers.  (See, e.g., Am. Cmplt. (Dkt. No. 116) ¶¶ 136-139, Ex. H)  Given these circumstances, this Court concludes that Cruden applies with equal force when the demand party is a master servicer alleged to have triggered Events of Default, because it would be equally futile for certificate holders to request that the master servicer "take legal action based on its own alleged breach of the PSA."  Bakal v. U.S. Bank Nat'l Ass'n, 15 Civ. 6976 (PKC), 2018 WL 1726053, at *7 (S.D.N.Y. Apr. 2, 2018).[74]

---

[73]  The parties have not provided the Court with definitions for the terms "Securities Administrator" and "Trust Administrator" as used in the applicable no-action clauses.  However, U.S. Bank has not disputed Plaintiffs' assertion that the Securities Administrator/Trust Administrator for these six trusts – Wells Fargo – is also "a master servicer for all 6 trusts, a servicer for at least ARMT 2005-10, CSFB 2004-8, and MABS 2006-AB1, a custodian for GSR 2006-AR1 and MABS 2006-AB1, and an originator for MABS 2006-AB1."  (Pltf. Opp. (Dkt. No. 138) at 28 n.98; see U.S. Bank Reply (Dkt. No. 129) at 19)

[74]  See also Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n, 439 F. Supp. 3d 275, 280 (S.D.N.Y. 2020) (adopting the reasoning of Bakal).

This Court acknowledges that Commerzbank I is to the contrary.  That court concludes that applying Cruden where the demand party is an entity other than the trustee threatens to "'swallow[] a no-action clause as a whole.'"  Commerzbank I, 277 F. Supp. 3d at 495 (quoting Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 187 (S.D.N.Y. 2011)).  This Court does not agree.  Under Bakal, the exception articulated in Cruden is still limited to those situations where certificate holders are required to ask the master servicer to initiate suit based on the master servicer's own misconduct – a plainly futile endeavor.

And while no-action clauses "are strictly construed" in New York, see Commerzbank I, 277 F. Supp. 3d at 496 (citing Cruden, 957 F.2d at 968), the issue here is not whether certificate holders

In sum, U.S. Bank's motion to dismiss is denied to the extent it is premised on the argument that the PSAs' no-action clauses bar Plaintiffs' claims.

### D.    <u>Plaintiffs' Standing as to Sold Certificates</u>

BOA contends that – because Plaintiffs "sold several of the WaMu certificates prior to initiating this action" – Plaintiffs have not sufficiently alleged that they have standing to bring their contract claims as to those certificates (the "Sold Certificates").  (BOA Br. (Dkt. No. 133) at 35-36)

Plaintiffs concede that, under New York law, they would not have standing as to Sold Certificates.  (Pltf. Opp. (Dkt. No. 140) at 23); <u>see</u> N.Y. Gen. Oblig. Law § 13-107(1) ("Unless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands of the transferrer. . . .").  Plaintiffs argue, however, that California law applies under New York's "center of gravity test" and that, under California law, "claims do not transfer with sale absent a manifest expression of intent to transfer them."  (Pltf. Opp. (Dkt. No. 140) at 23)

---

have fully complied with the requirements of a no-action clause, but whether strict compliance with a no-action clause would be futile.

In any event, the New York courts that have considered the issue have either expressly embraced <u>Bakal</u>'s reasoning or expressly rejected <u>Commerzbank I</u>.  <u>See</u> <u>Finkelstein v. U.S. Bank Nat'l Ass'n</u>, 75 Misc.3d 1202(A), 2022 WL 1311461, at *1-2 (N.Y. Sup. Ct. May 2, 2022); <u>IKB Int'l, S.A. v. LaSalle Bank N.A.</u>, 2021 N.Y. Slip Op. 30265(U) (Trial Order), 2021 WL 358318, at *4 & n.6 (N.Y. Sup. Ct. Jan. 27, 2021) (declining to follow <u>Commerzbank I</u>); <u>W. & S. Life Ins. Co. v. U.S. Bank Nat'l Ass'n</u>, 69 Misc.3d 1213(A), 2020 WL 6534496, at *3-4 (N.Y. Sup. Ct. Nov. 5, 2020) (citing <u>Bakal</u> with approval), <u>abrogated on other grounds</u>, 209 A.D.3d 6 (N.Y. 1st Dep't Aug. 9, 2022); <u>MLRN LLC v. U.S. Bank Nat'l Ass'n</u>, 2019 N.Y. Slip Op. 33379 (U) (Trial Order), 2019 WL 5963202, at *8 (N.Y. Sup. Ct. Nov. 13, 2019) (citing <u>Bakal</u> with approval), <u>aff'd</u> 190 A.D.3d 426 (Mem) (1st Dep't 2021).

Under New York choice of law principles,[75] "[f]or contract disputes, New York courts have adopted a 'center of gravity' or 'grouping of contacts' approach designed 'to establish which [s]tate has the most significant relationship to the transaction and the parties.'" Pac. Life Ins. Co., 2018 WL 1382105, at *16 (quoting Zurich Ins. Co. v. Shearson Lehman Hutton, Inc., 84 N.Y.2d 309, 317 (1994)). "That analysis requires the Court to consider (i) the places of contracting, negotiation, and performance; (ii) the location of the subject matter of the contract; and (iii) the domicile or place of business of contracting parties." Id.

The Amended Complaint, as supplemented by Plaintiffs' declaration in opposition to BOA's motion to dismiss, indicates that California law applies under New York's "center of gravity" test.

Plaintiffs' principal place of business is in Newport Beach, California. (Am. Cmplt. (Dkt. No. 116) ¶¶ 19-20; Fiek Decl. (Dkt. No. 142) ¶ 1) "Before the sales, [Plaintiffs'] investments in the Sold Certificates were managed by employees at [Plaintiffs'] office in Newport Beach, [California]." (Fiek Decl. (Dkt. No. 142) ¶ 2) Plaintiffs' employees who conducted the sales "were physically located in the Newport Beach Office." (Id. ¶ 3) The employees of the entities who bought the Sold Certificates "were also located in California." (Id. ¶ 4) Finally, the business records concerning the sales are located at Plaintiffs' Newport Beach office. (Id. ¶ 5) The Court concludes that California law governs whether Plaintiffs assigned

---

[75]  BOA does not dispute that New York choice of law principles apply to this issue. Moreover, no party has suggested that the choice of law rules of any other jurisdiction would mandate anything other than a "center of gravity" test. Accordingly, this Court will apply New York's choice of law principles. See Arakelian, 735 F. Supp. at 30 n.5; Melnick, 346 F. Supp. 2d 499, 506 n.39.

This Court further notes that – although the WaMu PSAs contain choice of law clauses, those clauses have "'no relevance to the question whether the contracts of sale . . . operated to assign certain rights of action.'" Pac. Life Ins. Co., 2018 WL 1382105, at *16 (quoting Semi-Tech Litig., LLC v. Bankers Tr. Co., 272 F. Supp. 2d 319, 330 (S.D.N.Y. 2003)).

their legal claims related to the Sold Certificates.  See Pac. Life Ins. Co., 2018 WL 1382105, at

*16 ("The contracting, negotiation, and performance of the sales all appear to have occurred in

California[,] . . . [t]he records of the relevant transactions are all located in California[,] [a]nd

there is no countervailing evidence that the center of gravity for these transactions was New

York.").[76]

"Under California law, absent a manifestation of intent, a seller does not transfer

legal claims to the buyer."  Id. (collecting cases).  Plaintiffs contend that their sale of certificates

"included no manifestation of intent to transfer claims, and [Plaintiffs] did not intend to transfer

[their] claims."  (Pltf. Opp. (Dkt. No. 140) at 23; see also Fiek Decl. (Dkt. No. 142) ¶ 6 ("I am

not aware of any [employee of Plaintiffs] ever expressing any intent to transfer legal claims in

connection with the Sold Certificates."))  BOA has not submitted any evidence to the contrary.

Accordingly, BOA's motion to dismiss is denied to the extent it is premised on

the argument that Plaintiffs lack standing to pursue breach of contract claims relating to the Sold

Certificates.

## V.      IMPLIED COVENANT CLAIMS

Defendants contend that the PSAs prohibit implied covenants, and that

accordingly Plaintiffs' implied covenant claims must fail.  (U.S. Bank Br. (Dkt. No. 127) at 34)

Plaintiffs do not disagree.  (See Pltf. Opp. (Dkt. No. 138) at 30 n.106 ("[Plaintiffs] will not try to

preserve a separate cause of action for breach of a covenant of good faith and fair dealing[.]")

---

[76]  BOA argues that certain of the buyers of the Sold Certificates have their principal place of
business in New York.  (See BOA Reply (Dkt. No. 136) at 21)  But under the center of gravity
test, that is only one aspect of one of the factors that this Court must consider.  BOA does not
dispute that Plaintiffs' principal place of business is in California, and the remaining elements of
the center of gravity test weigh in favor of applying California law.

Therefore, Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing are dismissed.

## VI.   TIA CLAIMS

The parties agree that the TIA only applies to the Indenture Trusts (BSARM 2005-7 and CMLTI 2006-AR1).  (See Pltf. Opp. (Dkt. No. 138) at 30; U.S. Bank Br. (Dkt. No. 127) at 32)  That is because "certificates issued by . . . PSA-governed . . . trusts are exempt from the TIA." Policemen's Annuity, 775 F.3d at 169.  Plaintiffs assert claims under TIA Sections 315(b), 315(c), and 316(b).

### A.   Claims Under TIA Sections 315(b) and 315(c)

Under Section 315(b) of the TIA, an indenture trustee must "give the indenture security holders . . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof." 15 U.S.C. § 77ooo(b).  Section 315(c) of the TIA requires the trustee to "exercise in case of default (as such term is defined in such indenture) such of the rights and powers vested in it by such indenture . . . as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." Id. § 77ooo(c).

U.S. Bank argues that Plaintiffs' TIA Section 315(b) and Section 315(c) claims fail, because "Plaintiffs do not plausibly allege issuer breaches[,] [a]nd alleged servicer breaches are insufficient, because they cannot ripen into Indenture EODs."  (U.S. Bank Br. (Dkt. No. 127) at 32 (emphasis in original))  As discussed above, however, Plaintiffs have plausibly alleged issuer breaches under the Indentures.  Accordingly, U.S. Bank's argument is not persuasive.  In any event, as to Plaintiffs' TIA Section 315(b) claims, the definition of "default" under Section 315(b) – unlike in Section 315(c) – is not strictly limited to Events of Default as

defined in the Indentures, and includes defaults by servicers.  See BlackRock/Mellon, 180 F.

Supp. 3d at 260; Royal Park/HSBC, 109 F. Supp. 3d at 612.

U.S. Bank also contends that "Plaintiffs do not adequately plead U.S. Bank's

actual knowledge or written notice . . . of issuer breaches that could ripen into [Events of

Default]."  (U.S. Bank Br. (Dkt. No. 127) at 32)  For the reasons discussed above, this Court has

concluded that Plaintiffs' allegations about U.S. Bank's knowledge are adequate at the pleading

stage.

U.S. Bank's motion to dismiss Plaintiffs' claims brought under TIA Sections

315(b) and 315(c) is denied.

### B.    Claims Under TIA Section 316(b)

TIA Section 316(b) states that

the right of any holder of any indenture security to receive payment of the
principal of and interest on such indenture security, on or after the respective due
dates expressed in such indenture security, or to institute suit for the enforcement
of any such payment on or after such respective dates, shall not be impaired or
affected without the consent or such holder. . . .

15 U.S.C. § 77ppp(b).

U.S. Bank argues that Plaintiffs' TIA Section 316(b) claims fail, because Section

316(b) protects certificate holders only from legal impairments to their ability to receive

payment, and Plaintiffs have not alleged any such legal impairments.  (U.S. Bank Br. (Dkt. No.

127) at 32)

In Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp., the Second Circuit

held that impairing a plaintiff's "practical ability to receive payment" does not violate TIA

Section 316(b).  Marblegate Asset, 846 F.3d 1, 5 (2d Cir. 2017).  Accordingly, in order to plead a

violation of TIA Section 316(b), a party must allege that an indenture was amended such that the

"[i]ndenture's core payment terms" are changed, or so as to "prevent any dissenting bondholders from initiating suit to collect payments due."  Id. at 17.

Here, the Amended Complaint merely alleges that Defendants violated TIA Section 316(b) by "impair[ing] the ability of the . . . Certificateholders[] to receive payment in connection with defective mortgage loans."  (Am. Cmplt. (Dkt. No. 116) ¶ 191)  Plaintiffs "acknowledge that a number of courts have rejected the argument that a trustee breaches [Section] 316(b) of the TIA by impairing investors' practical right to receive payments."  (Pltf. Opp. (Dkt. No. 138) at 31 n.108)

Because the Amended Complaint does not allege a legal impairment to Plaintiffs' ability to receive payment in connection with the Indenture Trusts, Plaintiffs' allegations are not sufficient to state a violation of TIA Section 316(b).  See, e.g., Phoenix Light/Deutsche Bank, 172 F. Supp. 3d at 722 (dismissing TIA Section 316(b) claim where the complaint "[did] not allege any involuntary restructuring conduct by [the RMBS trustee]"); Phoenix Light/Mellon, 2015 WL 5710645, at *10 ("Although the Court is not unsympathetic to Plaintiffs' argument that [the RMBS trustee's] behavior hampered certificateholders' ability to receive payments . . . , the text of the statute is clear – Section 316(b) does not provide Plaintiffs a cause of action in this case.") (emphasis in original).  Accordingly, Plaintiffs' TIA Section 316(b) claims are dismissed.

## VII.   STREIT ACT CLAIMS

Plaintiffs allege that Defendants violated Section 126(1) of New York's Streit Act by failing to

a. take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;

b. investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once they discovered breaches of representations and warranties in the Covered Trusts and

the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

c. make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

d. provide notice of, and take steps to remedy, the Master Servicers' and Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; . . .

e. render accurate reports under Regulation AB;

f. enforce the repurchase obligations of the Sponsors and/or Originators; and

g. protect the interest of the beneficiaries of the Covered Trusts.

(Am. Cmplt. ¶ 223)

Section 126(1) of the Streit Act provides:

No trustee shall hereafter accept a trust under any trust indenture or mortgage within the contemplation of this article or act as trustee thereunder unless the instrument creating the trust shall contain the following provisions, among others, which confer the following powers and impose the following duties upon the trustees:

1. In the case of an event of default (as such term is defined in such instrument), to exercise such of the rights and powers vested in the trustee by such instrument, and to use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

N.Y. Real Prop. Law § 126(1).

Defendants contend that Plaintiffs' Streit Act claims must be dismissed "because the Streit Act requires only that trust instruments include certain provisions, and Plaintiffs make no effort to identify the provisions the PSAs allegedly lack." (U.S. Bank. Br. (Dkt. No. 127) at 9)

Plaintiffs do not dispute Defendants' assertion, nor have they cited contrary law. (See Pltf. Opp. (Dkt. No. 138) at 31-32) Accordingly, Plaintiffs' claims under Section 126(1) of the Streit Act are dismissed. See, e.g., Pac. Life Ins. Co., 2018 WL 1382105, at *15 ("Plaintiffs here have failed to plead a claim under Section 126(1) of the Streit Act because they have not

alleged that Defendants accepted a deficient trust instrument.  Section 126(1) imposes no further

duty."); Commerzbank AG v. HSBC Bank USA, 15 Civ. 10032 (LGS), 2016 WL 3211978, at *2

(S.D.N.Y. June 8, 2016) ("The plain language of Section 126 is clear; it requires only that trust

instruments include certain provisions, and does not itself impose any affirmative duties on

trustees. . . . Because the Complaint does not allege that HSBC accepted a trust instrument that

lacked or disclaimed any required provisions, the Complaint does not state a claim under Section

126."); BlackRock/Wells Fargo, 247 F. Supp. 3d at 404 ("Plaintiffs fail to plead a claim under

Section 126(1) of the Streit Act because Plaintiffs have not pleaded that Defendant accepted a

deficient trust instrument and Section 126(1) imposes no further duty."); Phoenix Light SF Ltd.

v. U.S. Bank Nat'l Ass'n, 14 Civ. 10116 (KBF) 2016 WL 1169515, at *10-11 (dismissing Streit

Act claim because "Plaintiffs do not contend that defendants accepted a trust whose trust

instrument lacked any required provision"); Royal Park/Mellon, 2016 WL 899320, at *11

("[W]hile [S]ection 126 outlines duties and obligations that a trustee must undertake, it does not

impose those duties; instead, it mandates that those terms be included in the indenture.  Because

[Plaintiff] does not allege that such provisions were missing from the indentures or that the

provisions did not meet the requirements of [S]ection 126, the Court finds that [Plaintiff] has

failed to state a claim under [S]ection 126 of the Streit Act."); Phoenix Light/Mellon, 2015 WL

5710645, at *11 ("The [First Amended Complaint] does not, however, allege that [Defendant]

accepted a deficient indenture; accordingly, it does not state a claim under Section 126.").

## VIII.   TORT CLAIMS

Defendants have moved to dismiss Plaintiffs' claims for negligence, gross

negligence, negligent misrepresentation, and breach of fiduciary duty under the economic loss

doctrine.  (U.S. Bank Br. (Dkt. No. 127) at 33-34; BOA Br. (Dkt. No. 133) at 37-38)

A.      **Non-WaMu Trusts**

As to all of the Covered Trusts except for the WaMu Trusts, the parties agree that New York law governs Plaintiffs' tort claims.  (See U.S. Bank Br. (Dkt. No. 127) at 10-11 (contending that all Covered Trusts are governed by New York law except for the WaMu Trusts); Pltf. Opp. (Dkt. No. 138) at 33 (citing solely New York law in opposition to U.S. Bank's arguments regarding the economic loss doctrine); BOA Br. (Dkt. No. 133) at 37-38 (raising arguments under Delaware law only as to the WaMu Trusts); Pltf. Opp. (Dkt. No. 140) at 24 (arguing that "New York law governs" all of Plaintiffs' tort claims against BOA))

Under New York's economic loss doctrine, "[a] plaintiff cannot seek damages by bringing a tort claim when the injury alleged is primarily the result of economic injury for which a breach of contract claim is available."  Phoenix Light/Deutsche Bank, 172 F. Supp. 3d at 718-719 (citing BNP Paribas Mortg. Corp. v. Bank of Am., N.A., 949 F. Supp. 2d 486, 505 (S.D.N.Y. 2013)).  However, "the rule allows such recovery in the limited class of cases involving liability for the violation of a professional duty."  Hydro Inv'rs, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 18 (2d Cir. 2000).

"Courts in this District have split with regard to the application of the economic-loss doctrine to tort claims brought against an RMBS trustee."  BlackRock/Wells Fargo, 247 F. Supp. 3d at 399 (collecting cases).  "Dispositive in each case has been the nature of the plaintiff's claims:  Does plaintiff allege damages that flow from the violation of a professional duty, or merely from the violation of the governing agreements?"  Id.

While the Amended Complaint asserts multiple theories of tort liability, in opposing Defendants' motions to dismiss, Plaintiffs abandon all of those theories except for their claims that Defendants breached their "extra-contractual duties of due care and avoiding

conflicts of interest."  (Pltf. Opp. (Dkt. No. 140) at 23; see also Pltf. Opp. (Dkt. No. 138) at 33

("The Complaint plausibly alleges that [U.S. Bank] breached extra-contractual duties of loyalty

and due care."))  Accordingly, Plaintiffs' tort claims are dismissed to the extent that they are not

premised on Defendants' extra-contractual duties of due care and avoiding conflicts of interest.

    As to these two purported extra-contractual duties, Plaintiffs allege that

Defendants (1) "perform[ed] ministerial acts . . . in a grossly inadequate and negligent manner";

and (2) "failed to avoid conflicts of interest."  (Am. Cmplt. (Dkt. No. 116) ¶ 208)

    New York law imposes on all indenture trustees a "duty to perform its ministerial

functions with due care."  AG Cap. Funding Partners, L.P. v. State St. Bank & Tr. Co., 11

N.Y.3d 146, 157 (2008).  This duty exists separate and apart from the trustees' obligations under

the governing trust agreements.  See id.  New York law also imposes on indenture trustees a duty

"to avoid conflicts of interest," irrespective of "the express terms of indenture."  Id.

Accordingly, Plaintiffs' tort claims are not barred by the economic loss doctrine to the extent

they are premised on either of these extra-contractual duties.  See BlackRock/Wells Fargo, 247

F. Supp. 3d at 396-97 (denying motion to dismiss tort claims premised on ministerial acts and

conflicts of interest); Phoenix Light/Deutsche Bank, 172 F. Supp. 3d at 718 & n.7 (same).

    Therefore, with respect to all trusts except for the WaMu Trusts, Defendants'

motions to dismiss Plaintiffs' tort claims are denied to the extent those tort claims are premised

on Defendants' negligent performance of ministerial acts and Defendants' conflicts of interest.[77]

---

[77]  As in other RMBS cases in this District, Plaintiffs "conflate the duty to perform ministerial
acts with due care with their allegations that [the trustees] negligently performed or failed to
perform certain duties under the [PSAs]."  Phoenix Light/Deutsche Bank, 172 F. Supp. 3d at 718
n.7; (see, e.g., Am. Cmplt. (Dkt. No. 116) ¶ 84 (alleging that Defendants were negligent in
"failing to perform ministerial acts they were required to perform"; listing Defendants' purported
duties under the PSAs as examples of "ministerial acts"))

## B.   <u>WaMu Trusts</u>

The parties dispute which law governs Plaintiffs' tort claims with respect to the WaMu Trusts.  Defendants argue that Delaware governs, because of the choice of law clauses in the WaMu PSAs.  (BOA Br. (Dkt. No. 133) at 37)[78]  Plaintiffs argues that New York law governs, because "New York law is clear that choice of law provisions do not apply to tort claims unless tort claims are expressly referenced."[79]  (Pltf. Opp. (Dkt. No. 140) at 24)

As discussed above, because this case was transferred from the Southern District of Ohio, and because Defendants were both subject to personal jurisdiction in that court, Ohio law applies in interpreting the choice of law provisions in the WaMu PSAs.  <u>See</u> <u>Fin. One Pub.</u> <u>Co.</u>, 414 F.3d at 333.

Those choice of law provisions state:

> This Agreement shall be construed in accordance with the laws of the State of Delaware without giving effect to its conflict of laws provisions and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws without giving effect to the conflict of laws provisions.

---

Based on the Amended Complaint, it is not clear what ministerial acts Defendants performed apart from their express contractual duties.  <u>See</u> <u>Phoenix Light/Deutsche Bank</u>, 172 F. Supp. 3d at 718 n.8 (stating that plaintiffs' "form of pleading is not ideal and leaves to further motion practice a realistic determination of the scope of the tort claims in this case").  Plaintiffs' tort claims premised on ministerial acts survive Defendants' motions to dismiss only to the extent that they are not based on Defendants' allegedly negligent performance of their contractual obligations.

[78]  Although U.S. Bank does not expressly cite the WaMu PSAs' choice of law clauses, it contends that the WaMu Trusts are governed by Delaware law, and cites Delaware law in discussing the economic loss doctrine.  (<u>See</u> U.S. Bank Br. (Dkt. No. 127) at 11, 33)

[79]  Plaintiffs – who argue for the application of Ohio choice of law rules at other points in their brief (<u>see</u> Pltf. Opp. (Dkt. No. 140) at 26 (arguing that "[t]he law of the transferor court, Ohio, governs choice of law")) – do not explain why New York law governs the construction of the choice of law provisions at issue here.

(WaMu PSA Excerpts (Dkt. No. 134-2) at 31-32)  BOA argues that, under Ohio choice of

law rules, this provision extends to both Plaintiffs' contract claims and their tort claims.

(BOA Br. (Dkt. No. 133) at 37) In support of this argument, BOA cites Girgis v.

Countrywide Home Loans, Inc., 733 F. Supp. 2d 835 (N.D. Ohio 2010).  Girgis is of no

help to BOA.

   In Girgis, the choice of law provision stated that "[a]ll rights and

obligations contained in [the parties' agreement] are subject to any requirements and

limitations of applicable law."  Girgis, 733 F. Supp. 2d at 850.  The Northern District of

Ohio court, applying Ohio choice of law rules,[80] held that this language was broad

enough to cover tort claims that were "closely, and not simply tangentially, related to the

performance of the mortgage agreements."  Id. at 851.  As to plaintiff's remaining tort

claims – claims that were "not as directly derived from the contract itself" – the court

---

[80]  Although the Girgis court claimed to be applying "Ohio choice of law rules," it cites no Ohio law in its analysis of the choice of law clause at issue.  Instead, the court cites Sixth Circuit case law and another Ohio federal district court decision that relies on those same Sixth Circuit cases. The difficulty with that approach is that the Sixth Circuit cases on which Girgis relies are not interpreting choice of law clauses where the forum state is Ohio.  See Girgis, 733 F. Supp. 2d at 851 (citing Banek Inc. v. Yogurt Ventures U.S.A., Inc., 6 F.3d 357, 360 (6th Cir. 1993) (interpreting choice of law clause under "Michigan choice of law rules"); Moses v. Business Card Exp., 929 F.2d 1131, 1139 (6th Cir. 1991) (interpreting choice of law clause under "[b]oth Alabama and Michigan conflict of law rules")).  BOA and Plaintiffs have not argued that Ohio courts would interpret choice of law clauses in a materially different manner than the Girgis court, however, and this Court is not aware of Ohio case law that is inconsistent with the analysis in Girgis.

In support of their argument that the choice of law clause in the WaMu PSAs does not encompass their tort claims, Plaintiffs cite Bentley v. Equity Tr., No. 14CA10630, 2015 WL 7254796 (Ohio Ct. App., 9th Dist. Nov. 16, 2015).  (Pltf. Opp. (Dkt. No. 140) at 24 n.49)  But the choice of law clause in that case is more narrow than the provision found in the WaMu PSAs, and does not reference the "rights" and "obligations" of the parties.  See Bentley, 2015 WL 7254796, at *5 ("This Agreement . . . shall be governed by and construed under the applicable laws of the State of Ohio.").  Accordingly, Bentley is inapplicable here.

noted that "it [was] not as clear that the choice of law provision applie[d] to [those] claims."  Id. at 852.

        Here – as discussed above – the only tort claims that Plaintiffs continue to assert are based on extra-contractual duties.  As such, their tort claims are "not . . . directly derived from" the WaMu PSAs.  Id.  Accordingly, consistent with the analysis in Girgis, the Court concludes that the choice of law provisions in the WaMu PSAs do not encompass Plaintiffs' remaining tort claims.

        BOA does not dispute Plaintiffs' assertion that, if Delaware law does not govern Plaintiffs' tort claims, New York law applies.  (See Pltf. Opp. (Dkt. No. 140) at 24; BOA Reply (Dkt. No. 136) at 20-21)  This Court will therefore apply New York law to Plaintiffs' tort claims with respect to the WaMu Trusts.  See Arakelian, 735 F. Supp. 2d at 30 n.5 ("Inasmuch as [plaintiff] relies on New York law, and [defendant] does not object to the applicability of New York law, the Court is entitled [to] apply New York law. . . .").  For the reasons explained above, Plaintiffs' tort claims related to the WaMu Trusts will not be dismissed to the extent those claims are based on Defendants' negligent performance of ministerial acts and Defendants' conflicts of interest.

## <u>CONCLUSION</u>

For the reasons stated above,

(1)     Plaintiffs' breach of contract claims against U.S. Bank with respect to JPALT 2006-S2 are dismissed as untimely;

(2)     all of Plaintiffs' claims against BOA with respect to the Morgan Stanley Trust are dismissed as untimely;

(3)     all of Plaintiffs' claims against BOA with respect to WMALT 2007-4 are dismissed as untimely;

(4)     Plaintiffs' breach of contract claims against U.S. Bank are dismissed to the extent they are based on an alleged failure to provide notice of representation and warranty breaches related to JPALT 2006-S2, JPALT 2006-S4, and JPMMT 2007-A4;

(5)     Plaintiffs' breach of contract claims against both Defendants are dismissed to the extent they are based on Defendants' failure to enforce repurchase rights prior to an Event of Default for the WaMu Trusts;

(6)     Plaintiffs' breach of contract claims against both Defendants are dismissed to the extent that they are based on Defendants' failure to enforce repurchase rights prior to an Event of Default for the nine trusts identified in Dkt. No. 128-18;

(7)     Plaintiffs' breach of contract claims against both Defendants are dismissed to the extent they are based on a duty to take physical possession of mortgage files;

(8)     Plaintiffs' breach of contract claims against U.S. Bank are dismissed to the extent they are based on U.S. Bank's failure to review mortgage files and prepare exception reports related to the fifteen trusts identified in Dkt. Nos. 128-20 and 128-21;

(9)     Plaintiffs' breach of contract claims against both Defendants are dismissed to the extent they are based on a duty to enforce repurchase rights for loans with defective documentation held in the twenty-one trusts identified in Dkt. No. 128-23;

(10)    Plaintiffs' breach of contract claims against both Defendants are dismissed to the extent they are based on Defendants' failure to provide notice of pre-Event of Default servicer and master servicer breaches related to the twenty-two trusts listed in Dkt. No. 128-26;

(11)    Plaintiffs' breach of contract claims against both Defendants are dismissed to the extent they are based on alleged violations of Regulation AB – except for those claims related to BAFC 2007-D, ARMT 2005-10, CSFB 2004-8, and MSM 2006-7 that are not premised on the preparation of remittance reports;

(12)   Plaintiffs' claims against both Defendants for breach of the implied covenant of good faith and fair dealing are dismissed;

(13)   Plaintiffs' claims against both Defendants brought under TIA Section 316(b) are dismissed;

(14)   Plaintiffs' claims against both Defendants brought under Section 126(1) of the Streit Act are dismissed;

(15)   Plaintiffs' tort claims against both Defendants are dismissed to the extent that they are not premised on Defendants' extra-contractual duties of performing ministerial acts with due care and avoiding conflicts of interest.

In all other respects, Defendants' motions to dismiss are denied.

Dated:  New York, New York
        October 19, 2022

                                    SO ORDERED.

                                    Paul G. Gardephe
                                    United States District Judge