**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | x | |
| PACIFIC LIFE INSURANCE COMPANY and PACIFIC LIFE & ANNUITY COMPANY, | : : : : | Index No. 16-cv-00555-PGG |
| Plaintiffs, | : : | |
| -against- | : : | **<u>SECOND AMENDED COMPLAINT</u>** |
| U.S. BANK NATIONAL ASSOCIATION, | : : | |
| Defendant. | : : | **DEMAND FOR JURY TRIAL** |
| | : : | |
| | x | |

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...........................................................................................................1

NATURE OF ACTION ...................................................................................................................2

PARTIES ....................................................................................................................................7

JURISDICTION AND VENUE ..........................................................................................................8

FACTUAL ALLEGATIONS ..............................................................................................................9

I.      THE SECURITIZATION PROCESS........................................................................................9

II.     U.S. BANK'S DUTIES AND OBLIGATIONS..........................................................................11

        A.      Duties with Respect to Taking Physical Possession of Complete
                Mortgage Files and Enforcing Related Repurchase Obligations............................13

        B.      U.S. Bank Had a Duty to Provide Notice of Defaults and
                Enforce Repurchase Obligations Triggered by Such Notice .................................20

        C.      U.S. Bank Had a Duty to Act Prudently
                Upon the Occurrence of an Event of Default.........................................................23

        D.      U.S. Bank Had a Duty to Provide Notice of Events of Default.............................26

        E.      U.S. Bank Had a Duty to Provide Accurate
                Remittance Reports and Certifications under Regulation AB ...............................27

        F.      U.S. Bank Had a Duty to Address the Master Servicers'
                and Servicers' Failure to Meet Prudent Servicing Standards ...............................28

        G.      U.S. Bank Is Liable for Negligence in Performing Its Duties ...............................30

III.    U.S. BANK BREACHED ITS CONTRACTUAL,
        FIDUCIARY AND STATUTORY DUTIES .................................................................................32

        A.      U.S. Bank Was Aware of but Failed to Provide Notice of Sponsors' and
                Originators' Pervasive Representation and Warranty Breaches ............................32

                1.      The Identity of the Sponsors and Originators that Made
                        Representations and Warranties Regarding the Quality
                        of the Mortgage Loans Underlying the Covered Trusts .........................32

2. The Nature of the Sponsors' and Originators' Representations and Warranties ...................................................................................... 36

3. U.S. Bank's Discovery of Breaches of Representations and Warranties, but Failure to Provide Notice or Cause Repurchases with Respect to Breaches of Representations and Warranties and Mortgage File Exceptions ................................................................................................38

B. U.S. Bank Failed to Act Prudently Upon the Occurrence of Events of Default....48

1. Events of Default Relating to Document Delivery Failures in the Covered Trusts .....................................................49

2. U.S. Bank Received Written Notice of Representation and Warranty Violations Which Ripened into Events of Default..............56

3. Events of Default Concerning False Servicer Certifications .....................57

4. Events of Default Concerning the Master Servicers' and Servicers' Imprudent Servicing that Looted the Covered Trusts' Assets ...................59

5. Events of Defaults under the Indentures ...................................................60

C. U.S. Bank Provided False Regulation AB Certifications and Remittance Reports ...........................................................................................62

D. U.S. Bank Violated the Streit Act .........................................................................63

IV. U.S. BANK BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ....................................................................68

V. U.S. BANK FAILED TO PROTECT CERTIFICATEHOLDERS BECAUSE IT SUFFERED FROM CONFLICTS OF INTEREST  ...............................69

VI. U.S. BANK'S CONDUCT INJURED PLAINTIFFS ......................................................73

CAUSES OF ACTION ..............................................................................................................75

FIRST CAUSE OF ACTION (Violations of the TIA) ...............................................................75

SECOND CAUSE OF ACTION (Breach of Contract) ..............................................................77

THIRD CAUSE OF ACTION (Breach of Fiduciary Duty) ........................................................78

FOURTH CAUSE OF ACTION (Negligence and Gross Negligence) ........................................79

iii

FIFTH CAUSE OF ACTION (Negligent Misrepresentations) ......................................................79

SIXTH CAUSE OF ACTION (Violation of the Streit Act) ..........................................................81

SEVENTH CAUSE OF ACTION (Breach of Covenant of Good Faith) ......................................83

PRAYER FOR RELIEF ..............................................................................................................83

Pacific Life Insurance Company and Pacific Life & Annuity Company (collectively "PacLife" and "Plaintiffs") as purchasers of residential mortgage-backed securities ("RMBS") issued by certain Covered Trusts (defined below) by and through their attorneys, bring this action against Defendant U.S. Bank National Association ("U.S. Bank," "Defendant" or "Trustee"), and allege as follows:

## PRELIMINARY STATEMENT

1. This is an action about a Trustee who had duties to sound the alarm when it discovered problems affecting its RMBS trusts, enforce remedies to address those problems, and act prudently on behalf of Certificateholders when the trusts defaulted, but who chose to ignore widespread breaches and now disclaims any obligations to have acted for the benefit of the trust beneficiaries, the Certificateholders. As the Second Circuit recently observed, "[t]he RMBS industry in the lead up to the financial crisis was a textbook example of a small set of market participants racing to the bottom to set the lowest possible standards for themselves." *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 134 (2d Cir. 2017). U.S. Bank was part of that race to the bottom, and persistently sought to minimize its obligations in the documents governing the trusts for which it was Trustee.

2. But there is a limit to how low U.S. Bank can set the bar. The contractual protections in the governing documents, expressly for the benefit of Certificateholders, should be strictly construed against Defendant.[1] Common law protections against fraud and self-dealing should be strictly applied against Defendant. And federal and state statutes enacted to prevent

---

[1] Some of these contractual duties concern disclosure items under the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, and Regulation AB thereunder, 17 C.F.R. § 229.1100 *et seq.* All of these acts sought to increase reporting accountability, investment transparency, and investor understanding.

recurrence of the widespread trustee misconduct that contributed to the Great Depression, such as the Trust Indenture Act of 1939, codified at 15 U.S.C. §§ 77aaa-77bbbb ("TIA"),[2] and the Streit Act, N.Y. McKinney's Real Property Law §§ 124 *et seq.* (the "Streit Act"),[3] require inclusion of specific trust provisions to ensure the protection of trust beneficiaries. These statutory duties, like the reasonable-care contractual duties that survived Defendant's selfish purge, should also be strictly applied against Defendant.

3.      As the Trustee, U.S. Bank is not entitled to downwardly define its contractual, tort, and statutory duties to the point of meaninglessness. As the Second Circuit wisely admonished, "[t]he reasonable care standard will not countenance an industry-wide 'race to the bottom' to set the least demanding standard to assess [its] conduct," particularly where the industry is comprised of only a few interrelated participants who look out for each other's interests to the detriment of their ostensible beneficiaries and the public good. *Fed. Hous. Fin. Agency*, 873 F.3d at 132.

**NATURE OF ACTION**

4.      This action arises out of U.S. Bank's role as trustee for 32 securitization trusts (the "Covered Trusts"), identified in Exhibit A, and asserts claims against U.S. Bank for breaches of its contractual and fiduciary duties, and its duties under the TIA, 15 U.S.C.

---

[2] The Trust Indenture Act was motivated by a recognition that "the trustee should not be allowed, through indenture provisions never seen by the beneficiary, and which would not be understood even if they were seen, to whittle away at the number of his express duties until they are practically non-existent, and to surround itself with exculpatory clauses which leave it harmless, despite inactivity or negligence." Securities and Exchange Commission Report on the Study and Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees, Part VI, Trustees Under Indentures (June 18, 1936) at 5.

[3] The Streit Act was motivated to prohibit trust documents that "relieved the trustee from any duty or obligation to protect the bondholder's interest or preserve the property," N.Y. Times, Feb. 10, 1936, at 25, and to prevent trustees from arguing, as many did during the Streit Committee investigation, that the trustee "was relieved from practically every duty by an exculpatory clause" and could therefore "sit down and do nothing." 1936 Report No. 66 of the New York State Joint Legis. Committee, at 19.

2

§ 77aaa, *et seq.*, and the Streit Act, N.Y. Real Property Law § 124, *et seq.*

5.      The Covered Trusts were created to facilitate RMBS transactions introduced to investors from 2004 to 2007.  Ten of the RMBS transactions were sponsored by Washington Mutual Bank and Washington Mutual Mortgage Securities Corp. (collectively, "WaMu" and the "WaMu Trusts"), eight were sponsored by CitiMortgage, Inc., Citigroup Global Markets Realty Corp. and CSE Mortgage LLC ("Citibank" and the "Citibank Trusts"), five were sponsored by J.P. Morgan Acquisition Corp. and Chase Home Finance LLC ("JPMorgan" and the "JPMorgan Trusts"), two were sponsored by DLJ Mortgage Capital, Inc. ("Credit Suisse" and the "Credit Suisse Trusts"), one was sponsored by Bank of America, N.A. ("BANA" and the "BOA Trust"), one was sponsored by EMC Mortgage Corp. ("Bear" and the "Bear Trust"), one was sponsored by Goldman Sachs Mortgage Co. ("Goldman" and the "Goldman Trust"), one was sponsored by Morgan Stanley Mortgage Capital, Inc. ("Morgan Stanley" and the "Morgan Stanley Trust"), one was sponsored by UBS Real Estate Securities, Inc. ("UBS" and the "UBS Trust"), one was sponsored by Taylor, Bean & Whitaker Mortgage Corp. ("TBW" and the "TBW Trust"), and one was sponsored by Wells Fargo Bank, N.A.  ("Wells Fargo" and the "Wells Fargo Trust"). WAMU, Citibank, JPMorgan, Credit Suisse, BANA, Bear, Goldman, Morgan Stanley, UBS, TBW and Wells Fargo are referred to collectively as the "Sponsors."

6.      Plaintiffs purchased RMBS certificates with an original face value in excess of $900 million issued by the Covered Trusts identified in Exhibit B (the "Certificates"). Exhibit B identifies the Certificates Plaintiffs still hold (the "Held Certificates") and the Certificates Plaintiffs have sold (the "Sold Certificates").

7.      The Certificates represent interests in the cash flows associated with the

mortgage loans deposited into the Covered Trusts by the Sponsors and their affiliates or business partners.  The Certificateholders are the beneficiaries of the Covered Trusts.  The performance of the RMBS depended on the Sponsors depositing properly underwritten mortgage loans having complete documentation into the Covered Trusts.  The quality of the mortgage loans is critical, and numerous provisions of the governing agreements assure that only qualifying loans would be deposited into the Covered Trusts.  Similarly, because the securities were to be "mortgage-backed," numerous other provisions seek to assure that complete documentation for each loan, including an original mortgage note and a properly assigned mortgage, would be delivered to the Trustee.

8.      The Certificateholders, however, did not receive any loan or mortgage files that they could check to make certain that their contractual rights were being protected.  Rather, such investors were dependent upon their trustee representatives, U.S. Bank, to police the deal and protect their contractual and other legal rights.

9.      The Sponsors and Trustee typically had very close business relationships.  Nevertheless, as trustee, U.S. Bank was obligated to act against the financial interest of the Sponsors when demanded by the circumstances.  The principal protections received by investors in the Covered Trusts were their contractual rights to have the Sponsors or the party who originated the mortgage loans (the "Originators") replace or repurchase defective mortgage loans and the duties of the Trustee to enforce such obligations and the other rights of investors in the Covered Trusts.  U.S. Bank, however, abandoned its obligations and breached its contractual, fiduciary and statutory obligations to protect the rights of investors such as Plaintiffs.  As a result, Plaintiffs have suffered very material damages, which they seek to recover in this action.

4

10.     As Trustee for the Covered Trusts, U.S. Bank owes Plaintiffs and the other Certificateholders certain contractual and common law duties, as well as duties under the TIA and the Streit Act (which applies to the extent a PSA (defined below) is not "qualified" under the TIA) with respect to the mortgage loans owned by the Covered Trusts.  Among these duties are those set forth in governing agreements, generally identified as pooling and servicing agreements ("PSAs"),[4] which were incorporated by reference into the Certificates U.S. Bank signed, and under applicable state and federal laws.

11.     U.S. Bank breached its contractual, fiduciary and statutory duties in at least five different ways.

12.     <u>Breach of Contract</u>. U.S. Bank breached the PSAs by failing to: (i) provide notice of representation and warranty violations by the Originators and Sponsors; (ii) provide notice of the Servicers' breaches including failure to give notice or cause the responsible parties to repurchase loans that were subject to a breach of representation or warranty or missing documentation required to be delivered under the PSAs; (iii) cause the responsible parties to repurchase loans that were subject to a breach of representation or warranty or missing documentation required to be delivered under the PSAs; and (iv) prudently exercise all rights and remedies available to the Trustee under the PSAs upon the occurrence of an Event of Default.

13.     <u>Breach of Fiduciary Duty</u>. After an "Event of Default," the Trustee becomes akin to a traditional trustee with fiduciary duties.  U.S. Bank has a special fiduciary duty of

---

[4] Two of the Covered Trusts, BSARM 2005-7 and CMLTI 2006-AR1 set forth the Trustee's duties in Indentures as opposed to PSAs.  One of the Covered Trusts, GSR 2006-AR1 is governed by a Master Servicing and Trust Agreement, and the documents incorporated therein.  The term "PSAs" also refers to the Indentures for BSARM 2005-7 and CMLTI 2006-AR1, and the Master Servicing and Trust Agreement for GSR 2006-AR1, unless indicated otherwise.

undivided loyalty to secure the trust assets and maximize recoveries for the benefit of the trust beneficiaries, including Plaintiffs, after an Event of Default.  U.S. Bank breached its fiduciary duty to Plaintiffs by failing to take any actions to secure the trust assets and maximize recoveries for Certificateholders after the occurrence of Events of Default.

14.     Negligence and Negligent Misrepresentation. U.S. Bank as an RMBS trustee has extra-contractual duties to perform ministerial acts with due care and to avoid conflicts of interest.  U.S. Bank negligently performed ministerial acts by, for example, failing to provide requisite notices of breaches that it discovered.  U.S. Bank also violated its duty to avoid conflicts of interest because it failed to take actions for the benefit of the trust beneficiaries because it wanted to protect itself by not exposing systemic origination and servicing misconduct that U.S. Bank engaged in itself and by not jeopardizing future lucrative engagements with the other parties to the PSAs.  U.S. Bank also committed negligent misrepresentation by failing to disclose servicing breaches in Regulation AB reports as set forth below.

15.     Violation of the TIA. The TIA requires the trustee to provide Certificateholders notice of defaults under the operative indentures within 90 days of becoming aware of such defaults and to act prudently to protect the rights of Certificateholders during the period in which the default remains uncured.  U.S. Bank violated these provisions by failing to provide notice of defaults it discovered and failing to act prudently to protect the Certificateholders' interests by exercising all rights and remedies available to U.S. Bank under the governing agreements.

16.     Violation of the Streit Act. The Streit Act applies to the extent that a PSA is not "qualified" under the TIA.  Section 130-e of the Streit Act provides that any aggrieved

6

Certificateholder may seek to remove a trustee for cause shown.  Plaintiffs have good cause for relief against U.S. Bank because, among other things, U.S. Bank breached its duties to effectuate the repurchase of non-compliant loans and caused the time period to seek such repurchases to expire.  Plaintiffs seek damages under Section 130-e because the equitable remedy is ineffectual in the case of U.S. Bank because it could not cure the harm caused by U.S. Bank with respect to the failure to provide notice and effectuate remedies under the PSAs as the time period to do so has expired.

17.    Breach of the Implied Covenant of Good Faith and Fair Dealing. In the alternative, U.S. Bank breached the implied covenant of good faith and fair dealing by acting in bad faith and depriving Plaintiffs of the benefits of their contractual protections.

18.    By failing to perform its duties, U.S. Bank has caused Plaintiffs to suffer over $150 million of damages.

## PARTIES

19.    Plaintiff Pacific Life Insurance Company is an insurance company incorporated and existing under the laws of Nebraska with its principal place of business in Newport Beach, California.

20.    Plaintiff Pacific Life & Annuity Company is an insurance company incorporated and existing under the laws of Arizona with its principal place of business in Newport Beach, California.

21.    Non-party Bank of America ("Bank of America") is a national banking association organized and existing under the laws of the United States.  Bank of America does business throughout the United States, with its main office located in North Carolina.  In or about October 2007, Bank of America acquired LaSalle Bank National Corporation ("LaSalle"), which

was serving as trustee for the Morgan Stanley Trust and the WAMU Trusts.  Bank of America became successor trustee by merger to LaSalle.  Subsequently, from October 31, 2008 to August 1, 2011, Defendant U.S. Bank acquired Bank of America's securitization trust business and succeeded Bank of America as trustee for those Covered Trusts.

22.    Defendant U.S. Bank is a national banking association organized and existing under the laws of the United States.  U.S. Bank does business throughout the United States, with its main office in Ohio.  It serves as trustee for the Covered Trusts.  In or about December 2005, Wachovia Bank, N.A. ("Wachovia") was serving as trustee for one of the JPMorgan Trusts (JPMMT 2005-A7).  U.S. Bank became successor trustee when it acquired Wachovia's corporate trust and institutional custody businesses on or about December 30, 2005.

23.    For each of the Covered Trusts, U.S. Bank (or LaSalle, as predecessor trustee to Bank of America, or Wachovia, as predecessor trustee to U.S. Bank) signed Certificates incorporating the PSAs.  As the trustee for the Covered Trusts, U.S. Bank owed Certificateholders certain statutory, contractual and fiduciary duties with respect to the mortgage loans owned by the Covered Trusts, which it violated.

## JURISDICTION AND VENUE

24.    This Court has jurisdiction over the TIA claims asserted in this matter under 15 U.S.C. § 77v.  This Court has jurisdiction over the other claims asserted under 28 U.S.C. § 1367.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

25.    Venue is proper pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 77v as U.S. Bank resides and/or transacts business in this District and a substantial part of the events and

8

omissions giving rise to the claims asserted herein occurred in this District.

26.     This Court has personal jurisdiction over U.S. Bank because a substantial part of the administration of the Covered Trusts, out of which the claims asserted herein arise, is performed in New York.[5]

**FACTUAL ALLEGATIONS**

**I.      THE SECURITIZATION PROCESS**

27.     The process through which RMBS are created and sold is known as mortgage loan securitization.  In broad terms, mortgage loans are acquired from mortgage originators and pooled together in a trust, which issues securities representing interests in the cash flow from principal and interest payments on the pool of loans after certain costs and fees are deducted.

28.     The first step in each securitization is generally the acquisition of mortgage loans by a sponsor (or "seller"), such as WaMu, and the sale of a large pool of such loans by the sponsor to a depositor, typically a special-purpose affiliate of the sponsor.

29.     The depositor then conveys the pool of loans to a trustee, such as U.S. Bank, pursuant to a "pooling and servicing agreement" that establishes various prioritized "tranches" of interests in payments made by borrowers on the loans.  The trust issues certificates representing those tranches; the certificates are sold to an underwriter; and the underwriter re-sells the certificates at a profit to investors.  The sponsor (through its affiliated depositor) earns a profit on the excess of the proceeds of the sale of certificates to the underwriter over the cost of purchasing the mortgage loans.  Here, U.S. Bank acted as the trustee in connection with the relevant RMBS transactions.

---

[5] This action originally was filed in the District Court for the Southern District of Ohio. That District Court also had jurisdiction over U.S. Bank as alleged in the initial Complaint in this action.

30.    Pursuant to the PSA for each trust, a "servicer" is appointed to manage the collection of payments on the mortgage loans in return for a monthly fee.  The servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation and managing and selling foreclosed properties.

31.    The trustee delivers monthly remittance reports to holders of certificates describing the performance of underlying loans and compliance with the PSA.  The contents of those reports are specified in the PSA and in Item 1121 of SEC Regulation AB.  *See* 17 C.F.R. § 229.1121.  The servicer provides data to the trustee to include in these remittance reports.

32.    Each tranche in a loan securitization has a different level of risk and reward, and its own rating issued by a nationally recognized credit-rating agency such as Standard & Poor's or Moody's.  The most senior tranches generally receive the highest ratings, AAA or AA.  Junior tranches receive lower ratings, but offer higher potential returns.  Senior tranches are generally entitled to payment in full ahead of junior tranches, and shortfalls in principal and interest payments are generally allocated first to junior tranches.  This division of cash flows and losses is referred to as the "waterfall."

33.    Because the cash flow from payments made by mortgage borrowers on the underlying mortgage loans is the sole source of funds to pay holders of a mortgage-backed security, the credit quality of the security turns on the credit quality of, and the trust assets securing, the underlying loans, which often number in the thousands.

34.    U.S. Bank earned fees in connection with its roles as trustee, typically an annual fee based on the percentage of principal outstanding on the loans underlying the RMBS.  U.S.

Bank also received significant benefits from the interest-free deposits maintained in its accounts when the servicing payments were remitted to its accounts. U.S. Bank maintained accounts for thousands of trusts and earned enormous sums from the aggregate balances on these accounts. The RMBS trustee engagements further deepened U.S. Bank's business relationships with the sponsors and underwriters of the RMBS, leading to more lucrative future engagements.

## II.    U.S. BANK'S DUTIES AND OBLIGATIONS

35.    U.S. Bank's duties and obligations as Trustee for the Covered Trusts are spelled out in the PSAs and under applicable state and federal laws. These agreements govern the parties' respective rights and responsibilities in connection with the Covered Trusts. U.S. Bank entered into PSAs with:

(A) For the BOA Trust: (i) Banc of America Funding Corp., as Depositor; and (ii) Wells Fargo Bank, N.A., as the Master Servicer and Securities Administrator;

(B) For the Bear Trust: (i) Structured Asset Mortgage Investments II Inc., as Depositor; (ii) Bear Stearns ARM Trust 2005-7, as Issuer; (iii) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator; and (iv) EMC Mortgage Corporation as Seller and Company;

(C) For three of the Citibank Trusts (CMLTI 2005-7, CMLTI 2006-4, CMLTI 2007-AR5): (i) Citigroup Mortgage Loan Trust Inc., as Depositor; (ii) CitiMortgage, Inc., as Master Servicer and Trust Administrator or Master Servicer and Servicer; and (iii) Citibank, N.A., as Paying Agent, Certificate Registrar and Authenticating Agent;

(D) For three of the Citibank Trusts (CMALT 2007-A1, CMALT 2007-A4, CMALT 2007-A5, CMALT 2007-A6): (i) Citigroup Mortgage Securities, Inc., as Depositor; (ii) CitiMortgage, Inc., as Master Servicer and Servicer; and (iii) Citibank, N.A., as Paying Agent, Certificate Registrar and Authenticating Agent;

(E) For one Citibank Trust (CMLTI 2006-AR1): (i) Citigroup Mortgage Loan Trust Inc., as Depositor; (ii) CitiMortgage, Inc. as Master Servicer and Servicer; (iii) Citibank, N.A. as Note Registrar, Paying Agent, and Authenticating Agent; (iv) CSE Mortgage LLC, as Sponsor; and (v) CS OT I LLC, as Seller;

11

(F) For one Credit Suisse Trust (ARMT 2005-10): (i) Credit Suisse First Boston Mortgage Securities Corp., as Depositor; (ii) DLJ Mortgage Capital, Inc., as Seller; (iii) Wells Fargo Bank, N.A., as Master Servicer, Servicer, Back-up Servicer and Trust Administrator; (iv) Washington Mutual Bank as Seller and Servicer; and (v) Select Portfolio Servicing, Inc., as Servicer and Special Servicer;

(G) For one Credit Suisse Trust (CSFB 2004-8): (i) Credit Suisse First Boston Mortgage Securities Corp., as Depositor; (ii) DLJ Mortgage Capital, Inc., as Seller; (iii) Wells Fargo Bank, N.A., as Servicer, Master Servicer, and Trust Administrator; (iv) Washington Mutual Mortgage Securities Corp., as Seller and Servicer; (v) GreenPoint Mortgage Funding Inc., as Seller and Servicer, and (vi) Select Portfolio Servicing, Inc., as Servicer and Special Servicer;

(H) For the Goldman Trust: (i) GS Mortgage Securities Corp., as Depositor; (ii) JPMorgan Chase Bank, N.A. and Deutsche Bank National Co., as Custodians; and (iii) Wells Fargo Bank, N.A. as Securities Administrator, Master Servicer and Custodian;

(I) For three JPMorgan Trusts (JPALT 2006-S2, JPALT 2006-S4, JPMMT 2007-A4): (i) J.P. Morgan Acceptance Corp. I, as Depositor; and (ii) Wells Fargo Bank, N.A., as the Master Servicer and Securities Administrator;

(J) For one JPMorgan Trust (CFLX 2006-1): (i) Chase Mortgage Finance Corp., as Depositor; and (ii) JPMorgan Chase Bank, N.A., as Servicer, Custodian and Paying Agent;

(K)  For the TBW Trust: (i) Mortgage Asset Securitization Transactions, Inc., as Depositor; (ii) UBS Real Estate Securities Inc., as Transferor; and (iii) Wells Fargo Bank, N.A., as Master Servicer and Trust Administrator;

(L) For the UBS Trust: (i) Mortgage Asset Securitization Transactions, Inc., as Depositor; (ii) UBS Real Estate Securities Inc., as Transferor; and (iii) Wells Fargo Bank, N.A., as Master Servicer, Trust Administrator and Custodian; and

(M) For the Wells Fargo Trust: (i) Wells Fargo Asset Securities Corp., as Depositor; (ii) and Wells Fargo Bank, N.A., as Master Servicer.

36.    U.S. Bank (or Wachovia) entered into a PSA with: For one JPMorgan Trust (JPMMT 2005-A7), (i) J.P. Morgan Acceptance Corp. I, as Depositor; and (ii) Wells Fargo Bank, N.A., as the Master Servicer and Securities Administrator.

37.    Bank of America (or LaSalle) entered into PSAs with:

12

(A) For the Morgan Stanley Trust: (i) Morgan Stanley Capital I, Inc., as Depositor; and (ii) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator; and

(B) For the WaMu Trusts: (i) WaMu Asset Acceptance Corp., as the Depositors; and (ii) Washington Mutual Bank, as Servicer.

38.    As set forth above, in or about October 2007, Bank of America acquired LaSalle, which was serving as trustee for the Morgan Stanley Trust and the WaMu Trusts.  Bank of America became successor trustee by merger to LaSalle, succeeding to LaSalle's duties and obligations under the PSAs referenced directly above.  From October 31, 2008 to August 1, 2011, Defendant U.S. Bank acquired Bank of America's securitization trust business and succeeded Bank of America as trustee for those Covered Trusts.  Accordingly, Plaintiffs do not assert claims against U.S. Bank for acts, omissions, or breaches of contractual or other duties by Bank of America, its affiliates or their respective predecessors during the period that any such entity acted as trustee of a Covered Trusts.  As also set forth above, on or about December 30, 2005, U.S. Bank acquired Wachovia's corporate trust and institutional custody business, which was serving as trustee for one of the JPMorgan Trusts (JPMMT 2005-A7).  Plaintiffs assert claims as against U.S. Bank for its breaches and misconduct as to the Covered Trusts set forth above for which it served as Trustee. Plaintiffs further assert claims against U.S. Bank to the extent that U.S. Bank assumed liability for Wachovia's conduct with respect to JPMMT 2005-A7.

### A.    Duties with Respect to Taking Physical Possession of Complete Mortgage Files and Enforcing Related Repurchase Obligations

39.    Each PSA sets forth a process for conveying the mortgage loans to the Covered Trusts.  Typically, the Sponsors conveyed the loans to the Depositor for the Covered Trusts.  Then the Depositor conveyed the mortgage loans to U.S. Bank in its

capacity as the trustee for the Covered Trusts to hold for the benefit of the Certificateholders.  This process is set forth in Section 2.01 ("Conveyance of Mortgage Loans") of the CMLTI 2006-4 PSA, which provides in relevant part:

> The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to the Mortgage Loans identified on the Mortgage Loan Schedule, the rights of the Depositor under the Mortgage Loan Purchase Agreement (except Section 18 thereof), and all other assets included or to be included in REMIC I. Such assignment includes all interest and principal received by the Depositor or the Master Servicer on or with respect to the Mortgage Loans (other than payments of principal and interest due on such Mortgage Loans on or before the Cut-off Date). The Depositor herewith delivers to the Trustee an executed copy of the Mortgage Loan Purchase Agreement, and the Trustee, on behalf of the Certificateholders, acknowledges receipt of the same.

40.    The PSAs for the Citibank, JPMorgan, Credit Suisse, BOA, Bear, Goldman, Morgan Stanley, UBS, TBW, WaMu, and Wells Fargo Trusts set forth a substantially similar process.  *See* Ex. C § I.

41.    In addition, Section 2.02 of the CMLTI 2006-4 PSA ("Acceptance of the Trust Fund by the Trustee") provides that the Trustee is required to take physical possession of the mortgage loans and the accompanying mortgage files for the exclusive use and benefit of all current and future Certificateholders.  It provides:

> Subject to the provisions of Section 2.01 and subject to any exceptions noted on an exception report delivered by or on behalf of the Trustee, the Trustee acknowledges receipt of the documents referred to in Section 2.01 (other than such documents described in Section 2.01 (iv)) and all other assets included in the definition of 'Trust Fund' and declares that it holds and will hold such documents and the other documents delivered to it constituting the Mortgage File, and that it holds or will hold all such assets and such other assets included in the definition of 'Trust Fund' ***in trust for the***

14

> *exclusive use and benefit of all present and future Certificateholders*.
>
> The Trustee, by execution and delivery hereof, acknowledges receipt, subject to the review described in the succeeding sentence, of the documents and other property referred to in Section 2.01 and declares that the Trustee (or a Custodian on behalf of the Trustee) holds and will hold such documents and other property, including property yet to be received in the Trust Fund, in trust, upon the trusts herein set forth, *for the benefit of all present and future Certificateholders*.

(Emphasis added.)  The PSAs for the Citibank, JPMorgan, Credit Suisse, BOA, Bear, Goldman, Morgan Stanley, UBS, TBW, WaMu, and Wells Fargo Trusts set forth a substantially similar process.  *See* Ex. C § II.

42.   Section 2.01 of the CMLTI 2006-4 PSA also specifically sets forth the operative documents that must be contained in the Mortgage File for the mortgage loans.  It provides:

> In connection with such transfer and assignment, the Depositor does hereby deliver to, and deposit with, the Trustee or a Custodian on its behalf, the following documents or instruments (a 'Mortgage File') with respect to each Mortgage Loan so transferred and assigned:
>
> (i) The *Mortgage Note, endorsed* by manual or facsimile signature without recourse by the Originator or an Affiliate of the Originator in blank or to the Trustee showing a complete chain of endorsements from the named payee to the Trustee or from the named payee to the Affiliate of the Originator and from such Affiliate to the Trustee;
>
> (ii) *The original recorded Mortgage*, noting the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan, *with evidence of recording thereon* or a copy of the Mortgage certified by the public recording office in those jurisdictions where the public recording office retains the original;
>
> (iii) Unless the Mortgage Loan is registered on the MERS® System, *an assignment to the Trustee in recordable form of the Mortgage* which may be included, where permitted by local law, in a blanket assignment or assignments of the Mortgage to the Trustee, *including any intervening assignments and showing a complete*

15

*chain of title from the original mortgagee named under the Mortgage to the Person assigning the Mortgage Loan to the Trustee* (or to MERS, noting the presence of the MIN, if the Mortgage Loan is registered on the MERS® System);

(iv) *Any original assumption, modification, buydown or conversion-to- fixed-interest-rate agreement applicable to the Mortgage Loan*. . . .

(Emphasis added.)  The PSAs for the Citibank, JPMorgan, Credit Suisse, BOA, Bear, Goldman, Morgan Stanley, UBS, TBW, WaMu, and Wells Fargo Trusts set forth a substantially similar process.  *See* Ex. C § III.

43.     Physical possession of these documents by U.S. Bank was necessary to transfer the ownership rights to the mortgage loans from the Sponsors and Depositors to the Covered Trusts.

44.     U.S. Bank had a contractual and common law obligation under the PSAs to review each of the mortgage files for the mortgage loans and certify that the documentation for each of the loans was accurate and complete.

45.     The first step in the certification process was the preparation of an initial certification acknowledging that the Trustee (or the custodian acting on behalf of the Trustee) had received and reviewed the two key documents for the mortgage loan: (i) the original mortgage note with a complete chain of endorsements from the Originator to U.S. Bank as the trustee for the Covered Trusts; and (ii) a duly executed assignment of mortgage.

46.     The Trustee (or the custodian acting on behalf of the Trustee) was then required to attach to the certification a mortgage loan schedule identifying those loans for which the Trustee had obtained the original mortgage note with endorsements and a duly executed assignment of mortgage, and a schedule identifying the mortgage loans for which the Trustee had not obtained the original mortgage note with endorsements or the

16

assignment of mortgage.  This is spelled out in Section 2.02 of the Credit Suisse PSA,

("Acceptance by the Trustee"), which provides:

> Pursuant to Section 6 of the Custodial Agreement[6], not later than 90 days after the Closing Date, the Custodian shall deliver to the Depositor, the Master Servicer, each Seller and Servicer, the Trustee and the Trust Administrator a Trust Receipt and Final Certification with respect to the Mortgage Loans in the form annexed hereto as Exhibit I, with any applicable exceptions noted thereon.
>
> If, in the course of such review, the Custodian finds any document constituting a part of a Mortgage File which does not meet the requirements of Section 2.01, the Custodian shall list such as an exception in the Trust Receipt and Final Certification pursuant to Section 6 of the Custodial Agreement; provided, however, that the Custodian shall not make any determination as to whether (i) any endorsement is sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note or (ii) any assignment is in recordable form or is sufficient to effect the assignment of and transfer to the assignee thereof under the mortgage to which the assignment relates.

The PSAs for the Citibank, JPMorgan, BOA, Bear, Goldman, Morgan Stanley, UBS, TBW,

WaMu and Wells Fargo Trusts set forth substantially similar requirements.  *See* Ex. C § IV.

47.    After a designated period, U.S. Bank was required to issue a Final

Certification.  The "Form of Final Certification of Trustee," which was attached to the

Credit Suisse PSA as Exhibit I, provides:

> Ladies and Gentlemen:
>
> In accordance with and subject to the provisions of Section 2.02 of the above referenced Pooling and Servicing Agreement the undersigned, ***as Trustee, hereby certifies that, except for the exceptions noted on the schedule attached hereto, as to each Mortgage Loan listed in the Mortgage Loan Schedule it has reviewed the Mortgage File and has determined that (based solely on its review of each such documents on its face) (i) all documents***

---

[6] Pursuant to the Credit Suisse PSA, the Custodial Agreement is defined as the "certain custodial agreement dated as of November 1, 2004 among the Custodian, the Trustee, and the Trust Administrator, pursuant to which the Custodian Agrees to hold any of the documents or instruments referred to in Section 2.01 of this Agreement as agent for the Trustee."

17

> *described in clauses (i)-(v) of Section 2.01(b) of the Pooling and Servicing Agreement are in its possession, (ii) such documents have been reviewed by it and have not been mutilated, damaged, defaced, torn or otherwise physically altered and such documents relate to such Mortgage Loan and (iii) each Mortgage Note has been endorsed and each assignment of Mortgage has been delivered as provided in Section 2.01 of the Pooling and Servicing Agreement.* The Trustee has made no independent examination of any documents required to be delivered in accordance with Section 2.01 of the Pooling and Servicing Agreement beyond the review specifically required therein. The Trustee makes no representations as to: (i) the validity, legality, sufficiency, enforceability or genuineness of any of the documents required to be delivered in accordance with Section 2.01 of the Pooling and Servicing Agreement or any of the Mortgage Loans identified on the Mortgage Loan Schedule, or (ii) the collectability, insurability, effectiveness or suitability of any such Mortgage Loan.

(Emphasis added.)  The PSAs for the Citibank, JPMorgan, BOA, Bear, Goldman, Morgan Stanley, UBS, TBW, WaMu, and Wells Fargo Trusts contain a substantially similar form of Final Certification.  *See* Ex. C § V.

48.     The Final Certification is the key certification that U.S. Bank (or a Custodian on its behalf) was required to prepare for the Covered Trusts.  In this document, U.S. Bank certified that (i) there was full and complete loan documentation in accordance with the requirements of the PSAs for those loans specifically identified on the mortgage loan schedule, and (ii) U.S. Bank had not obtained complete required documentation for those loans identified on the document exception report.  If there was a defect with any mortgage file, then U.S. Bank was obligated to demand itself, or in some cases notify other parties who, in turn, were required to demand, that the Sponsor cure the defect leading to the exception (typically within 90 days) or repurchase or substitute the defective loans.  For example, Section 2.03(b) of the GSR 2006-AR1 PSA provides:

> Upon discovery by a Responsible Officer of the Master Servicer, the Securities Administrator or the Trustee or notice to the Master

18

Servicer, the Securities Administrator or the Trustee of *any defective or missing document* (as described in the related Sale Agreement) in a Trustee Mortgage Loan File, or of any breach by any Seller of any representation, warranty or covenant under the related Sale Agreement, which defect or breach materially and adversely affects the value of any Mortgage Loan or the interest of the Trust therein (it being understood that any such defect or breach shall be deemed to have materially and adversely affected the value of the related Mortgage Loan or the interest of the Trust therein if the Trust incurs a loss as a result of such defect or breach), *the parties discovering or receiving notice of such defect or breach shall notify the Trustee. Upon discovering or receipt of notice of such breach, the Trustee shall promptly request that such Seller cure such defect or breach and, if such Seller does not cure such defect or breach in all material respects by the end of the cure period specified in such Sale Agreement and any extension of the cure period granted as permitted by such Sale Agreement, shall enforce such Seller's obligation under such Sale Agreement to purchase such Mortgage Loan from the Trustee.*

49.    As another example, Section 2.03(a) of the CMLTI 2006-4 PSA provides:

*Upon discovery or receipt of notice by the Depositor, the Master Servicer, the Trust Administrator or the Trustee of any materially defective document in, or that a document is missing from, a Mortgage File* or of the breach by the Seller of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement in respect of any Mortgage Loan which materially adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, *the party so discovering or receiving notice shall promptly notify the other parties to this Agreement, and the Trustee thereupon shall promptly notify the Seller of such defect, missing document or breach and request that the Seller deliver such missing document or cure such defect or breach within 90 days from the date the Seller was notified of such missing document, defect or breach, and if the Seller does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee shall enforce the obligations of the Seller under the Mortgage Loan Purchase Agreement (i) to repurchase such Mortgage Loan from REMIC I at the Purchase Price within 90 days after the date on which the Seller was notified (subject to Section 2.03(e)) of such missing document, defect or breach, and (ii) to indemnify the Trust Fund in respect of such missing document, defect or breach*, in the case of each of (i) and (ii), if and to the extent that the Seller is obligated to do so under the Mortgage Loan Purchase Agreement.

19

(Emphasis added.)  The PSAs for the Citibank, JPMorgan, Credit Suisse, BOA, Bear, Morgan Stanley, UBS, WaMu, TBW and Wells Fargo Trusts contain substantially similar requirements with respect to the Trustee's notice and/or enforcement duties with respect to loans lacking the mortgage file documents required under the PSAs.  *See* Ex. C § VI.

50.    After the passage of a specified period of time, the Trustee for most of the trusts could not seek substitution of loans and could merely demand repurchase.  For example, Section 2.03(d) of the CMLTI 2006-4 PSA provides that substitution is not an available remedy more than two years from closing.  The PSAs for the Citibank, JPMorgan, Credit Suisse, BOA, Bear, Morgan Stanley, TBW, WaMu, and Wells Fargo Trusts have similar cutoffs.  *See* Ex. C § VI.  In any event, because any substituted loans must be virtually identical to the initial loan, including maturity date and other terms, substitution was not generally feasible more than a year after closing because conforming, non-defaulting loans of the same vintage were no longer widely available for inclusion in the securitizations.

**B.    U.S. Bank Had a Duty to Provide Notice of Defaults and Enforce Repurchase Obligations Triggered by Such Notice**

51.    The Sponsors and Originators of the Covered Trusts made detailed representations and warranties regarding the quality of the mortgage loans held by the Covered Trusts.  Those representations and warranties are described in detail in Section III(A)(2), *infra*.  With respect to the Covered Trusts, when U.S. Bank became aware of breaches of representations and warranties that materially and adversely affected Certificateholders' interests, that knowledge triggered critical and substantial obligations on U.S. Bank's part to act for the benefit of Certificateholders.  The precise articulation of U.S. Bank's obligations in such circumstances varied from one form of PSA to another.

20

52.    As an initial matter, the Trustee had an obligation pursuant to the PSAs to provide notice to all parties of the Sponsors' or Originators' breaches of representations and warranties under the PSAs or MLPAs.[7]

53.    For example, Section 2.09 of the WaMu PSA provides:

> Upon discovery by any of the Company, the Servicer or the Trustee (in the case of the Trustee, having actual knowledge thereof) of a breach of any of the representations and warranties in respect of the Mortgage Loan set forth in Section 3.1 of the Mortgage Loan Purchase Agreement . . . that materially and adversely affects the value of the related Mortgage Loans or the interests of the Trust in the related Mortgage Loans, the party discovering such breach shall give prompt written notice to the others.  Any breach of the representation set forth in clause (xxvii) or clause (xxviii) of such Section 3.1 thereof shall be deemed to materially and adversely affect the value of the related Mortgage Loans or the interests of the Trust in the related Mortgage Loans. The Servicer shall promptly notify the applicable Seller of such breach and take appropriate steps on behalf of the Trust to enforce such Seller's obligation, pursuant to Section 3.3 of the Mortgage Loan Purchase Agreement, to cure such breach in all material respects or repurchase or substitute for the affected Mortgage Loan or Mortgage Loans or any property acquired in respect thereof, in accordance with and subject to the time limitations set forth in such Section 3.3.

The PSAs for the Citibank, JPMorgan, Credit Suisse, BOA, Bear, Goldman, Morgan Stanley, UBS, TBW and Wells Fargo Trusts contain substantially similar provisions.  *See* Ex. C § VI.

54.    While the precise formulation of U.S. Bank's role in enforcing the responsible parties' obligations to repurchase loans breaching their representations and warranties differed, U.S. Bank also had an enforcement role in the Covered Trusts.  *See* Ex. C § VI. Some of the PSAs explicitly provide that U.S. Bank shall enforce the responsible parties'

---

[7] The PSAs for JPALT 2006-S2, JPALT 2006-S4, and JPMMT 2007-A4 do not identify U.S. Bank as a party required to provide notices of breaches of representations and warranties, but they obligate U.S. Bank to enforce the repurchase of loans breaching representations and warranties or lacking the required documentation in the mortgage files, and U.S. Bank had notice of both documentary defects and breaches of representations and warranties as set forth below.

repurchase obligations.  *See, e.g.*, GSR 2006-AR1 § 2.03, JPALT 2006-S2 and S4 § 2.05, MABS 2006-AB1 § 2.03, MSM 2006-7 § 2.05(a), TBW 2006-6 § 2.03, WFMBS 2006-AR1 §§ 2.02-03.  In other PSAs, U.S. Bank's responsibility to enforce the Sponsor's repurchase obligation is expressed by noting that the Trustee will be reimbursed for its expenses incurred enforcing the repurchase obligation or by assigning the Trustee managerial functions in the repurchase protocol, such as extending the cure period.  *See*, *e.g.*, ARMT 2005-10 § 2.03 and CSFB 2004-8 § 2.03(c).  In the WaMu Trusts, the Trustee becomes the enforcer of the repurchase protocol when the Seller is the Servicer, which was the case for the WaMu Trusts.  WaMu PSA § 2.07.  This makes sense because the party required to repurchase non-compliant loans should not be the party enforcing the repurchase protocol.  Further, the WaMu Trusts required that the Trustee "shall at all times be acting on behalf of the Trust or the Certificateholders."  WaMu PSA § 8.16.[8]

55.      In addition, the PSAs require that U.S. Bank provide notice of breaches of representations and warranties or covenants made by the Servicers or the Master Servicers.  For example, Section 7.01(ii) of the WaMu PSA provides that most breaches by the Servicer ripen into an Event of Default if left unremedied for sixty days after "written notice of such failure . . . shall have been given to the Servicer by the Trustee. . . ."  This provision clearly contemplates that the Trustee "shall" provide notice of Servicer breaches upon becoming aware of such breaches, which makes sense as the Trustee was the party required to police the deal for investors.  The PSAs for the Citibank, JPMorgan, Credit Suisse, BOA, Bear, Goldman, Morgan Stanley, UBS, TBW and Wells Fargo Trusts contain substantially similar

---

[8] Several of the Covered Trusts require that the Trustee receive a notice from another party before enforcing the repurchase protocol.  *See, e.g.*, BAFC 2007-D § 2.02. As set forth below, the Trustee did receive notice of documentary exceptions and breaches of representations and warranties.

provisions.  *See* Ex. C § X.

56.     The PSAs for other Covered Trusts require U.S. Bank to provide notice of Master Servicer or Servicer breaches that could become Events of Default.  *See, e.g.*, BAFC 2007-7 § 8.04, CMLTI 2005-7, 2006-4 and 2007-AR5 § 7.03(b), CMLTI 2006-AR1 § 5.03(b), JPALT 2006-S4 § 6.19, JPMMT 2005-A7 and 2007-A4 § 6.19, MSM 2006-7 § 6.19, and WFMBS 2006-AR1 § 7.04; *see* Ex. C § XIV.

57.     In addition, after the occurrence of an Event of Default or a substantial breach of the PSA by the Trustee, the Trustee assumes the same duties as a common law trustee which includes, among other things, to provide beneficiaries notice of all defaults under the operative trust documents, which include the PSAs here.

58.     Congress also enacted the TIA to ensure, among other things, that investors in certificates, bonds and similar instruments, have adequate rights against, and receive adequate performance from, the responsible trustees.  15 U.S.C. § 77bbb.

59.     Under Section 315(b) of the TIA, U.S. Bank was required to give Certificateholders notice of a default under the PSAs within 90 days of learning of such default.  15 U.S.C. § 77ooo(b).

60.     As set forth in Section III hereof, U.S. Bank failed to give notice of numerous defaults and breaches of representations and warranties or covenants as required under the PSAs, common law, and the TIA.

C.      **U.S. Bank Had a Duty to Act Prudently**
        **Upon the Occurrence of an Event of Default**

61.     Under the PSAs and applicable law, U.S. Bank owed a fiduciary duty to Certificateholders upon the occurrence of an Event of Default.  U.S. Bank's post-default fiduciary duties are described in Section 8.01(a) of the WaMu PSA, which provides in

23

relevant part, "[i]n case an Event of Default hereunder . . . the Trustee shall exercise such of the rights and powers vested in it by this Agreement or the Countrywide Agreement, as applicable, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." The PSAs for the Citibank, JPMorgan, Credit Suisse, BOA, Bear, Goldman, Morgan Stanley, UBS, TBW and Wells Fargo Trusts impose substantially similar obligations on U.S. Bank. *See* Ex. C § VII.

62.    The PSAs contain substantially similar definitions for what constitutes an Event of Default. For example Section 7.01 of WaMu PSA provides that an Event of Default includes: "[f[ailure on the part of the Servicer to duly observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer contained in the Certificates or this Agreement which continues unremedied for a period of 60 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Trustee, or to the Servicer and Trustee by the Holders of Certificates evidencing Percentage Interests aggregating not less than 25%." *See* Ex. C § X. The WaMu PSA also provides that similar uncured breaches by the Depositor ripen into Events of Default. *Id.*

63.    The PSAs for other Covered Trusts provide that uncured breaches by the Master Servicer constitute Events of Default. *Id.* The Master Servicers are obligated to supervise, monitor and enforce the Servicers' servicing of the mortgage loans. For example, Section 3.01 of the BAFC 2007-D PSA provides that "the Master Servicer shall supervise, monitor and oversee the obligations of the Servicers to service and administer their respective Mortgage Loans in accordance with the terms of the applicable Servicing Agreement. . . . and shall cause each Servicer to perform the covenants, obligations and

24

conditions to be performed and observed by such Servicer under the Applicable Servicing Agreement." Section 3.02 of the BAFC-D PSA further provides that the "Master Servicer, for the benefit of the Trust and the Certificateholders, shall enforce the obligations of each Servicer under the related Servicing Agreement . . . ." Accordingly, unremedied servicing breaches also give rise to Events of Defaults based on the Master Servicers' failure to supervise, monitor and enforce the Servicers' compliance with their servicing obligations.

64.    Events of Default under the Indentures for BSARM 2005-7 and CMLTI 2006-AR1 are defined as uncured defaults by the Issuers. *See* Ex. C § X. The Issuers have broad duties to protect the trust estate. For example, Section 3.04 of the BSARM 2005-7 PSA provides that the Issuer shall "cause the Issuer or the Indenture Trustee to enforce any of the rights to the Mortgage Loans," and "preserve and defend title to the Trust Estate and the rights of the Indenture Trustee and the Noteholders in such Trust Estate against the claims of all persons and parties." *See also* CMLTI 2006-AR1 § 3.04.

65.    The duty to act as a prudent person is also triggered under the common law when the trustee substantially breaches its obligations under an indenture. Under such circumstances, the repudiating trustee cannot rely on provisions of the indenture providing the trustee with the protections afforded to an indenture trustee.

66.    In addition, Section 315(c) of the TIA provides that upon the occurrence of a "default" the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs. 15 U.S.C. § 77ooo(c).

67.    The Streit Act provides that upon the occurrence of an "event of default," an

indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.  The Streit Act also requires trustees to avoid conflicts of interest.

68.    The Streit Act further requires that a trustee carry out its duties under the applicable indenture with reasonable care.

69.    Upon the occurrence of an Event of Default, a prudent trustee would have exercised all of its rights under the PSAs, including for example, to ensure that defaulted loans that were eligible for repurchase or substitution due to representation and warranty violations or because they were missing required documentation were put back to the responsible parties.  A prudent trustee would have also taken steps to remedy servicing breaches that increased the loss severities dramatically on the underlying mortgage loans.

70.    As set forth in Section III hereof, U.S. Bank failed to exercise its duties both prior to and after the occurrence of defaults and Events of Default.

**D.    U.S. Bank Had a Duty to Provide Notice of Events of Default**

71.    The PSAs required U.S. Bank to notify all Certificateholders of every uncured Event of Default known to it.  For example, Section 8.01 of the WaMu PSA provides that "[w]ithin 90 days after the occurrence of any Event of Default known to the Trustee, the Trustee shall transmit to all Certificateholders (with a copy to the Rating Agencies) notice of each Event of Default, unless such Event of Default shall have been cured or waived."  The PSAs for certain of the Citibank, JPMorgan, Bear, Morgan Stanley, UBS, TBW and Wells Fargo Trusts contain substantially similar requirements.  *See* Ex. C § XIV.

72.    Certain of the PSAs or Indentures for other Covered Trusts also require U.S.

26

Bank to provide notice to Certificateholders of Master Servicer or Servicer breaches that could become Events of Default.  *See, e.g.*, CMLTI 2005-7, 2006-4, and 2007-AR5 § 7.03(b), CMLTI 2006-AR1 § 5.03(b), and WFMBS 2006-AR1 § 7.04; s*ee* Ex. C § XIV. For the BOA Trust, the Trustee provides notice to the Securities Administrator, which in turn provides notice to the Certificateholders.  *See* Ex. C § XIV (If "the Trustee shall have knowledge of an Event of Default, the Trustee shall give prompt written notice thereof to the Securities Administrator and the Securities Administrator shall give prompt written notice therof to the Certificateholders in accordance with Section 8.01.").

### E.    U.S. Bank Had a Duty to Provide Accurate Remittance Reports and Certifications under Regulation AB

73.    Certain of the PSAs require U.S. Bank to forward to rating agencies and to make available to Certificateholders monthly remittance reports describing the performance of underlying loans.[9]  For example, Section 4.05 of the WaMu PSA provides the following:

> [w]ith each distribution from the Certificate Account on a Distribution Date, the Trustee shall send to each rating Agency and shall make available to each Certificateholder the statement required by Section 4.02(b).  The Trustee may make available such statement and certain other information, including, without limitation, information required to be provided by the Trustee pursuant to Section 3.13, to Certificateholders through the Trustee's Corporate Trust home page on the world wide web.  Such web page is currently located at 'www.etrustee.net.'

The PSAs for the Citibank, JPMorgan, Credit Suisse, BOA, Bear, Goldman, Morgan Stanley, UBS, TBW and Wells Fargo Trusts contain substantially similar requirements.  *See* Ex. C § VIII.

---

[9]  In the case of the Citibank Trusts, CitiMortgage held the responsibility, in the case of the Wells Fargo Trust, the Master Servicer held the responsibility, in the case of one of the JPMorgan Trusts (CFLX 2006-1) the Paying Agent held the responsibility, and in the case of the other four JPMorgan Trusts and the Credit Suisse, BOA, Bear, Goldman, Morgan Stanley, UBS and TBW Trusts, the Securities or Trust Administrator held the responsibility.

74.     Under item 1121 of SEC Regulation AB, such reports must disclose "[m]aterial breaches of pool asset representations or warranties or transaction covenants." *See* 17 C.F.R. § 229.1121(a)(12).

75.     Regulation AB requires the Depositors, Servicers, and, to the extent the Trustee engages in servicing functions, the Trustee to certify on a Form 10-K filed a year after each RMBS transaction that: (i) "[p]olicies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements;" (ii) trust assets securing the loans held by the Covered Trust had been maintained as required by the relevant transaction agreements, pool assets and related documents were safeguarded; and (iii) the remittance reports provided to investors complied with SEC rules.  *See* 17 C.F.R § 229.1122(d)(1)(i), (3)(i)(C), (4)(i) and (ii).  The Servicers and Trustee further provide a similar certification annually that covers all trusts that they service or administer.  Either the Trustee, or the Custodian who acts for the Trustee, was required to make such certifications for all post-2005 Covered Trusts.

76.     As set forth in Section III(D) hereof, U.S. Bank breached its statutory, fiduciary and contractual duties by failing to provide accurate certifications under Regulation AB and by failing to provide notice of false certifications provided by the Master Servicers and Servicers.

**F.     U.S. Bank Had a Duty to Address the Master Servicers' and Servicers' Failure to Meet Prudent Servicing Standards**

77.     Each PSA required the Master Servicers or Servicers to service the loans underlying the Covered Trusts prudently.  As set forth above, the PSAs required the Master Servicers to monitor, supervise and enforce the obligations of the Servicers.

78.     For example, Section 3.01 of the WaMu PSA provides: "Washington Mutual

28

Bank shall act as Servicer to service and administer the WMB Loans on behalf of the Trust in accordance with the terms hereof, consistent with prudent mortgage loan servicing practices." The PSAs for the Citibank, JPMorgan, Credit Suisse, BOA, Bear, Goldman, Morgan Stanley, UBS, TBW and Wells Fargo Trusts contain substantially similar requirements.  *See* Ex. C § IX.

79.    As noted above, the PSAs for the Citibank, JPMorgan, Credit Suisse, BOA, Bear, Goldman, Morgan Stanley, UBS, TBW and Wells Fargo Trusts provide that failure to meet prudent servicing standards is an Event of Default if left uncured for a designated period of time after notice of the default.  For example, Section 7.01 of the WaMu PSA provides that an Event of Default is triggered by:

> [f]ailure on the part of the Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer contained in the Certificates or in this Agreement which continues unremedied for a period of 60 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Trustee, or to the Servicer and the Trustee by the Holders of Certificates evidencing Percentage Interests aggregating not less than 25%.

Ex. C § X.

80.     Additionally, pursuant to Section 6.14 of the Morgan Stanley PSA, an Event of Default is triggered by any failure of the Master Servicer to perform its covenants under the PSA (including the duties to meet prudent servicing standards and to notify the Trustee of any default) or any breach by the Master Servicer of a representation or warranty regardless of whether notice is provided if such default occurs within the first year of the trust (the reporting period).  After the initial one-year period, failure by the Master Servicer to perform its duties and obligations under the PSA is an Event of Default if left uncured 60

29

days after notice of the default.  *See* Ex. C § X.

81.     Upon a Master Servicer or Servicer default or Event of Default, U.S. Bank was obligated to act.  As discussed above in Section II(B), U.S. Bank had a duty to provide notice when it became aware of breaches of the PSA by the Servicers or the Master Servicers.  If the defaults were not cured within the grace period, or if U.S. Bank failed to give notice, U.S. Bank was required to take action to address the defaults.  For example, the WaMu PSA provides that once a Master Servicer Event of Default occurred, the Trustee had the authority and obligation to "terminate all of the rights . . . and obligations of the Servicer," *see* WaMu PSA § 7.01 (*see also* Ex. C § X), and "be subject to all the responsibilities, duties and liabilities relating thereto," *see* WaMu PSA § 7.02.  The PSAs for the Citibank, JPMorgan, Credit Suisse, BOA, Bear, Goldman, Morgan Stanley, UBS, TBW and Wells Fargo Trusts impose substantially similar obligations on U.S. Bank.  *See* Ex. C § XI.  More generally, U.S. Bank, as trustee, had a duty to exercise all rights available under the PSAs to protect Certificateholders' interests and do so with due care.

82.     As set forth in Sections III hereof, U.S. Bank breached its statutory, fiduciary and contractual duties by failing to take actions to address Master Servicer and Servicer defaults and Events of Default.

**G.     U.S. Bank Is Liable for Negligence in Performing Its Duties**

83.     Under the plain language of the PSAs, the TIA, the Streit Act and applicable common law, U.S. Bank had a duty to perform its duties under the PSAs competently and are liable for its negligent failure to do so.  Section 8.01 of the WaMu PSA provides in relevant part:

> *No provision of this Agreement shall be construed to relieve the Trustee or the Delaware Trustee from liability for its own*

***negligent action, its own negligent failure to act or its own willful misconduct***; provided, however, that:

Prior to the occurrence of an Event of Default and after the curing of all such Events of Default which may have occurred, the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement,

Neither the Trustee nor the Delaware Trustee shall be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee or the Delaware Trustee, and, in the absence of bad faith on the part of the Trustee or the Delaware Trustee, such trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to such trustee and conforming to the requirements of this Agreement; and

Neither the Trustee nor the Delaware Trustee shall be personally liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Certificateholders holding Certificates which evidence Percentage Interests aggregating not less than 25% relating to the time, method and place of conducting any proceeding for any remedy available to such trustee, or relating to the exercise of any trust or power conferred upon such trustee under this Agreement.

(Emphasis added.)  The PSAs for the Citibank, JPMorgan, Credit Suisse, BOA, Bear, Goldman, Morgan Stanley, UBS, TBW and Wells Fargo Trusts contain substantially similar provisions.  *See* Ex. C § VII.

84.    Every trustee also has a non-waivable duty to exercise due care in the performance of ministerial acts required to be undertaken in the course of the administration of the trust.  U.S. Bank can be held liable for its own negligence in failing to perform ministerial acts it was required to perform, including, among other things, its responsibilities to: (i) take physical possession of the operative documents for the mortgage loans in the Covered Trusts; (ii) identify those mortgage loans for which there was missing, defective or incomplete documentation on the document exception report attached to the final

certification; (iii) make accurate representations in the certifications provided; (iv) render accurate reports under Regulation AB; (v) give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' widespread practice of including in securitization trusts loans which breached such representations and warranties; and (vi) provide notices of servicing related breaches known to the Trustee.  These are duties that U.S. Bank was required to perform under the PSAs, and U.S. Bank can be held liable for its own negligence when performing these duties on behalf of Certificateholders.

85.    Every trustee—including U.S. Bank —has an absolute duty to avoid conflicts of interest and a duty of undivided loyalty to trust investors.  This duty is non-waivable and arises independently of the PSAs.

### III.    U.S. BANK BREACHED ITS CONTRACTUAL, FIDUCIARY AND STATUTORY DUTIES

#### A.    U.S. Bank Was Aware of but Failed to Provide Notice of Sponsors' and Originators' Representation and Warranty Breaches

86.    U.S. Bank failed to give notice of defaults that occurred when the Sponsors or Originators breached representation and warranty provisions providing that all loans met applicable loan origination guidelines.  In reality, during the 2005–2007 time period, the Sponsors and Originators regularly disregarded their underwriting guidelines and the representations and warranties made to securitization trusts.

##### 1.    The Identity of the Sponsors and Originators that Made Representations and Warranties Regarding the Quality of the Mortgage Loans Underlying the Covered Trusts

87.    Either the Sponsor, Originator, or sometimes both, provided representations and warranties to the Covered Trusts.

88.     The chart below identifies each of the entities disclosed to be the Sponsors,

Originators and obligors of the loans included in the Covered Trusts:

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| 1 | ARMT 2005-10 | DLJ Mortgage Capital, Inc. | DLJ Mortg. Capital; Washington Mutual Bank | DLJ Mortg. Capital; Washington Mutual Bank |
| 2 | BAFC 2007-D | Bank of America, N.A. | Bank of America; American Home Mortg. Corp.; GreenPoint Mortg. Funding, Inc.; Wells Fargo Bank | Bank of America, N.A.; Bank of America; American Home Mortg. Corp.; GreenPoint Mortg. Funding, Inc.; Wells Fargo Bank |
| 3 | BSARM 2005-7 | EMC Mortgage Corp. | Bank of America; Countrywide Home Loans; National City Mortg. Co. | EMC Mortgage Corp. |
| 4 | CFLX 2006-1 | Chase Home Finance LLC | JPMorgan Chase Bank, N.A. | Chase Home Finance LLC |
| 5 | CMALT 2007-A1 | CitiMortgage, Inc. | CitiMortgage Inc. | CitiCorp Mortgage Securities, Inc. |
| 6 | CMALT 2007-A4 | CitiMortgage, Inc. | CitiMortgage Inc.; Provident Funding Associates | CitiCorp Mortgage Securities, Inc. |
| 7 | CMALT 2007-A5 | CitiMortgage, Inc. | CitiMortgage Inc.; American Home Mortg. Corp.; Provident Funding Associates; ABN Amro | CitiCorp Mortgage Securities, Inc. |
| 8 | CMALT 2007-A6 | CitiMortgage, Inc. | CitiMortgage Inc.; ABN Amro | CitiCorp Mortgage Securities, Inc. |
| 9 | CMLTI 2005-7 | Citigroup Global Markets Realty Corp. | Countrywide Home Loans, Inc.; GreenPoint Mortg. Funding, Inc.; SunTrust Mortg. Inc.; National City Mortg. Co.; Wells Fargo Bank, N.A. | Citigroup Global Markets Realty Corp.; Countrywide Home Loans, Inc.; GreenPoint Mortg. Funding, Inc.; SunTrust Mortg. Inc.; National City Mortg. Co.; Wells Fargo Bank, N.A. |

|  | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| 10 | CMLTI 2006-4 | Citigroup Global Markets Realty Corp. | PHH Mortg. Corp.; National City Mortg. Inc.; Equity Now Inc.; SunTrust Mortg., Inc.; American Home Mortg. Corp.; Washington Mutual Bank; Ameriquest Mortg. Co. | Citigroup Global Markets Realty Corp. |
| 11 | CMLTI 2006-AR1 | CSE Mortgage LLC | Wells Fargo Bank, N.A. | Citigroup Global Markets Realty Corp.; Wells Fargo Bank, N.A. |
| 12 | CMLTI 2007-AR5 | Citigroup Global Markets Realty Corp. | Wells Fargo Bank, N.A. | Citigroup Global Markets Realty Corp. |
| 13 | CSFB 2004-8 | DLJ Mortgage Capital, Inc. | DLJ Mortg. Capital; GreenPoint Mortg. Funding, Inc.; Washington Mutual Mortg. Securities Corp. | DLJ Mortg. Capital; GreenPoint Mortg. Funding, Inc.; Washington Mutual Mortg. Securities Corp. |
| 14 | GSR 2006-AR1 | Goldman Sachs Mortgage Co. | American Home Mortg. Corp.; Countrywide Home Loans, Inc.; GMAC Mortg. Corp.; National City Mortg. Co.; Wells Fargo Bank, N.A. | American Home Mortg. Corp.; Countrywide Home Loans, Inc.; GMAC Mortg. Corp.; National City Mortg. Co.; Wells Fargo Bank, N.A. |
| 15 | JPALT 2006-S2 | J.P. Morgan Mortgage Acquisition Corp. | SunTrust Mortg., Inc.; M&T Mortg. Corp.; GreenPoint Mortg. Funding, Inc. | J.P. Morgan Mortgage Acquisition Corp.; SunTrust Mortg., Inc.; M&T Mortg. Corp.; GreenPoint Mortg. Funding, Inc. |
| 16 | JPALT 2006-S4 | J.P. Morgan Mortgage Acquisition Corp. | Countrywide Home Loans, Inc.; Chase Home Finance LLC; JPMorgan Chase Bank, N.A.; PHH Mortg. Corp. | J.P. Morgan Mortgage Acquisition Corp.; Countrywide Home Loans, Inc.; Chase Home Finance LLC and JPMorgan Chase |

34

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| | | | | Bank, N.A.; PHH Mortg. Corp. |
| 17 | JPMMT 2005-A7 | J.P. Morgan Mortgage Acquisition Corp. | PHH Mortg. Corp.; Chase Home Fin. LLC; JPMorgan Chase Bank, N.A.; Wells Fargo Bank, N.A.; CTX Mortg. Co., LLC | J.P. Morgan Mortgage Acquisition Corp.; PHH Mortg. Corp.; Chase Home Fin. LLC; JPMorgan Chase Bank, N.A.; Wells Fargo Bank, N.A.; CTX Mortg. Co., LLC |
| 18 | JPMMT 2007-A4 | J.P. Morgan Mortgage Acquisition Corp. | Chase Home Fin. LLC; JPMorgan Chase Bank, N.A. | J.P. Morgan Mortgage Acquisition Corp.; Chase Home Fin. LLC; JPMorgan Chase Bank, N.A. |
| 19 | MABS 2006-AB1 | UBS Real Estate Securities Inc. | Wells Fargo Bank, N.A. | UBS Real Estate Securities Inc. |
| 20 | MSM 2006-7 | Morgan Stanley Mortgage Capital, Inc. | Morgan Stanley Mortg. Capital Inc.; Morgan Stanley Credit Corp.; GreenPoint Mortg. Funding, Inc.; MortgageIT, Inc. | Morgan Stanley Mortg. Capital Inc.; Morgan Stanley Credit Corp.; GreenPoint Mortg. Funding, Inc.; MortgageIT, Inc. |
| 21 | TBW 2006-6 | Taylor, Bean & Whitaker Mortgage Corp. | Taylor, Bean and Whitaker Mortg. Corp. | UBS Real Estate Securities Inc. |
| 22 | WAMU 2006-AR2 | Washington Mutual Bank | Washington Mutual Bank | Washington Mutual Bank |
| 23 | WAMU 2006-AR8 | Washington Mutual Bank | Washington Mutual Bank | Washington Mutual Bank |
| 24 | WAMU 2006-AR16 | Washington Mutual Bank | Washington Mutual Bank | Washington Mutual Bank |
| 25 | WAMU 2006-AR18 | Washington Mutual Bank | Washington Mutual Bank | Washington Mutual Bank |
| 26 | WAMU 2007-HY1 | Washington Mutual Bank | Washington Mutual Bank | Washington Mutual Bank |
| 27 | WAMU 2007-HY2 | Washington Mutual Bank | Washington Mutual Bank | Washington Mutual Bank |
| 28 | WAMU 2007-HY3 | Washington Mutual Bank | Washington Mutual Bank | Washington Mutual Bank |
| 29 | WAMU 2007-HY4 | Washington Mutual Bank | Washington Mutual Bank | Washington Mutual Bank |
| 30 | WAMU 2007-HY7 | Washington Mutual Bank | Washington Mutual Bank | Washington Mutual Bank |

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| 31 | WMALT 2007-4 | Washington Mutual Mortgage Securities Corp. | Washington Mutual Bank | Washington Mutual Mortgage Securities Corp. |
| 32 | WFMBS 2006-AR1 | Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. | Wells Fargo Asset Securities Corp. |

### 2. The Nature of the Sponsors' and Originators' Representations and Warranties

89.    The Covered Trusts contained representations and warranties concerning the pool of loans in the aggregate and the loans individually.  For example, for the WaMu Trusts, the Seller represented and warranted in the WaMu MLPA[10] that "[t]he Mortgage Loans have been underwritten substantially in accordance with [WaMu's] Underwriting Standards."  WaMu MLPA § 3.1(xx).  WaMu further represented and warranted the following:

> (i) The information set forth in the Mortgage Loan Schedule delivered on the Closing Date was true and correct in all material respects at the date or dates respecting which such information is furnished;
>
> (ii) As of the Closing Date, each Mortgage relating to a Mortgage Loan that is not a Cooperative Loan is a valid and enforceable . . . first lien on an unencumbered estate in fee simple or . . . leasehold estate in the related Mortgaged Property . . . ;
>
> (iii) Immediately upon the transfer and assignment contemplated herein, the Purchaser shall have good title to, and will be the sole legal owner of, each Mortgage Loan, free and clear of any encumbrance or lien . . . ;
>
> (iv) Except as set forth on Schedule III to the Term Sheet, if applicable, as of the day prior to the Cut-Off Date, all payments due on each Mortgage Loan had been made and no Mortgage Loan had been delinquent (*i.e.*, was more than 30 days past due) more than

---

[10] Section 2.09 of the WaMu PSA provides that WaMu "hereby assigns to the Trust all of its rights under the [MLPA], to the extent that the [MLPA] relates to the Mortgage Loans."

once in the preceding 12 months and any such delinquency lasted for no more than 30 days;

(vii) Each Mortgage Loan at the time it was made complied with all applicable local, state and federal laws, including, without limitation, usury, equal credit opportunity, disclosure and recording laws, and predatory and abusive lending laws applicable to the originating lender . . . ;

(ix) As of the Closing Date, each Mortgage Loan that is not a Cooperative Loan is covered by an ALTA form or CLTA form of mortgagee title insurance policy, or other form of policy of insurance acceptable to Fannie Mae or Freddie Mac. . . . ;

(xi) The Mortgage Note related to (a) each Mortgage Loan . . . requires the related Mortgagor to maintain a policy of hazard insurance, with extended coverage in an amount which is not less than the original principal balance of such Mortgage Loan. . . ;

(xiv) Each Mortgage (exclusive of any riders thereto) was documented by appropriate Fannie Mae/Freddie Mac mortgage instruments in effect at the time of origination, or other instruments approved by the Seller . . . ;

(xvi) As of the Closing Date, each Mortgage and Mortgage Note is the legal, valid and binding obligation of the maker thereof and is enforceable in accordance with its terms . . . ;

(xix) Prior to origination or refinancing, an appraisal of each Mortgaged Property was made by an appraiser on a form satisfactory to Fannie Mae or Freddie Mac . . . ;

(xxii) The Seller used no adverse selection procedures in selecting the Mortgage Loans from among the outstanding mortgage loans of the same type originated or purchased by it which were available for sale to the Purchaser and as to which the representations and warranties in this Section 3.1 could be made . . .;

(xxv) With respect to any Mortgage Loan as to which an affidavit has been delivered by the Seller to the Purchaser or its assignee certifying that the original Mortgage Note is a Destroyed Mortgage Note, if such Mortgage Loan is subsequently in default, the enforcement of such Mortgage Loan or of the related Mortgage will not be materially adversely affected by the absence of the original Mortgage Note (or portion thereof, as applicable);. . . .

37

(xxvii) No Mortgage Loan is a High Cost/Covered Loan, and no Mortgage Loan originated during the period of October 1, 2002 through March 6, 2003 is governed by the Georgia Fair Lending Act;

(xxviii) No Mortgage Loan is subject to the Home Ownership and Equity Protection Act of 1994 or Section 226.32 of Regulation Z, is a 'high-cost' loan or a 'predatory' loan as defined under any state or local law or regulation applicable to the originator of such Mortgage Loan or which would result in liability to the purchaser or assignee of such Mortgage Loan under any predatory or abusive lending law . . . ; and

(xxix) No Mortgage Loan has a Closing Date Loan-to-Value Ratio greater than 100%.

WaMu MLPA § 3.1.  In addition to the representation and warranties concerning the contents of the mortgage files for the underlying loans, the PSAs contained separate requirements for the content of the mortgage files to be transferred to the Covered Trusts as set forth above.  The PSAs or mortgage loan purchase agreements for the Citibank, JPMorgan, Credit Suisse, BOA, Bear, Goldman, Morgan Stanley, UBS, TBW and Wells Fargo Trusts contain substantially similar provisions.  *See* Ex. C § XII.

**3.    U.S. Bank's Discovery of Breaches of Representations and Warranties, but Failure to Provide Notice or Cause Repurchases with Respect to Breaches of Representations and Warranties and Mortgage File Exceptions**

90.    As noted above in Section II(B), each party, including the Trustee, had an obligation to provide notice of breaches of these representations and warranties and such notice triggered the Sponsors' or Originators' obligation to repurchase or substitute the defective loan.  *See also* Ex. C § VI.

91.    U.S. Bank knew that the Sponsors and Originators regularly disregarded their underwriting guidelines and representations and warranties made to securitization trusts long before Certificateholders learned of such problems.  Upon information and belief, U.S. Bank

38

discovered breaches of representations and warranties in the Covered Trusts when it received notices of representation and warranties breaches and other defaults specifically for numerous of the Covered Trusts.

92.    On top of the breach notices pertaining to the Covered Trusts, U.S. Bank served as trustee of hundreds, if not thousands, of RMBS trusts from 2004–2007 including many transactions involving the Sponsors and Originators.  In the course of administering these trusts, U.S. Bank learned that the Sponsors and Originators had departed from their underwriting guidelines, engaged in predatory lending and failed to ensure mortgage loans complied with state and federal laws.

93.    For example, while serving as trustee for various RMBS trusts, U.S. Bank was presented with a large number of defaulted loans that were originated by the Sponsors and Originators here and foreclosures were commenced often in U.S. Bank's name.

94.    Indeed, U.S. Bank commenced foreclosure actions in 2005-2008 for numerous loans in which the Sponsors or Originators were at issue, including, for example, foreclosure actions in which:

a.   Chase Home Finance served as Sponsor.  *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Lemerise*, No. 07-cv-1889 (C.P. Medina Cnty. 2007); *U.S. Bank Nat'l Ass'n v. Pinson*, No. 2007-cv-02176 (C.P. Montgomery Cnty. 2007).

b.   Countrywide Home Loans served as Originator.  *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Weber*, No. 2007-cv-01644 (C.P. Montgomery Cnty. 2007); *U.S. Bank Nat'l Ass'n v. Houston*, No. 2007-cv-03070 (C.P. Montgomery Cnty. 2007).

c.   Credit Suisse Financial Corporation served as Originator.  *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Bratcher*, No. 2008-07-5043 (C.P. Summit Cnty. 2008); *U.S. Bank Nat'l Ass'n v. Knoepfle*, No. 08-0727 (C.P. Montgomery Cnty. 2008); *U.S. Bank Nat'l Ass'n v. Robey*, No. 08-6267 (C.P. Montgomery Cnty. 2008).

d.   JPMorgan Chase Bank, N.A. served as Originator.  *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Siminou*, No. 0810754 (N.Y. Sup. Ct. 2008).

95.    Sometimes the defaults and foreclosures occurred just months after the loan was

originated or securitized.  In each foreclosure, U.S. Bank had a duty to examine foreclosure filings.  *See, e.g.*, WaMu PSA § 8.01(b) ("The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to it which are specifically required to be furnished to it pursuant to any provision of this Agreement, shall examine them to determine whether they are in the form required by this Agreement").  As real party in interest in these foreclosure actions, U.S. Bank had knowledge of the contents of foreclosure filings.  Through these filings, U.S. Bank knew that the borrowers either (i) did not qualify for the loans because they did not have the ability to repay the loans; (ii) were victims of predatory lending; or (iii) were given a loan that did not comply with state or federal law.

96.     U.S. Bank also commenced repurchase actions against Sponsors or Originators at issue here.  However, none of these actions included a Covered Trust, despite allegations by U.S. Bank that the Sponsors' and Originators' misconduct was widespread and systemic.  For example, at the direction of certain certificateholders, U.S. Bank, in its role as trustee or securities administrator, commenced actions against, among other entities, DLJ Mortgage (the Originator of loans for two of the Covered Trusts) and GreenPoint (the Originator of loans for five of the Covered Trusts) to compel repurchase of loans that breached representations and warranties.  In those actions, U.S. Bank alleged, among other things, that:

- The Originators sold a material number of loans to securitization trusts that did not comply with applicable underwriting guidelines, in violation of their representations and warranties;

- The Servicers failed to provide notice of each breach of a representation or warranty with respect to a mortgage loan; and

- The Servicers failed to use reasonable efforts to foreclose upon or otherwise

40

comparably convert the ownership of properties securing such of the mortgage loans as came into and continued in default and as to which no satisfactory arrangements could be made for collection of delinquent payments.

*See*, *e.g.*, *U.S. Bank Nat'l Ass'n v. Greenpoint Mortg. Funding, Inc.*, No. 09-cv-600352 (N.Y. Sup. Ct. Feb. 5, 2009); *MASTR Asset Back Sec. Trust 2006-HE3, by U.S. Bank Nat'l Ass'n v. WMC Mortg. Corp.*, No. 11-cv-02542 (D. Minn. Sept. 2, 2011); *U.S. Bank Nat'l Ass'n v. DLJ Mortg. Capital, Inc.*, No. 13-cv-650369 (N.Y. Sup. Ct. Feb. 1, 2013); *Asset Backed Sec. Corp. Home Equity Loan Trust, Series AMQ 2006-7 (ABSHE 2006-HE7), by U.S. Bank Nat'l Ass'n v. DLJ Mortg. Capital, Inc.*, No. 12-cv-654147 (N.Y. Sup. Ct. May 5, 2013); *U.S. Bank Nat'l Ass'n v. Greenpoint Mortg. Funding, Inc.*, No. 13-cv-4707 (S.D.N.Y. Jul. 8, 2013); *U.S. Bank Nat'l Ass'n v. DLJ Mortg. Capital, Inc.*, No. 13-cv-651174 (N.Y. Sup. Ct. Jul. 31, 2013); *U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, No. 13-cv-651954 (N.Y. Sup. Ct. Nov. 6, 2013); *U.S. Bank Nat'l Ass'n v. DLJ Mortg. Capital, Inc.*, No. 13-cv-652699 (N.Y. Sup. Ct. Jan. 6, 2014). These lawsuits, in which U.S. Bank alleged pervasive and systemic breaches of representations and warranties, and which U.S. Bank began filing as early as 2009, demonstrate that it was aware of similarly pervasive and systemic breaches of representations and warranties in the Covered Trusts, but nonetheless failed to exercise due care.

97. In one repurchase action that U.S. Bank brought against GreenPoint Mortgage Funding, Inc., U.S. Bank stated in its complaint that "less than two years after the close of the transaction, the loans began to default at staggering rates . . . ." *See* Compl. ¶ 2, *U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, No. 09-cv-600352 (N.Y. Sup. Ct. Feb. 5, 2009). U.S. Bank stated that a forensic review conducted before filing the complaint revealed that "an astonishing…93%" of the sampled loans did not comply with GreenPoint's representations and warranties, and that the "results of the sample analysis, together with the

41

severe underperformance of the entire pool of GreenPoint loans, indicate that such breaches were not confined to the sample of loans reviewed, but rather were pervasive." *Id.* ¶ 2. Additionally, U.S. Bank stated that the breaches identified "suggest a pervasive pattern of malfeasance, misconduct and/or negligence in connection with GreenPoint's loan-origination practices as a whole." *Id.* ¶ 36.

98.     Thus, beginning as early as 2009 and thereafter, U.S. Bank discovered in the course of its trustee duties the following: widespread uncured breaches of the representations and warranties regarding the loans held by specific Covered Trusts; the obligation of the party that made those representations and warranties to repurchase the loans; loans for which the mortgage files were missing or incomplete; the obligation to correct material defects in the mortgage files; and the material and adverse impact such breaches and defects had on the Covered Trusts. Nonetheless, U.S. Bank failed to make any claim against the responsible party, and instead allowed the statute of limitations for asserting any such claim to lapse.

99.     U.S. Bank's awareness of these facts is demonstrated, for example, by U.S. Bank's September 21, 2009 filing of proof of claims in *In re Lehman Brothers Holdings Inc., et al.*, No. 08-13555 (JMP) (Bankr. S.D.N.Y.). Acting as Trustee for a number of RMBS trusts, specifically including the four GreenPoint Trusts at issue in this case, U.S. Bank filed proofs of claim stating:

> ***Repurchase Obligations.*** Pursuant to the Trust Agreements, the Debtor made certain representations, warranties and covenants about the Mortgage Loans that were subsequently acquired by the Trusts. **If there is a violation of a representation, warranty or covenant with respect to any Mortgage Loan that was sold to the Trust that materially adversely affects the value of such Mortgage Loan or the interest of the Certificateholders therein, the Debtor is obligated to repurchase that Mortgage Loan.**
>
> **As of the date of this Proof of Claim, the Trustee has been advised that the Debtor's representations, warranties and/or**

42

**covenants with respect to the Mortgage Loans identified on Schedule B were incorrect or untrue which materially and adversely affect the value of such Mortgage Loans and the interest of the Certificateholders therein and such breaches cannot be or have not been cured.** . . . To date, the Debtor has not fulfilled its obligation to repurchase these Mortgage Loans. **As a result of the Debtor's breach of its representations, warranties and/or covenants in respect of these Mortgage Loans and the Debtor's (and Seller's) failure to repurchase them, the Trustee hereby asserts a claim against the Debtor in an amount not less than the repurchase price as and when required by the Trust Agreements and/or the Mortgage Loan Sale Agreements**, plus such additional amount for any other breaches of the obligations to repurchase as may exist from time to time plus interest on any past due amount as noted below.

. . .

***Obligation to Cure Documentary Exceptions.*** **In addition to the foregoing, the Custodians have identified that certain Mortgage Loan files are missing or contain defective documentation. The Debtor is obligated to correct material defects in the loan files. . . . [M]any if not all of these may impair the value of the respective Mortgage Loan or the interest of the holders of the Certificates therein. As a result, the Trustee asserts a claim up to the lesser of the full principal amount of these Mortgage Loans or the outstanding balance of the Certificates as set forth by Trust in Schedule D**, plus such additional amount as may be determined based upon additional documentary exceptions becoming known by the Trustee.

(emphasis added.)

100.    U.S. Bank discovered document exceptions for the Covered Trusts as well because, as set forth above, either U.S. Bank itself or Custodians on behalf of U.S. Bank completed the certifications and exception reports for the Covered Trusts. The Sponsors or Originators were obligated to repurchase the mortgage loans with uncured documentary exceptions.

101.    U.S. Bank also received written notice of systemic, widespread Sponsor breaches from monoline insurers.

43

102.    Monoline insurance is a form of credit enhancement that involves purchasing insurance to cover losses from any defaults.  Many RMBS trusts were insured by monoline insurers.  The sponsors of the mortgage loans made representations and warranties concerning the underwriting standards of the loans in the governing agreements for the insured RMBS.  The governing agreements for the insured RMBS transactions have a repurchase procedure through which the monoline insurers must provide notice of a breach of representation and warranty to the responsible mortgage loan sponsor and the parties to the agreement, including the trustee.

103.    Monoline insurers have filed many complaints against Sponsors and Originators of the Covered Trusts for breaches of their representations and warranties in connection with other RMBS trusts.  Prior to filing suit against the mortgage loan sponsors, the monoline insurers were often able to obtain and carry out a forensic loan level review of the loans at issue.

104.    For example, in *MBIA Ins. Co. v. Morgan Stanley*, No. 29951/10 (N.Y. Sup. Ct. Dec. 6, 2010), the monoline insurer MBIA Insurance Corporation ("MBIA") sued Morgan Stanley, Morgan Stanley Mortgage Capital Holdings, LLC and Saxon Mortgage Services, Inc., reporting that its review of loan files securitized by the defendants revealed breaches of representations and warranties, including an extraordinarily high incidence of material deviations from the underwriting standards that defendants represented would be followed.  Of the 2,957 loan files that were reviewed by MBIA, 2,857 or 96.6% contained one or more breaches of the mortgage loan representations.  *Id*. at 72.  The reviewed mortgage loans included 1,051 that were selected at random from the securitized pool, of which 982 or 93.4% contained one or more breaches of the mortgage loan representations.  *Id*.  Another 1,906 defaulted loans were reviewed, of which 1,875 or 98.4% contained one or more breaches of the mortgage loan representations.  *Id*.  In May 2011, the court denied a motion to dismiss all but one count of the

complaint.  *MBIA Ins. Corp. v. Morgan Stanley*, 42 Misc. 3d 1213(A), 984 N.Y.S.2d 633 (Sup.

Ct. 2011).  The parties settled the case in December 2011.

105.    In *MBIA Ins. Co. v. Credit Suisse Sec. (USA) LLC*, No. 603751/2009 (N.Y. Sup.

Ct. Feb. 11, 2010), MBIA sued Credit Suisse.  *Id.*  MBIA reported that its review of loan files

securitized by the defendants revealed breaches of representations and warranties, including an

extraordinarily high incidence of material deviations from the underwriting standards that

defendants represented would be followed.  *Id.*  Of the 1,798 loan files that were reviewed by

MBIA, approximately 85% contained one or more breaches of the mortgage loan

representations.  *Id.*  In other cases, monoline insurers have reached similar findings regarding

Credit Suisse's widespread breach of representations and warranties concerning the loans

securitized in Credit Suisse-label trusts.  *See, e.g.*, Compl., *Assured Guaranty Municipal Corp. v.

DLJ Mortg. Capital Inc.*, No. 652837/2011 (N.Y. Sup. Ct. Oct. 17, 2011) (forensic review

confirmed that DLJ breached representations about the loans and that a huge number of defective

mortgages were packaged into securities); Compl., *FGIC* v. *Credit Suisse Secs. (USA) LLC,* No.

651178/2013, at ¶ 9 (N.Y. Sup. Ct. Apr. 2, 2013) (forensic review confirmed that "Credit

Suisse's pre-closing representations were fraudulent, the warranties it made in the Insurance

Agreement were false, and it willfully disregarded and frustrated its contractual covenants").

106.    U.S. Bank received notice of Morgan Stanley and Credit Suisse monoline actions

as it was the trustee for trusts in those actions.

107.    Because the monoline insurers' findings from loan level reviews set forth both in

their breach notices and publicly available lawsuits reflected these common mortgage loan

sellers' systemic and pervasive violations of underwriting and securitization guidelines, U.S.

Bank discovered that these same defective underwriting and securitization practices applied

45

equally to the Covered Trusts containing loans originated and securitized by these same Originators and Sponsors.

108.    In addition to U.S. Bank's receipt of breach notices for the Covered Trusts, and acknowledgment of the Sponsors' and Originators' widespread breaches of representations and warranties through statements in U.S. Bank's own court filings or information it discovered in foreclosure actions and monoline insurers' actions set forth above, U.S. Bank also was aware, beginning in 2009 or 2010, of facts that began to emerge publicly which demonstrated to U.S. Bank that the Sponsors and Originators—and, indeed, U.S. Bank itself as set forth below—had regularly included loans in securitizations that did not comply with applicable underwriting guidelines, made predatory loans and failed to meet state and federal lending guidelines. These facts are set forth in Exhibit F.  That U.S. Bank itself was involved in the same misconduct demonstrates that it was aware of widespread, systemic abandonment of underwriting guidelines and related representation and warranty breaches by other market participants.

109.    The Sponsors and Originators have been the subject of numerous investigations and lawsuits alleging systematic abandonment of underwriting guidelines in the pursuit of profits.  These investigations and lawsuits contain ample evidence available to U.S. Bank that mortgage loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.  Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans.

110.    Further, these lawsuits and investigations demonstrate that the originators originated mortgage loans with the goal of increasing volume, rather than evaluating the

mortgagor's ability to repay the loan, and regularly made exceptions to underwriting guidelines in the absence of sufficient compensating factors. These lawsuits, in conjunction with the poor performance of the underlying loans (which U.S. Bank was aware of as it issued regular reports regarding performance) and the public information concerning widespread issues among originators, were more than sufficient to provide U.S. Bank with notice that large numbers of loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.

111.    U.S. Bank was aware of these reports, investigations and lawsuits and it also had additional information concerning representation and warranty violations that it learned in the course of administering the Covered Trusts. In addition to the notices pertaining to the Covered Trusts, U.S. Bank also had access to non-public information regarding the Covered Trusts that would have confirmed the widespread representation and warranty violations and documentary exceptions affected the Covered Trusts if U.S. Bank had not been willfully blind or had conducted even a limited investigation. Thus, U.S. Bank was aware of the defaults, but failed to provide the required notice and pursue repurchase claims.

112.    While investors such as Plaintiffs lacked the ability to determine whether the publicly reported misconduct by the Sponsors and Originators impacted specific loans backing the Covered Trusts, U.S. Bank had knowledge of specific problems with specific loans as well as access to the mortgage loan files. At a minimum, in its roles as Trustee to hundreds of RMBS trusts, U.S. Bank was privy to information that would have provided the "scent" of a problem with the loans underlying the Covered Trusts. Having caught wind of the problem, U.S. Bank had statutory and common law duties requiring it to "nose to the source."

47

113.    The Sponsors' and Originators' systemic abandonment of underwriting guidelines has had a devastating effect on the performance of the Covered Trusts.  Almost all of the Certificates acquired by Plaintiffs were triple-A or double-A rated at the time of purchase.  *See* Ex. D.  Now most are "junk" bonds that do not qualify for any investment grade rating.  *See id.*  These downgrades were prompted by the alarming rate of defaults and delinquencies of the mortgage loans backing the Covered Trusts and the information that has emerged concerning the Sponsors' and Originators' systemic abandonment of underwriting guidelines.  A summary of the Covered Trusts' default and delinquency rates and the Covered Trusts' cumulative losses is attached as Exhibit E.

114.    If U.S. Bank had provided the required notices, it would have forced the Sponsors or Originators to repurchase, or substitute if within the period specified in the PSAs, the relevant loans, and the Sponsors would not have been able to issue additional fraudulent RMBS certificates.  U.S. Bank had a continuing duty to provide such notice but failed to do so throughout its tenure as Trustee.  Indeed, U.S. Bank let the statute of limitations to bring repurchase claims based on breaches of representation and warranties and documentary exceptions lapse by failing to provide notice or take other action within six years of the closing of each Covered Trust.

**B.    U.S. Bank Failed to Act Prudently
        Upon the Occurrence of Events of Default**

115.    When U.S. Bank learned that the Master Servicers or Servicers failed to provide notice of numerous breaches of representation and warranty provisions as required under the PSAs, U.S. Bank should have acted like a prudent person would in the exercise of its own affairs and (i) taken action against the Master Servicers or Servicers; (ii) taken steps to require the Sponsors or Originators to repurchase or substitute the loans; and (iii) notified

Certificateholders of the Master Servicers' or Servicers' defaults and the breaches of representation and warranty provisions.  During the period that an Event of Default was in existence, U.S. Bank had a continuing duty to prudently exercise all remedies available to it, including to enforce repurchase rights.  As such, U.S. Bank should have, at a minimum, reviewed all defaulted loans as it defaulted and whether a responsible party was required to repurchase such loans.  U.S. Bank continually failed to do so and let the statute of limitations to bring repurchase claims lapse by failing to take sufficient action within six years of the closing of each Covered Trust.

116.    Although certain Events of Default require formal notice and an opportunity to cure, U.S. Bank cannot escape its duty of prudence by failing to provide the required notice.  As set forth in Section III(A), U.S. Bank was aware (or would have been aware if it had carried out its duties) that the Master Servicers, Servicers, Depositors, Sponsors, and U.S. Bank itself, failed to provide notice of the Sponsors' and Originators' representation and warranty violations that occurred in the Covered Trusts.  U.S. Bank, however, did not provide notice of such defaults as it was required to do.  Because these defaults would have seasoned into Events of Default if notice had been provided, U.S. Bank had the duty to act prudently to exercise available remedies, including to enforce repurchase provisions once it learned of such defaults.

117.    As described below, additional Events of Default occurred under the terms of the PSAs.  U.S. Bank has repeatedly breached its duty to prudently exercise available remedies after Events of Default throughout the life of the Covered Trusts.

### 1.    Events of Default Relating to Document Delivery Failures in the Covered Trusts

118.    As discussed above in Section II, U.S. Bank, or Custodians acting on its

49

behalf, had a duty to identify in final certifications and exception reports mortgage files that were missing documentation required to be delivered under the PSAs, typically documents required to prove ownership of the note and mortgage or otherwise protect title.  U.S. Bank knew of numerous instances where it did not receive the original mortgage note with all intervening endorsements that showed a complete chain of endorsement from the Originator to the Sponsor or Depositor or a lost mortgage note affidavit, as well as a duly executed assignment of mortgage for each loan that was not a MERS loan, the original recorded mortgage for each loan that was not a MERS loan, the original mortgage for those loans that were MERS loans, or the original recorded assignment or assignment of the mortgage together with all interim recorded assignments and the original lender's title policy.

119.    When U.S. Bank, or Custodians on its behalf, prepared the final certifications and exceptions reports, they were provided to the Sponsors, Depositors and Master Servicers (or Servicers) indicating many of these missing documents.  U.S. Bank was aware that affected loans were not repurchased or substituted for because the Trustee was required to take action each time a loan was substituted or repurchased.  For example, Section 2.10 of the WaMu PSA requires the Trustee to execute documents, or amend MERS registrations, whenever a loan is substituted for or repurchased.  Other PSAs provide that it was the Trustee's duty to seek cure, repurchase or substitution and, as a result, U.S. Bank knew that affected loans were not cured, repurchased, or substituted because it did not seek such remedies.

120.    Rather than take action to ensure the responsible parties cured such defects or substituted or repurchased the affected loans, U.S. Bank stood by while the Sponsors, Servicers and Master Servicers of the Covered Trusts engaged in so called "robosigning" on

a widespread basis when the missing documents were needed to foreclose on properties underlying the Covered Trusts.  As set forth in Exhibit G, U.S. Bank and the entities disclosed to be Sponsors, Servicers and Master Servicers of the Covered Trusts have been implicated in numerous governmental reports, court orders, and press reports regarding servicing misconduct and the massive cover up of the failure to deliver documentation concerning securitized mortgage loans known as the "robo-signing" scandal.  This is powerful evidence of the systemic document delivery failures and U.S. Bank's knowledge of such failures.

121.    The chart below identifies each of the entities disclosed to be Sponsors, Servicers and Master Servicers of the Covered Trusts, each of which engaged in a cover-up of the relevant Sponsors' and Depositors' systemic document delivery failures (as fully described in Exhibit G).[11]

|  | **Trust** | **Sponsor** | **Servicers** | **Master Servicer** |
|---|---|---|---|---|
| 1 | ARMT 2005-10 | DLJ Mortgage Capital, Inc. | Washington Mutual Bank; Wells Fargo Bank, N.A.; Select Portfolio Servicing, Inc.; Countrywide Home Loans Servicing LP; GMAC Mortgage Corp.; National City Mortgage Co.; EverBank; PHH Mortgage Corp.; IndyMac Bank, F.S.B. | Wells Fargo Bank, N.A. |
| 2 | BAFC 2007-D | Bank of America, N.A. | Bank of America, N.A.; Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |
| 3 | BSARM 2005-7 | EMC Mortgage Corp. | Bank of America, N.A.; Countrywide Home Loans Servicing LP; EMC Mortgage Corp.; HomeBanc Mortgage Corp.; National | Wells Fargo Bank, N.A. |

---

[11] As set forth below, certain servicers have since been replaced by other servicers who have themselves engaged in similar conduct.

| | Trust | Sponsor | Servicers | Master Servicer |
|---|---|---|---|---|
| | | | City Mortgage Co.; and PHH Mortgage Corp. | |
| 4 | CFLX 2006-1 | Chase Home Finance LLC | JPMorgan Chase Bank, N.A.; Chase Home Finance LLC | |
| 5 | CMALT 2007-A1 | CitiMortgage, Inc. | CitiMortgage, Inc. | CitiMortgage, Inc. |
| 6 | CMALT 2007-A4 | CitiMortgage, Inc. | CitiMortgage, Inc. | CitiMortgage, Inc. |
| 7 | CMALT 2007-A5 | CitiMortgage, Inc. | CitiMortgage, Inc. | CitiMortgage, Inc. |
| 8 | CMALT 2007-A6 | CitiMortgage, Inc. | CitiMortgage, Inc.; ABN AMRO Mortgage Group, Inc. | CitiMortgage, Inc. |
| 9 | CMLTI 2005-7 | CitiMortgage, Inc. | Countrywide Home Loans Servicing LP; GreenPoint Mortgage Funding, Inc.; SunTrust Mortgage Inc.; National City Mortgage Co.; Wells Fargo Bank, N.A. | CitiMortgage, Inc. |
| 10 | CMLTI 2006-4 | Citigroup Global Markets Realty Corp. | PHH Mortgage Corp.; National City Mortgage Co.; Wells Fargo Bank, N.A.; SunTrust Mortgage; Washington Mutual Bank; GMAC Mortgage Corp. | CitiMortgage, Inc. |
| 11 | CMLTI 2006-AR1 | CSE Mortgage LLC | Wells Fargo Bank, N.A. | CitiMortgage, Inc. |
| 12 | CMLTI 2007-AR5 | Citigroup Global Markets Realty Corp. | Wells Fargo Bank, N.A. | CitiMortgage, Inc. |
| 13 | CSFB 2004-8 | DLJ Mortgage Capital, Inc. | GreenPoint Mortgage Funding, Inc.; Select Portfolio Servicing, Inc.; Wells Fargo Bank, N.A.,; ABN AMRO Mortgage Group, Inc.; Cenlar FSB; CitiMortgage, Inc.; Chase Manhattan Mortgage Corp.; Countrywide Home Loans Servicing LP; Fifth Third Bank; HSBC Mortgage Corporation (USA); Nexstar Financial Corp.; Wachovia | Wells Fargo Bank, N.A. |

|  | Trust | Sponsor | Servicers | Master Servicer |
|---|---|---|---|---|
|  |  |  | Mortgage Corp.; Washington Mutual Bank |  |
| 14 | GSR 2006-AR1 | Goldman Sachs Mortgage Co. | American Home Mortgage Servicing, Inc.; Countrywide Home Loans Servicing LP; GMAC Mortgage Corp.; National City Mortgage Co.; Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |
| 15 | JPALT 2006-S2 | J.P. Morgan Mortgage Acquisition Corp. | JPMorgan Chase Bank, N.A.; SunTrust Mortgage, Inc. | Wells Fargo Bank, N.A. |
| 16 | JPALT 2006-S4 | J.P. Morgan Mortgage Acquisition Corp. | Countrywide Home Loans Servicing LP; JPMorgan Chase Bank, N.A.; PHH Mortgage Corp. | Wells Fargo Bank, N.A. |
| 17 | JPMMT 2005-A7 | J.P. Morgan Mortgage Acquisition Corp. | JPMorgan Chase Bank, N.A.; PHH Mortgage Corp.; Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |
| 18 | JPMMT 2007-A4 | J.P. Morgan Mortgage Acquisition Corp. | JPMorgan Chase Bank, N.A. | Wells Fargo Bank, N.A. |
| 19 | MABS 2006-AB1 | UBS Real Estate Securities Inc. | Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |
| 20 | MSM 2006-7 | Morgan Stanley Mortgage Capital, Inc. | Morgan Stanley Credit Corp.; GMAC Mortgage Corp.; GreenPoint Mortgage Funding, Inc.; PHH Mortgage Corp.; Wachovia Mortgage Corp.; Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |
| 21 | TBW 2006-6 | Taylor, Bean & Whitaker Mortgage Corp. | Taylor, Bean & Whitaker Mortgage Corp. | Wells Fargo Bank, N.A. |
| 22 | WAMU 2006-AR2 | Washington Mutual Bank | Washington Mutual Bank |  |
| 23 | WAMU 2006-AR8 | Washington Mutual Bank | Washington Mutual Bank |  |
| 24 | WAMU 2006-AR16 | Washington Mutual Bank | Washington Mutual Bank |  |
| 25 | WAMU 2006-AR18 | Washington Mutual Bank | Washington Mutual Bank |  |
| 26 | WAMU 2007-HY1 | Washington Mutual Bank | Washington Mutual Bank |  |

| | Trust | Sponsor | Servicers | Master Servicer |
|---|---|---|---|---|
| 27 | WAMU 2007-HY2 | Washington Mutual Bank | Washington Mutual Bank | |
| 28 | WAMU 2007-HY3 | Washington Mutual Bank | Washington Mutual Bank | |
| 29 | WAMU 2007-HY4 | Washington Mutual Bank | Washington Mutual Bank | |
| 30 | WAMU 2007-HY7 | Washington Mutual Bank | Washington Mutual Bank | |
| 31 | WMALT 2007-4 | Washington Mutual Mortgage Securities Corp. | Washington Mutual Bank | |
| 32 | WFMBS 2006-AR1 | Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |

122.    Events of Default occurred shortly after the final exception reports were delivered for each of the Covered Trusts under multiple provisions of the PSAs.  These Events of Default triggered a continuing duty to review defaulted loans to determine if such loans should be repurchased.

123.    First, each PSA requires that the Servicers' failure to adhere to prudent servicing standards, or the Master Servicers' failure to monitor and require the Servicers to adhere to prudent servicing standards, ripens into an Event of Default if left uncured within a specified period after notice by the Trustee of such breach.  For example, Section 7.01 of the WaMu PSA provides that an Event of Default occurs if the Servicer fails to prudently service the mortgage loans and such breach is not remedied within 60 days of notice of the breach.  The Citibank, JPMorgan, Credit Suisse, BOA, Bear, Goldman, Morgan Stanley, UBS, TBW and Wells Fargo Trusts PSAs contain similar provisions.  *See* Ex. C § X.  As set forth in Exhibit G, when borrowers defaulted and the Servicers or Master Servicers were required to commence foreclosures they fabricated the documents necessary to foreclose rather than cause the Sponsor, Depositor or Originator to repurchase or substitute the affected loan.  Both the Servicers and U.S.

54

Bank was aware that these loans were not put back to the Sponsors or Originators and, instead, as described in Exhibit G, that the Servicers robo-signed the documentation required to foreclose. These acts of robo-signing were breaches of the applicable prudent servicing standards, as a prudent servicer would have insisted that the loans be repurchased, and would not have forged documents or submitted such fraudulent evidence in judicial foreclosure proceedings. And Master Servicers properly monitoring Servicers would have not permitted Servicers to commit forgery and submit fraudulent court filings. Having failed to provide notice to the Servicers and Master Servicers of these defaults, the Trustee had an obligation to act prudently to address all defaults.

124. Second, Section 7.01(c)(i) of the WaMu PSA provides that an Event of Default also occurs if the Depositor (in addition to the Servicer) fails to perform its obligations under the PSA and such breach is not remedied within 60 days of notice of the breach. As discussed above in Sections II(A) and III(A)(3), the Depositor had an obligation to deliver complete mortgage loan files but failed to do so. Pursuant to Section 2.07 of the WaMu PSA, the final exception report provided notice of the Depositor's breaches. *See* Ex. C § IV. Following such notice, the breaches ripened into Events of Default and U.S. Bank during its tenure as Trustee had a duty to exercise due care to protect Certificateholders' interests. *See* Ex. C § X.

125. Third, the Citibank, JPMorgan, Credit Suisse, BOA, Bear, Goldman, Morgan Stanley, UBS, TBW and Wells Fargo Trusts provide that failure to meet prudent servicing standards is an Event of Default if left uncured for a designated period of time after notice of the default. *See* Ex. C §§ IX, X. As also set forth in Section II(F) above, the Morgan Stanley PSA provides that the Master Servicer's failure to perform its covenant to prudently

55

service the mortgage loans within the first year of the trust ripened into an Event of Default immediately.  Because the Servicers failed to act prudently and cause the repurchase or substitution of loans with incomplete documentation rather than foreclose, Events of Default were triggered under these PSAs without regard to the notice required to be given by the Trustee.

126.    These Events of Default triggered U.S. Bank's duty to act prudently to protect the interests of the Certificateholders in all respects, a duty that continues to this date because the document defects were not cured within the required period and the affected loans were not repurchased.  U.S. Bank had a continuing obligation to seek repurchase of loans missing required documentation throughout its tenure as Trustee, including as loans on the final exception report defaulted.  U.S. Bank further had a duty to determine whether other defaulted loans should be put back to the responsible parties' based on representation and warranty violations because an Event of Default had occurred.  U.S. Bank has repeatedly breached these duties throughout its tenure as Trustee.

### 2.    U.S. Bank Received Written Notice of Representation and Warranty Violations Which Ripened into Events of Default

127.    In addition to the Events of Default discussed above, on July 21, 2011, the Association of Mortgage Investors notified JPMorgan and major RMBS trustees that "substantial evidence [] has emerged of abuses in the servicing and monitoring of" RMBS.  The letter set forth in detail the publicly available evidence demonstrating that there was widespread evidence, including some of the evidence referenced in this Amended Complaint, that loan originators had systemically breached representations and warranties provided to securitization trusts, and that the parties servicing loans underlying securitization trusts had systemically breached their obligations under applicable servicing agreements.  The letter cautioned, "[y]ou cannot be

negligent in ascertaining the pertinent facts regarding the underlying collateral;" "[u]pon discovery of representation or warranty breaches, you have to notify the appropriate parties;" "you must comply with your obligations . . . to take action to remedy the servicer Events of Default in the best interests of the Certificateholders."

128.    On or about December 15, 2011, a group of institutional investors purporting to hold over 25% of the outstanding notes for the JPMorgan Trusts for which U.S. Bank serves as trustee provided notice of numerous defaults by the Servicers, Sponsor and Originators.

129.    To date, U.S. Bank has not exercised due care to ensure that the Certificateholders' interests are protected, and instead, has agreed to a settlement of repurchase liabilities for the JPMorgan Trusts that is grossly inadequate.

130.    Upon information and belief, U.S. Bank received notices of other Events of Defaults specifically referencing the Covered Trusts.

### 3.    Events of Default Concerning False Servicer Certifications

131.    Each PSA obligated the Servicer to certify annually that it met its obligations under the PSAs and applicable federal regulations.  For example, Section 3.13(e) of the WaMu PSA requires the Servicer to certify, among other things,

>    (i)    a review of the Servicer's (or, in the case of a statement from any such other party, such other party's) activities during the preceding calendar year (or the applicable portion thereof in the case of the initial statement) and of its performance under this Agreement (or the servicing agreement applicable to such other party) has been made under such officer's supervision; and

>    (ii)    to the best of such officer's knowledge, based on such review, the Servicer (or such other party) has fulfilled all of its obligations under this Agreement (or the servicing agreement applicable to such other party) in all material respects throughout the preceding calendar year (or the applicable portion thereof) or, if there has been a failure to

> fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status thereof;

The PSAs for the Citibank, JPMorgan, Credit Suisse, BOA, Bear, Goldman, Morgan Stanley, UBS, TBW and Wells Fargo Trusts contain substantially similar requirements. *See* Ex. C § XIII.

132.    The failure to provide a conforming certification is an Event of Default under each of the PSAs. *See* Ex. C § X. Under the BOA, TBW and UBS PSAs, such failure is automatically an Event of Default without the requirement for any notice. *See* Ex. C § X.

133.    U.S. Bank received certifications, or at a minimum had access to and should have received them, that it knew to be false because the Servicers were not in fact meeting their obligations under the PSAs and the certifications failed to disclose numerous representations and warranty violations. As discussed in Sections III(A)(3), III(B)(1) and III(C), U.S. Bank was aware of numerous representation and warranty violations that were not disclosed in the required servicing certifications. U.S. Bank was aware of these breaches and therefore knew the required Servicer certifications did not conform because they were false and the PSAs only allowed U.S. Bank to relay on the certifications if it had a good faith basis to believe them to be true. Events of Default were triggered as a result.

134.    In addition, under the Credit Suisse and Goldman Sachs PSAs, the Servicers or Master Servicers provide a representation and warranty and covenant that all reports provided under the PSA, including servicing compliance certifications, were accurate and complete. For example, Section 2.1(m) of the GSR 2006-AR1 Servicing Agreement provides: "No statement, report or other document prepared and furnished by the Servicer or to be prepared and furnished by the Servicer pursuant to this Agreement in connection with the

transactions contemplated hereby contain or will contain any untrue statement of fact or omit to state a fact necessary to make the statements contained therein not misleading." The Credit Suisse PSAs contain substantially similar provisions. *See* ARMT 2005-10 PSA § 2.08(b) and CSFB 2004-8 PSA § 2.08(b). As addressed above in Section II(B), U.S. Bank had a duty to provide notice of breaches of representations and warranties or covenants resulting from the Servicers' or Master Servicers' false certifications, but failed to do so despite being aware of them. Because U.S. Bank cannot avoid the duty to act prudently by failing to give notice of a default, these breaches ripened into an Event of Default triggering U.S. Bank's duty to act prudently to protect the Certificateholders' interests.

### 4. Events of Default Concerning the Master Servicers' and Servicers' Imprudent Servicing that Looted the Covered Trusts' Assets

135. In addition to the servicing related defaults and Events of Default described above, the Servicers and Master Servicers have engaged in a variety of schemes to overcharge borrowers in default in violation of their contractual duties to prudently service the loans. These scams have dramatically increased loss severities on defaulted mortgages and, as a result, dramatically increased Plaintiffs' losses.

136. From 2005 until today, the Servicers and Master Servicers have cheated borrowers and the Covered Trusts after default by, *inter alia*, charging improper and excessive fees (including without limitation fees for property maintenance prior to foreclosure), failing to properly oversee third-party vendors and procuring insurance policies for properties that were already insured.

137. When a defaulting borrower's home is foreclosed upon and sold, the Servicers and Master Servicers deduct their fees (which defaulting borrowers are in no position to pay themselves) and any servicing advances from sale proceeds before any funds are transferred

to the securitization trust that purportedly owned the mortgage loan and thus was entitled to the net sale proceeds.  By charging and collecting improper and inflated fees, the Servicers and Master Servicers wrongfully diverted trust assets away from the Certificateholder and to the Servicers themselves.

138.    These overcharges are unlawful and resulted in breaches under the PSAs because they do not meet the prudent servicing standard.  As noted in Sections III(B)(1) and III(B)(3), servicing related defaults known to U.S. Bank triggered U.S. Bank's duty to act prudently.  U.S. Bank was aware of these servicing scams, which have been the subject of high profile government investigations, lawsuits and press coverage, including articles in banking industry publications like the *American Banker*.  Exhibit H summarizes the servicing misconduct involving the relevant Servicers and Master Servicers. Nonetheless, U.S. Bank has failed to act prudently to protect Certficateholders, including Plaintiffs, from the Servicers' and Master Servicers' looting of assets from the Covered Trusts.

### 5.    Events of Defaults under the Indentures

139.    As noted above, two of the Covered Trusts were documented using an Indenture rather than a PSA.  While the same type of Events of Default occurred under the Indenture as described herein, the relevant provisions are slightly different in that the Issuer's (*i.e.*, the trust's) breach of the Indenture gives rise to an Event of Default rather than the Master Servicer's  or Servicer's breaches.  As described above, the Indentures require the Issuer to broadly take actions to protect the trust collateral.

140.    The failure to do so is an Event of Default.  For example, the Definitions of the BSARM 2005-7 Indenture defines an Event of Default to include when:

> [t]here occurs a default in the observance or performance of any covenant or agreement of the Issuer made in the Indenture, or

any representation or warranty of the Issuer made in the Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith proving to have been incorrect in any material respect as of the time when the same shall have been made, and such default shall continue or not be cured, or the circumstance or condition in respect of which such representation or warranty was incorrect shall not have been eliminated or otherwise cured, for a period of 30 days after there shall have been given, by registered or certified mail, to the Issuer by the Indenture Trustee or to the Issuer and the Indenture Trustee by the Holders of at least 25% of the aggregate Note Principal Balance of the Outstanding Notes, a written notice specifying such default or incorrect representation or warranty and requiring it to be remedied and stating that such notice is a notice of default hereunder . . . .

141.    As discussed above, U.S. Bank provided written notice that the mortgage files were incomplete. The Issuers under the Indentures failed to protect the trust assets, a fact that U.S. Bank was well aware of. As a result, an Event of Default occurred under the Indentures in the first year of the existence of BSARM 2005-7 and CMLTI 2006-AR1. In addition, the Indentures provide that the Issuer must give notice to the Trustee of any defaults that could give rise to an Event of Default within five days of their occurrence. For example, Section 5.01 of the Indenture for BSARM 2005-7 provides in relevant part, "[t]he Issuer shall deliver to the Indenture Trustee, within five days after learning of the occurrence of a Default, written notice in the form of an Officer's Certificate of any event which with the giving of notice and the lapse of time would become an Event of Default . . . ." *See also* CMLTI 2006-AR1 § 5.01. The Issuers were aware of defaults that could give rise to Events of Default, such as the failure to protect the trust assets by ensuring that the mortgages were properly transferred to the trusts, but did not give the required notice. U.S. Bank was fully aware of this omission as it provided the mortgage file exception reports and was a party that should have received notice of any potential Event of Default. Events of Default occurred under this provision as well, and the Trustee failed to act prudently after their

61

occurrence.

    **C.**       **U.S. Bank Provided False Regulation AB**
                   **Certifications and Remittance Reports**

142. For the first year of their existence, all of the Covered Trusts were reporting entities under the Securities Exchange Act of 1934. For Covered Trusts offered 2006 and later, at the end of the trust's first year, the Depositor filed with the SEC with respect to each Covered Trust a report on Form 10-K. For the BAFC 2007-D, MSM 2006-7 and WFMBS 2006-AR1 Trusts, the Form 10-K contained a certification from the Trustee that all servicing requirements had been met, that there were no breaches of representations and warranties, that the underlying properties securing the loans held by the Covered Trust had been maintained as required by the relevant transaction agreements, and that pool assets and related documents were safeguarded. *See* SEC Regulation AB, 17 C.F.R § 229.1122(d)(4)(i) and (ii).[12] The Servicers made similar certifications. U.S. Bank re-certified (or should have re-certified) annually that the servicing requirements were met with respect to all trusts that it administered. These filings were false and misleading in that they failed to disclose the Sponsors' widespread failure to transfer complete mortgage files to the Covered Trusts and the Sponsors' and Originators' many breaches of representations and warranties regarding the underwriting of the mortgage loans and their obligations as to transfer of title.

143. U.S. Bank regularly received and/or made remittance reports available to Certificateholders as it was required to do under the PSAs. *See* Ex. C § VIII. Under Item 1121 of SEC Regulation AB, such reports must disclose "[m]aterial breaches of pool asset

---

[12] Because the Trustee was involved in "servicing functions" the Trustee should have provided the certification for all trusts for which Regulation AB applied.

representations or warranties or transaction covenants." *See* 17 C.F.R. § 229.1121(a)(12).

Where U.S. Bank was involved in the servicing functions for the Covered Trusts it was

required to certify that the remittance reports complied with all SEC rules.  U.S. Bank,

however, did not disclose the Sponsors', Originators', Servicers' and Master Servicers'

numerous breaches of representations and warranties and transaction covenants, and the

Master Servicers' and Securities Administrators' failure to provide complete and accurate

remittance reports.

144.    The effect of the multiple disclosure failures concerning breaches of

representations and warranties and contractual requirements has been to mislead

Certificateholders and conceal U.S. Bank's breaches of its contractual, fiduciary and

statutory duties.

145.    If U.S. Bank had filed accurate certifications, as it was required to do, the

Sponsors or Originators would have been forced to repurchase, or substitute if within the

specified period, all of the non-compliant loans, and the Certificate losses would have been

substantially eliminated.  Moreover, if U.S. Bank had exercised a reasonable degree of care

and issued accurate certifications, the Sponsors and Originators would not have been able to

continue to unload defective and non-compliant mortgage loans in securitization

transactions.

### D.    U.S. Bank Violated the Streit Act

146.    U.S. Bank violated its statutory duties under the Streit Act with respect to the

Covered Trusts for which the Trust Indenture Act does not apply.

147.    The Streit Act's preamble, entitled "Purpose and application of article," provides:

"It is the purpose of the legislature, in enacting this article, to provide for the regulation and

63

supervision of the appointment, creation, agreements, acts, conduct, practices and proceedings of trustees . . . ." N.Y. Real Prop. Law § 124. Section 130-h of the Act further states: "This article shall be construed liberally to effectuate its purpose." *Id*. § 130-h. Section 130-e of the Act provides for broad relief in the form of the removal of the trustee to any person aggrieved by any act or omission to act of a trustee. Section 126 governs both the terms of an indenture (or PSA) and how a trustee must act, specifying minimum trustee powers and duties, including, as this Court has held, the obligation to exercise prudent-person duties post-Event of Default. [13]

148.    The Streit Act was enacted in the 1930s. The United States experienced a real estate boom in the 1920s. N.Y. Leg. Doc. (1936) No. 66 at 14. The real estate boom was financed through mortgage-backed securities ("MBS"). *Id*. The MBS market in the 1920s consisted of both commercial MBS and residential MBS, known in the 1920s as "guaranteed mortgage participation certificates." Goetzmann & Newman, Securitization in the 1920's 4-5 (Dec. 11, 2009).

149.    There was little regulation of such MBS in the 1920s. Beginning in late-1926, the New York Attorney General conducted an investigation into MBS practices and sought to reform the industry, including mandating the appointment of truly independent trustees. *Asks More Reform in Realty Bonds*, N.Y. Times, Feb. 8, 1927. Meanwhile, the American Construction Council, chaired by Franklin D. Roosevelt, called a national conference to discuss State supervision of bond houses, uniformity in appraisal procedure, and other problems in the MBS market. *Realty Bond Houses Adopt New Rules*, N.Y. Times, Feb. 7, 1927 at 1. The *New York Times* article reporting on this national conference noted that "[t]he practice of having the issuing

---

[13] To the extent that U.S. Bank contends that the Streit Act only requires that the PSAs include provisions specified in Section 126 of the Streit Act, then, in the alternative, U.S. Bank violated the Streit Act because the PSAs do not include all of the provisions set forth in Section 126.

house act as its own trustee, or provide a trustee which is not a bank or trust company, has been criticized as setting up a 'straw man' as trustee for the funds of the investor." *Id.* at 2.

150.     These initial attempts to regulate the MBS market, however, did not prevent the market from suffering a "catastrophic decline beginning in late 1928," as "[t]he market fell from a peak in May 1928 of 100.10, a premium versus par, to a low of just 24.75 cents on the dollar in April 1933."  Goetzmann & Newman, *supra* at 16. "By nearly every measure, real estate securities were as toxic in the 1930s as they are now."  *Id.* at 18.  The New York Moreland Act Commissioner appointed in 1934 to investigate mortgage insurance in connection with MBS called the collapse of MBS "one of the greatest disasters which has falled upon our investing community in the history of our state."  Report of the Moreland Commission, at 1-2 (Oct. 5, 1934).

151.     The loans underlying MBS in the 1920s suffered from many of the same problems as the loans backing RMBS issued in recent years.  For example, according to the Moreland Act Commissioner's report, loans underlying MBS consisted of loans on vacant or foreclosed properties, loans with inflated appraisals, loans in default, and poorly performing loans initially included or later substituted into the trusts.  *Id.* at 93-95, 112-14, 118-19.

152.     There was a substantial public uproar regarding the abuses in MBS.  For example, during a 1934 grand jury investigation into irregularities in mortgage companies, more than 200 individual MBS investors stormed the New York County Criminal Court building demanding to be heard by the grand jury.  *Mortgage Inquiry Stormed by Crowd*, N.Y. Times, Aug. 9, 1934.

153.     Amidst the public uproar, in the summer of 1934, Governor Herbert Lehman urged the New York Legislature to pass legislation to bring relief to MBS investors, noting that "it would be unconscionable for the Legislature to continue to neglect the plight and the needs of

65

the certificate holders and to disregard the benefits that legislation could bring to them." *Text of Lehman's Radio Mortgage Appeal*, N.Y. Times, Aug. 16, 1934. A "Joint Legislative Committee to Investigate Bondholders' Committees, Stockholders' Committees, Creditors' Committees, Certificate Holders' Committees, Corporations, Trustees and Fiduciaries" chaired by Saul S. Streit (the "Streit Committee") was created pursuant to an April 16, 1935 resolution of the Legislature. N.Y. Leg. Doc. No. 66, at 3 (1936).

154.    The Streit Committee found that as a result of massive MBS defaults, "a fertile field was created for unscrupulous underwriters who sold the bonds . . . the enrichment of trustees and of managing companies, many of whom under the pretense of protecting the unsuspecting victim of a defaulted bond profited at the expense of the bewildered bondholder." N.Y. Leg. Doc. No. 66, at 15 (1936).

155.    Regarding trustees specifically, the Streit Committee concluded that "[m]any trustees were generally negligent and remiss in their duty to bondholders." *Id*. at 10. The Committee observed: "After a default, however, with the scattered ownership of the bonds, the trustee's duties ought to be for the protection of the bondholders' interest. Yet there is no responsibility imposed upon the trustee." *Id*. at 19. For example, the Streit Committee found that the Continental Bank and Trust Company, the trustee for 126 MBS, engaged in "revolting" conduct and that the bank "was remiss in its duty as trustee, overcharged the bondholders, was dilatory in presenting plans for reorganization and indulged management companies in committing waste and extravagance." *Id*. at 41. When Edward Weinfield, then chief counsel for the Streit Committee, questioned trustee witnesses, they admitted that they did "nothing" for their fees and permitted companies servicing the properties underlying MBS to engage in vast waste. *Vast Waste Seen on Straus Bonds*, N.Y. Times, Nov. 27, 1935.

66

156.    Indeed, the Streit Committee found that the "general attitude of the trustees and their attorneys who appeared before this committee was that a trustee because of the claimed inadequacy of compensation prior to default could not be expected to assume active trust duties." N.Y. Leg. Doc. No. 66, at 20 (1936).  An attorney for a trustee for over 100 MBS testified to the Committee: "It (the trustee) was relieved from practically every duty by an exculpatory clause – the trustee under this indenture could sit down and do nothing."  *Id*. at 19.  The same attorney stated: "I think in a sense it was fraud on the investors, because, I think, the ordinary man who buys a bond with a trust company as trustee imagines that the company has some duties to perform in looking after the security whereas in point of fact the trust indenture reads that the trustee can 'sit still and fold his hands if he chooses.'"  *Id*. at 20.

157.    In May 1936, the New York Legislature passed the Streit Act.  According to a subsequent Streit Committee report, the Act was "intended to afford genuine and not feigned protection to bondholders where issues were in default and imposing active duties upon a trustee under trust indentures." N.Y. Leg. Doc. No. 94, at 7(1937).  "These statutes looked toward adequate control of issues and sought to prevent continued waste in the administration of properties.  They also sought to provide full protection to bondholders with respect to the operation and management of properties secured by mortgages, participations of which in various forms had been sold and distributed to the public at large."  *Id*.

158.    As set forth above, U.S. Bank has engaged in the same conduct and aggrieved Plaintiffs in the same ways as the Depression-era trustees whose conduct the Streit Act was passed to remedy.  Like its predecessor MBS trustees, U.S. Bank sat on its hands and did nothing in response to widespread breaches and defaults in the Covered Trusts and catastrophic losses suffered by certificateholders such as Plaintiffs.  Instead of exercising its powers to protect

67

certificateholders such as Plaintiffs, U.S. Bank sat idly and permitted servicers to loot the trust assets. And U.S. Bank failed to act prudently post-Events of Default as set forth above. U.S. Bank's actions and failures to act—precisely the type of misconduct the Streit Act was enacted to remedy—violated the Streit Act.

## IV.    U.S. BANK BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

159.    In addition and in the alternative to U.S. Bank's breaches of contracts set forth above, U.S. Bank's actions and inactions have had the effect of destroying and injuring the right of Plaintiffs' to receive the fruits of the contracts in connection with the Covered Trusts. Like the Depression-era trustees discussed above, U.S. Bank has engaged in an elaborate charade whereby it assumed all rights to enforce remedies on behalf of investors, such as Plaintiffs, in the Covered Trusts, but abdicated all responsibility to enforce such rights.

160.    For example, upon discovery or notice of breaches of representations and warranties for loans underlying the Covered Trusts, U.S. Bank failed to provide notice to the other parties to the PSAs, which would lead to enforcement of the loan sellers' obligation to repurchase the defective loans. U.S. Bank also failed to provide notice when it became aware of Master Servicers' and Servicers' breaches of the PSAs, which would have triggered Events of Default and, in turn, U.S. Bank's heightened duties to protect certificateholders such as Plaintiffs.

161.    While U.S. Bank discovered or received notice of such breaches, U.S. Bank, as a result of conflicts of interest described below, actively sought to preclude or hinder the delivery of notices of such breaches that would have triggered the repurchase protocol and Events of Default because it did not want to receive enhanced duties and shed light on its own participation

68

in the same type of breaches or jeopardize lucrative client relationships. U.S. Bank's actions deprived Plaintiffs of the fruits of their contracts in violation of the implied covenant of good faith and fair dealing.

## V.    U.S. BANK FAILED TO PROTECT CERTIFICATEHOLDERS BECAUSE IT SUFFERED FROM CONFLICTS OF INTEREST

162.    U.S. Bank failed and unreasonably refused to take action to protect the Trusts and Certificateholders against Originator and Sponsor breaches and Master Servicer and Servicer violations because it would have exposed that U.S. Bank was engaged in the same misconduct in its roles as servicer and originator for other mortgages and RMBS trusts, and would have imperiled U.S. Bank's lucrative business relationships with the Sponsors, Originators, Master Servicers and Servicers.

163.    U.S. Bank and its affiliates' systemic documentation failures, lack of internal controls and improper foreclosure practices have been the subject of numerous lawsuits and government investigations.

164.    During the fourth quarter of 2010, banking regulators reviewed the adequacy of controls and governance over U.S. Bank's foreclosure processes.  The reviews uncovered significant problems in U.S. Bank's foreclosure processing, including "critical weaknesses" in U.S. Bank's foreclosure practices and oversight of default services vendors. *See Interagency Review of Foreclosure Policies and Practices* (Apr. 2011), http://www.federalreserve.gov/boarddocs/rptcongress/interagency_review_foreclosures_201 10413.pdf.

165.    On April 13, 2011, based on the deficiencies in the review and the risk of additional issues as a result of weak controls and processes, the Federal Reserve Board initiated formal enforcement actions requiring U.S. Bancorp, the corporate parent of U.S.

69

Bank, to address its pattern of misconduct and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing. According to the Federal Reserve Board press release, "[t]hese deficiencies represent significant and pervasive compliance failures and unsafe and unsound practices at [U.S. Bancorp]." The enforcement action required U.S. Bancorp to improve its residential mortgage loan servicing and foreclosure practices. As part of the enforcement action, U.S. Bank entered into a consent order with the Federal Reserve Board, which found that U.S. Bank had engaged in "unsafe or unsound practices with respect to the manner in which [U.S. Bank] handled various foreclosure and related activities."

166.    In 2011, the Office of the Comptroller of the Currency ("OCC") entered into consent orders with U.S. Bank and several other servicers (the "OCC Consent Orders"). In February 2016, the OCC terminated the OCC Consent Order and assessed a civil money penalty of $10 million against U.S. Bank. The OCC found that U.S. Bank had violated the OCC Consent Order by failing to correct mortgage servicing deficiencies in a timely fashion. *See* http://www.gao.gov/assets/690/680960.pdf.

167.    In addition, in July 2012, the city of Los Angeles sued U.S. Bank for illegally foreclosing on 1,500 homes and blighting the city by allowing 150 foreclosed homes to fall into disrepair, and demanded that U.S. Bank improve the conditions. Compl., *People of the State of California v. U.S. Bank N.A., et al.*, Cal. Sup. Ct. No. BC488436 (Jul. 16, 2012). The Complaint states that U.S. Bank "disregarded virtually every one of its legal duties and responsibilities as owner, resulting in the creation and maintenance of an alarming number of vacant nuisance properties and substandard occupied housing units." *Id.* ¶ 7.

168.    In December 2011, a class of homeowners brought a putative class against U.S.

Bank targeting kickbacks paid by ASIC to U.S. Bank related to force-placed flood insurance policies. *Ellsworth v. U.S. Bank*, 908 F.Supp.2d 1063 (N.D. California 2012); *Downey Savings & Loan Assoc. v. Trujillo*, 32 Mis.3d 1231(A) (N.Y. Sup. Ct. 2011). The court denied U.S. Banks' motion to dismiss plaintiffs' complaint, which contained allegations that U.S. Bank "manipulate[ed] the force-placed insurance process, arranged for and paid kickbacks in connection with force-placed insurance, and retained money for force-placing backdated flood insurance policies." *Id.*

169.    U.S. Bank engaged in improper foreclosure proceedings, including utilizing robo-signers who executed foreclosure affidavits based on personal knowledge when in fact the robo-signers lacked any such knowledge and filing foreclosure actions where neither the original note nor assignment identified U.S Bank as the holder of the note or mortgage. *See e.g.*, *BAC Funding Consortium Inc. ISAOA/ATIMA v. Jean-Jacques*, 28 So.3d 936 (Fla. Dist. Ct. App. 2010); *Downey Savings & Loan Assoc. v. Trujillo*, 32 Mis.3d 1231(A) (N.Y. Sup. Ct. 2011). U.S. Bank's own robo-signing is evidence of its failure to remedy or even address robo-signing within trusts where it served as trustee.

170.    On December 20, 2010, New Jersey Administrative Director of the Courts, Judge Grant, took the extraordinary step of issuing an administrative order requiring 24 loan servicers and RMBS trustees to file certifications demonstrating that there were no irregularities in the handling of their foreclosure proceedings. *In re Residential Mortg. Foreclosure Pleading & Document Irregularities*, No. 01-2010 (Super. N.J. Dec. 20, 2011). The order was directed at, among others, U.S. Bank. *Id*.

171.    Because U.S. Bank was engaging in the same illicit and improper acts as the servicers for the Trusts, U.S. Bank failed to enforce the servicer violations, or even alert the

71

Certificateholders to the servicers' misconduct.

172.    Evidence also has come to light showing that U.S. Bank was engaged in the same type of shoddy origination and imprudent securitization practices that are set herein.  As an originator, U.S. Bank sold hundreds of millions of dollars of loans that breached its representations and warranties.

173.    U.S. Bank paid $200 million following a Department of Justice ("DOJ") investigation of U.S. Bank's origination practices.  According to the DOJ, U.S. Bank knowingly originated and underwrote FHA-insured mortgage loans from 2006 through 2011 that did not meet the necessary underwriting requirements.  Press Release, Dep't of Just., *Justice Department, U.S. Bank to Pay $200 Million to Resolve Alleged FHA Mortgage Lending Violations* (June 30, 2014), http://www.justice.gov/opa/pr/us-bank-pay-200-million-resolve-alleged-fha-mortgage-lending-violations.  U.S. Bank also admitted that it failed to identify deficiencies in FHA-insured loans, failed to report deficient loans, and did not take corrective action regarding the loans.  *Id.*

174.    U.S. Bank, as an originator for other RMBS trusts, sold billions of dollars of loans, many of which materially breached representations and warranties.  Many of the same banks or their affiliate entities that act as Sponsors to the Covered Trusts, similarly were the parties that Sponsored the trusts that included loans originated by U.S. Bank.  Accordingly, because U.S. Bank itself faced enormous repurchase liability for loans sold in breach of representations and warranties, including loans in RMBS trusts sponsored by the same Sponsors of the Covered Trusts, U.S. Bank was disincentivized to take any action to address breaches and defaults in the Covered Trusts.

## VI.    U.S. BANK'S CONDUCT INJURED PLAINTIFFS

175.    U.S. Bank's breaches of its contractual, statutory and fiduciary duties have caused Plaintiffs over $150 million of damages.

176.    If U.S. Bank had performed its duties as trustee, it would have enforced the obligations of the Sponsors and Originators and caused them to buy back, or replace with non-defective loans, the vast majority, if not all, of the loans that ultimately defaulted and caused Plaintiffs' losses.  And if U.S. Bank had enforced these repurchase or substitution obligations, as it was required to do, the Certificates would have retained their market value as highly rated bonds with similar coupon rates that are now trading at a very significant premium, and, with respect to the Sold Certificates, Plaintiffs would have been able to sell the certificates at a higher price. PacLife conducted all aspects of the sales from its Newport Beach, California offices.

177.    U.S. Bank's failure to address the Master Servicers' and Servicers' failure to adhere to prudent servicing practices also increased the loss severities (*i.e.*, the amount of principal loss caused by defaults) on defaulted loans dramatically.  The extended foreclosure timelines that resulted from document delivery failures and the robo-signing scandal resulted in increased servicing fees, increased property tax and utility expenditures which were borne by the Covered Trusts, a decline in value of the underlying properties and ultimately less sale proceeds for the Covered Trusts and Certificateholders.  The overcharging for default related services and forced-placed insurance further increased loss severities as those overcharges were collected by the Master Servicer or Servicer from foreclosure sale proceeds.

178.    If U.S. Bank had met its contractual, statutory and fiduciary duties with respect to missing or defective documents in the mortgage loan files, it would have caused

73

the Sponsors or Originators to substitute or repurchase all loans where the Master Servicers, Servicers, Sponsors, Depositors and Originators failed to deliver required documentation to the Trustee or breached representations and warranties regarding the mortgage loans.  This would have included numerous loans that had already defaulted or would ultimately default. Moreover, U.S. Bank's failures with respect to documentation deficiencies has placed a cloud over title and has limited the Covered Trusts' ability to efficiently foreclose on properties underlying the Covered Trusts that has impacted the market value of the Certificates.  And U.S. Bank's failure to commence damages actions against the Master Servicers and Servicers caused further losses and emboldened these parties to continue their lucrative servicing scams.

179.    U.S. Bank's failure to meet its contractual, fiduciary, statutory and common law duties once it became aware of defaults relating to the numerous representation and warranty breaches by the Sponsors or Originators further caused harm.  If U.S. Bank had provided notice of representation and warranty violations and defaults and acted with due care as it was required to do upon the occurrence of a default or Event of Default, it would have caused the Sponsors or Originators to repurchase loans as they were required to do and required the Master Servicers and Servicers to replace the assets they have looted from the Covered Trusts.

180.    Many, if not all of, the repurchase or substitution claims described above have lapsed due to U.S. Bank's inaction as New York courts have held that the underlying representation and warranty claims that U.S. Bank failed to pursue accrued for statute of limitations purposes on the date of the closing of the relevant securitization.

## CAUSES OF ACTION[14]

### FIRST CAUSE OF ACTION
(Violations of the TIA)[15]

181.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

182.    The PSAs underlying and establishing the Covered Trusts are "indentures," and U.S. Bank is an "indenture trustee," under the TIA.  15 U.S.C. § 77aaa(7), (10).

183.    As Certificateholders, Plaintiffs are trust beneficiaries entitled to the protections afforded under the TIA.

184.    The TIA applies to the PSAs and the related Certificates.  15 U.S.C. § 77ddd(a)(1).

185.    U.S. Bank violated the TIA in at least three ways.  First, TIA Section 315(b) provides that the indenture trustee must notify certificateholders of "all defaults known to the trustee, within ninety days after the occurrence thereof."  15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)).  As set forth above, U.S. Bank failed to carefully investigate serious, known issues with the loans in the trust, or to notify certificateholders of numerous defaults, including the failure of the responsible parties to cure, repurchase or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of representations and warranties.

186.    Second, in case of default (as that term is defined in the indenture), the TIA

---

[14] Plaintiffs acknowledge that the Court in its October 19, 2022 Opinion & Order (ECF No. 212) dismissed certain of Plaintiffs' claims. Plaintiffs include these claims for the purpose of reserving their right to appeal.

[15] Plaintiffs acknowledge that the United States Court of Appeals for the Second Circuit has held that the TIA does not apply to RMBS similar to certain of the RMBS at issue here. Plaintiffs include a claim under the TIA with respect to those RMBS to the extent there are any further developments in the law and for purposes of preserving any rights on appeal.

requires that the trustee exercise its rights and powers under the governing agreement as a "prudent man would exercise or use [them] under the circumstances in the conduct of his own affairs." 15 U.S.C. § 77ooo(c). Here, as set forth above, U.S. Bank did not act prudently after learning of numerous serious issues related to material breaches of representations and warranties and servicer defaults and Events of Default. A prudent person would have taken action to investigate these issues carefully, pursue repurchase remedies and cure defective mortgage loans. In addition, a prudent person would have taken action against the responsible parties for the failure to properly execute and deliver mortgage file documents.

187. Third, the TIA states that "[n]otwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security . . . shall not be impaired or affected without the consent of such holder." 15 U.S.C. § 77ppp(b). U.S. Bank has impaired the ability of the trusts, and consequently the Certificateholders, to receive payment in connection with defective mortgage loans for which U.S. Bank failed to take action to correct. In addition, U.S. Bank has impaired the ability of the trusts, and consequently the Certificateholders, to receive payment by failing to enforce the repurchase remedy.

188. These breaches materially and adversely affected the interests of the Certificateholders because they resulted in the trusts being burdened with large numbers of defective loans that should have been put back to the responsible parties and Originators.

189. U.S. Bank is liable to Plaintiffs for damages incurred as a result of its violations of the TIA in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

190.   Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

191.   The PSAs are valid and binding contracts entered into between U.S. Bank (or the predecessor trustee), each Covered Trust, the Sponsors, the Master Servicers, the Servicers and the Depositors.

192.   The PSAs provide, among other things, the terms under which U.S. Bank acts as trustee for the Covered Trusts.

193.   As current holders and/or former holders of Certificates or Notes issued by each Covered Trust, Plaintiffs are express, intended third party beneficiaries under the PSAs entitled to enforce the performance of U.S. Bank.

194.   U.S. Bank breached several obligations that it undertook on behalf of Plaintiffs as Certificateholders including, without limitation, to:

     (a) take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;

     (b) investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered breaches of representations and warranties in the Covered Trusts and the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

     (c) make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

     (d) provide notice of, and take steps to remedy, the Master Servicers' and Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and

     (e) render accurate reports under Regulation AB;

(f)  enforce the repurchase obligations of the Sponsors and/or Originators; and

(g) protect the interest of the beneficiaries of the Covered Trusts.

195.    The specific provisions breached by U.S. Bank are further detailed herein and in the Exhibits hereto.

196.    U.S. Bank's breach of its duties set forth in the PSAs, as described above, caused Plaintiffs' losses on their Certificates and diminished their value.

197.    Plaintiffs have performed their obligations under the PSAs.

198.    U.S. Bank is liable to Plaintiffs for the losses they suffered as a direct result of U.S. Bank's failure to perform their contractual obligations under the PSAs.

## THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty)

199.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

200.    As set forth in detail above, U.S. Bank owed Certificateholders, including Plaintiffs, an extra-contractual fiduciary duty to act in good faith, avoid conflicts of interests when performing the obligations set forth in the PSAs, and to take steps to protect the collateral of the Covered Trusts once an Event of Default occurred or payments to Certificateholders became impaired.

201.    As set forth in detail above, U.S. Bank breached its fiduciary obligations by failing to exercise due care and by acting for its own interests instead of protecting the interest of the certificateholders, including Plaintiffs, after the occurrence of Events of Defaults.

202.    The violations by U.S. Bank of its fiduciary obligations impaired

78

Certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Plaintiffs' Certificates.

## FOURTH CAUSE OF ACTION
### (Negligence and Gross Negligence)

203.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

204.    U.S. Bank owed Certificateholders, including Plaintiffs, extra-contractual duties to perform ministerial acts with due care and undivided loyalty, and to avoid conflicts of interests.  As described above, U.S. Bank performed or failed to perform its responsibilities in a grossly inadequate and negligent manner.  U.S. Bank also failed to avoid conflicts of interest as described above.

205.    U.S. Bank's negligence and gross negligence impaired Certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Plaintiffs' Certificates.

## FIFTH CAUSE OF ACTION
### (Negligent Misrepresentation)

206.    U.S. Bank repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

207.    This is a claim for negligent misrepresentation against U.S. Bank.  As U.S. Bank served in its capacity as trustee for hundreds of trusts sponsored by the Sponsors or including loans originated by the Originators from 2005–2007, it had unique and special knowledge about the mortgage loans in the Covered Trusts and the mortgage files for those loans.  In particular, U.S. Bank had unique and special knowledge regarding: (i) whether the Master Servicers or Servicers had failed to perform its duties under the PSAs; (ii) whether

79

the operative documents for the mortgage loans had been transferred to the Trustee, and its interests perfected, for the benefit of Certificateholders in the Covered Trusts; (iii) whether the mortgage files contained missing, defective or incomplete information; (iv) whether the improperly documented loans were identified on the final exception report and whether the irregularities remained uncorrected; and (v) whether the statements in the various certifications provided by U.S. Bank and described herein were accurate.

208.   Because Plaintiffs could not evaluate the mortgage files for the mortgage loans underlying the Certificates, and because Plaintiffs could not examine whether those files contained complete and accurate documentation for the mortgage loans, they were heavily reliant on U.S. Bank's unique and special knowledge regarding the mortgage loans and the mortgage files when determining whether or not to make each investment in the Certificates, and whether or not to demand that U.S. Bank exercise its powers under the PSAs to require the other parties to the PSAs to satisfy their obligations, including to repurchase or substitute the defective loans.  Plaintiffs were entirely reliant on U.S. Bank to provide accurate information regarding the loans and mortgage files with respect to these matters.

209.   Plaintiffs necessarily relied on U.S. Bank's unique and special knowledge regarding the mortgage loans and mortgage files for those loans in the Covered Trusts.  U.S. Bank's status as the trustee for the Covered Trusts, coupled with its unique and special knowledge about the underlying loans and the mortgage files, created a special relationship of trust, confidence and dependence between U.S. Bank and Plaintiffs.

210.   U.S. Bank, in the exercise of due care, should have been aware that Plaintiffs relied on its unique and special expertise and experience and depended upon U.S. Bank for

accurate and truthful information.  U.S. Bank also knew that the facts regarding the mortgage loans and the mortgage files were exclusively within its knowledge.

211.    Based on its expertise, superior knowledge and relationship with Plaintiffs, U.S. Bank owed a duty to Plaintiffs to provide complete, accurate and timely information regarding the mortgage loans and mortgage files for the Certificates.  U.S. Bank negligently breached its duty to provide such information to Plaintiffs.

212.    U.S. Bank's negligent misrepresentations impaired Certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Plaintiffs' Certificates.

### SIXTH CAUSE OF ACTION
**(Violation of the Streit Act)**

213.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

214.    As Certificateholders, Plaintiffs are trust beneficiaries entitled to the protections afforded under the Streit Act.  The Streit Act was enacted to provide for the proper administration of mortgage trusts and requires that the trustee must exercise due care in performing its obligations.  N.Y. Real Prop. Law § 124.

215.    The Certificates are "mortgage investments" subject to the Streit Act.  N.Y. Real Prop. Law § 125(1).

216.    The PSAs underlying and establishing the Covered Trusts are "indentures," and U.S. Bank is a "trustee," under the Streit Act.  N.Y. Real Prop. Law § 125(3).

217.    Section 126(1) of the Streit Act provides that upon an event of default the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in their exercise, as a prudent man would

exercise or use under the circumstances in the conduct of his own affairs.

218. Section 130-e of the Streit Act provides that "[a] trustee, committee or any member thereof and a depositary may be removed by the court *for cause shown upon the application of any person aggrieved by the act or omission to act of such trustee*, committee, member or depository after such notice and opportunity to be heard in his or her defense as the court shall direct."

219. As set forth above, U.S. Bank failed to exercise its rights under the PSAs after becoming aware of defaults and events of default by failing to:

    a. take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;

    b. investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered breaches of representations and warranties in the Covered Trusts and the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

    c. make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

    d. provide notice of, and take steps to remedy, the Master Servicers' and Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and

    e. render accurate reports under Regulation AB;

    f. enforce the repurchase obligations of the Sponsors and/or Originators; and

    g. protect the interest of the beneficiaries of the Covered Trusts.

220. U.S. Bank is liable to Plaintiffs for damages incurred as a result of its violations of the Streit Act.

82

## SEVENTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith)

221.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

222.    At all relevant times, U.S. Bank owed Plaintiffs, as express, intended third party beneficiaries under the PSAs, a duty of good faith and fair dealing pursuant to the PSAs that required U.S. Bank to ensure that it did not, by act or omission, injure the rights of the Plaintiffs to receive the benefits and protections provided for under the PSAs.

223.    By the conduct described above, U.S. Bank breached its duty of good faith and fair dealing under the PSAs.

224.    U.S. Bank's breaches are material.

225.    As a result of these breaches, Plaintiffs have suffered damages and will continue to suffer damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A.    Awarding compensatory damages and/or equitable relief in favor of Plaintiffs against U.S. Bank for breaches of its statutory, contractual and fiduciary duties, its gross negligence, ordinary negligence and its negligent misrepresentations, in an amount to be proven at trial, including interest thereon;

B.    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

C.    Such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues triable by jury.

84

Dated:  April 20, 2023

By: */s/ David H. Wollmuth*

David H. Wollmuth
Steven S. Fitzgerald
Ryan A. Kane
Philip R. Schatz
Roselind F. Hallinan
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
sfitzgerald@wmd-law.com
rkane@wmd-law.com
pschatz@wmd-law.com
rhallinan@wmd-law.com