UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| PACIFIC LIFE INSURANCE COMPANY and PACIFIC LIFE & ANNUITY COMPANY, Plaintiffs, -v- U.S. BANK NATIONAL ASSOCIATION, Defendant. | : | 16-CV-00555 (JAV) <br> <u>OPINION AND ORDER</u> |

JEANNETTE A. VARGAS, United States District Judge:

The present action arises from a purchase by Plaintiffs Pacific Life Insurance Company and Pacific Life & Annuity Company (collectively, "Pacific Life" or "Plaintiffs") of more than $900 million worth of residential mortgage-backed securities certificates issued by 32 trusts, for which Defendant U.S. Bank National Association ("U.S. Bank" or "Defendant") served as trustee. Pacific Life brings this action against U.S. Bank for statutory violations, breach of contract, breach of trustee duties, and tortious conduct due to U.S. Bank's performance as trustee. Presently before the Court are Pacific Life's and U.S. Bank's cross-motions for partial summary judgment pursuant to Federal Rule of Civil Procedure 56, supported by more than 900 exhibits collectively spanning tens of thousands of pages. ECF Nos. 289, 299. For the following reasons, each motion for partial summary judgment is **GRANTED IN PART AND DENIED IN PART**.

## BACKGROUND

The general factual background and procedural history is set forth in Judge Gardephe's October 19, 2022 Memorandum Opinion and Order (ECF No. 212), *Pac. Life Ins. Co. v. US Bank Nat'l Ass'n*, 636 F. Supp. 3d 366, 379-88 (S.D.N.Y. 2022) ("*Pac. Life*"), familiarity with which is presumed. Although many facts are undisputed, the Court notes disputed facts where relevant.

### A. Securitization in Residential Mortgage-Backed Securities Trusts

Residential mortgage-backed securities ("RMBS") are financial products collateralized by residential mortgages. *Pac. Life*, 636 F. Supp. 3d at 379. Securitization is the process through which thousands of individual mortgages are pooled together into discrete trusts, which then issue securities to investors in the form of certificates. *Id.* As part of the securitization process, a "sponsor" or "seller" first acquires multiple mortgage loans from a mortgage "originator." *Id.* The sponsor then sells a group of these loans—known as a "loan pool"—to a "depositor," which is often a special-purpose affiliate of the sponsor. *Id.* The depositor conveys the loan pool to a "trustee," which holds the loan pool in trust under a "pooling and servicing agreement" ("PSA"), a "master servicing and trust agreement" ("MSTA"), or an indenture. *Id.*; *see, e.g.*, ECF No. 306-2 (PSA); ECF No. 306-4 (indenture); ECF No. 306-15 (MSTA).

The relevant PSA, MSTA, or indenture is the primary agreement governing each trust. *See* ECF No. 302 ("SUF"), ¶¶ 36-37; ECF No. 304 ("CUF"), pt. 1, ¶¶ 36-37; ECF No. 301-12 (identifying the relevant agreements for each trust). The Court

refers to such agreements (including incorporated ancillary agreements, such as sale and servicing agreements) as the "governing agreements."

The governing agreement for each trust establishes "tranches" of the loan pool by risk level. *Pac. Life*, 636 F. Supp. 3d at 379. The senior tranches contain mortgages with lower risk and lower interest rates, while the more junior tranches contain mortgages with greater risk and higher interest rates. *Id.* The trustee sells certificates representing these tranches to underwriters, who then sell the certificates to investors (who are known as "certificateholders"). *Id.*

Pursuant to the governing agreement for each RMBS trust, a "servicer" is appointed to manage the collection of payments on the underlying mortgage loans, monitor delinquent borrowers, foreclose on defaulted loans, monitor compliance with representations and warranties regarding loan origination, track mortgage documentation, and manage and sell foreclosed properties. *Id.* Servicers also provide trustees with data about the underlying mortgage loans, which trustees then deliver in monthly remittance reports to certificate holders. *Id.* In some cases, the governing agreement provides that servicers' activities are to be overseen by a "master servicer." *Id.*

**B. The Covered Trusts, Pacific Life, and U.S. Bank**

This case originally concerned 32 RMBS trusts that were funded, or "closed,"[1] between 2004 and 2007. *Id.*; SUF, ¶ 52; CUF, pt. 1, ¶ 52; ECF No. 301-11.

---

[1] "The date the trust 'closed' designates the commencement of [the] trust['s] existence and the trustee's duties." *Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 665 F. Supp. 3d 483, 490 n.5. (S.D.N.Y. 2023).

Presently, only 31 of those trusts are still at issue (the "Covered Trusts").[2] SUF, ¶ 1; CUF, pt. 1, ¶ 1. Ten of these trusts were sponsored by Washington Mutual Bank or Washington Mutual Mortgage Securities Corp. (the "WaMu Trusts").[3] ECF No. 225-1 at 3-4. Eight trusts were sponsored by CitiMortgage, Inc., Citigroup Global Markets Realty Corp., or CSE Mortgage LLC.[4] *Id.* at 1-2. Four trusts were sponsored by J.P. Morgan Acquisition Corp. or Chase Home Finance LLC.[5] *Id.* Two

---

[2] J.P. Morgan Alternative Loan Trust 2006-S2 ("JPALT 2006-S2") is no longer at issue. *Compare* ECF No. 225 ("Second Amended Complaint" or "SAC"), ¶ 35(I), *with* ECF No. 301-1 at 1-3 (excluding JPALT 2006-S2 from the trusts at issue).

[3] The full names and short titles of these 10 trusts are: WaMu Mortgage Pass-Through Certificates, Series 2006-AR2 ("WAMU 2006-AR2"); WaMu Mortgage Pass-Through Certificates, Series 2006-AR8 ("WAMU 2006-AR8"); WaMu Mortgage Pass-Through Certificates, Series 2006-AR16 ("WAMU 2006-AR16"); WaMu Mortgage Pass-Through Certificates, Series 2006-AR18 ("WAMU 2006-AR18"); WaMu Mortgage Pass-Through Certificates, Series 2007-HY1 ("WAMU 2007-HY1"); WaMu Mortgage Pass-Through Certificates, Series 2007-HY2 ("WAMU 2007-HY2"); WaMu Mortgage Pass-Through Certificates, Series 2007-HY3 ("WAMU 2007-HY3"); WaMu Mortgage Pass-Through Certificates, Series 2007-HY4 ("WAMU 2007-HY4"); WaMu Mortgage Pass-Through Certificates, Series 2007-HY7 ("WAMU 2007-HY7"); and Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-4 ("WMALT 2007-4"). ECF No. 225-1 at 3-4.

[4] The full names and short titles of these eight trusts are: CitiMortgage Alternative Loan Trust, Series 2007-A1 ("CMALT 2007-A1"); CitiMortgage Alternative Loan Trust, Series 2007-A4 ("CMALT 2007-A4"); CitiMortgage Alternative Loan Trust, Series 2007-A5 ("CMALT 2007-A5"); CitiMortgage Alternative Loan Trust, Series 2007-A6 ("CMALT 2007-A6"); Citigroup Mortgage Loan Trust Inc., Mortgage Pass-Through Certificates, Series 2005-7 ("CMLTI 2005-7"); Citigroup Mortgage Loan Trust 2006-4 ("CMLTI 2006-4"); Citigroup Mortgage Loan Trust 2006-AR1 ("CMLTI 2006-AR1"); and Citigroup Mortgage Loan Trust 2007-AR5 ("CMLTI 2007-AR5"). *Id.* at 1-2.

[5] The full names and short titles of these four trusts are: ChaseFlex Trust Series 2006-1 ("CFLX 2006-1"); J.P. Morgan Alternative Loan Trust 2006-S4 ("JPALT 2006-S4"); J.P. Morgan Trust 2005-A7 ("JPMMT 2005-A7"); and J.P. Morgan Trust 2007-A4 ("JPMMT 2007-A4"). *Id.*

trusts were sponsored by DLJ Mortgage Capital, Inc.[6] *Id.* The following entities each sponsored one of the remaining seven trusts: Bank of America, N.A.; EMC Mortgage Corp.; Goldman Sachs Mortgage Co.; UBS Real Estate Securities Inc.; Morgan Stanley Mortgage Capital, Inc.; Taylor, Bean & Whitaker Mortgage Corp.; and Wells Fargo Bank, N.A. ("Wells Fargo").[7] *Id.* at 1-4.

Pacific Life Insurance Company is an insurance company incorporated in Nebraska with its principal place of business in Newport Beach, California. SAC, ¶ 19; SUF, ¶ 115; CUF, pt. 1, ¶ 115; ECF No. 142, ¶ 1. Pacific Life & Annuity Company is an insurance company incorporated in Arizona with its principal place of business in Newport Beach, California. SAC, ¶ 20; SUF, ¶ 116; CUF, pt. 1, ¶ 116; ECF No. 142, ¶ 1.

Plaintiffs purchased 36 RMBS certificates issued by the 31 Covered Trusts with an original face value of approximately $950 million. *See* SAC, ¶ 6; ECF No. 301-42, Ex. A. Between 2010 and 2014, Plaintiffs sold 19 certificates in their entirety, and portions of two additional certificates, from the Covered Trusts. SUF, ¶¶ 114-14.12; CUF, pt. 1, ¶¶ 114-14.12; *see* ECF No. 301-42, Ex. A.

---

[6] The full names and short titles of these two trusts are: Adjustable Rate Mortgage 2005-10 ("ARMT 2005-10") and CSFB Mortgage-Backed Pass-Through Certificates, Series 2004-8 ("CSFB 2004-8"). *Id.*

[7] The respective full names and short titles of these trusts are: Banc of America Funding 2007-D Trust ("BAFC 2007-D"); Bear Sterns ARM Trust 2005-7 ("BSARM 2005-7"); GSR Mortgage Loan Trust 2006-AR1 ("GSR 2006-AR1"); MASTR Asset Backed Securities Trust 2006-AB1 ("MABS 2006-AB1"); Morgan Stanley Mortgage Loan Trust 2006-7 ("MSM 2006-7"); TBW Mortgage-Backed Trust 2006-6 ("TBW 2006-6"); and Wells Fargo Mortgage Backed Securities 2006-AR1 Trust ("WFMBS 2006-AR1"). *Id.* at 1-4.

U.S. Bank is a national banking association, and its main office is in Ohio. SAC, ¶ 22; ECF No. 30 at 1. For all 31 Covered Trusts, U.S. Bank is the current trustee. SUF, ¶ 1; CUF, pt. 1, ¶ 1. For 12 of those trusts (JPMMT 2005-A7, MSM 2006-7, and the ten WaMu Trusts), U.S. Bank was not the original trustee. SUF, ¶¶ 3-3.3; CUF, pt. 1, ¶¶ 3-3.3. On November 29, 2005, U.S. Bank succeeded Wachovia Bank, National Association ("Wachovia") as trustee for JPMMT 2005-A7. SUF, ¶ 3.3; CUF, pt. 1, ¶ 3.3. On October 31, 2008, U.S. Bank succeeded Bank of America, N.A. as trustee for MSM 2006-7. SUF, ¶ 3.1; CUF, pt. 1, ¶ 3.1. On January 20, 2011, U.S. Bank succeeded Bank of America, N.A. as trustee for the WaMu Trusts. SUF, ¶ 3.2; CUF, pt. 1, ¶ 3.2.

### C. JP Morgan and Citigroup Settlement Agreements

In 2008, an economic bubble in the housing market collapsed, and homeowners across the country began defaulting on mortgages at an alarming rate, causing the value of RMBS to plummet. *Commerzbank AG v. U.S. Bank, N.A.*, 100 F.4th 362, 369 (2d Cir. 2024). The collapse gave rise to a range of RMBS suits brought by investors and financial institutions that lost money. *Id.* The collapse also led to numerous settlements between the major players involved in funding and operationalizing RMBS trusts, such as between sponsors, like JPMorgan Chase & Co. ("JPMorgan") and Citigroup Inc. ("Citigroup"), and trustees, like U.S. Bank.

On December 19, 2014, U.S. Bank accepted a settlement agreement relating to claims involving numerous RMBS trusts between Citigroup, investors, and the accepting trustees (including U.S. Bank; Deutsche Bank National Trust Company;

HSBC Bank USA, National Association; and Law Debenture Trust Company of New York). SUF, ¶ 205; CUF, pt. 1, ¶ 205; *see generally* ECF No. 301-125 (the "Citigroup Settlement"). Four of the 31 Covered Trusts were involved in the Citigroup Settlement: CMLTI 2005-7, CMLTI 2006-4, CMLTI 2006-AR1, CMLTI 2007-AR5. SUF, ¶ 206; CUF, pt. 1, ¶ 206.

U.S. Bank, along with other accepting trustees, commenced a proceeding pursuant to New York Civil Practice Law and Rules ("CPLR") Article 77 ("Article 77") to seek judicial approval of their decision to accept the settlement. ECF No. 301-129. Despite an extensive public notice period, no objections to the settlement were filed. *Id.* at 3. Applying summary judgment standards, the court found that each of the Trustees "had acted within the bounds of its discretion, reasonably, and in good faith with respect to its evaluation and acceptance of the settlement [agreement]." *Id.* at 4; ECF No. 301-130 at 3. In doing so, the Court relied upon evidence that the Trustees had engaged outside legal experts to examine in detail the Trustees' potential recovery in a suit against Citigroup, including, *inter alia*, contractual limitations on, or conditions precedent to, the Trustees' ability to pursue repurchase obligations; the applicable statute of limitations governing cure and repurchase actions; whether sufficient time remained for conditions precedent to suit to be fulfilled; the legal effect of certain tolling agreements; and the risks of litigation should the Trustees reject the proposed settlement and file suit against Citigroup. ECF No. 301-129 at 7, 14-15. The court placed emphasis on an expert's conclusion regarding the lapse of the six-year statute of limitation for claims

against Citigroup for breach of contract. *Id.* at 15.

On August 1, 2014, U.S. Bank accepted a settlement agreement relating to claims involving numerous RMBS trusts between JPMorgan, investors, and the accepting trustees (including U.S. Bank; The Bank of New York Mellon; The Bank of New York Mellon Trust Company, N.A.; Deutsche Bank National Trust Company; HSBC Bank USA, National Association; Law Debenture Trust Company of New York; Wells Fargo; and Wilmington Trust, National Association). SUF, ¶ 219; CUF, pt. 1, ¶ 219; *see generally* ECF No. 301-131 (the "JPMorgan Settlement"). Five of the 31 Covered Trusts were involved in the JPMorgan Settlement: BSARM 2005-7, CFLX 2006-1, JPALT 2006-S4, JPMMT 2005-A7, and JPMMT 2007-A4. SUF, ¶ 220; CUF, pt. 1, ¶ 220.

An Article 77 proceeding was likewise commenced to seek approval of the decision to accept the JP Morgan Settlement. ECF No. 301-136. Objections were filed, and an evidentiary hearing was held over four days in January 2016. *Id.* at 1; ECF Nos. 301-139, 301-140, 301-141. The evidence presented at the hearing "largely parallel[ed] the evidence submitted by the trustees" in support of the Citigroup Settlement." ECF No. 301-138 at 9. Legal experts opined as to the viability of claims against JP Morgan, including repurchase claims, and analyzed potential statute of limitations issues that could preclude such claims. *Id.* at 12-14. Relying on this evidence, the court held, as it had with respect to the Citigroup settlement, that "the Trustees exercised their discretionary power reasonably and in good faith in approving the Proposed Settlement." *Id.* at 34.

## LEGAL STANDARDS

A grant of summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (citation omitted).

The moving party has the burden of demonstrating "that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("[T]he burden is on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact . . . ."). A party "asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "Where the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied." *Giannullo v. City of New York*, 322 F.3d 139, 140-41 (2d Cir. 2003) (cleaned up).

But where the party moving for summary judgment meets its initial burden of showing the absence of a genuine issue of material fact, the burden shifts to the

non-moving party to bring forth specific facts showing that there is a factual question that must be resolved at trial. *See* Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).

When determining whether a genuine and material factual dispute exists, the Court must view all "evidence in the light most favorable to the [non-moving party]." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (citation omitted). Accordingly, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012).

Ultimately, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Summary judgment is also "appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Bruno v. City of Schenectady*, 727 F. App'x 717, 719 (2d Cir. 2018) (summary order) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## DISCUSSION

### A. U.S. Bank's Motion for Partial Summary Judgment

In its motion for partial summary judgment, Defendant raises seven primary arguments. Four arguments relate to threshold issues: (1) whether Plaintiffs can

bring claims based on sold certificates, (2) whether issue preclusion bars claims in nine trusts, (3) whether the negating clauses bar claims in 16 trusts, and (4) whether Plaintiffs' claims are untimely. ECF No. 300 ("Def. Br.") at 4-14. Three arguments relate to merits issues: (5) whether pre-event of default ("EOD") claims fail on their merits, (6) whether post-EOD claims fail on their merits, and (7) whether Plaintiffs' tort claims fail on their merits. *Id.* at 14-25. The Court considers each in turn.

**1. Claims on Sold Certificates**

Defendant argues that, under New York law, Plaintiffs' claims concerning the 19 certificates[8] that Plaintiffs sold in full and the portions of the two additional certificates[9] that Plaintiffs sold between 2010 and 2014—except Trust Indenture Act of 1939 ("TIA") claims relating to two certificates[10]—are foreclosed because the associated legal claims vested in the transferees upon sale. *See* Def. Br. at 1, 4, 7 n.3. Plaintiffs have conceded that, if New York law governs the issue of whether

[8] Of these 19 certificates, three were issued by CMALT 2007-A4, two by WAMU 2007-HY1 (bearing CUSIP Nos. 92925VAE0 and 92925VAK6), and one by each of the following trusts: JPALT 2006-S4 (bearing CUSIP No. 466302AK2), ARMT 2005-10, BAFC 2007-D, BSARM 2005-7, CMALT 2007-A6, CMLTI 2005-7, CMLTI 2006-AR1, CMLTI 2007-AR5, JPMMT 2005-A7, WAMU 2006-AR2, WAMU 2007-HY3, WAMU 2007-HY7, WFMBS 2006-AR1, and WMALT 2007-4. SUF, ¶¶ 132-50; CUF, pt. 1, ¶¶ 132-50; ECF No. 301-42, Ex. A. The Court identifies CUSIP numbers for certificates only where Pacific Life sold some, but not all, of its certificates from those trusts.

[9] These certificates were issued by JPALT 2006-S4 (CUSIP No. 466302AJ5) and CSFB 2004-8 (CUSIP No. 22541SW95). SUF, ¶¶ 114.1, 114.11; CUF, pt. 1, ¶¶ 114.1, 114.11; ECF No. 301-42, Ex. A.

[10] These certificates were issued by BSARM 2005-7 and CMLTI 2006-AR1. CUF, pt. 2, ¶ 573; ECF No. 309 ("CF"), pt. 2, ¶ 573.

associated legal claims vest in the transferee upon the sale of a security (the "Sold Certificates issue"), their claims fail. *Pac. Life*, 636 F. Supp. 3d at 433; ECF No. 140 at 14-15. The parties disagree, however, as to whether Ohio or New York choice-of-law rules apply to, and whether New York or California substantive law governs, the Sold Certificates issue. *Compare* Def. Br. at 4-7, *with* ECF No. 303 ("Pls. Opp'n") at 18-22.

**a. Choice of Law**

The Court concludes that Ohio choice-of-law rules apply. Following transfer under 28 U.S.C. § 1404(a), "the transferee court must follow the choice-of-law rules that prevailed in the transferor court." *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 333 (2d Cir. 2005) (quoting *Ferens v. John Deere Co.*, 494 U.S. 516, 519 (1990)). While there are certain exceptions to this rule, *see, e.g.*, *Chaiken v. VV Pub. Corp.*, 119 F.3d 1018, 1030 (2d Cir. 1997) (holding that transferee forum law governs where diversity action is transferred to cure defect of personal jurisdiction), neither party has argued that an exception applies here, *see* Def. Br. at 4-7; Pls. Opp'n at 18-22. Furthermore, Judge Gardephe did not previously hold that an exception applied in the present action with respect to U.S. Bank. *See Pac. Life*, 636 F. Supp. 3d at 390-91.

"Ohio applies the Restatement of Law 2d, Conflict of Laws to determine proper jurisdiction." *Commerzbank*, 100 F.4th at 384. The Second Restatement employs a two-step approach to resolve conflicts of laws. *Premium Freight Mgmt., LLC v. PM Engineered Sols., Inc.*, 906 F.3d 403, 406 (6th Cir. 2018). "The first step

is to determine if there is an actual conflict between the substantive laws of the states involved." *Id.* at 406-07. "Only if they conflict must [a court] proceed to the second step to choose between them." *Id.* at 407.

There is an actual conflict of law under Ohio law when the law of one state recognizes a claim, but the law of another state forecloses that claim. *Id.* at 407. Here, there is an actual conflict between the substantive laws of New York and California. Under New York law, "[u]nless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands of the transferrer," where bond means "any and all shares and interests in an issue of bonds, notes, debentures or other evidences of indebtedness of individuals, partnerships, associations or corporations, whether or not secured." N.Y. Gen. Oblig. Law § 13-107(1)-(2). In contrast, "[u]nder California law, absent a manifestation of intent, a seller [of a security] does not transfer legal claims to the buyer." *Pac. Life Ins. Co. v. Bank of N.Y. Mellon*, No. 17-CV-01388 (KPF), 2018 WL 1382105, at *16 (S.D.N.Y. Mar. 16, 2018) (citations omitted). Accordingly, if New York law applies, several of Plaintiffs' claims relating to the sold certificates will be foreclosed, *see Commerzbank*, 100 F.4th at 384, but if California law applies, those same claims will be cognizable, *see Pac. Life Ins. Co.*, 2018 WL 1382105, at *16.

To determine the applicable law where there is an issue in contract and the parties have not designated the governing law in advance, Ohio courts apply Section 188 of the Second Restatement on the Conflict of Laws ("Second Restatement") to determine the state with the most significant relationship to the

contract. *See, e.g.*, *Ohayon v. Safeco Ins. Co. of Ill.*, 91 Ohio St. 3d 474, 477 (Ohio 2001); *Nationwide Mut. Ins. Co. v. Ferrin*, 21 Ohio St. 3d 43, 44-45 (Ohio 1986); *Gries Sports Enters., Inc. v. Modell*, 15 Ohio St. 3d 284, 287 (Ohio 1984). In making this assessment, Ohio courts weigh the five factors listed in Section 188(2): "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict of Laws § 188(2) (A.L.I. 1971).

Ohio courts consider these factors in conjunction with Section Six of the Second Restatement, which sets forth the overarching principles that govern a choice-of-law determination. *See, e.g.*, *Wise v. Zwicker & Assocs., P.C.*, 780 F.3d 710, 718 (6th Cir. 2015); *Nat'l Union Fire Ins. Co. v. Watts*, 963 F.2d 148, 150-51 (6th Cir. 1992). These factors include "the needs of the interstate and international systems," "the relevant policies of the forum, the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue," "the protection of justified expectations," "the basic policies underlying the particular field of law," "certainty, predictability and uniformity of result," and "ease in the determination and application of the law to be applied." Restatement (Second) of Conflict of Laws § 6. "Application of [Sections] 6 and 188 of the Restatement requires a sensitive, fact-specific analysis." *Wise*, 780 F.3d at 718.

**b. Application of Second Restatement**

When weighing the five factors in Section 188(2) to determine whether New

York or California has the most significant relationship to the relevant contracts, the Court is guided by the Second Circuit's recent analysis in *Commerzbank*, 100 F.4th at 384-86, which considered analogous facts.[11] In *Commerzbank*, the Second Circuit analyzed whether New York law or English law governed the issue presented here under Ohio choice-of-law rules in an RMBS case. *Id.* at 384-86. The London employees of Commerzbank, which is incorporated in Germany, sold 30 certificates to buyers in London. *See id.* at 367 n.5, 379, 384-85. Although the buyers worked in London, they were separately employed by 11 different counterparties, seven of whom had their principal place of business in New York. *See id.* at 384-86. The settlement of those sales was conducted through the

[11] Pointing to Judge Gardephe's decision denying Defendant's motion to dismiss, Plaintiffs implicitly invoke the "law-of-the-case doctrine" to suggest that the Court has already determined that California substantive law governs the Sold Certificates issue. *See* Pls. Opp'n at 18-19 (citing *Pac. Life*, 636 F. Supp. 3d at 433-34). "The law of the case doctrine commands that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (cleaned up). Such cogent and compelling reasons include "an intervening change in law, availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Id.* at 99-100 (cleaned up).

Judge Gardephe's decision was limited to claims brought against Bank of America ("BOA"), a defendant which is now dismissed from this case, and was decided under New York choice-of-law rules, which no party disputed. *Pac. Life*, 636 F. Supp. 3d at 433 n.75. Thus, Judge Gardephe was not called upon to determine whether, under Ohio's choice-of-law rules, New York or California substantive law applied. *See id.* In any event, even if Judge Gardephe's prior decision had reached the issue presented here, there has been an intervening change of law: the Second Circuit's 2024 decision in *Commerzbank*. Accordingly, the Court engages in the choice-of-law inquiry on the Sold Certificates issue anew with *Commerzbank* in mind.

Depository Trust Company ("DTC") in New York.[12] *Id.* at 385.

More specifically, the book-entry certificates were housed at DTC, and the transfers and payments pursuant to those sales occurred through the DTC. *See id.* at 370, 385. Additionally, while all but one of the PSAs pursuant to which the sold certificates were issued specified that New York law governed (and the remaining one specified that Delaware law governed), all of the PSAs provided that transfers of the sold certificates are governed by DTC's rules, which are based in New York law and federal securities law. *Id.* at 385. On these facts, the Second Circuit held that two factors (the place of negotiations and contracting) favored the application of English law, while the remaining three factors (the place of performance; location of subject matter; and domicile, residence, nationality, place of incorporation, and place of business of the parties) ultimately favored the application of New York law. *Id.* at 384-86. Accordingly, the Second Circuit held that New York had the most significant relationship to the contracts at issue. *Id.* at 386.

**i. Place of Contracting and Negotiating**

In the instant case, it is undisputed that Plaintiffs' principal place of business is California. *See* Def. Br. at 6. It is further undisputed that the traders who

[12] The DTC is a clearing house. The role of the DTC is to operate a securities settlement system, including by: "(1) holding securities in physical form (but immobilized) or . . . in dematerialized form; (2) maintaining securities accounts for Participants; (3) providing Participants with central safekeeping services and asset services, including the administration of corporate actions and redemptions; and (4) transfers and pledges of securities, and the settlement of transactions for Participants." *Commerzbank*, 100 F.4th at 370 (cleaned up).

negotiated the sales were separately employed by nine different counterparties, six of whom have their principal place of business in New York.[13]

Yet in evaluating place of contracting and negotiation, what is relevant is not the principal place of business of the parties to the transaction (which is considered under factor five), but the location of the individuals who actually performed the negotiations and finalized the contracts. *Commerzbank*, 100 F.4th at 384-85. In that respect, the undisputed record shows that the individuals responsible on Plaintiffs' side of the transaction were located in California. ECF No. 142, ¶¶ 1, 3-4; CUF, pt. 2, ¶¶ 746-55; CF, pt. 2, ¶¶ 746-55.

---

[13] For seven of the 19 transactions, Credit Suisse Securities LLC was the counterparty. *See* SUF, ¶¶ 132, 134, 142-44, 149-50; CUF, pt. 1, ¶¶ 132, 134, 142-44, 149-50. Credit Suisse Securities LLC's principal place of business is New York, New York. SUF, ¶ 186; CUF, pt. 1, ¶ 186. For three of the 19 transactions, J.P. Morgan Securities, Inc. or J.P. Morgan Securities LLC was the counterparty. *See* SUF, ¶¶ 146-48; CUF, pt. 1, ¶¶ 146-48. Both J.P. Morgan entities' principal place of business is New York, New York. SUF, ¶¶ 193-94; CUF, pt. 1, ¶¶ 193-94. For two of the 19 transactions, Barclays Capital Inc. was the counterparty. *See* SUF, ¶¶ 138, 141; CUF, pt. 1, ¶¶ 138, 141. Barclays Capital Inc.'s principal place of business is New York, New York. SUF, ¶ 188; CUF, pt. 1, ¶ 188. For two of the 19 transactions, The Royal Bank of Scotland PLC was the counterparty. *See* SUF, ¶¶ 135, 140; CUF, pt. 1, ¶¶ 135, 140. The Royal Bank of Scotland PLC's principal place of business is Edinburgh, Scotland. SUF, ¶ 189; CUF, pt. 1, ¶ 189. For two of the 19 transactions, Morgan Stanley Capital Servicers LLC was the counterparty. *See* SUF, ¶¶ 136-37; CUF, pt. 1, ¶¶ 136-37. Morgan Stanley Capital Services LLC's principal place of business is New York, New York. SUF, ¶ 190; CUF, pt. 1, ¶ 190. For one of the 19 transactions, Barclays Bank was the counterparty. *See* SUF, ¶ 133; CUF, pt. 1, ¶ 133; ECF No. 301-109 at Paclife USB000632993. Barclays Bank's principal place of business is London, England. SUF, ¶ 187; CUF, pt. 1, ¶ 187. For one of the 19 transactions, Bank of America was the counterparty. *See* SUF, ¶ 139; CUF, pt. 1, ¶ 139. Bank of America's principal place of business is Charlotte, North Carolina. SUF, ¶ 191; CUF, pt. 1, ¶ 191. For one of the 19 transactions, Jefferies LLC was the counterparty. *See* SUF, ¶ 145; CUF, pt. 1, ¶ 145. Jefferies LLC's principal place of business is New York, New York. SUF, ¶ 192; CUF, pt. 1, ¶ 192.

Although Defendant points out that certain counterparty employees were located in New York, Def. Br. at 6, the record does not indicate whether, and to what extent, any of these employees were involved in negotiating the sales or drafting the contracts at issue. *See generally* ECF Nos. 301-109, 301-110, 301-111, 301-112, 301-113, 301-114, 301-115, 301-116, 301-117, 301-118, 301-119, 301-120, 301-121, 301-122, 301-123, 301-124. In contrast, Plaintiffs cite evidence demonstrating that the negotiations took place with counterparty salespersons largely based in California, and that the trading tickets were prepared by traders located in California. Pls. Opp'n at 19; CUF, pt. 2, ¶¶ 753-54; *see also* ECF No. 351 ("Hr'g Tr.") at 9:7-8 (counsel for Defendant concedes that there is "no dispute that the people with whom the traders at Pacific Life were talking were mostly in California."). Accordingly, these two factors weigh in favor of Plaintiffs.

**ii. Place of Performance**

In *Commerzbank*, the Second Circuit concluded that, because (a) the certificates at issue were housed at DTC, which is located in New York, (b) the certificates were transferred to the new certificate-holders by DTC at its New York office, (c) the PSAs for the sold certificates were governed by New York law, and (d) the PSAs provided that transfers of sold certificates would be made according to DTC's rules and procedures, which are governed by New York law, the place of performance for the sale of the certificates was New York. 100 F.4th at 385.

The same is true here. The settlement of each of the sales at issue was conducted through the DTC in New York, which is where the book-entry certificates

were housed and where the transfers and payments pursuant to those sales occurred. *See* Hr'g Tr. at 23:7-10, 31:20–32:1, 33:15–34:9; ECF No. 301-101 at Paclife_USB000414491; ECF No. 301-104 at PacLife_USB000419646; ECF No. 301-105 at PacLife_USB000414377; *see, e.g.*, SUF, ¶¶ 133, 139, 140, 143, 145, 147, 149, 195-202; CUF, pt. 1, ¶¶ 133, 139, 140, 143, 145, 147, 149, 195-202. *Compare* ECF No. 301-107 at 36:2-10 (Fiek), *with* CUF, pt. 2, ¶ 747, *and* CF, pt. 2, ¶ 747. Additionally, while the governing agreements for 12 of the sold certificates specify that New York law governs, and the remaining seven governing agreements specify that Delaware law governs, *see* SUF, ¶¶ 38-39; CUF, pt. 1, ¶¶ 38-39, the governing agreements for all 19 sold certificates provide that certificate transfers are governed by the DTC's rules or the rules of the entity through which the transfers are made, *see* ECF No. 301-2 at 1-6, 9; ECF No. 306-7 § 5.1(b)(iv); ECF No. 306-9 § 5.1(b)(iv). And all of the transactions were in fact cleared through the DTC. *Compare* ECF No. 301-107 at 36:2-10 (Fiek), *with* CUF, pt. 2, ¶ 747, *and* CF, pt. 2, ¶ 747. Since these facts largely align with the facts in *Commerzbank*, the Second Circuit's holding controls.

Plaintiffs make much of the fact that Pacific Life is not itself a participant in the DTC. Hr'g Tr. at 31:23–33:3. The import of this, according to Plaintiffs, is that they never "owned the book-entry certificate." *Id.* at 30:3-12. The certificates were instead registered in the name of Plaintiffs' custodian, Bank of New York Mellon, which is a DTC participant. *Id.* at 30:3-12; *see id.* at 32:3-11. According to Plaintiffs, the only thing they could transfer, and thus the subject matter of their

contract, was their "beneficial interest" in the certificates. *Id.* at 24:25–25:2; *see id.* at 22:25–23:19, 25:7–26:10.

Yet the Second Circuit has made clear that, where the language of the governing agreement prescribes that transfers of certificates must be accomplished through the DTC, and the transfers of the certificates are in fact settled through the DTC in accordance with its rules and procedures, that is determinative of this prong. *See Commerzbank*, 100 F.4th at 385. Plaintiffs concede that the book-entry certificates relating to the Covered Trusts at issue were held at the DTC and transferred through the DTC. *See* Hr'g Tr. at 23:7-10, 31:20–32:2. The subject matter of the contract, the certificates, are therefore located in New York.[14]

Even in the absence of this controlling precedent, Plaintiffs' argument would fail on its own terms. Plaintiffs' assertion that the location of their beneficial interest in the certificates should be deemed to be California is pure *ipse dixit*. They have not undertaken any of the context-specific analysis necessary to determine the physical situs of their beneficial interest. *See, e.g.*, *Af-Cap Inc. v. Republic of Congo*, 383 F.3d 361, 371 (5th Cir. 2004), *decision clarified on reh'g*, 389 F.3d 503 (5th Cir. 2004) ("The situs of intangible property is about as intangible a concept as is known to the law."); *Aurelius Cap. Partners, LP v. Republic of Argentina*, No. 07-CV-11327

---

[14] At least one court has found it relevant that Pacific Life was not a DTC participant when determining that California law applied to the Sold Certificates Issue. *See Pac. Life Ins. Co. v. Bank of N.Y. Mellon*, No. 17-CV-01388 (KPF), 2023 WL 5128079, at *8 (S.D.N.Y. Aug. 10, 2023) ("*BNYM*"). The *BNYM* decision predates the Second Circuit's holding in *Commerzbank*, however.

(TPG), 2010 WL 2925072, at *3 (S.D.N.Y. July 23, 2010) (hinging situs analysis upon "common sense appraisal of the requirements of justice and convenience in particular conditions" (citation omitted)). The language of the PSAs themselves, however, strongly suggests that Plaintiffs' beneficial interest should be deemed to run with the book-entry certificate. For example, the PSA for JPALT 2006-S4, at Section 3.09(a), defines a book-entry certificate as "beneficial interests in Certificates designated as 'Book-Entry Certificates' in this Agreement, ownership and transfers of which shall be evidenced or made through book entries by a Clearing Agency as described in Section 3.09." ECF No. 301-2 at 5. Section 5.07 of the PSA for WAMU 2006-AR2 similarly speaks of the "Beneficial Holder's interest" in the "Book-Entry Certificates." *Id.* at 3. And Section 5.01(b) of the PSA from CMLTI 2007-AR5, provides:

> The Certificate Owners shall hold their respective Ownership Interests in and to such Certificates through the book-entry facilities of the Depository . . . . All transfers by Certificate Owners of their respective Ownership Interests in the Book-Entry Certificates shall be made in accordance with the procedures established by the Depository Participant or brokerage firm representing such Certificate Owner. Each Depository Participant shall only transfer the Ownership Interests in the Book-Entry Certificates of Certificate Owners it represents or of brokerage firms for which it acts as agent in accordance with the Depository's normal procedures.

*Id.* at 4. The governing agreements contemplate that the transfer of beneficial interests in the certificates, along with the certificates themselves, will be through the DTC, in accordance with DTC rules. This factor thus weighs in favor of New York.

#### iii. Location of Subject Matter of the Contract

With respect to the subject matter of the contract, the facts are again materially indistinguishable from *Commerzbank*. The Second Circuit looked to the language of the PSAs and offering documents, which stated that the certificates would be held at the DTC in New York, and that the DTC would hold and execute the actual transfer of the certificates. *Commerzbank*, 100 F.4th at 385. The governing contracts in this action contain substantively similar language. *Compare id.* ("The initial Depository shall be The Depository Trust Company, the nominee of which is Cede & Co., as the registered Holder of the Book-Entry Certificates."), *with* ECF No. 301-2 at 4 (defining "Depository" as "the Depository Trust Company, or any successor Depository hereafter named. The nominee of the initial Depository, for purposes of registering those Certificates that are to be Book-Entry Certificates, is CEDE & Co."). This factor likewise favors New York.

#### iv. The Place of Incorporation and Place of Business of the Parties

The factor relating to the parties' place of incorporation and place of business is largely indeterminative. Plaintiffs' principal place of business is California. For 15 of the transactions at issue, the counterparty's principal place of business was New York. For those 15 transactions, this factor is thus in equipoise. For the remaining four transactions, this factor weighs slightly in favor of California.

#### v. Section Six of the Restatement

The center of gravity test does not provide a clear answer as to which state has the most significant relationship to the contract, with the factors largely evenly

balanced between New York and California. The Court must therefore look to the overarching choice-of-law principles set forth in Section Six of the Restatement to resolve the issue. *See Ohayon*, 91 Ohio St. 3d at 491 (Resnick, J., dissenting) (observing that, where the contacts listed in Section 188(2) reveal the state with the most significant relationship to the transaction and the parties, "it is unnecessary to give independent significance to the general principles that underlie all fields of choice-of-law rules because those principles are already given expression through the relevant contacts listed in Section 188(2). But this is not true in all cases, and Section 188(2) was never intended to be the exclusive determinant in all cases involving contracts.").

"When sections 6 and 188 are read together, it is clear they only provide a broad general framework for the resolution of choice of law issues in the context of a contract dispute." *Int'l Ins. Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 606 (6th Cir. 1996). Accordingly, "a judge must balance principles, policies, factors, weights, and emphases to reach a result, the derivation of which, in all honesty, does not proceed with mathematical precision." *Id.* Moreover, the choice-of-law principles found in the Restatement "need not be given equal weight in every circumstance, nor are they intended to be exclusive. They also are relatively elastic, and in some cases equivocal." *Id.*; *see also Est. of Sample through Cornish v. Xenos Christian Fellowship, Inc.*, 139 N.E.3d 978, 987 (Ohio Ct. App. 2019) ("Notably, a court need not give the choice-of-law principles found in Section 6 equal weight in every circumstance.").

The Section Six principle most relevant here concerns "the protection of justified expectations." Restatement (Second) of Conflict of Laws § 6(2)(g). Indeed, "[i]n the absence of [a choice-of-law provision], the Restatement's contractual choice-of-law rules seek to protect the justified expectations of the contracting parties." *Ohayon*, 91 Ohio St. 3d at 476-77.

Plaintiffs contend that protecting the justified expectations of the contracting parties requires applying California law. *See* Pls. Opp'n at 20-21. Yet Plaintiffs have not provided any evidence that the contracting parties expected California law to govern the Sold Certificates issue. *See id.* at 18-22. Rather, the evidence before the Court concerning which law the contracting parties expected to govern points to New York or Delaware law, not California law. *See* SUF, ¶¶ 38-39; CUF, pt. 1, ¶¶ 38-39; *see, e.g.*, ECF No. 301-2 at 4, 5, 7-8. Additionally, Defendant presents evidence indicating that a request to include a rider in an RMBS sales transaction explicitly adopting the California rule and reserving the ability to bring legal claims post-sale negatively impacts pricing and interest from potential purchasers. *See* ECF No. 308-11 at CB_BNYM00248567-68, CB_USB01563054-55, CB_USB01506466-67. This suggests that the California rule is not the default expectation among RMBS traders, who transact in a national (and international) market. In view of the foregoing, if protecting the justified expectations of the contracting parties favors the application of any law here, it favors New York law over California law.

Giving greater weight to the fact that RMBS certificate transfers are almost

uniformly effectuated through the DTC in New York—and DTC rules explicitly incorporate New York law—would also provide greater certainty, predictability, and uniformity of result for transactions that take place across a national market, in accord with Section 6(2)(f) of the Restatement. Doing so would also provide greater ease in the determination and application of law to be applied, in accordance with Section 6(2)(g).

The Court thus concludes that New York law governs the Sold Certificates issue, and Plaintiffs cannot bring claims concerning the 19 certificates, except TIA claims concerning BSARM 2005-7 and CMLTI 2006-AR1, and the portions of the other two certificates that were sold. The Court grants summary judgment in favor of Defendant with respect to these claims.

**2. Issue Preclusion**

Defendant moves for summary judgment with respect to claims related to the nine trusts[15] that were the subject of Article 77 proceedings approving settlement agreements with Citigroup and JPMorgan, arguing that issue preclusion bars Plaintiffs' claims. Def. Br. at 8. "[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 (1984). Since the Article 77 proceedings occurred in New York court, the Court applies New York law concerning issue preclusion.

[15] These trusts are BSARM 2005-7, CFLX 2006-1, CMLTI 2005-7, CMLTI 2006-4, CMLTI 2006-AR1, CMLTI 2007-AR5, JPALT 2006-S4, JPMMT 2005-A7, and JPMMT 2007-A4. *See* SUF, ¶¶ 206, 220; CUF, pt. 1, ¶¶ 206, 220.

Issue preclusion (also known as collateral estoppel) is related to, but distinct from, the doctrine of claim preclusion (also known as res judicata). *Simmons v. Trans Express Inc.*, 37 N.Y.3d 107, 111-12 (N.Y. 2021). Issue preclusion "prevents a party from relitigating in a subsequent action or proceeding an *issue* clearly raised in a prior action or proceeding and decided against that party whether or not the causes of action are the same." *Id.* (emphasis added) (cleaned up). Issue preclusion applies where:

> (1) the issues in both proceedings are identical,
>
> (2) the issue in the prior proceeding was actually litigated and decided,
>
> (3) there was a full and fair opportunity to litigate in the prior proceeding, and
>
> (4) the issue previously litigated was necessary to support a valid and final judgment on the merits.

*Conason v. Megan Holding, LLC*, 25 N.Y.3d 1, 17 (N.Y. 2015) (citation omitted). Ultimately, however, this is a flexible framework designed to determine whether relitigation of a settled issue should be permitted considering fairness to the parties, conservation of the court's and litigant's resources, and societal interests in consistent and accurate results. *Buechel v. Bain*, 97 N.Y.2d 295, 304 (N.Y. 2001).

> The litigant seeking the benefit of collateral estoppel must demonstrate that the decisive issue was necessarily decided in the prior action against a party, or one in privity with a party. The party to be precluded from relitigating the issue bears the burden of demonstrating the absence of a full and fair opportunity to contest the prior determination.

*Id.* (internal citation omitted).

Defendant frames the issue decided in the Article 77 proceedings as whether U.S. Bank "appropriately handled the trusts' potential repurchase claims against JPMorgan and Citigroup (or their affiliates) for loans with alleged R&W breaches or document exceptions, and the trusts' potential claims against JPMorgan for failing to properly service the loans." Def. Br. at 9. Defendant argues that this issue is identical to the issue presented here because accepting "Plaintiffs' primary theory—that U.S. Bank breached pre- and post-EOD duties by failing to litigate against obligated parties to force repurchase of loans with R&W breaches or document exceptions"—requires the Court to "necessarily reject the Article 77 court's decision." *Id.*

Defendant's argument fails on two fronts. First, these issues were not actually litigated as part of the Citibank Article 77 proceedings. There were no objectors to the Citibank settlement agreement, and no trial on the issue. Defendant contends that under New York law, actual litigation of an issue is not required, citing the New York Court of Appeals decision in *Buechel v. Bain*. Hr'g Tr. at 37:4-20. Yet *Buechel* does not support this position. Rather, *Buechel* held that the actual litigation requirement had been satisfied where an entity in privity with the plaintiffs had fully litigated the underlying issue through trial and appeal. *Buechel*, 97 N.Y.2d at 304; *see also Simmons*, 37 N.Y.3d at 111 (holding that courts much "examine the realities of litigation, such as recogni[zing] that if the first proceeding involved trivial stakes, it may not have been litigated vigorously" (cleaned up)); *Milione v. City Univ. of N.Y.*, 59 N.Y.S.3d 796, 798 (2d Dep't 2017)

(holding that the issue in the prior proceeding must be "actually litigated and decided" for issue preclusion to apply).

More fundamentally, the issues resolved in the Article 77 proceeding are not identical to the issues in the present action. The state court merely held that U.S. Bank and the other trustees reasonably exercised their discretionary power in accepting the settlement agreements. *See In re U.S. Bank Nat. Ass'n*, 51 Misc. 3d 273, 288 (N.Y. Sup. Ct. 2015) (holding "[U.S. Bank] exercised [its] discretionary power reasonably and in good faith in accepting the RMBS Trust Settlement Agreement"); *U.S. Bank Nat. Ass'n v. Fed. Home Loan Bank of Bos.*, No. 652382/2014, 2016 WL 9110399, at *3 (N.Y. Sup. Ct. Aug. 12, 2016) (holding "[U.S. Bank] acted within the bounds of its discretion, reasonably, and in good faith with respect to its evaluation and acceptance of the Settlement Agreement, concerning the Accepting Trusts").

That holding does not resolve the separate question of whether U.S. Bank previously breached its contractual duties under the PSAs by failing to timely act on its repurchase enforcement claims[16] against Citigroup and JPMorgan. To the contrary, the state courts' assessment of the reasonableness of the potential settlement amounts included a recognition that the trustee's repurchase enforcement claims would likely be barred by the statute of limitations.

[16] By "repurchase enforcement claims," the Court refers to Plaintiffs' claims that seek to hold Defendant liable for failing to uphold its obligation as trustee to require the seller, sponsor, or other similarly situated deal party to substitute or repurchase defective mortgage loans in the RMBS trusts. *See, e.g.*, ECF No. 306-16 § 2.05(a); ECF No. 306-34 § 2.02(b).

Specifically, in New York, such claims must be brought, at the latest, within six years of the closing dates of the trusts. *See Deutsche Bank Nat'l Tr. Co. Tr. for Harborview Mortg. Loan Tr. v. Flagstar Cap. Markets Corp.*, 32 N.Y.3d 139, 146-47 (2018). The latest closing date[17] of the four covered trusts[18] in the Citigroup Settlement was March 30, 2007. *See* ECF No. 301-11 at 1 (listing CMLTI 2007-AR5's closing date as March 30, 2007). The latest closing date of the five trusts[19] in the JPMorgan Settlement was May 30, 2007. *See id.* (listing JPMMT 2007-A4's closing date as May 30, 2007). U.S. Bank's repurchase enforcement claims concerning the trusts involved in the Citigroup Settlement and the JPMorgan Settlement therefore expired on March 30, 2013, and May 30, 2013, respectively.

Accordingly, when U.S. Bank entered into an agreement to toll these claims with Citigroup beginning March 21, 2014, ECF No. 301-97 at 1-2, and with JPMorgan beginning July 14, 2013, ECF No. 301-96 at 1, these claims had already lapsed. So, by the time U.S. Bank accepted the Citigroup Settlement on December 19, 2014, Citigroup Settlement at 24, and the JPMorgan Settlement on August 1, 2014, JPMorgan Settlement at 24, U.S. Bank's settlement position had materially worsened due to U.S. Bank's failure to timely act on its repurchase enforcement claims. In approving the reasonableness of the settlement agreements, the state

[17] "The date the trust 'closed' designates the commencement of [the trust's] existence and the trustee's duties." *Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 665 F. Supp. 3d at 490 n.5.
[18] The four trusts are CMLTI 2005-7, CMLTI 2006-4, CMLTI 2006-AR1, and CMLTI 2007-AR5. ECF No. 301-126 at 2-3, 7-8.
[19] The five trusts are BSARM 2005-7, CFLX 2006-1, JPALT 2006-S4, JPMMT 2005-A7, and JPMMT 2007-A4. ECF No. 301-132 at 5-7.

court recognized as much, relying upon analysis by legal experts on the statute of limitations issue and how that had adversely affected the Trust's potential recovery in any potential suit that could be brought against JP Morgan or Citigroup. ECF No. 301-138 at 12-14; ECF No. 301-129 at 14-15.[20]

Consequently, the underlying settlements do not compensate the trusts' beneficiaries for any injury sustained due to U.S. Bank's breaches. This point distinguishes the present decision from *Pacific Life Insurance Company v. Bank of New York Mellon*. In that case, the district court held that issue preclusion applied to an Article 77 decision approving a settlement agreement between RMBS trustees and Countrywide Home Loans, Inc. ("Countrywide"). *See BNYM*, 2023 WL 5128079, at *11. Yet in that case, the defendant's claims against Countrywide had not yet expired. *See Pac. Life Ins. Co. v. Bank of N.Y. Mellon*, No. 17-CV-01388 (KPF) (RWL), 2022 WL 1446552, at *14 (S.D.N.Y. Feb. 22, 2022), *report and recommendation adopted in part, rejected in part*, *BNYM*, 2023 WL 5128079. The *BNYM* court thus found that the state court had necessarily passed judgment on the same issue as presented there—"whether Defendant's actions with respect to

[20] Defendant argues that there are other tolling agreements that investors had negotiated with Citigroup and JPMorgan that may impact the timeline undergirding the Court's analysis. Hr'g Tr. at 51:3-17. Such tolling agreements, however, do not appear to be in the voluminous evidentiary record before the Court. They also absent from Defendant's submissions correcting its previous summary-judgment arguments in light of those agreements. *See* ECF No. 323 at 1-6; ECF No. 323-1 at 1-5; ECF No. 323-2 at 1-16; ECF No. 323-3; ECF No. 323-4 at 1-4; ECF No. 323-5 at 1-64; ECF No. 324 at 1-3. Defendant has therefore failed to establish an undisputed issue of fact sufficient to be granted summary judgment on this question.

the released claims were in the certificateholders' best interests, and whether releasing such claims fulfilled Defendant's duties to certificateholders"—because "the Article 77 court blessed Defendant's decision *not* to pursue alternative means of enforcing rights and remedies against Countrywide and instead to settle potential claims against these entities for substantial consideration paid out to certificateholders." 2023 WL 5128079, at *14.

Defendant argues that, "[a]t the time of the settlement[s], it was still an open question in New York as to when the statute of limitations on [repurchase enforcement] claims would run, and that was resolved after they entered into the settlement[s]." Hr'g Tr. at 51:19-23. The sharp edge of Defendant's argument is that, since there was an open question about the limitations period, then the repurchase enforcement could have been pursued when the settlements were accepted, and therefore those settlements reflect the value of abstaining from such litigation. Although Defendant is correct that the question of when the statute of limitations for repurchase enforcement claims accrues under New York law was not settled until 2015, *see ACE Sec. Corp. v. DB Structured Prods., Inc.*, 25 N.Y.3d 581, 589 (N.Y. 2015) ("*ACE*"), it had been determined at the time the Article 77 courts reached their decisions, and was relied upon by the state court decisions. Indeed, the record demonstrates that Defendant was aware that the relevant claims had likely expired before *ACE* was decided, and that this formed a crucial part of the

decision to accept the settlement agreements.[21]

Accordingly, the Court denies Defendant summary judgment on this issue.

### 3. Negating Clauses

Defendant argues that Plaintiffs' claims relating to 19 certificates are entirely barred by the negating clauses in their governing agreements. Def. Br. at 11. These negating clauses generally provide:

> Except as expressly provided herein, nothing in this Agreement or in any Certificate, expressed or implied, shall give to any Person, other than the parties hereto and their respective successors hereunder, any separate trustee or co-trustee appointed under Section 8.10 and the Certificateholders, any benefit or any legal or equitable right, remedy or claim under this Agreement.

---

[21] For example, when approving the Citigroup Settlement, the Article 77 Court noted that Defendant's legal expert, retired New York Justice Anthony J. Carpinello, "anticipated the determination of the Court of Appeals" in *ACE* by "advis[ing] that the six-year limitations period applicable to breach of contract claims accrues at the time the Trusts closed." *In re U.S. Bank Nat. Ass'n*, 51 Misc. 3d at 280, 287. In his November 21, 2014 legal report submitted in connection with that settlement, Justice Carpinello explained:

> The majority of courts, both federal and state, which have had to address the issue of when the six-year Statute of Limitations begins to run on claims for violations of the type of representations and warranties allegedly committed by Citigroup, have held that the violations occurred as of the date that the Trusts were funded or "closed" because the Trustees would have been entitled to sue for those violations when the representations and warranties were first made.

Hon. Anthony J. Carpinello, *Proposed RMBS Trust Settlement Agreement (the "Proposed Settlement Agreement") dated April 7, 2014 by and among Citigroup Inc. and its direct and indirect subsidiaries and certain institutional investors, relating to certain RMBS trusts (the "Trusts")*, https://web.archive.org/web/20160826220017/http://citigrouprmbssettlement.com/pdflib/Carpinello_Expert_Report.pdf (last visited July 15, 2026).

*E.g.*, ECF No. 301-19 at 1. Although it is undisputed that Plaintiffs received the necessary authorizations from Cede & Co. to sue in accordance with these negating clauses in 2024, Defendant argues that those authorizations fail under Federal Rule of Civil Procedure 17(a)(3) because they were not obtained within a reasonable time after objection. Def. Br. at 11. Since Defendant's Rule 17 objection was originally raised in its Answer in November 2022, ECF No. 216 at 47, and Plaintiffs received authorizations from Cede & Co. between January 2024 and September 2024, ECF No. 301-98 at PacLife_USB000633078-83; ECF No. 301-99 at PacLife_USB000633144-63, roughly 14 to 22 months elapsed between Defendant's objection and Plaintiffs' receipt of authorizations. Accordingly, Defendant argues that this delay renders Plaintiffs' authorizations "untimely and ineffective." Def. Br. at 11-12 (quoting *Phoenix Light SF Ltd. v. Wells Fargo Bank, N.A.*, No. 14-CV-10102 (KPF) (SN), 2022 WL 2702616, at *17 (S.D.N.Y. July 12, 2022) (granting defendant's motion for summary judgment because plaintiffs' five-year lapse in obtaining authorizations was not a reasonable time to obtain such authorizations after defendant raised its Rule 17 objection)).

Rule 17(a)(3) provides, "The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." The advisory committee's note to Rule 17(a)(3) explains, "The provision that no action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has

been allowed, after the objection has been raised, for ratification, substitution, . . . is added simply in the interests of justice." Fed. R. Civ. P. 17 advisory committee's note to 1966 amendment. Accordingly, "[t]he determination of what constitutes a reasonable time is left to the discretion of the court." *Monplaisir v. City of N.Y., Dep't of Fin.*, No. 24-CV-01882 (LJL), 2025 WL 1150700, at *1 (S.D.N.Y. Apr. 18, 2025) (citation omitted).

Here, Defendant does not argue that Plaintiffs' delay in receiving the authorizations from Cede & Co. prejudiced Defendant in any way. *See* Def. Br. at 11-12. Dismissing Plaintiffs' claims for failure to obtain the requisite authorizations at an earlier time would thus not serve the interests of justice. Moreover, months before summary judgment briefing even commenced, Plaintiffs "received the proper authorizations for all . . . of the certificates at issue, rendering the question of standing [as it pertains to the negating clauses] moot." *Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 665 F. Supp. 3d at 493 (citing *Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aires*, 415 F.3d 242, 245 (2d Cir. 2005)). The Court therefore denies Defendant summary judgment on these claims.

**4. Statute of Limitations**

Defendant argues that a number of Plaintiffs' breach of contract claims are barred by California's four-year statute of limitations. Def. Br. at 12-14. Before considering these arguments, the Court first sets out the applicable law relating to the statute of limitations and California's discovery rule.

**a. Legal Standard**

**i. Statute of Limitations**

As noted earlier, since this action was transferred from the Southern District of Ohio under Section 1404(a), Ohio choice-of-law rules apply. "In choice-of-law situations, the procedural laws of the forum state, including applicable statutes of limitations, are generally applied." *Lawson v. Valve-Trol Co.*, 81 Ohio App. 3d 1, 4 (Ohio Ct. App. 9th Dist. 1991) (citing, *inter alia*, *Howard v. Allen*, 30 Ohio St. 2d 130 (Ohio 1972)). Ohio is the forum state for this purpose, and therefore Ohio law regarding the statute of limitations applies here. *E.g.*, *Ferens*, 494 U.S. at 525-26; *Commerzbank*, 100 F.4th at 379; *see also Diffley v. Allied-Signal, Inc.*, 921 F.2d 421, 423 (2d Cir. 1990) ("In diversity cases, state statutes of limitations govern the timeliness of state law claims, and state law determines the related questions of what events serve to commence an action and to toll the statute of limitations." (cleaned up)).

Under Ohio law, Plaintiffs' claims must "be timely under both (1) Ohio's statute of limitations . . . *and* (2) the limitations period of the jurisdiction where the claim accrued." *Commerzbank*, 100 F.4th at 379 (citing Ohio Rev. Code § 2305.03(B)); *Taylor v. First Resol. Inv. Corp.*, 148 Ohio St. 3d 627, 637 (Ohio 2016). For the reasons set forth in Judge Gardephe's decision, the jurisdiction in which Plaintiffs' claims accrued was California. *Pac. Life*, 636 F. Supp. 3d at 394-99. Accordingly, both Ohio's and California's statutes of limitations apply here, but the shorter statute of limitations controls. *Taylor*, 148 Ohio St. 3d at 637. Since the

applicable version of Ohio's statute of limitations for breach of contract is eight years, *see Commerzbank*, 100 F.4th at 379 & n.23, and California's statute of limitations for breach of contract is four years, Cal. Civ. Proc. Code § 337, then California's statute of limitations controls.

Plaintiffs, however, argue that Ohio's eight-year limitations period should apply to their contract claims. Pls. Opp'n at 18. Plaintiffs note that, while this action was pending, "Ohio passed an amended borrowing statute, applicable retroactively to April 7, 2005, which said that another state's shorter statute of limitations should be borrowed only for tort claims, *i.e.*, not for contract claims." *Id.* Plaintiffs conclude that Ohio's eight-year limitations period for contract claims should apply, not California's four-year limitations period, thereby rendering all of Plaintiffs' claims timely.

Plaintiffs' argument fails. As explained in Judge Gardephe's prior decision in this case, "Article II, Section 28 of the Ohio Constitution 'prohibits the [Ohio legislature] from passing retroactive laws that, when appl[ied], act to impair vested rights.'" *Pac. Life*, 636 F. Supp. 3d at 394 n.17 (quoting *State v. LaSalle*, 96 Ohio St.3d 178, 180-81 (Ohio 2002)). Since "Ohio courts have interpreted fully matured statute of limitations defenses as vested rights protected by Article II, Section 28 of the Ohio Constitution," *id.* (collecting cases), and some of Plaintiffs' contract claims expired prior to the 2021 amendment, then Defendant's fully matured statute of limitations defenses are vested rights protected by Ohio's Constitution, *see id.* Consequently, "this Court must look to the version of Ohio's borrowing statute in

effect prior to the 2021 amendment in determining whether Plaintiffs' breach of contract claims are time-barred." *Id.* Under that version of Ohio's borrowing statute, as this Court has already found, California's four-year limitations period governs.

**ii. California's Discovery Rule**

In California, a breach-of-contract claim ordinarily accrues "at the time of the breach of contract, and the statute of limitations begins to run at that time regardless of whether any damage is apparent or whether the injured party is aware of his right to sue." *Perez-Encinas v. AmerUs Life Ins. Co.*, 468 F. Supp. 2d 1127, 1134 (N.D. Cal. 2006) (applying California law). This default rule does not apply, however, in breach-of-contract actions where the "breaches . . . are[] committed in secret and, moreover, where the harm flowing from those breaches will not be reasonably discoverable by plaintiffs until a future time." *Gryczman v. 4550 Pico Partners, Ltd.*, 107 Cal. App. 4th 1, 4-5 (2003). In such situations, California's discovery rule applies. *Id.*

Under California's discovery rule, "the statute of limitations does not begin to run until the plaintiff either (1) actually discovers the injury and its cause or (2) could have discovered the injury and its cause through the exercise of reasonable diligence." *Angeles Chem. Co. v. Spencer & Jones*, 44 Cal. App. 4th 112, 120 (1996); *accord Apr. Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805, 826 (1983). Pursuant to the second prong, "[a] plaintiff has reason to discover a cause of action when he or she has reason at least to suspect a factual basis for its elements." *Fox v. Ethicon*

*Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005) (cleaned up). In this context, "suspicion of 'elements' of a cause of action" means suspicion of "the 'generic' elements of wrongdoing, causation, and harm" such that courts examine "whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." *Id.* Put another way:

> A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her.

*Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1111 (1988).

California's discovery rule employs "an objective standard." *Brewer v. Remington*, 46 Cal. App. 5th 14, 31 (2020). The discovery rule thus treats plaintiffs as possessing "presumptive knowledge of an injury if they have information of circumstances to put them on inquiry or if they have the opportunity to obtain knowledge from sources open to their investigation." *Fox*, 35 Cal. 4th at 807-08 (cleaned up). Accordingly, "the discovery rule does not operate to delay accrual of a cause of action beyond the point at which their factual basis became accessible to plaintiff to the same degree as it was accessible to every other member of the public." *NBCUniversal Media, LLC v. Superior Ct.*, 225 Cal. App. 4th 1222, 1234 (2014) (cleaned up).

California's discovery rule also operates through a burden-shifting framework. On a motion for summary judgment, the defendant bears the initial

burden of showing that the applicable limitations period ran out before the complaint was filed. Once the defendant carries this burden, the burden shifts to the plaintiff "to show that a triable issue of one o[r] more material facts exists." *Gryczman*, 107 Cal. App. 4th at 6-7. Specifically, "[t]he issue which must be shown to be triable is whether plaintiff exercised due diligence in discovering the breach." *Id.* at 7. In other words, the plaintiff must present evidence raising an issue of fact "that, despite diligent investigation of the circumstances of the injury, he or she could not have reasonably discovered facts supporting the cause of action within the applicable statute of limitations period." *Fox*, 35 Cal. 4th at 809.

Here, Defendant satisfied its initial burden of showing that the four-year limitations period ran out before Plaintiffs filed this action on June 24, 2015, ECF No. 1 at 226, with respect to several of Plaintiffs' claims, *see* Def. Br. at 12-14, as discussed *infra* Discussion, pt. A.4.b. Accordingly, the burden shifts to Plaintiffs to demonstrate a triable issue as to whether Plaintiffs exercised due diligence but nonetheless could not reasonably have discovered the relevant facts within the limitations period.

In response, Plaintiffs do not argue that they exercised due diligence and were nonetheless prevented from discovering their claims. *See* Pls. Opp'n at 17-18. Instead, citing paragraphs 733 through 744 of their Rule 56.1 Statement, Plaintiffs simply assert that "PacLife did not discover its claims against USB more than four years before filing its lawsuit, and USB can point to no evidence that it did." *Id.* at 17. Much of the evidence cited for this proposition does not actually establish that

Plaintiffs lacked notice of their potential claims against U.S. Bank, however. For example, while Plaintiffs point to evidence that Defendant did not declare the existence of any EODs or send various notices to certificateholders, CF, pt. 2, ¶ 734, 737-44, this does not establish that Plaintiffs otherwise lacked information of their potential injury such that their duty to inquire further was not triggered. As Judge Gardephe previously noted, the allegations in Plaintiffs' own Amended Complaint, ECF No. 116, establish that since at least February 5, 2009, there were publicly filed lawsuits and public reporting that would have put Plaintiffs "on notice of pervasive and systemic breaches of representations and warranties in the Covered Trusts." *Pac. Life*, 636 F. Supp. 3d at 403 (cleaned up).

In the Rule 30(b)(6) deposition testimony of Pacific Life on which Plaintiffs principally rely, the witness attests that "before this complaint was filed," Pacific Life did not have any knowledge of alleged warranty breaches, imprudent loan servicing by servicers of the trust, or the failure to deliver mortgage loan paperwork. ECF No. 306-388 at 184:20–185:8. Yet at some point Pacific Life became sufficiently aware of their claims to retain counsel to investigate on their behalf. *Id.* at 185:14-18. Notably, Plaintiffs do not set forth what information led them to retain counsel, when this information became available to them, and why such information was not available to them sooner.

Plaintiffs thus fail to carry their burden of raising a triable issue as to whether they exercised due diligence, and whether the relevant facts could not reasonably have been discovered within the limitations period. As California's

discovery rule is inapplicable here, Plaintiffs' claims accrued at the time of the breach of contract.

**b. Application**

**i. Timeliness of Pre-EOD Repurchase Enforcement Claims**

Defendant's first two timeliness arguments turn on Defendant's repurchase obligations for loans with document exceptions. *See* Def. Br. at 12-14. Defendant contends that Plaintiffs' pre-EOD repurchase enforcement claims relating to five trusts[22] are time-barred because the trusts' governing agreements specified the time by which the trustee must perform its duty, and thus the claims accrued more than four years before Plaintiffs filed suit. *Id.* at 12. Defendant further argues that, with respect to at least nine trusts, the Trustee was obligated to perform its repurchase duties within a reasonable time period, such that Plaintiffs' pre-EOD repurchase claims expired before Plaintiffs filed suit. *Id.* at 13-14.[23]

The governing agreements for the trusts at issue have substantially similar processes related to pre-EOD repurchase obligations arising from loans with

[22] These trusts are BSARM 2005-7, JPALT 2006-S4, JPMMT 2005-A7, JPMMT 2007-A4, and MSM 2006-7. ECF No. 301-3 at 1-2.

[23] If the reasonable time is 90 days, then Defendant argues that such claims expired across 14 trusts. Def. Br. at 13-14; ECF No. 301-4 at 1. These trusts are BAFC 2007-D, BSARM 2005-7, CMLTI 2005-7, CMLTI 2006-4, CMLTI 2006-AR1, CMLTI 2007-AR5, GSR 2006-AR1, JPALT 2006-S4, JPMMT 2005-A7, JPMMT 2007-A4, MABS 2006-AB1, MSM 2006-7, TBW 2006-6, WFMBS 2006-AR1. ECF No. 301-4 at 1-2. If, in the alternative, the reasonable time is three years, then Defendant argues that such claims expired across nine trusts. Def. Br. at 14. These trusts are CMLTI 2005-7, CMLTI 2006-4, CMLTI 2006-AR1, GSR 2006-AR1, JPALT 2006-S4, JPMMT 2005-A7, MABS 2006-AB1, TBW 2006-6, WFMBS 2006-AR1. ECF No. 301-4 at 3-4.

document exceptions.[24] First, Defendant receives a document exception report identifying a material defect in the mortgage file[25] (*i.e.*, there are missing or defective documents materially affecting the value of that mortgage file) for a loan held in one of the Covered Trusts. *E.g.*, ECF No. 306-16 § 2.05(a); *see* ECF No. 301-4 at 1-2. Next, Defendant or the custodian who receives it on Defendant's behalf must notify the seller or similarly situated deal party of the defect (the "Notice Requirement"). *E.g.*, ECF No. 306-16 § 2.05(a); *see* ECF No. 301-4 at 1-2. The seller or similarly situated deal party must cure the defect within either 90 or 120 days of receiving such notice (the "Cure Period"), depending upon the terms of the governing agreement. *E.g.*, ECF No. 306-16 § 2.05(c); *see* ECF No. 301-24 at 1-2; ECF No. 301-4 at 1-2. If the Cure Period expires and the seller or similarly situated deal party has not cured the defect, then Defendant is obligated, as the trustee, to require that party to "repurchase or . . . substitute one or more Replacement Mortgage Loans for the affected Mortgage Loan" (the "Repurchase Requirement"). *E.g.*, ECF No. 301-16 § 2.05(c); *see* ECF No. 301-24 at 1-2.

The governing agreements, however, do not clearly specify the timeframes in which Defendant (or the custodian on Defendant's behalf) must complete the Notice Requirement and the Repurchase Requirement. "Where a contract does not specify

[24] A mortgage loan has a material document exception when there are missing or defective documents in its mortgage file that materially and adversely affect its value.

[25] A "mortgage file" typically includes, *inter alia*, the mortgage note, the mortgage or deed of trust, documents reflecting assignments or transfers of the property, and title insurance policy documents. SUF, ¶ 53 n.2.; CUF, pt. 1, ¶ 53 n.2.

a date or time for performance, New York law implies a reasonable time period." *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007).[26]

Regarding the Notice Requirement, many of the governing agreements simply specify that, "upon discovery," the seller shall be "promptly" notified of the defect. *E.g.*, ECF No. 301-82 § 2.05(a). Considering the nature and language of the relevant provisions, Defendant therefore contends that 90 days is "the outer limit of a reasonable time to give notice." Def. Br. at 13. Plaintiffs do not dispute this interpretation of the governing agreements. *See* Pls. Opp'n at 15-18. Accordingly, the Court assumes *arguendo* that a reasonable period in which to complete the Notice Requirement is 90 days.

#### ii. Trusts With "Express" Time Limitations for Repurchase Requirement

Defendant contends that the governing agreements for five trusts explicitly prescribe a time limitation for performance of the Repurchase Requirement. Def. Br. at 12. The Court agrees that one of these trusts, BSARM 2005-7, imposes a 90-day deadline for Defendant to perform its repurchase obligations, and thus Plaintiffs' pre-EOD repurchase claims accrued long before the four-year statute of limitations expired. With respect to the other four trusts, the Court disagrees that the governing agreements set an express time limitation for pre-EOD repurchase performance.

---

[26] The parties agree that New York law applies to this question of contract interpretation. *Compare* Def. Br. at 12-14, *with* Pls. Opp'n at 15-17. Accordingly, the Court applies New York law. *See Prince of Peace Enters., Inc. v. Top Quality Food Mkt., LLC*, 760 F. Supp. 2d 384, 397 (S.D.N.Y. 2011).

The Sale and Servicing Agreement for BSARM 2005-7 provides:

> In accordance with the Mortgage Loan Purchase Agreement or the applicable Subsequent Mortgage Loan Purchase Agreement, as the case may be, the Seller shall correct or cure any such Material Defect within ninety (90) days from the date of notice from the Indenture Trustee of the defect and if the Seller fails to correct or cure the Material Defect within such period, ***the Indenture Trustee shall enforce the Seller's obligation under the Mortgage Loan Purchase Agreement or the applicable Subsequent Mortgage Loan Purchase Agreement, as the case may be, within 90 days from the Indenture Trustee's notification***, provide a Substitute Mortgage Loan or purchase such Mortgage Loan at the Repurchase Price Second . . . .

ECF No. 306-34 § 2.02(a) (emphasis added).

This language obligates Defendant to complete the Repurchase Requirement within a 90-day period. *Zittman v. HSBC Bank USA, N.A.*, 206 N.Y.S.3d 61, 63 (1st Dep't 2024). What is less clear is when the Repurchase Requirement's 90-day period begins to run. A strict reading of the language "within 90 days from the Indenture Trustee's notification" would seem to refer to the date on which the Trustee notified the Seller of the defect. Here, that would mean Plaintiffs' claims accrued on July 26, 2006. *See* ECF No. 301-4 at 1.

Under that interpretation, however, the time during which the seller is obligated to cure the defect is the same time during which the trustee must enforce repurchase. That would lead to the absurd result that the trustee must enforce repurchase obligations before knowing whether the seller will cure, thereby rendering the Cure Period a nullity. *See Mastrovincenzo v. City of New York*, 435

F.3d 78, 104 (2d Cir. 2006) (holding that "words should be given the meanings ordinarily ascribed to them and absurd results should be avoided" when interpreting contracts (citation omitted)); *LaSalle Bank Nat. Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." (cleaned up)).

The more reasonable interpretation, in light of the process outlined in the governing agreements, is that the parties intended the time to perform the Repurchase Requirement to run at the Cure Period's expiration. While this interpretation avoids the incongruous result above, it is in tension with the provision as written. Accordingly, the provision is ambiguous as to when the Repurchase Requirement's 90-day period begins to run.

The Court need not resolve this issue, however, as Plaintiffs' claims are time-barred under either construction. On the interpretation most favorable to Plaintiffs, Plaintiffs' pre-EOD repurchase enforcement claims concerning BSARM 2005-7 accrued on October 24, 2006. *See* ECF No. 301-4 at 1. Under California's four-year limitations period, these claims would have originally expired on October 24, 2010. Since these claims were tolled for 704 days, ECF No. 301-27, the statute of limitations expired on September 27, 2012. Accordingly, these claims were time-barred when Plaintiffs filed suit on June 24, 2015.

The governing agreements for the other four trusts provide:

> [I]f the Seller or related Originator, as applicable, does not deliver such missing document or cure such defect or

> breach in all material respects during such period, the Trustee shall enforce the obligations of the related Originator under the related Purchase and Servicing Agreement, as modified by the Acknowledgement and then, to the extent that the related Originator fails to cure such defect or breach, the Seller under this Agreement, and cause the related Originator or the Seller, as the case may be, to repurchase that Mortgage Loan from the Trust Fund at the Purchase Price on or prior to the Determination Date following the expiration of such specified period . . . .

*E.g.*, ECF No. 306-17 § 2.05(a); *see* SUF, ¶¶ 92-95; CUF, pt. 1, ¶¶ 92-95. Defendant argues that this provision sets an express time for Defendant to enforce repurchase, namely by the "Determination Date." Def. Br. at 12. Generally speaking, the "Determination Date" is "the day each month when the Servicer calculates the amount of funds that will be remitted to the Trustee for distribution to Trust certificate holders." *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 632 F. Supp. 3d 517, 534 (S.D.N.Y. 2022). Defendant's argument therefore hinges upon interpreting the phrase "on or prior to the Determination Date" as modifying the phrase "cause the related Originator or the Seller . . . to repurchase that Mortgage Loan." *See* Def. Br. at 12.

This argument is unavailing. As persuasively reasoned by Judge Paul Engelmayer when considering this same argument, the phase "on or prior to the Determination Date" more reasonably modifies the phrase "the Purchase Price." *Ambac*, 632 F Supp. 3d at 534-36.[27] Indeed, "[t]his reading not only accords with

[27] Although the contractual term that Judge Engelmayer interpreted was "Repurchase Price," that term is functionally equivalent to the term "Purchase Price" in the present context. *See Ambac*, 632 F Supp. 3d at 534-36.

the 'last antecedent' canon and gives meaning to each provision—it also avoids the absurdities risked by U.S. Bank's construction." *Id.* at 535. Accordingly, these trusts' governing agreements do not explicitly identify a time by which the Repurchase Requirement must be completed. *See id.* at 535-36. As such, Defendant's argument fails.

**iii. Reasonable Time Limitations for Repurchase Requirement**

The question, then, is what constitutes a reasonable time period for the Trustee's performance of its pre-EOD repurchase enforcement obligations with respect to any trust that does not contain an express time limitation. Defendant contends that it had at most 90 days in which to enforce its pre-EOD repurchase enforcement obligations for loans with document exceptions. *See* Def. Br. at 13. In the alternative, Defendant argues that at most a three-year period would be a reasonable time limit to enforce the pre-EOD repurchase enforcement claims, such that claims would still be time-barred for nine trusts. *Id.* at 14. The Court is not persuaded.

"What constitutes a reasonable time for performance depends upon the facts and circumstances of the particular case," including "the previous conduct of the parties." *Zev v. Merman*, 73 N.Y.2d 781, 783 (N.Y. 1988). When the facts are disputed, "[t]he question of what is a reasonable period of time for performance of a particular contract is a question of fact for a jury." *Ambac*, 632 F. Supp. 3d at 536 (quoting *BLD Prods., LLC v. Remote Prods., Inc.*, 509 F. App'x 81, 81 (2d Cir. 2013) (summary order)).

Plaintiffs present evidence that Defendant has treated a period of six years as a reasonable time to pursue repurchase enforcement claims in similar cases. *See* ECF No. 306-612 at 2-5. If a reasonable time to perform is six years, then Plaintiffs' claims would not be time-barred. *See* ECF No. 301-4. As several courts in this District have concluded in similar cases, the Court holds that the question of what constitutes a reasonable time to perform must be reserved for the jury. *Ambac*, 632 F. Supp. 3d at 536, 540; *Phoenix Light SF Ltd. v. Wells Fargo Bank, N.A.*, 2022 WL 2702616, at *24-25; *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 585 F. Supp. 3d 540, 580 (S.D.N.Y. 2022).

In sum, Defendant's motion for summary judgment as to the timeliness of Plaintiffs' pre-EOD repurchase enforcement claims is denied except as to BSARM 2005-7.

#### iv. Timeliness of All Repurchase Enforcement Claims Concerning CSFB 2004-8 and JPMMT 2005-A7

Finally, Defendant argues that all repurchase enforcement claims related to CSFB 2004-8 and JPMMT 2005-A7 are time-barred.[28] Def. Br. at 14. Since CSFB 2004-8 closed on November 29, 2004, and JPMMT 2005-A7 closed on September 29, 2005, Defendant asserts its repurchase enforcement claims concerning those trusts expired in November 2010, and September 2008, respectively. *Id.* Under New York

[28] Although the Court has already granted summary judgment in Defendant's favor on all claims relating to JPMMT 2005-A7, *supra* Discussion, pt. A.1., the Court nonetheless considers Defendant's argument with respect to this trust, and concludes that Defendant is also entitled to summary judgment with respect to these claims on this alternate basis.

law, Defendant contends, while the New York statute of limitations applies to Defendant's claims regarding CSFB 2004-8, the North Carolina statute of limitations applies to Defendant's claims regarding JPMMT 2005-A7. *Id.* Defendant explains this is because, under New York's borrowing statute, those claims accrued to the original trustee Wachovia in North Carolina. *Id.* Applying California's limitations period, Defendant concludes that Plaintiffs' claims expired four years after Defendant's claims expired, meaning that Plaintiffs' CSFB 2004-8 claims expired in May 2015,[29] and Plaintiffs' JPMMT 2005-A7 claims expired in September 2012. *Id.*; ECF No. 301-29 at 1.

In response, Plaintiffs argue that application of California's discovery rule and Ohio's eight-year statute of limitations renders these claims timely. Pls. Opp'n at 17-18. The Court, however, has already concluded that California's discovery rule and Ohio's eight-year statute of limitations do not apply. *Supra* Discussion, pt. A.4. Plaintiffs' argument thus fails. As Plaintiffs do not otherwise challenge Defendant's untimeliness argument related to CSFB 2004-8 and JPMMT 2005-A7, *see* Pls. Opp'n at 15-18, the Court deems any such challenge waived. Defendant is therefore entitled to summary judgment on Plaintiffs' repurchase enforcement claims regarding CSFB 2004-8 and JPMMT 2005-A7.

[29] This calculation also takes into account the 180-day class tolling period concerning CSFB 2004-8. ECF No. 301-27 at 1.

### 5. Pre-EOD Claims[30]

Defendant also contends that Plaintiffs' pre-EOD claims fail on the merits. Def. Br. at 21-23. To assess these arguments, the Court must first identify Defendant's duties under the governing agreements. "The duties of an RMBS trustee are distinct from those of an 'ordinary trustee,' which might have duties extending well beyond the agreement." *BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 247 F. Supp. 3d 377, 385 (S.D.N.Y. 2017) (cleaned up). "Before an [Event of Default] has occurred, RMBS Trustees' rights and duties are defined exclusively by the terms of the agreement." *IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*, 40 N.Y.3d 277, 285 (N.Y. 2023) (cleaned up); *see BlackRock*, 247 F. Supp. 3d at 385. "This is true regardless of whether the trust is an indenture trust or a PSA trust." *BlackRock*, 247 F. Supp. 3d at 385 (cleaned up). "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *IKB Int'l*, 40 N.Y.3d at 285.

Since each Covered Trust is governed by a different governing agreement, U.S. Bank's duties as trustee differ somewhat on a trust-by-trust basis. *Pac. Life*, 636 F. Supp. 3d at 381. Nonetheless, many of the governing agreements share the

[30] Although the Court has already granted summary judgment in Defendant's favor on all claims relating to several trusts, *supra* Discussion, pt. A.1., the Court nonetheless addresses certain contractual provisions governing those trusts and, where appropriate, certain evidence pertaining to some of those trusts as an alternate basis upon which to grant summary judgment. To the extent the Court declines to consider particular evidence because summary judgment has already been granted as to the relevant trust, the Court notes that limitation expressly.

same or substantially similar provisions. *Id.* Most importantly, the governing agreements uniformly bifurcate U.S. Bank's duties as trustee into duties that apply before and after an EOD.

**a. Pre-EOD Duties**

For all 31 Covered Trusts, the governing agreements generally provide that, "prior to the occurrence of an Event of Default . . . [the Trustee] undertake[s] to perform such duties and only such duties as are specifically set forth in this Agreement as duties of the Trustee." ECF No. 301-13 at 1-2; *e.g.*, ECF No. 306-3 § 9.01(a)(i). For 27 of the Covered Trusts, the governing agreements also generally provide that, before an EOD occurs, "[n]o implied covenants or obligations shall be read into this Agreement against the Trustee." ECF No. 301-13 at 4; *e.g.*, ECF No. 306-3 § 9.01(b)(i). Accordingly, the governing agreements generally proscribe the imposition of extra-contractual or implied duties on the trustee before an EOD occurs.[31] But while "a pre-EOD [RMBS] Trustee's role is essentially ministerial," a Trustee nonetheless "has . . . a duty to avoid conflicts of interest and a duty to

[31] While Plaintiffs dispute this characterization of the Covered Trusts, they do not point to any specific language in the governing agreements that calls into question the plain and unambiguous reading of this language. CUF, pt. 1, ¶¶ 40, 51. Instead, Plaintiffs simply "refer the Court to the governing agreements for an accurate and in-context recitation of their contents." *Id.* Having reviewed the governing agreements themselves, the Court finds that Plaintiffs have not created a genuine dispute as to the limited nature of the duties imposed upon the trustee by the governing agreements before an EOD occurs.

perform ministerial tasks with due care, in addition to any express duties provided by the governing agreements." *IKB Int'l*, 40 N.Y.3d at 285.

There are two categories of pre-EOD duties expressly imposed on the trustee under the various governing agreements that are relevant to the instant motion. First, for 11 of the Covered Trusts, the governing agreements impose upon the trustee a duty to enforce the repurchase of mortgage loans with material document exceptions. ECF No. 306-629 at 2-4, 5, 8-11, 13-16, 18, 30-31. For eight of these trusts,[32] this duty is triggered when the designated party (typically the seller or sponsor) receives written notice of the defect, that notice requests the party to cure the defect, and that party fails to cure the defect within the designated period. *See id.* at 4-5, 8-11, 13, 15, 18, 30-31. For three of these trusts,[33] the repurchase obligation is activated when the trustee receives written notice of the party's failure to cure after the expiration of the designated period. *See id.* at 2-3, 14-16.

Second, for 12 of the Covered Trusts, the governing agreements require the trustee to enforce repurchase obligations for mortgage loans with a material breach of any R&W. *See* ECF No. 306-628 at 1-3, 8-10, 12-18, 29-30.[34] For six of these

[32] These trusts are BSARM 2005-7, CMLTI 2005-7, CMLTI 2006-4, CMLTI 2007-AR5, GSR 2006-AR1, JPMMT 2005-A7, MSM 2006-7, and WFMBS 2006-AR1. *See* ECF No. 306-629 at 4, 8-11, 13, 15, 18, 30-31.

[33] These trusts are BAFC 2007-D, JPALT 2006-S4, and JPMMT 2007-A4. *See id.* at 2-3, 14-16.

[34] Although Plaintiffs claim there are 13 such trusts, the evidence upon which Plaintiffs rely for this point indicates that only 12 trusts have provisions using the phrase "shall enforce" in the context of enforcing repurchase of mortgage loans with an R&W breach. *See* CUF, pt. 2, ¶ 607 (citing ECF No. 306-628); ECF No. 306-628 at 1-32. Although Plaintiffs also cite records relating to CMLTI 2006-AR1, *see* CUF, pt. 2, ¶¶ 269-79, CMLTI 2006-AR1's governing agreement provides only that "[t]he

trusts,[35] this duty arises when the designated party (typically the seller or sponsor) is provided written notice of the breach, that notice requests the party to cure the breach, and that party fails to cure the breach within the designated period. *See id.* at 8-10, 12, 14, 15-18. For four of these trusts,[36] the duty arises when the foregoing preconditions are met and the trustee also receives written notice of that party's failure to cure. *See id.* at 1-3, 13, 15, 29-30. For two of these trusts,[37] the trustee's repurchase obligation commences when the transferor either discovers the breach or receives written notice of the breach from any designated party, and the transferor then fails to cure that breach within 90 days of discovery or notice. *See id.* at 15-19.

"Taken together, these breach and remedy provisions make clear that breaches must be [noticed or known] (and remedied) relative to the particular mortgage loans in breach; as such, knowledge of 'pervasive breaches' does not suffice." *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, No. 14-CV-10104 (VEC), 2017 WL 3973951, at *8 (S.D.N.Y. Sept. 7, 2017). As a result, when resolving motions for summary judgment on pre-EOD R&W claims, courts routinely require plaintiffs to provide "evidence to support their claims 'loan-by-loan and trust-by-

---

Indenture Trustee . . . has . . . the right to enforce the remedies against Citigroup Global Markets Realty Corp. provided in such Section 6 of the Mortgage Loan Purchase Agreement." ECF No. 306-628 at 9-10. While these remedies include repurchase of mortgage loans with an R&W breach, merely possessing the right to enforce such remedies does not impose a duty on the trustee to do so in this context. *See* ECF No. 306-33 § 6.

[35] These trusts are CMLTI 2005-7, CMLTI 2006-4, CMLTI 2007-AR5, GSR 2006-AR1, JPMMT 2005-A7, and MSM 2006-7. *See* ECF No. 306-628 at 8-10, 12, 14, 17.

[36] These trusts are BAFC 2007-D, JPALT 2006-S4, JPMMT 2007-A4, and WFMBS 2006-AR1. *See id.* at 1-3, 13, 15, 29-30.

[37] These trusts are MABS 2006-AB1 and TBW 2006-6. *See id.* at 15-19.

trust.'" *Id.* at *9 (quoting *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 162-63 (2d Cir. 2014)); *see also Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 665 F. Supp. 3d at 494-95; *Royal Park Invs. SA/NV v. HSBC Bank USA Nat'l Ass'n*, No. 14-CV-08175 (LGS) (SN), 2017 WL 945099, at *4 (S.D.N.Y. Mar. 10, 2017); *MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Est. Sec. Inc.*, No. 12-CV-07322 (PKC), 2015 WL 764665, at *9 (S.D.N.Y. Jan. 9, 2015).

**b. Written Notice**

Defendant first argues that, as to four trusts, the trustee's repurchase enforcement duty as to mortgage loans with "loan-characteristic" R&W breaches[38] arose only if it received written notice of the obligated party's failure to cure, and as to a fifth trust, TBW 2006-6, only if it received written notice of a specific breach from a specified party.[39] *See* ECF No. 307 ("Def. Reply") at 9; Def. Br. at 21; SUF, ¶¶ 253-53.2. Defendant contends that the record lacks evidence that it received such notices, and thus it is entitled to summary judgment as to these pre-EOD claims. Def. Br. at 21.

Defendant is wrong about when the trustee's pre-EOD R&W repurchase

[38] Defendant clarifies that its argument only targets Plaintiffs' pre-EOD loan-characteristic R&W claims that "do not include breaches related to the completeness of the Mortgage File" or "the status of the Mortgage File," SUF, ¶ 250 n.4, such as claims arising from false R&Ws "relating to underwriting guidelines and loan characteristics." Def. Br. at 21.

[39] The first four trusts are BAFC 2007-D, JPALT 2006-S4, JPMMT 2007-A4, and WFMBS 2006-AR1. *Compare* Def. Br. at 21, *with* SUF, ¶¶ 253-253.2, *and* ECF No. 301-9.

enforcement duty arises as to TBW 2006-6. As noted *supra*, the governing agreement for this trust does not condition the trustee's duty upon the *trustee* receiving notice from a specified party. *See* ECF No. 306-21 § 2.03. Rather, TBW 2006-6's governing agreement provides:

> The Trustee shall enforce the obligations of the Transferor in accordance with this Section 2.03 to correct or cure any such breach of a representation or warranty made herein, and if the Transferor fails to correct or cure the defect within such period, and such defect materially and adversely affects the interests of the Certificateholders or the Certificate Insurer in the related Mortgage Loan, the Trustee shall enforce the Transferor's obligations hereunder to (i) purchase such Mortgage Loan at the Purchase Price or (ii) substitute for the related Mortgage Loan an Eligible Substitute Mortgage Loan.

*Id.* Accordingly, the trustee's repurchase enforcement duty arises when the transferor fails to uphold its obligation to correct or cure a material R&W breach within a certain period. *See id.* The transferor's obligation to correct or cure a material R&W breach, in turn, is described as follows:

> The Transferor hereby covenants that within ninety (90) days of the earlier of its discovery or its receipt of written notice from any party of a breach of any representation or warranty made pursuant to this Section 2.03 which materially and adversely affects the interest of the Certificateholders or the Certificate Insurer in any Mortgage Loan, it shall cure such breach in all material respects, and if such breach is not so cured, shall, (i) if such ninety (90) day period expires prior to the second anniversary of the Closing Date, remove such Deleted Mortgage Loan from the Trust Fund and substitute in its place an Eligible Substitute Mortgage Loan or Mortgage Loans into the Trust Fund, in the manner and subject to the conditions set forth in this Section; or (ii) repurchase the affected Mortgage Loan or Mortgage Loans from the

> Trustee at the Purchase Price in the manner set forth below.

*Id.* As such, the transferor fails to uphold its obligation when it fails to correct or cure a material R&W breach for 90 days following the earlier of either its discovery of that breach or its receipt of written notice about that breach from any specified party. *See id.* The trustee's repurchase enforcement duty is thus not conditioned upon the trustee's receipt of written notice, but rather upon the failure of the transferor to uphold its obligation.[40] *See id.*

Nonetheless, Plaintiffs fail to present any evidence that the transferor failed to uphold its obligation to correct or cure TBW 2006-6 mortgage loans with material R&W breaches after discovering or receiving notice about such breaches, or that Defendant discovered or had knowledge of specific TBW 2006-6 mortgage loans with material R&W breaches. Plaintiffs ultimately point to five exhibits, but none meet the mark. *See* CUF, pt. 1, ¶ 253 (citing ECF No. 306-615 (citing ECF Nos. 306-215, 306-234, 306-235, 306-246, 306-254); Pls. Opp'n at 11 (citing ECF No. 306-615). To begin, four of the five exhibits fail to identify specific loans. *See* ECF Nos. 306-234, 306-235, 306-246, 306-254. For the sole exhibit that does identify specific loans, the only identified breaches relate to document exceptions, not loan-characteristic

---

[40] If the specified parties comply with their obligation upon discovery of a material R&W breach under Section 2.03 to "give prompt notice thereof" to other specified parties, including the trustee, then the trustee will be provided "prompt notice" of the breach before the trustee's repurchase enforcement duty arises with respect to that breach. *See* ECF No. 306-21 § 2.03. Strictly speaking according to the terms of TBW 2006-6's governing agreement, however, the trustee's repurchase enforcement duty is not conditioned upon its receipt of such notice about the breach, and its duty is certainly not conditioned upon receipt of written notice.

R&Ws. *See* ECF No. 306-215. Accordingly, the Court grants Defendant summary judgment on Plaintiffs' pre-EOD R&W repurchase enforcement claims concerning TBW 2006-6.

The governing agreements for the other four trusts—BAFC 2007-D, JPALT 2006-S4, JPMMT 2007-A4, and WFMBS 2006-AR1—require the trustee to receive written notice that the designated party failed to cure a specific R&W breach within a designated period. *See* ECF No. 306-628 at 1-3, 13, 15, 29-30. To avoid the grant of summary judgment, Plaintiffs must therefore provide evidence sufficient to create a disputed issue of fact as to whether Defendant received such written notice.[41]

Plaintiffs have created a chart listing nearly 200 exhibits that they claim show Defendant received written breach notices generally. *See* Pls. Opp'n at 11 (citing ECF No. 306-615). Yet the relevant inquiry is whether Defendant received loan-specific written notice of R&W breaches concerning JPALT 2006-S4 and JPMMT 2007-A4. Of the exhibits listed, only 13 relate to these two trusts.[42] Based on a review of those exhibits, the Court concludes there is a genuine dispute regarding whether the trustee received the requisite written notice triggering its repurchase enforcement duty concerning JPALT 2006-S4's mortgage loans 1742458918 and 1845715746. *See* ECF No. 306-159 at USBANK-PAC00590028;

[41] The Court does not consider the evidence relating to BAFC 2007-D and WFMBS 2006-AR1 as the Court has already granted summary judgment in Defendant's favor on all claims relating to those trusts. *Supra* Discussion, pt. A.1.

[42] These exhibits are ECF Nos. 306-154, 306-155, 306-156, 306-157, 306-158, 306-159, 306-160, 306-161, 306-210, 306-211, 306-251, 306-261, 306-267.

ECF No. 306-160 at USBANK-PAC00213102. With respect to Plaintiffs' remaining pre-EOD R&W repurchase enforcement claims concerning JPALT 2006-S4 and JPMMT 2007-A4, Defendant's motion for summary judgment is granted because there is no evidence in the record that Defendant received the requisite written notice.

**c. Successor Trustee**

Defendant argues that it did not have a duty to address document exceptions in 11 trusts[43] because it lacked knowledge of those exceptions. Def. Br. at 22. Notice of the document exceptions was provided to the prior trustee, not to Defendant. *Id.* According to Defendant, since it had no obligation to review the mortgage files when it became trustee, it cannot be held liable for failing to discover these document exceptions or take action. *Id.* Indeed, at least two witnesses testified that Defendant, upon becoming successor trustee, did not review mortgage loan files for uncured document exceptions. *See* ECF No. 301-142 at 48:1-12 (Kaplan); ECF No. 301-143 at 32:5-7 (Elbert). One of those witnesses also testified that this lack of review was due to a belief that Defendant did not have an obligation to perform that review. *See* ECF No. 301-142 at 48:1-12 (Kaplan).

In response, Plaintiffs argue that there is evidence in the record suggesting that Defendant discovered, or otherwise had actual knowledge of, the document exceptions. Pls. Opp'n at 12-13. Specifically, Defendant's employees reviewed the

[43] These trusts are MSM 2006-7 and the ten WaMu Trusts. *Compare* Def. Br. at 22, *with* SUF, ¶ 244.

mortgage files to incorporate data from those files into its own system and "have an inventory of what [it was] holding." ECF No. 306-397 at 106:16-17 (Jacobs); *accord* CUF, pt. 2, ¶¶ 690-96, 703-08; CF, pt. 2, ¶¶ 690-96, 703-08. Once this "data mapping" process was complete, Defendant's personnel could see in their system "what was currently an open exception" with regard to each mortgage loan. ECF No. 306-397 at 105:9-10, 17-18 (Jacobs). Plaintiffs also point to testimony that various groups, such as "structured finance," "a CDO group," and "document custody" reviewed "physical documents . . . such as the transaction documents and . . . core documents" as part of the trustee transition. *Id.* at 78:4-5, 7-10, 16-17 (Jacobs).

At least one other court in this District has reached a different conclusion on similar evidence. *See, e.g.*, *Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 665 F. Supp. 3d at 494. The Court agrees that, under the governing agreements, Defendant "only has the duties specifically and expressly assigned in the [governing agreements], which did not require [Defendant] to re-review the physical loan files when it received them." *Id.* at 493-94. Yet the evidence indicates that several groups of Defendant's employees did in fact review these files to incorporate their information into Defendant's inventory. On this record, there is evidence sufficient to create a genuine dispute as to whether Defendant actually discovered the document exceptions with respect to the eleven trusts for which it became the successor trustee, through its data mapping project or otherwise. Accordingly, Defendant's motion for summary judgment with respect to Plaintiffs' pre-EOD

notice claims for these trusts is denied.

**d. Duty to Investigate**

Defendant seeks summary judgment with respect to Plaintiffs' pre-EOD loan-characteristic R&W claims relating to tens of thousands of loans[44] across the 31 Covered Trusts. *See* ECF No. 307 ("Def. Reply") at 10; Def. Br. at 22 (citing SUF, ¶¶ 248-52; ECF No. 301-30). For these loans, Defendant argues that it did not discover or receive notice of a loan-specific R&W breach that materially and adversely affected the loan's value or investors' interests in the loan. Def. Br. at 22. In the absence of such loan-specific discovery or notice, Defendant contends, its duty to address loan-characteristic R&W breaches never arose. *Id.* at 22-23. Plaintiffs counter that Defendant had actual knowledge of widespread problems regarding the underlying loans, gained through such sources as Congressional investigations and monthly reports showing performance problems in the Covered Trusts, as well as loan-specific notice, thereby giving rise to a duty to investigate. *See* Pls. Opp'n at 11-12.

Plaintiffs' arguments are unavailing. To start, it bears repeating that "[b]efore an EOD has occurred, RMBS Trustees' rights and duties are defined exclusively by the terms of the agreement." *IKB Int'l*, 40 N.Y.3d at 285 (cleaned up). The governing agreements impose no duty to investigate upon the Trustee.

Accordingly, to survive summary judgment, Plaintiffs must provide evidence of Defendant's discovery, actual knowledge, or receipt of notice of material R&W

[44] As specified in Defendant's Chart 10. ECF No. 301-10.

breaches. Moreover, "the Second Circuit [has] made clear that to prevail on the merits of their RMBS claims, [Plaintiffs] cannot rely on generalized proof; rather, [Plaintiffs] must prove their claims that the Trustee breached its contractual obligations 'loan-by-loan and trust-by-trust.'" *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, 2017 WL 3973951, at *8 (quoting *Ret. Bd. of the Policemen's Annuity*, 775 F.3d at 162-63). Thus, at this stage of the litigation, Plaintiffs must come forward with evidence of notice on a loan-by-loan basis.

Plaintiffs fail to provide such loan-specific evidence. Plaintiffs reference "notices received from the RMBS Investor Clearing House, the Association of Mortgage Investors, and additional investors; Congressional investigations into Sponsor/Seller misconduct; and monthly reports showing performance problems in the Trusts." Pls. Opp'n at 12 (citing CUF, pt. 2, ¶¶ 327-29, 636-86). Virtually none of the cited exhibits, however, reference specific loans.[45] The only exception is the July 2010 monthly ARMT 2005-10 remittance report, which identifies roughly 210 mortgage loans either in foreclosure, bankruptcy, or Real Estate Owned ("REO")[46] status. *See* ECF No. 306-452 at USBANK-PAC00110903-904, USBANK-PAC00110906-10, USBANK-PAC00110912. The Court need not consider this report, however, as it has already granted summary judgment to Defendant on all

[45] The referenced exhibits are found at ECF Nos. 306-452, 306-453, 306-458, 306-465, 306-501, 306-502, 306-503, 306-504, 306-505, 306-506, 306-507, 306-508, 306-509, 306-510, 306-511, 306-512, 306-513, 306-514, 306-515, 306-516, 306-517, 306-518, 306-519, 306-520, 306-521, 306-522, 306-523, 306-524, 306-525, 306-526, 306-613. *See* CUF, pt. 2, ¶¶ 327-29, 636-86.
[46] When a mortgage loan is in REO status, the mortgaged property was foreclosed upon, failed to sell at the foreclosure auction, and is now owned by the lender.

claims relating to ARMT 2005-10. *Supra* Discussion, pt. A.1.

Plaintiffs also point to a summary chart of exhibits that purportedly demonstrates the trustee's knowledge of R&W breaches. *See* Pls. Opp'n at 11 (citing ECF No. 306-615). On a trust-by-trust basis, the chart lists the exhibits that establish the R&W breach and then in a separate column lists related correspondence. *Id.* This chart, however, does not attempt to correlate any of the hundreds of referenced exhibits to specific loans, let alone match those loan references to particular R&W breaches. Apparently Plaintiffs expect the Court to sift through this voluminous material and do their work for them. The Court declines to do so.[47]

Fortunately for Plaintiffs, however, Defendant identifies 64 specific loans for which there are notices reflecting an actual or potential R&W breach. ECF No. 323-4 at 1-4. *Compare* Def. Br. at 22-23, *with* ECF No. 301-30 at 1-3, *and* ECF No. 323-4 at 1-4. The Court therefore focuses on those particular loans.

The Court rejects Defendant's argument that it would have been futile for Defendant to enforce repurchase of some of these loans for the reasons discussed below. *Infra* Discussion, pt. A.6.b. The Court also rejects Defendant's argument that it could not have discovered an actual breach from notice of a potential breach

[47] Counsel for Plaintiffs is plainly aware of the necessity of providing such information for the Court's benefit, as it has compiled charts referencing breaches concerning thousands of specific mortgage loans by loan identification number across multiple RMBS trusts in other litigation. *See Commerzbank AG v. U.S. Bank Nat'l Ass'n*, 457 F. Supp. 3d 233, No. 16-CV-04569 (WHP) (S.D.N.Y. 2020), ECF No. 320-38 (referencing breaches for 4,245 separate mortgage loans by loan identification number across 39 RMBS trusts).

because notice of a potential breach as to a specific loan encompasses notice of the facts underlying an actual breach as to that loan. Accordingly, with respect to these 64 loans, the Court finds that there is a genuine dispute as to whether Defendant discovered, had actual knowledge, or received the appropriate notice of a material R&W breach as required by the governing agreements. For Plaintiffs' remaining pre-EOD loan-characteristic R&W claims, Defendant's motion for summary judgment is granted.

**6. Post-EOD Claims**[48]

Following an EOD, the governing agreements generally obligate Defendant to "exercise its contractual rights and powers [with] the same degree of care and skill . . . as a prudent person would exercise in the conduct of such person's own affairs" so long as that EOD "remains continuing and uncured." ECF No. 306-617 at 1-8. Plaintiffs assert that Defendant knew of uncured EODs in all Covered Trusts but failed to exercise its rights and powers as trustee as a prudent person would. CUF, pt. 2, ¶ 717 (citing *id.*, ¶¶ 25-31, 37-40, 615-22). Accordingly, Plaintiffs assert several categories of post-EOD claims. *Id.*, ¶¶ 717-25.

Defendant argues that Plaintiffs' claims based on hundreds of alleged EODs fail on the merits. *See* Def. Br. at 14-21. The requirements for an EOD vary by

[48] Although the Court has already granted summary judgment in Defendant's favor on all claims relating to several trusts, *supra* Discussion, pt. A.1., the Court nonetheless addresses certain contractual provisions relating to those trusts and, where appropriate, certain evidence pertaining to some of those trusts, as an alternate basis upon which to grant summary judgment. To the extent the Court declines to consider particular evidence because summary judgment has already been granted as to the relevant trust, the Court notes that limitation expressly.

trust and by the type of EOD at issue. The Court must therefore examine each post-EOD claim to determine if, under the terms of the relevant governing agreement, Plaintiffs have adduced sufficient evidence that an EOD occurred.

**a. Written Notice**

Defendant has moved for summary judgment with respect to a number of Plaintiffs' post-EOD claims based upon the material contractual failure of a servicer, master servicer, issuer, or depositor. The Court refers to this type of EOD as a "Material Failure EOD." It is not disputed that for the vast majority of the Covered Trusts, a Material Failure EOD does not occur in the absence of written notice. *See* ECF No. 301-5 at 1-3; ECF No. 301-6 at 1-2. *Compare* SUF, ¶¶ 254-57, *with* CUF, pt. 1, ¶¶ 254-57. What is in dispute is the nature of the written notice required. Consideration of the specific language of the relevant governing agreements is thus in order.

For 29 of the 31 Covered Trusts, the governing agreements provide that a Material Failure EOD[49] occurs when (1) the relevant party (the servicer, master servicer, or depositor[50])[51] fails to duly observe or perform in any material respect

[49] Some of the governing agreements also refer to an EOD as either a "Master Servicer Event of Termination," *e.g.*, ECF No. 306-19 § 7.01(ii), or a "Master Servicer Event of Default," *e.g.*, ECF No. 306-10 § 7.01(ii).

[50] The governing agreements that identify the relevant party as the depositor refer to the depositor as "the Company." *E.g.*, ECF No. 306-22 at 1.

[51] For BAFC 2007-D, CMLTI 2005-7, CMLTI 2006-4, CMLTI 2007-AR5, GSR 2006-AR1, JPALT 2006-S4, JPMMT 2005-A7, JPMMT 2007-A4, MABS 2006-AB1, MSM 2006-7, TBW 2006-6, and WFMBS 2006-AR1, the governing agreements provide that the relevant party is the master servicer. ECF No. 306-626 at 4-5, 9-10. For the ten WaMu Trusts, the governing agreements provide that the relevant party is the servicer or depositor. *Id.* at 11-12. For ARMT 2005-10, CMALT 2007-A1,

any of its covenants or agreements set forth in the respective governing agreement,[52] (2) the relevant party receives written notice of the material failure from a designated party, (3) the notice includes a demand to remedy the failure,[53] and (4) the relevant party fails to cure the identified material failure for a specified

CMALT 2007-A4, CMALT 2007-A5, CMALT 2007-A6, CSFB 2004-8, the governing agreements provide that the relevant party is the master servicer or servicer. *Id.* at 2-3. For CFLX 2006-1, the governing agreement provides that the relevant party is the servicer. *Id.* at 8.

[52] *See* ECF No. 306-2 § 8.01(c); ECF No. 306-3 § 8.01(b); ECF No. 306-5 § 9.01(b); ECF No. 306-6 § 7.1(c); ECF No. 306-7 § 7.1(c); ECF No. 306-8 § 7.1(c); ECF No. 306-9 § 7.1(c); ECF No. 306-10 § 7.01(ii); ECF No. 306-11 § 7.01(ii); ECF No. 306-13 § 7.01(ii); ECF No. 306-14 § 8.01(b); ECF No. 306-15 § 8.04(b); ECF No. 306-16 § 6.14(a)(ii); ECF No. 306-17 § 6.14(a)(ii); ECF No. 306-18 § 6.14(a)(ii); ECF No. 306-19 § 7.01(ii); ECF No. 306-20 § 6.14(a)(ii); ECF No. 306-21 § 7.01(ii); ECF No. 306-22 § 7.01(a)(ii), (b)(i); ECF No. 306-23 § 7.01(a)(ii), (b)(i); ECF No. 306-24 § 7.01(a)(ii), (b)(i); ECF No. 306-25 § 7.01(a)(ii), (b)(i); ECF No. 306-26 § 7.01(a)(ii), (b)(vii); ECF No. 306-27 § 7.01(a)(ii), (b)(vii); ECF No. 306-28 § 7.01(a)(ii), (b)(vii); ECF No. 306-29 § 7.01(a)(ii), (b)(i); ECF No. 306-30 § 7.01(a)(ii), (b)(vii); ECF No. 306-31 § 7.01(iii); ECF No. 306-32 § 7.01(a)(ii), (b)(i); CUF, pt. 2, ¶¶ 1-2; CF, pt. 2, ¶¶ 1-2.

[53] The governing agreement for ARMT 2005-10, however, does not specify that the written notice needs to require the identified failure to be remedied. ECF No. 306-2 § 8.01(c).

period of time.[54] For three of these 29 trusts,[55] a Material Failure EOD can also occur in the absence of written notice, so long as the master servicer has actual knowledge of its material failure. ECF No. 306-10 § 7.01(ii); ECF No. 306-11 § 7.01(ii); ECF No. 306-13 § 7.01(ii).

For the remaining two Covered Trusts,[56] the indenture provides that a Material Failure EOD occurs when (1) the issuer defaults in the observance or performance of any covenant set forth in the indenture, (2) the issuer receives written notice of that default from a designated party by registered or certified mail, (3) the notice demands the failure be remedied, and (4) the notice states that it is a "notice of default" under the indenture. ECF No. 306-4, app. A at USBANK-PAC00195361-62; ECF No. 306-12, app. A at USBANK-PAC00261067.

New York courts have held that the written notice offered as the basis for such post-EOD breach of contract claims must be sufficiently specific to constitute

[54] *See* ECF No. 306-2 § 8.01(b); ECF No. 306-3 § 8.01(b); ECF No. 306-5 § 9.01(b); ECF No. 306-6 § 7.1(c); ECF No. 306-7 § 7.1(c); ECF No. 306-8 § 7.1(c); ECF No. 306-9 § 7.1(c); ECF No. 306-10 § 7.01(ii); ECF No. 306-11 § 7.01(ii); ECF No. 306-13 § 7.01(ii); ECF No. 306-14 § 8.01(b); ECF No. 306-15 § 8.04(b); ECF No. 306-16 § 6.14(a)(ii); ECF No. 306-17 § 6.14(a)(ii); ECF No. 306-18 § 6.14(a)(ii); ECF No. 306-19 § 7.01(ii); ECF No. 306-20 § 6.14(a)(ii); ECF No. 306-21 § 7.01(ii); ECF No. 306-22 § 7.01(a)(ii), 7.01(b)(i); ECF No. 306-23 § 7.01(a)(ii), 7.01(b)(i); ECF No. 306-24 § 7.01(a)(ii), 7.01(b)(i); ECF No. 306-25 § 7.01(a)(ii), 7.01(b)(i); ECF No. 306-26 § 7.01(a)(ii), 7.01(b)(vii); ECF No. 306-27 § 7.01(a)(ii), 7.01(b)(vii); ECF No. 306-28 § 7.01(a)(ii), 7.01(b)(vii); ECF No. 306-29 § 7.01(a)(ii), 7.01(b)(i); ECF No. 306-30 § 7.01(a)(ii), 7.01(b)(vii); ECF No. 306-31 § 7.01(iii); ECF No. 306-32 § 7.01(a)(ii), 7.01(b)(i); CUF, pt. 2, ¶¶ 1.1.-1.5; CF, pt. 2, ¶¶ 1.1.-1.5.

[55] These trusts are CMLTI 2005-7, CMLTI 2006-4, and CMLTI 2007-AR5. ECF No. 306-10 § 7.01, 7.01(ii); ECF No. 306-11 § 7.01, 7.01(ii); ECF No. 306-13 § 7.01, 7.01(ii).

[56] These trusts are BSARM 2005-7 and CMLTI 2006-AR1. ECF No. 306-4, app. A at USBANK-PAC00195361-62; ECF No. 306-12, app. A at USBANK-PAC00261067.

adequate notice, in part by "identify[ing] the loan or trust alleged to be in breach." *W. & S. Life Ins. Co. v. U.S. Bank Nat'l Ass'n*, 173 N.Y.S.3d 543, 551 (1st Dep't 2022); *see also Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 665 F. Supp. 3d at 496 (requiring "facts giving rise to an Event of Default [to] be trust-specific" when examining post-EOD claims "[o]n summary judgment" (cleaned up)); *Commerzbank AG v. U.S. Bank Nat'l Ass'n*, 457 F. Supp. 3d 233, 249 (S.D.N.Y. 2020) (requiring evidence of "trust-specific breaches" when examining post-EOD claims "at summary judgment"), *aff'd in part, vacated in part on other grounds*, 100 F.4th 362 (2d Cir. 2024). Accordingly, the written notice must at least name or identify the trust allegedly in breach.

Defendant challenges post-EOD claims that rely upon (1) Regulation AB reports ("RegABs"), (2) depositor failures to deliver a complete mortgage file, (3) issuer failures to timely deliver opinions of counsel, (4) letters from certificateholders, (5) letters from U.S. Bank to servicers, (6) exception reports, and (7) various servicer, master servicer, and issuer failures to satisfy the written notice requirement. Def. Br. at 14-21.

In response, Plaintiffs argue the absurdity doctrine excuses the written notice prerequisite for certain of the trusts. Pls. Opp'n at 10. Plaintiffs also counter that the seven challenged categories of documents were each sufficient to trigger a Material Failure EOD. *See id.* at 3-8. Finally, to the extent that the Court concludes that these documents do not satisfy the written notice requirement, Plaintiffs argue that "the prevention doctrine prohibits [Defendant] from arguing

that no EODs occurred based on its failures to give proper notice." *Id.* at 8.

**i. Absurdity Doctrine**

The Court begins with Plaintiffs' absurdity doctrine argument. Plaintiffs contend that, with respect to three trusts, the "breaching party is, in practice, the only party that can provide notice to trigger EODs," and so strict adherence to the written notice requirement would lead to an absurd result. *Id.*[57]

Plaintiffs' argument is unpersuasive as it pertains to CSFB 2004-8 and MSM 2006-7. For those trusts, while Wells Fargo is both a party that can provide and receive notice triggering a Material Failure EOD, there is at least one other party that can provide such notice as well, *see* ECF No. 301-23 at 3-4; ECF No. 306-448 at 4, 6, and so the notice frameworks do not create an absurdity.

Under GSR 2006-AR1's governing agreement, only the securities administrator can provide written notice to trigger an EOD, and only the master servicer can receive written notice to trigger an EOD. ECF No. 306-15 § 8.04(b). Since Wells Fargo is GSR 2006-AR1's only securities administrator and only master servicer, ECF No. 306-448 at 5, then one party must notify itself to trigger a Material Failure EOD: Wells Fargo.

In these circumstances, the Court finds that Plaintiffs have raised a fact question as to whether the written notice requirement is capable of meaningful application, and should therefore be excused. *Nomura Home Equity Loan, Inc.,*

[57] Plaintiffs also raise absurdity arguments with respect to ARMT 2005-10, BAFC 2007-D, and JPMMT 2005-A7, but summary judgment relating to those trusts has already been granted in Defendant's favor. *Supra* Discussion, pt. A.1.

*Series 2006-FM2 ex rel. HSBC Bank USA, Nat'l Ass'n v. Nomura Credit & Cap., Inc.*, 30 N.Y.3d 572, 581 (N.Y. 2017) ("a contract must be construed in a manner which gives effect to each and every part, so as not to render any provision meaningless or without force or effect"); *see also LDIR, LLC v. DB Structured Prods., Inc.*, 99 N.Y.S.3d 327 (1st Dep't 2019) ("The language at issue is ambiguous because, as noted earlier, it nonsensically obligates DBSP to provide notice to itself of breaches it discovers. Allowing the clause to remain as written would render this provision meaningless."). Accordingly, the Court denies Defendant's motion for summary judgment as it relates to all post-EOD claims concerning GSR 2006-AR1.

**ii. EODs Based on Regulation AB Reports**

Plaintiffs rely on 94 separate RegABs to provide the necessary written notice of a contractual material failure to the appropriate designated party under the relevant governing agreement. Def. Br. at 16-17. Regulation AB establishes the disclosure and reporting requirements applicable to asset-backed securities offerings filed under the Securities Act of 1933 and the Securities Exchange Act of 1934. *See* 17 C.F.R. §§ 229.1100-1125. The RegABs in question consist of reports issued by servicers or master servicers disclosing instances of noncompliance.

The relevant governing agreement for each of the trusts at issue requires a particular designated party to send written notice to another designated party (typically the servicer or master servicer) in order for a Material Failure EOD to occur. *Compare* ECF No. 301-31 at 1-20, *with* ECF No. 301-23 at 1-8. But the RegABs are not notices provided *to* servicers or master servicers; they are notices

*from* those entities. Defendant therefore contends that these RegABs cannot be relied upon to satisfy the written notice requirement for a Material Failure EOD claim. Def. Br. at 16. Plaintiffs do not dispute that the RegABs were not sent to the designated parties, but counter that the master servicers and servicers "themselves provided written notice of their performance failures" and "any further notice back to them would have been superfluous and unnecessary to trigger an EOD." Pls. Opp'n at 5.

The language in the governing agreements with respect to notice is unambiguous. None of the governing agreements state that a servicer or master servicer can send notice to itself. ECF No. 301-23 at 1-8. While it may be counterintuitive to require notice back to the party that itself disclosed the noncompliance, that is what the explicit language of the governing agreements requires. *See W. & S. Life Ins. Co.*, 173 N.Y.S.3d at 551 ("A servicer's annual assessment–i.e., a document created by a servicer–is not notice to a servicer. Moreover, each PSA specifies who can send written notice, and, for obvious reasons, no PSA says a servicer can send notice to itself." (citation omitted)). The governing agreements could have contained a provision excusing the notice requirement where the servicer or master servicer had actual knowledge of the defaults, but they do not. As such, the written notice requirement cannot be satisfied by RegABs sent by the servicers or master servicers.

With respect to 21 of the RegABs, however, Defendant sent letters to servicers or master servicers about instances of noncompliance identified in those

reports.[58] Defendant argues that those letters were also insufficient to trigger EODs because they were either sent from the wrong designated party, sent to the wrong designated party, or did not contain the appropriate information. Def. Br. at 16-17.

The letters that Defendant sent regarding CSFB 2004-8, ECF No. 306-613 at 2, 35, do not satisfy the written notice requirement because the trustee cannot provide written notice under the governing agreement, ECF No. 301-23 at 1, 3. The letters that Defendant sent to the master servicer and servicer of BSARM 2005-7, ECF No. 306-613 at 9, are insufficient because only written notice sent to the issuer can ripen into a Material Failure EOD under BSARM 2005-7's governing agreement, ECF No. 301-23 at 1. The letters concerning JPALT 2006-S4, JPMMT 2007-A4, and MSM 2006-7, *see* ECF No. 306-613 at 42-44, 51-53, 58, do not constitute the requisite written notice because those trusts' governing agreements require written notice from certificateholders or the trustee to the master servicer, ECF No. 301-23 at 3-4. Those letters were either sent from the wrong party or to the wrong party.[59] The letter relied upon as notice for CMALT 2007-A1, CMALT 2007-A5, and CMLTI 2006-AR1, ECF No. 306-613 at 15, 17, 19, 21, 31 (citing ECF No. 306-378), does not reference any specific trust, *see* ECF No. 306-378 at

---

[58] Because the Court has already granted summary judgment in Defendant's favor on all claims relating to ARMT 2005-10, JPMMT 2005-A7, CMALT 2007-A4, CMALT 2007-A6, and WFMBS 2006-AR1, *supra* Discussion, pt. A.1., the Court excludes those trusts from its analysis.

[59] These letters are located on the docket at ECF Nos. 306-150, 306-151, 306-152, 306-154, 306-155, 306-180, 306-375, 306-376, 306-377, 306-380, 306-381, and 306-382.

USBANK-PAC00225110-16. Similarly, the letter that supposedly provides notice of noncompliance in MABS 2006-AB1 and TBW 2006-6, ECF No. 306-613 at 57, 59, 88, also does not explicitly reference any of these trusts, *see* ECF No. 301-151 at USBANK-PAC00227112-14.

Whether the letters docketed at ECF Nos. 306-345, 306-375, 306-376, and 306-377[60] provide the requisite written notice for CFLX 2006-1, WAMU 2006-AR8, WAMU 2006-AR16, WAMU 2006-AR18, WAMU 2007-HY1, WAMU 2007-HY2, and WAMU 2007-HY4 raises a disputed factual question that cannot be resolved on summary judgment, however.[61] These letters were sent by the trustee (the designated party) to the servicer (the corresponding designated party), *see* ECF No. 301-175 at 6, 10-11; they explicitly identified the trusts as noncompliant with their respective governing agreements; and they requested a prompt response detailing the actions taken to cure the identified instances of noncompliance. *See, e.g.*, ECF No. 306-345 at USBANK-PAC00223058-66. While it is unclear whether the identified breaches were material, "the materiality of any particular breach is a question of fact under New York law." *Deutsche Bank Nat'l Tr. Co. for Morgan Stanley Structured Tr. I 2007-1 v. Morgan Stanley Mortg. Cap. Holdings LLC*, 289 F. Supp. 3d 484, 513 (S.D.N.Y. 2018) (citing *Orlander v. Staples, Inc.*, 802 F.3d 289,

---

[60] The Court does not include the letter docketed at ECF No. 306-379 because the recipient, Washington Mutual Mortgage Securities Corp., was not a servicer for any of the Covered Trusts as of the date of that letter. *See* ECF No. 301-31 at 20 n.26.

[61] The Court does not address the evidence as it concerns WAMU 2006-AR2, WAMU 2007-HY3, WAMU 2007-HY7, WMALT 2007-4, and BAFC 2007 D because the Court has already granted summary judgment in Defendant's favor on all claims relating to those trusts. *Supra* Discussion, pt. A.1.

298 (2d Cir. 2015)). Accordingly, that question is left for the factfinder.

#### iii. EODs Based on Depositor Failures to Deliver a Complete Mortgage File

Plaintiffs seek to rely on final certifications and exception reports detailing a depositor's failure to deliver a complete mortgage file to satisfy the written notice requirement for Material Failure EODs for the ten WaMu Trusts.[62] Pls. Opp'n at 6 (citing CUF, pt. 2, ¶¶ 176-213). Defendant contends that those certifications and exception reports cannot provide the requisite written notice because they were delivered by the custodian and because they do not require any failures to be remedied. Def. Br. at 17-18 (citing SUF, ¶¶ 277-79).

Defendant has the better argument. The governing agreements for the WaMu Trusts only identify the trustee and certificateholders as having the authority to provide the requisite written notice to trigger a Material Failure EOD. *E.g.*, ECF No. 306-22 § 7.01(a)(ii), 7.01(b)(i). While those governing agreements provide that "any documents delivered by the Company or the Servicer to the Custodian, if any, shall be deemed to have been delivered to the Trustee for all purposes hereunder," and "any documents held by the Custodian, if any, shall be deemed to be held by the Trustee for all purposes hereunder," *e.g.*, *id.* § 2.05, they do not grant the custodian the ability to send the written notice needed to trigger a Material Failure EOD, *e.g.*, *id.* §§ 2.05, 2.07, 7.01. Rather, the WaMu Trusts'

[62] Although the Court has already granted summary judgment to Defendant on all claims relating to WAMU 2006-AR2, WAMU 2007-HY3, WAMU 2007-HY7, and WMALT 2007-4, *supra* Discussion, pt. A.1., the Court nonetheless considers Defendant's argument with respect to these trusts.

governing agreements cabin the custodian's authority to ministerial tasks identified in sections 2.05 and 2.12. *E.g.*, *id.* § 2.05 ("The Trustee is authorized, with the Servicer's consent, to appoint on behalf of the Trust any bank or trust company approved by each of the Company and the Servicer as Custodian of the documents or instruments referred to in this Section 2.05 or in Section 2.12, and to enter into a Custodial Agreement for such purpose."). For example, the governing agreements state, "Pursuant to the Initial Custodial Agreement, the Initial Custodian shall perform responsibilities of the Trustee on the Trustee's behalf with respect to the delivery, receipt, examination, custody and release of the Mortgage Files related to the Mortgage Loans identified in the Initial Custodial Agreement, as provided therein." *E.g.*, *id.* § 2.05. Accordingly, the custodian's written notice cannot trigger Material Failure EODs with respect to the WaMu Trusts.

#### iv. EODs Based on Issuer Failures to Timely Deliver Opinions of Counsel

Plaintiffs have also failed to create a disputed issue of fact as to their post-EOD claims under BSARM 2005-7 based on the issuer's failure to timely deliver opinions of counsel. The governing agreement for BSARM 2005-7 requires written notice to be sent by registered or certified mail and to state that it is a "notice of default." ECF No. 306-4, app. A at USBANK-PAC00195361-62. The emails Plaintiffs cite as evidence of written notice contain none of these features. *See* ECF No. 301-156 at USBANK-PAC00538793-804; ECF No. 301-157 at USBANK-PAC00575477-80; ECF No. 301-158 at USBANK-PAC00600949-51.

#### v. EODs Based on Letters from Certificateholders

Plaintiffs also rely upon five letters[63] certificateholders sent to various deal parties relating to 16 of the Covered Trusts to satisfy the written notice requirement.[64] *See* Pls. Opp'n at 7, 9; CUF, pt. 2, ¶¶ 214-86. The Court need not review two of the five letters, *see* ECF No. 301-162 at USBANK-PAC00215507 (concerning ARMT 2005-10); ECF No. 301-164 at USBANK-PAC00214668 (concerning WFMBS 2006-AR1, as they concern trusts for which summary judgment has previously been granted to Defendant. *Supra* Discussion, pt. A.1. Having reviewed the other three letters, the Court concludes they were not sent to or from the correct parties, and thus do not provide the requisite written notice.

The letter sent to Defendant on May 14, 2014, fails to satisfy CMLTI 2006-AR1's written notice requirement because that letter was sent to the trustee. *See* ECF No. 301-160 at USBANK-PAC00277219. Only written notice to the issuer can trigger an EOD for that trust. *See* ECF No. 301-23 at 3.

Plaintiffs similarly cannot rely on the letter sent to Defendant on December 15, 2011, *see* ECF No. 301-161 at USBANK-PAC00592135, as the trustee is not the

---

[63] *See* ECF Nos. 301-160, 301-161, 301-162, 301-163, 301-164. *Compare* Def. Br. at 18, *with* SUF, ¶¶ 285-95.

[64] These trusts are ARMT 2005-10, BSARM 2005-7, CFLX 2006-1, CMLTI 2006-AR1, JPALT 2006-S4, JPMMT 2005-A7, JPMMT 2007-A4, MSM 2006-7, WAMU 2006-AR2, WAMU 2006-AR8, WAMU 2007-HY1, WAMU 2007-HY2, WAMU 2007-HY3, WAMU 2007-HY4, WFMBS 2006-AR1, and WMALT 2007-4. *Compare* Def. Br. at 18, *with* SUF at 63-67. Although the Court has already granted summary judgment in Defendant's favor on all claims relating to JPMMT 2005-A7, WAMU 2006-AR2, WAMU 2007-HY3, and WMALT 2007-4, *supra* Discussion, pt. A.1., the Court nonetheless reviews the evidence Plaintiffs offer to refute Defendant's argument as to these trusts.

designated party for receipt of written notice under the governing agreements for BSARM 2005-7, CFLX 2006-1, JPALT 2006-S4, JPMMT 2005-A7, JPMMT 2007-A4, WAMU 2006-AR2, WAMU 2006-AR8, WAMU 2007-HY1, WAMU 2007-HY2, WAMU 2007-HY3, WAMU 2007-HY4, and WMALT 2007-4. Those trusts require that written notice be sent to the issuer, servicer, master servicer, or depositor. *See* ECF No. 301-23 at 1-2, 5-8.

Finally, the September 18, 2012 letter sent to Defendant concerning MSM 2006-7 does not satisfy that trust's written notice requirement. *See* ECF No. 301-163 at USBANK-PAC00214746. Under the MSM 2006-7 governing agreement, only written notice provided by a group of certificateholders with more than 50% of the aggregate voting interests can trigger an EOD. ECF No. 301-123 at 4. The letter's sender only purports to represent certificateholders with "at least 25%" of the relevant voting interests. ECF No. 301-163 at USBANK-PAC00214739.

**vi. EODs Based on Letters from U.S. Bank to Servicers**

Plaintiffs also attempt to base post-EOD claims on four generalized letters, *e.g.*, ECF No. 301-166; ECF No. 301-167; ECF No. 301-168; ECF No. 301-171, that Defendant sent to multiple servicers and master servicers, ECF No. 301-36. These letters lack the required specificity to trigger a Material Failure EOD. Indeed, none of these letters name or identify the specific trusts that allegedly breached the terms of the governing agreements. *See, e.g.*, ECF No. 301-166; ECF No. 301-167; ECF No. 301-168; ECF No. 301-171. "Therefore, they are insufficiently specific to constitute written notice." *W. & S. Life Ins. Co.*, 173 N.Y.S.3d at 551.

#### vii. EODs Based on Exception Reports

Nor do exception reports sent by the trust custodian constitute written notice to servicers that servicers breached the governing agreements by liquidating loans with uncured document exceptions. Def. Br. at 19; *see* Pls. Opp'n at 7-8. These claims relate to all Covered Trusts except CFLX 2006-1, JPMMT 2005-A7, and WAMU 2006-AR2.[65] *See* CUF, pt. 2, ¶ 310; CF, pt. 2, ¶ 310.

Similar to the WaMu Trusts, *supra* Discussion, pt. A.6.a.iii, the relevant governing agreements do not vest authority in the custodian to provide written notice that can trigger an EOD, *see, e.g.*, ECF No. 306-19 §§ 2.01, 2.02, 2.03, 7.01(ii).

The Court notes that three of these trusts—CMLTI 2005-7, CMLTI 2006-4, and CMLTI 2007-AR5—have governing agreements specifying that the master servicer's actual knowledge can trigger a Material Failure EOD. ECF No. 306-10 § 7.01(ii); ECF No. 306-11 § 7.01(ii); ECF No. 306-13 § 7.01(ii). The Court, however, has already granted summary judgment to Defendant on all claims concerning CMLTI 2005-7. *Supra* Discussion, pt. A.1. Concerning CMLTI 2006-4 and CMLTI 2007-AR5, Plaintiffs do not argue that the master servicer had actual knowledge of a material failure that could ripen into a Material Failure EOD. *See* Pls. Opp'n at 7-8. Plaintiffs have therefore waived reliance on any such argument.

[65] Although the Court has already granted summary judgment in Defendant's favor on all claims relating to many of the trusts at issue here, *supra* Discussion, pt. A.1., the Court nonetheless examines the evidence relating to those trusts.

### viii. EODs Based on Various Servicer, Master Servicer, and Issuer Failures

Finally, Defendant argues that Plaintiffs cannot satisfy the written notice requirement for seven different types of Material Failure EODs that allegedly occurred in one or more of 28 trusts: (1) the servicer's failure to repurchase mortgage loans that it had modified ("Repurchase EOD"), (2) the master servicer's failure to supervise and enforce the obligations of a servicer ("Supervision EOD"), (3) the master servicer's failure to take action after a servicer filed for Chapter 11 bankruptcy protection ("Chapter 11 EOD"), (4) the servicer's and master servicer's failure to provide notice or otherwise take action after discovering R&W breaches ("R&W EOD"), (5) the master servicer's failure to prudently service mortgage loans and to supervise and enforce the servicer obligations ("Prudent Service EOD"), (6) the issuer's failure to enforce the indenture trustee's repurchase enforcement obligations ("Indenture Trustee EOD"), and (7) the servicer's and master servicer's failure to properly maintain REO properties and adhere to industry-standard foreclosure timelines ("REO EOD"). Def. Br. at 19-20 (citing SUF, ¶¶ 307-25); CUF, pt. 1, ¶¶ 307-25.

Plaintiffs counter that USB cannot dismiss various post-EOD claims across 28 Trusts "based on one sentence in its Motion and arguments improperly raised in its Rule 56.1 statement." Pls. Opp'n at 8. Pointing out the absence of evidence on an essential element common to a group of claims does not require extensive legal argument, however. Moreover, the relevant statements in Defendant's Rule 56.1 Statement overwhelmingly concern factual matters about the dearth of evidence.

*See* SUF, ¶¶ 307-25. Accordingly, Defendant has shifted the burden to Plaintiffs to come forward with responsive evidence, which they have largely failed to do. *See United States v. Rem*, 38 F.3d 634, 643 (2d Cir. 1994) ("When the moving party has pointed to the absence of evidence to support an essential element on which the party opposing summary judgment has the burden of proof, the opposing party, in order to avoid summary judgment, must show the presence of a genuine issue by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in his favor, to establish the existence of that element at trial.").

Second, Plaintiffs contend that Defendant "either completely ignores or baselessly discounts PacLife's evidence of written notice." Pls. Opp'n at 8 (citing CUF, pt. 2, ¶¶ 5-164). With respect to Plaintiffs' post-EOD claims that rely on Repurchase EODs,[66] Supervision EODs,[67] R&W EODs,[68] Prudent Service EODs,[69] and Indenture Trustee EODs,[70] however, Plaintiffs do not dispute that the requisite written notice was not provided. CUF, pt. 1, ¶ 312 ("Undisputed that U.S. Bank did not provide written notice to Wells Fargo, as Master Servicer, regarding its failures to monitor, oversee, supervise, and enforce the obligations of TBW as Servicer under the Servicing Agreement."); *id.*, ¶ 321 ("Undisputed that U.S. Bank failed to provide

---

[66] These claims concern CFLX 2006-1. SUF, ¶ 307; CUF, pt. 1, ¶ 307.

[67] These claims concern TBW 2006-6. SUF, ¶¶ 308-12; CUF, pt. 1, ¶¶ 308-12.

[68] These claims concern all 31 Covered Trusts, except CMLTI 2005-7, CMLTI 2006-4, and CMLTI 2007-AR5. *See* SUF, ¶¶ 256-57, 318; CUF, pt. 1, ¶¶ 256-57, 318; ECF No. 301-5.

[69] These claims concern CMLTI 2006-AR1 and BSARM 2005-7. SUF, ¶¶ 319-21; CUF, pt. 1, ¶¶ 319-21.

[70] These claims concern CMLTI 2006-AR1 and BSARM 2005-7. SUF, ¶¶ 322-23; CUF, pt. 1, ¶¶ 322-23.

notice to the relevant Issuers in the BSARM 2005-7 and CMLTI 2006-AR1 Trusts."); *id.*, ¶ 323 ("Undisputed to the extent U.S. Bank failed to provide notice of its own failures, or the responsible parties' failures, to the relevant Issuers in the BSARM 2005-7 and CMLTI 2006-AR1 Trusts."); *see also id.*, ¶ 307 (failing to dispute lack of written notice and citing *Commerzbank*, 457 F. Supp. 3d at 250 to invoke prevention doctrine in support of alleged occurrence of EOD); CUF, pt. 1, ¶ 318 (same). Accordingly, Plaintiffs have failed to present evidence raising a triable question of fact as to whether the requisite written notice occurred.

Plaintiffs' post-EOD claims that rely on Chapter 11 EODs relate to MSM 2006-7[71] and concern the master servicer's failure to take action after a servicer (Residential Capital, LLC), and certain affiliated entities (specifically, GMAC Mortgage, LLC), filed for Chapter 11 bankruptcy protection. *See* SUF, ¶¶ 313-17; CUF, pt. 1, ¶¶ 313-17. Although Plaintiffs point to a notice that Defendant provided to certificateholders about a servicer filing for Chapter 11 bankruptcy protection as evidence of written notice, CUF, pt. 1, ¶ 313 (citing ECF No. 301-174 at USBANK-PAC00136010), they otherwise concede that it is "[u]ndisputed" that "[t]here is no evidence . . . that the Master Servicer received written notice of [this] alleged material failure . . . based on its alleged failure to act after GMAC's bankruptcy." CUF, pt. 1, ¶ 317. Concerning the proffered notice, Plaintiffs further explain that Defendant made this notice publicly available to certificateholders on

[71] Plaintiffs also raise an argument as it pertains to GSR 2006-AR1, which the Court need not address since it has already denied Defendant summary judgment with respect to post-EOD claims concerning that trust. *Supra* Discussion, pt. A.6.a.i.

Wells Fargo's[72] website. CUF, pt. 1, ¶ 316 (citing ECF No. 306-476).

This notice fails to generate a genuine dispute as to whether the master servicer for MSM 2006-7 received the written notice required to trigger a Material Failure EOD. MSM 2006-7's governing agreement requires "written notice of" "[a]ny failure on the part of the Master Servicer duly to observe or perform" its obligations under the agreement in any material respect. ECF No. 306-20 § 6.14(a)(ii). But the notice here does not identify or describe a failure by Wells Fargo, the master servicer. *See* ECF No. 301-174 at USBANK-PAC00136010-15. Moreover, MSM 2006-7's governing agreements also specifies that the written notice must "requir[e] the [failure] to be remedied." ECF No. 306-20 § 6.14(a)(ii). Yet the notice here contains no such demand directed at the master servicer. *See* ECF No. 301-174 at USBANK-PAC00136010-15.

As to Plaintiffs' post-EOD claims that rely on REO EODs, Plaintiffs argue that they have presented evidence of written notice because "Plaintiffs' interrogatory responses include evidence of U.S. Bank's notice" and there is additional relevant "evidence set forth in Plaintiffs' responses and objections to Defendant's proposed findings of fact, Plaintiffs' memorandum of law, and [Plaintiffs' Rule 56.1 Statement]." CUF, pt. 1, ¶¶ 324-25.[73] Plaintiffs cite only three exhibits to support their responses, however. *See id.* (citing ECF Nos. 301-43, 306-

[72] Wells Fargo is the master servicer for MSM 2006-7. ECF No. 306-448 at 6.
[73] Plaintiffs assert claims with respect to all 31 Covered Trusts. The Court excludes GSR 2006-AR1 from its analysis, as Defendant's summary judgment motion on post-EOD claims concerning that trust has already been denied. *Supra* Discussion, pt. A.6.a.i.

631, 306-633).

These exhibits themselves are wholly inadequate to constitute evidence of written notice. Neither Plaintiffs' summaries of the governing agreements' provisions, ECF Nos. 306-631, 306-633, nor Plaintiffs' interrogatory responses, ECF No. 301-43, constitute admissible evidence of written notice.

The three pages of interrogatory responses, CUF, pt. 1, ¶ 325 (citing ECF No. 301-43 at 22-24), refer to other potential sources of evidence, such as Section IV of Plaintiffs' January 26, 2022 interrogatory responses and Plaintiffs' response to Interrogatory No. 10. ECF No. 301-43 at 22-24. Plaintiffs did not include in the record their response to Interrogatory No. 10. Section IV of Plaintiffs' January 26, 2022 interrogatory responses cross references numerous depositions and approximately fifty notices or letters that may be relevant. *See id.* at 27-32. But Plaintiffs do not indicate whether and where these documents may be found in the voluminous record before the Court. Moreover, Plaintiffs do not specifically cite any of these depositions or notices in their Rule 56.1 Statement in response to Defendant's assertion that Plaintiffs lack evidence of written notice. *See* CUF, pt. 1, ¶¶ 324-25.

Plaintiffs appear content to let the Court hunt through "the evidence set forth in [their] responses and objections to Defendant's proposed findings of fact, Plaintiffs' memorandum of law, and [their Rule 56.1 Statement]" to find relevant evidence among the 900-plus exhibits submitted in support of the instant motions for partial summary judgment. *Id.*, ¶ 325. Such an approach is contrary to Local

Rule 56.1.

"The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). To that end, Local Civil Rule 56.1 provides, "Each statement by the movant or opponent under Rule 56.1(a) and (b), including each statement denying and controverting any statement of material fact, must be followed by *citation to evidence* that would be admissible and set forth as required by Fed. R. Civ. P. 56(c)." Loc. Civ. R. 56.1(d) (emphasis added). Federal Rule of Civil Procedure 56 further requires that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . *citing to particular parts of materials in the record*." Fed. R. Civ. P. 56(c) (emphasis added). In response to Defendant's statements that Plaintiffs lack evidence of written notice to support their post-EOD claims that rely on basis 7, Plaintiffs' Rule 56.1 Statement fails to cite admissible evidence that would controvert that assertion. *See* CUF, pt. 1, ¶¶ 324-25. The Court is not required to consider evidence that the parties fail to identify in their Rule 56.1 statements. *Holtz*, 258 F.3d at 73 (citation omitted). Plaintiffs have failed to raise a fact issue regarding written notice as to the REO EODs.

**ix. The Prevention Doctrine**

The Court now turns to Plaintiffs' alternative argument concerning the

prevention doctrine. "Generally, the prevention doctrine provides that a party may not insist upon performance of a condition precedent when its nonperformance has been caused by the party itself." *Commerzbank*, 457 F. Supp. 3d at 249 (cleaned up). "Where a promisor has no duty to bring about the condition precedent to his promise, only active conduct by the promisor to frustrate the occurrence of the condition precedent constitutes waiver of that condition precedent." *In re Bankers Tr. Co.*, 450 F.3d 121, 128 (2d Cir. 2006). The question, then, is whether Defendant can insist upon the provision of the written notice requirement for the occurrence of an EOD, or whether Plaintiffs have established a triable issue as to whether the written notice requirement can be excused because Defendant's failure to send a notice to cure constituted active conduct designed to frustrate the occurrence of an EOD.

The New York Appellate Division has addressed the application of the prevention doctrine to analogous cases involving an RMBS trustee's failure to provide written notice. Under New York law, the Appellate Division determined that "[a] defendant's failure to send a notice to cure to the servicers is not 'active conduct'" within the meaning of the prevention doctrine. *Fixed Income Shares: Series M v. Citibank, N.A.*, 69 N.Y.S.3d 288, 290 (1st Dep't 2018); *see also Blackrock Balanced Cap. Portfolio (FI) v. U.S. Bank Nat'l Ass'n*, 86 N.Y.S.3d 484, 486 (1st Dep't 2018) (quoting same). Accordingly, the Appellate Division has rejected attempts to rely on the prevention doctrine to establish an EOD. *Id.*

As the application of the prevention doctrine raises an issue of state law, this

Court must either apply the precedent of the state's highest court, or in the absence of such precedent, assess how the New York Court of Appeals would decide this legal question. *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir. 2000). Decisions of the Appellate Division, however, are "helpful indicators" as to how the Court of Appeals would rule, *id.*, and are "not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise," *West v. AT&T*, 311 U.S. 223, 237 (1940). "Other data include relevant case law from other jurisdictions on the same or analogous issues, scholarly writings in the field, and any other resources available to the state's highest court." *Michalski*, 225 F.3d at 116.

Courts in this District are split on whether an RMBS trustee's failure to send a notice to cure constitutes "active conduct" under New York law. Some courts have rejected the First Department's holding, determining that "the New York Court of Appeals would decide otherwise." *Commerzbank*, 457 F. Supp. 3d at 250 (cleaned up). In doing so, these courts reason that the First Department did not adequately address "why failure to send notice is not 'active conduct' when such failure could plausibly have been intentional or due to active frustration by the trustee." *Nat'l Credit Union Admin. Bd. v. Deutsche Bank Nat'l Tr. Co.*, 410 F. Supp. 3d 662, 685 (S.D.N.Y. 2019). Other courts, however, have relied upon the New York Appellate Division's holding, largely without discussion. *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 585 F. Supp. 3d at 592 (quoting *Blackrock*, 86 N.Y.S.3d at 486); *Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, No. 18-CV-11366 (LLS),

2020 WL 4226689, at *5 (S.D.N.Y. July 23, 2020) (quoting *Blackrock*, 86 N.Y.S.3d at 486).

As an initial matter, although Plaintiffs urge this Court to apply Judge Stein's decision in *National Credit Union*, Plaintiffs overstate the holding of that case. Plaintiffs contend that *National Credit Union* stands for the proposition that the prevention doctrine applies where "the trustee could, but declines to, provide notice necessary to trigger an EOD." Pls. Opp'n at 9.[74] That is not so. Indeed, the district court in *National Credit Union* ultimately granted summary judgment to the trustee when after discovery, the plaintiff was unable to point to any "evidence of active conduct by the trustee demonstrating that the failure to send notice was intentional or that it actively frustrated other deal parties from providing the requisite notice." *Nat'l Credit Union Admin. Bd. v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-08919 (SHS), 2025 WL 2380538, at *15 (S.D.N.Y. Aug. 15, 2025). Thus, even *National Credit Union* does not permit application of the prevention doctrine based exclusively upon a failure to provide notice.

In any event, the Court adopts the New York Appellate Division's rule that a failure to send a notice to cure is not active conduct within the meaning of the prevention doctrine. The rule articulated by *Fixed Income Shares* is fully consistent

[74] Plaintiffs also suggest that Judge Gardephe similarly disagreed with the Appellate Division and ruled that the mere failure to provide notice can implicate the prevention doctrine. Pls. Opp'n at 9. This misrepresents the Court's prior decision. Judge Gardephe distinguished the Appellate Division's decisions in *Blackrock* and *Fixed Income Shares* because the pleadings here included allegations of active misconduct by the trustee that could plausibly have resulted in hindering the delivery of notices. *Pac. Life*, 636 F. Supp. 3d at 424.

with New York law and likely would be adopted by the Court of Appeals. Notably, the First Department, in deciding *Fixed Income Shares*, explicitly applied *Amies v. Wesnofske*, 255 N.Y. 156 (1931), a decision from the Court of Appeals articulating the parameters of New York's prevention doctrine. *Fixed Income Shares*, 69 N.Y.S.3d at 290. In *Amies*, a brokerage firm that had facilitated a contract for the purchase of land sued for an unpaid commission that had been due upon the closing of the transaction. 255 N.Y. at 159. When the purchasers decided not to complete the transaction, the defendants entered into a revised contract with the purchasers, whereby the defendants released the purchasers from their obligations under the sale contract while retaining the deposit. *Id.* The defendants argued that, because the purchasers had elected not to go through with the transaction, the condition precedent to the payment of the commission to the brokers never occurred. *Id.* at 162. The question presented to the Court of Appeals was whether the occurrence of the condition precedent should be excused because the promisor was the "cause of the failure of performance of a condition upon which his own liability depends." *Id.* The Court of Appeals held that "active conduct of the conditional promisor, preventing or hindering the fulfillment of the condition," results in waiver of the condition. *Id.* at 163. Yet the Court of Appeals cautioned that "no such doctrine can be efficacious to compel positive action by the promisor to bring about the performance of the condition. For that result the implication of a promise would be requisite." *Id.* As the sellers had made no promise to the broker to close on the property transaction, the Court of Appeals concluded that the sellers' acceptance of

the purchasers' default did not constitute "a positive act . . . hindering or preventing performance." *Id.* at 164.

Analogizing the facts of *Amies* to the RMBS context, the First Department in *Fixed Income Shares* found that, by requiring the trustee to send a notice to cure to servicers when it was otherwise under no obligation to do so, the plaintiffs were similarly seeking to "compel positive action" by the trustee. *Fixed Income Shares*, 69 N.Y.S.3d at 290. In such circumstances, the failure to send notices does not constitute active conduct preventing or hindering the occurrence of an EOD. *Id.*

This decision accords with the Second Circuit's analysis of the prevention doctrine in *Bankers Trust*. In drawing the distinction between active conduct and failure to act, the Second Circuit likewise conducted an in-depth analysis of the *Amies* decision. 450 F.3d at 127-28. The Second Circuit explained that "according to *Amies*, the reason why a waiver of the condition would be triggered only by active conduct hindering the fulfillment of the condition, and not by failure to act, was that the vendor owed no duty to the brokers to take active steps to compel the buyers' performance. It would be otherwise had the sellers owed the brokers a duty to take steps to compel the buyers' performance of the contract of sale." 450 F.3d at 128.

With these principles in mind, the Court now evaluates whether the prevention doctrine applies. The governing agreements for most of the Covered Trusts do not provide that the trustee has a duty to submit notices to a designated party that could ripen into a Material Failure EOD if left uncured. *See* CUF, pt. 2, ¶ 540; CF, pt. 2, ¶ 540. As to these trusts, Defendant's failure to send notices (that

it was under no legal obligation to provide) does not constitute active conduct that hindered or prevented the occurrence of an EOD.

That is not the case for JPALT 2006-S4, JPMMT 2007-A4, and MSM 2006-7, for which the governing agreements provide that, "[i]n the event that the Trustee . . . shall have actual knowledge of any action or inaction [or failure] of the Master Servicer that would become an Event of Default upon the Master Servicer's failure to remedy the same after notice, the Trustee . . . shall give notice thereof to the Master Servicer." ECF No. 308-8 at 1-2.[75] Furthermore, for these trusts, the trustee can trigger a Material Failure EOD by sending notice of a material contractual failure to the master servicer. *See* ECF No. 306-16 § 6.14(a)(ii); ECF No. 306-18 § 6.14(a)(ii); ECF No. 306-20 § 6.14(a)(ii). Given that the trustee had an affirmative duty to provide notice of failures that could ripen into EODs to the master servicer if the trustee had actual knowledge of those failures,[76] the prevention doctrine could apply to Plaintiffs' post-EOD claims concerning these trusts.

---

[75] Plaintiffs argue that WFMBS 2006-AR1 has a similar provision. Pls. Opp'n at 9 (citing CUF, pt. 2, ¶ 540). Plaintiffs are wrong. The language in WFMBS 2006-AR1's governing agreement that Plaintiffs claim imposes a duty in fact merely provides an option. ECF No. 306-31 § 7.04 ("the Trustee may, but need not . . . give notice"). Additionally, BAFC 2007-D and JPMMT 2005-A7 do have similar provisions, but the Court has already granted summary judgment to Defendant on all claims relating to those two trusts. *Supra* Discussion, pt. A.1.

[76] As relevant here, the master servicer for these trusts is contractually obligated to "monitor the performance of the Servicers under the [governing agreements], and shall use its reasonable good faith efforts to enforce the obligations of the Servicers to duly and punctually to perform all of their respective duties and obligations thereunder." *E.g.*, ECF No. 306-16 § 9.01(a). Accordingly, the master servicer's failure to perform this obligation could qualify as a contractual material failure.

The question, then, is whether Plaintiffs presented evidence that Defendant had actual knowledge of the master servicer's alleged breaches concerning these three trusts. Plaintiffs present evidence that the master servicer failed to ensure proper servicing of certain mortgage loans in JPALT 2006-S4, JPMMT 2007-A4, and MSM 2006-7 and that Defendant had actual knowledge of those failures. *See* ECF No. 301-31 at 1-20 (listing RegABs identifying breaches concerning JPALT 2006-S4, JPMMT 2007-A4, and MSM 2006-7); ECF No. 301-61 at USBANK-PAC00273297 (referencing document exceptions in JPALT 2006-S4); ECF No. 301-62 at USBANK-PAC00283716 (referencing document exceptions in JPALT 2006-S4); ECF No. 301-64 at USBANK-PAC00273300 (referencing document exceptions in JPMMT 2007-A4); ECF No. 301-65 at USBANK-PAC00273365 (referencing document exceptions in JPMMT 2007-A4); ECF No. 301-67 at USBANK-PAC00273504 (referencing document exceptions in MSM 2006-7); ECF No. 301-68 at USBANK-PAC00273498 (referencing document exceptions in MSM 2006-7); ECF No. 301-69 at USBANK-PAC00203360 (referencing document exceptions in MSM 2006-7); ECF No. 301-161 at USBANK-PAC00592135-39 (identifying breaches concerning JPALT 2006-S4 and JPMMT 2007-A4 in letter from certificateholders); ECF No. 301-163 at USBANK-PAC00214738-46 (identifying breaches concerning MSM 2006-7 in letter from certificateholders). Since the master servicer is obligated to monitor the performance of the servicers and ensure that mortgage loans are being appropriately serviced, *see, e.g.*, ECF No. 306-16 § 9.01(a), failure to do so is potentially a contractual failure. Whether such breaches are material is a

question left to the factfinder. *Deutsche Bank*, 289 F. Supp. 3d at 513. The Court therefore denies Defendant's motion to the extent it seeks summary judgment concerning Plaintiffs' post-EOD claims for JPALT 2006-S4, JPMMT 2005-A7, and MSM 2006-7 that are based on these reports and letters.

To apply the prevention doctrine to Plaintiffs' post-EOD claims concerning the remaining trusts, Plaintiffs must present evidence indicating that Defendant actively frustrated a designated party from receiving or providing written notice. Plaintiffs cite evidence that they argue suggests Defendant actively worked to prevent certificateholders[77] from providing written notice. Pls. Opp'n at 9-10. None of this evidence suffices to create a disputed issue of material fact.

Plaintiffs point to evidence that Defendant "would not provide to any investor a list of other investors in the same [t]rust." CUF, pt. 2, ¶ 560 (citing ECF No. 306-486). While true, Defendant refused to provide such information because investors' identities are confidential. ECF No. 306-487 at 200:7-12 (Reynolds). Instead, when investors approached Defendant to gather the required number of investors to make a demand or provide written notice, Defendant assisted them by "providing a notice to other holders" of the certificates. *Id.* at 199:22-25 (Reynolds). The evidence thus indicates Defendant actively helped certificateholders when they tried to gather the requisite number of certificateholders to provide written notice.

[77] All Covered Trusts, except GSR 2006-AR1, provide that a group of certificateholders, if they possess enough certificates or voting interests, can provide the requisite written notice to trigger a Contractual Failure EOD. *See* ECF No. 301-23 at 1-8.

Plaintiffs next argue that Defendant concealed servicer noncompliance disclosures from certificateholders until 2014 and also concealed exception reports from certificateholders. Pls. Opp'n at 9-10. Yet this is a mere repackaging of their argument that Defendant failed to provide the requisite notice. Plaintiffs do not present any evidence that Defendant failed to disclose servicer disclosures of noncompliance or document exception reports to certificateholders when Defendant was obligated to do so. *See* CUF, pt. 2, ¶¶ 33-36, 558-59, 563-66, 571-72; CF, pt. 2, ¶¶ 33-36, 558-59, 563-66, 571-72; ECF No. 306-397 at 266:24–269:4 (Jacobs). Accordingly, just as the failure to send a notice to cure is not active conduct in the context of the prevention doctrine, neither is the failure to send servicer disclosures of noncompliance or document exception reports to certificateholders.

Plaintiffs also argue that there is evidence of Defendant filing false RegABs that concealed numerous document deficiency issues from certificateholders. Pls. Opp'n at 10 (citing CUF, pt. 2, ¶¶ 548-57, 562-70). Plaintiffs identify five such RegABs. CUF, pt. 2, ¶ 552 (citing ECF Nos. 306-479, 306-480, 306-481, 306-482, 306-483). Plaintiffs claim that these RegABs concealed document deficiency issues because Defendant knew that collateral was not appropriately maintained but did not disclose that information in its certification as required by RegAB Item 1122(d)(4)(i). *See* CUF, pt. 2, ¶¶ 552-57. Plaintiffs also state that Defendant failed to disclose "the existence of uncured exceptions" and "noncompliance pertaining to collateral or security on pool assets" as required by "Item 1122(d)(4) of RegAB." *Id.*,

¶¶ 567-69.[78]

There is no evidence suggesting that four of the RegABs concealed document deficiency issues from certificateholders. Defendant did not assess compliance with Item 1122(d)(4)(i) in these RegABs. ECF No. 306-479 at USBANK-PAC00316959; ECF No. 306-480 at USBANK-PAC00211956; ECF No. 306-482 at USBANK-PAC00615328; ECF No. 306-483 at USBANK-PAC00211892. Nor was Defendant obligated to make such an assessment via these certifications.[79] *See* CF, pt. 2, ¶¶ 552, 556.

In the fifth RegAB, Defendant assessed Item 1122(d)(4)(i) and did not disclose any noncompliance. ECF No. 306-481 at USBANK-PAC00682511-13. But

---

[78] Plaintiffs further point to various disclosures that Defendant did not make in its RegABs, but Plaintiffs fail to explain why those disclosures had to be made as part of Defendant's compliance with Regulation AB. CUF, pt. 2, ¶¶ 562-66, 70. Accordingly, the Court disregards these statements as irrelevant to the question of whether Defendant filed false RegABs.

[79] Assessment of compliance with RegAB Item 1122(d)(4)(i) is only required from the "party participating in the servicing function" of Item 1122(d)(4)(i). 17 C.F.R. § 229.1122(a). The servicing function of Item 1122(d)(4)(i) concerns whether "[c]ollateral or security on pool assets is maintained as required by the transaction agreements or related pool asset documents." *Id.* § 229.1122(d)(4)(i). This means that "[t]he servicing criterion in Item 1122(d)(4)(i) requires an assessment of whether the mortgage and related documents, rather than the physical properties underlying the mortgages, are maintained as required by the transaction agreements or related pool asset documents." SEC Div. of Corp. Fin., *Asset-Backed Securities*, § 322.03 (last updated Aug. 8, 2006), https://perma.cc/FVU5-ZGEK. Accordingly, only the deal party that maintains the mortgage files and related documents (typically the custodian, *see, e.g.*, ECF No. 306-3 § 2.03) is required to assess Item 1122(d)(4)(i). Here, Defendant only performed this role with respect to BAFC 2007-D at the time the certifications were completed. *See* ECF No. 306-436 at 2-4. Since BAFC 2007-D was not one of the trusts evaluated as part of the four RegAB certifications at issue here, *see id.*, Defendant was not obligated to assess Item 1122(d)(4)(i).

Defendant's assessment of Item 1122(d)(4)(i) only concerned BAFC 2007-D among the 31 Covered Trusts. *See* ECF No. 306-436 at 2-3. Since the Court has already granted summary judgment in favor of Defendant with respect to Plaintiffs' claims relating to BAFC 2007-D, *supra* Discussion, pt. A.1, there is no need to consider application of the prevention doctrine with respect to this RegAB.

In addition, Plaintiffs refer to evidence of Defendant improperly withholding a Material Failure EOD notice regarding CMLTI 2006-AR1. Pls. Opp'n at 10 (citing CUF, pt. 2, ¶¶ 586-600). Specifically, on August 19, 2011, Defendant drafted a written notice to CMLTI 2006-AR1's issuer demanding the issuer provide an Opinion of Counsel, and notifying the issuer that it had 30 days to cure the material failure before a Material Failure EOD occurred. *See* ECF Nos. 306-492, 306-493. The record indicates that Defendant never issued the EOD notice. ECF No. 306-494 at USBANK-PAC00426553-63. The Court need not determine whether Plaintiffs have raised a fact issue as to whether the prevention doctrine applies to this potential EOD, however, as Defendant did not move for summary judgment with respect to this claim. CF, pt. 2, ¶ 594.

Finally, Plaintiffs point to Defendant's failure to provide notice of any "defaults"[80] in BSARM 2005-7 and CMLTI 2006-AR1. Pls. Opp'n at 10 (citing CUF,

---

[80] BSARM 2005-7's governing agreement defines "default" as "[a]ny occurrence which is or with notice or the lapse of time or both would become an Event of Default." ECF No. 306-4, app. A at USBANK-PAC00195360. CMLTI 2006-AR1's governing agreement defines "default" as "[a]ny occurrence which is or, with notice or the lapse of time or both, would become an Event of Default." ECF No. 306-12, app. A at USBANK-PAC00261065.

pt. 2, ¶¶ 573-76). But Plaintiffs do not provide any evidence that a default occurred in either BSARM 2005-7 or CMLTI 2006-AR1. *See* CUF, pt. 2, ¶¶ 573-76.

* * *

In sum, the Court grants Defendant's motion for summary judgment as the post-EOD claims for which lack of notice was asserted, except (i) post-EOD claims concerning GSR 2006-AR1; (ii) post-EOD claims under JPALT 2006-S4, JPMMT 2005-A7, and MSM 2006-7 based upon Defendant's alleged actual knowledge of the master servicer's failure to ensure proper servicing of certain mortgage loans or the letters at ECF Nos. 301-161 and 301-163; and (iii) post-EOD claims under CFLX 2006-1, WAMU 2006-AR8, WAMU 2006-AR16, WAMU 2006-AR18, WAMU 2007-HY1, WAMU 2007-HY2, and WAMU 2007-HY4 that rely on ECF Nos. 306-345, 306-375, 306-376, and 306-377 to provide the requisite written notice.

**b. Merits of Post-EOD Claims Regarding Expired Repurchase Enforcement Claims**

Defendant has moved for summary judgment with respect to post-EOD claims based upon the Trustee's failure to seek repurchase where the statute of limitations on the repurchase claim had expired before the EODs arose. Def. Br. at 21. Defendant asserts it would have been futile for Defendant to pursue those claims, and so Defendant cannot be liable no matter the scope of Defendant's post-EOD duties. *Id.*

In response, Plaintiffs point out that the limitations period for those claims remained unsettled until the New York Court of Appeals decided *ACE* in June 2015. Pls. Opp'n at 10-11. Since Defendant previously pursued and favorably resolved

post-EOD repurchase enforcement claims that would have been time-barred under the limitations period articulated in *ACE*, *see* CUF ¶¶ 602-603, Plaintiffs argue that Defendant cannot now excuse its failure to bring similar claims before that decision was issued. Pls. Opp'n at 10-11. Defendant responds that *ACE* did not set a new legal principle but merely clarified what the limitations period had always been. Def. Reply at 9.

Defendant is correct that "a judicial decision construing the words of a statute does not constitute the creation of a new legal principle," and that "[t]he construction of a statute is, rather, the exercise of determining the intent of the Legislature when the act was passed." *People v. Hill*, 85 N.Y.2d 256, 262 (N.Y. 1995) (cleaned up). Regardless, Defendant is not entitled to summary judgment on these claims.

The governing agreements generally provide that the trustee has a duty to act as a prudent person in exercising its rights and power after an EOD occurs or after the trustee has notice or actual knowledge of an EOD. ECF No. 306-617 at 1-8; *e.g.*, ECF No. 306-2 § 9.01. When an EOD occurs, "the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use *under the circumstances* in the conduct of such person's own affairs." ECF No. 306-2 § 9.01 (emphasis added). Accordingly, the inquiry before the Court is whether, under the circumstances at the time the alleged EODs occurred, Defendant exercised its rights and powers as a prudent person would have exercised them in the conduct of his or

her own affairs. In other words, when the alleged EODs arose and it was unsettled whether Defendant's repurchase enforcement claims had expired, would a prudent person have litigated those claims anyway? "[T]he question of when a 'prudent person' would sue . . . is a fact-intensive question." *Ambac*, 632 F. Supp. 3d at 541. Considering the complexities of the facts impacting that assessment, that question cannot be resolved as a matter of law.

**7. Merits of Tort Claims**

Defendant argues that it is entitled to summary judgment on Plaintiffs' tort claims because they impermissibly duplicate Plaintiffs' breach-of-contract claims. Def. Br. at 23-25. Plaintiffs counter that their tort claims are based upon Defendant's extra-contractual duties to perform its ministerial functions with due care and to avoid conflicts of interest. Pls. Opp'n at 14-15.

Plaintiffs rely on Judge Gardephe's prior decision in this case, which held that Plaintiffs could maintain claims for negligent performance of ministerial acts and for failure to avoid conflicts of interest under New York's economic loss doctrine. *Pac. Life*, 636 F. Supp. 3d at 438. As discussed *supra*, the law-of-the-case doctrine "does not rigidly bind a court to its former decisions." *Holder*, 564 F.3d at 99 (citation omitted). Indeed, a court "may depart from the law of the case for cogent or compelling reasons including an intervening change in law." *Id.* (cleaned up).

On this issue, there has been an intervening change of law. In 2023, the New York Court of Appeals addressed analogous facts in *IKB International* and reached

a conclusion opposite to that of Judge Gardephe. *Compare IKB Int'l.*, 40 N.Y.3d at 290-92, *with Pac. Life*, 636 F. Supp. 3d at 437-40. As here, *IKB International* involved a suit by investors against an RMBS trustee for failing to enforce post-EOD repurchase obligations. The Court of Appeals held that courts should not apply the economic loss doctrine to determine whether tort claims are duplicative of breach of contract claims, as the doctrine does not apply outside of the product liability context. *IKB Int'l*, 40 N.Y.3d at 290. The Court of Appeals then dismissed the plaintiffs' tort claims against the RMBS trustee for conflicts of interest and breach of fiduciary duty, as they were duplicative of the breach of contract claims. *Id.* at 291-292.

Since "the relevant state law is established by a decision of the State's highest court, that decision is binding on the federal courts." *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 34 (2018) (cleaned up). At the motion to dismiss stage, Judge Gardephe's decision applied the economic loss doctrine, which the Court of Appeals has now clarified is inapplicable in the RMBS context. The Court therefore applies the holding of *IKB International* to decide the current motion.

Under New York law, the Court must "evaluate the nature of the injury, how the injury occurred[,] and the harm it caused" to determine if tort claims must be dismissed as duplicative. *IKB Int'l*, 40 N.Y.3d at 291 (cleaned up). "A simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Id.* at 290 (cleaned up). But "[e]ven where

the plaintiff has pleaded a legal duty independent of the contract, its tort claims should be dismissed if they are based on the same misconduct, and seek the same damages, for the same injury, allegedly caused by the breach of contract." *Triaxx Prime CDO 2006-1 Ltd. v. U.S. Bank Nat'l Ass'n*, No. 21-CV-11019 (BCM), 2024 WL 1381354, at *15 (S.D.N.Y. Mar. 31, 2024) (citation omitted). Ultimately, "where [the] plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory." *IKB Int'l*, 40 N.Y.3d 277 at 290 (citation omitted).

Here, as in *IKB International*, the nature of Defendant's alleged tortious misconduct mimics its actions that allegedly breached the governing agreements. *See id.* at 291. Plaintiffs claim that Defendant violated a duty to avoid conflicts of interest by failing "to take actions adverse to the interests USB shared with Servicers, especially [given] the frequency and breadth of Servicer breaches that came to USB's attention." Pls. Opp'n at 14-15. The adverse actions that Defendant allegedly failed to take, however—such as acting to remedy breaches by Servicers, exercising its rights and powers as trustee as a prudent person would when confronted with knowledge of uncured EODs, and enforcing repurchase obligations—would constitute performance of its contractual duties. CUF, pt. 2, ¶¶ 713-18. The Court of Appeals determined in *IKB International* that such tort claims cannot be brought against an RMBS trustee because they essentially allege that the trustee "breached [its] contractual duties *because of* conflicts of interest." 40 N.Y.3d at 291.

Plaintiffs also assert that Defendant violated a duty to perform ministerial

acts with due care by "consciously avoiding Trustee obligations because of the potential adverse impact on USB's business." Pls. Opp'n at 14. These descriptions of Defendant's tortious misconduct similarly restate Plaintiffs' theories about how Defendant violated its contractual duties by failing to notify designated parties of various breaches and failing to enforce repurchase claims.

As in *IKB International*, the nature of the alleged harms is also duplicative. 40 N.Y.3d at 292. The Second Amended Complaint describes the tort harm as "impair[ing] Certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Plaintiffs' Certificates." SAC, ¶ 202. This harm merely reframes the monetary harm that Plaintiffs suffered due to Defendant's alleged contractual breaches: the certificates' value plummeted. Indeed, that decline in value is the direct result of Defendant's alleged failure to perform its contractual obligations under the governing agreements. *See id.*, ¶ 198 ("U.S. Bank is liable to Plaintiffs for the losses they suffered as a direct result of [Defendant's] failure to perform [its] contractual obligations under the PSAs."). "There is no injury alleged here that a separate tort claim would include that is not already encompassed in plaintiffs' contract claim." *IKB Int'l*, 40 N.Y.3d at 292 (cleaned up).

Accordingly, Defendant's summary judgment motion regarding Plaintiffs' tort claims is granted.

**B. Pacific Life's Motion for Partial Summary Judgment**

In its Answer to Plaintiffs' Second Amended Complaint, Defendant assert 62 affirmative defenses. *See generally* ECF No. 231 ("Answer"). Plaintiffs now seek summary judgment as to 19 of those affirmative defenses. ECF No. 290 ("Pls. Br.") at 14-15. Defendant does not oppose summary judgment on ten of those affirmative defenses. *Compare id.*, *with* ECF No. 293 ("Def. Opp'n") at 1-2. Accordingly, the Court grants summary judgment in favor of Plaintiffs as to affirmative defense numbers 21 (advice of counsel), 34 (unclean hands), 40 (no-action clause), 41 (champerty), 44 (monoline insurance), 46 (unjust enrichment), 54 (third-party guarantee), 55 (settlements received by prior holders), 59 (assumption of risk), and 61 (economic loss). *See* ECF No. 297 ("Pls. Reply") at 1.

The remaining nine affirmative defenses in dispute relate to: (1) damages mitigation, (2) damages offsets from derivative transactions, (3) damages offsets from collateral sources, (4) laches, (5) waiver, (6) ratification, (7) forfeiture, (8) acquiescence, and (9) estoppel. *Compare* Pls. Br. at 14-15, *with* Def. Opp'n at 1-2. The Court considers each in turn.

**1. Failure to Mitigate**

Under New York law, "[i]n a breach of contract action, a plaintiff ordinarily has a duty to mitigate the damages that he incurs. If the plaintiff fails to mitigate his damages, the defendant cannot be charged with them. This duty applies to those damages that the plaintiff could have avoided with reasonable effort and without undue risk, burden, or expense." *Tang Cap. Partners, LP v. BRC Inc.*, 757

F. Supp. 3d 363, 413 (S.D.N.Y. 2024). "A duty to mitigate damages arises when (1) a contract is breached and (2) it appears that the breaching party has abandoned or repudiated his obligations under the contract." *Alta Partners, LLC v. Getty Images Holdings, Inc.*, 165 F.4th 141, 160 (2d Cir. 2026) (citation omitted).

Plaintiffs argue that, because "USB affirmatively denies that it ever repudiated or abandoned its contracts," it therefore "cannot meet its burden of identifying the trigger for the alleged duty to mitigate." Pls. Br. at 6. The crux of Plaintiffs' argument is that, if a defendant denies abandoning or repudiating a contract as its primary defense, it is therefore precluded from asserting as an affirmative defense the failure to mitigate damages. That is not the law. *See, e.g.*, *Nat'l Credit Union Admin. Bd. v. Deutsche Bank Nat'l Tr. Co.*, 2025 WL 2380538, at *21 n.20 ("Deutsche Bank proceeds in the alternative with this affirmative [mitigation] defense. Its primary defense is that it did not breach the PSAs. At this juncture, Deutsche Bank need not abandon its primary defense and offer a date of breach."). "It is well settled that the alternative pleading principles of Rule 8(d) apply even at the summary judgment stage of litigation." *Polanco v. City of New York*, No. 14-CV-07986 (NRB), 2018 WL 1804702, at *10 (S.D.N.Y. Mar. 18, 2018).

Plaintiffs also contend that "a plaintiff is not required to take steps in mitigation that should have been taken by the breaching defendant." Pls. Br. at 6 (cleaned up). Yet "the crux of any mitigation analysis is the reasonableness of a plaintiff's actions." *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-04394 (AJN) (BCM), 2016 WL 4613390, at *19 (S.D.N.Y. Aug. 31, 2016) (citation

omitted). Plaintiffs have not established as a matter of law that there were no reasonable mitigation actions they could have taken, such as hedging or selling their certificates. "Whether a party puts forth sufficient effort to mitigate damages is a question of fact and typically resolved during trial." *Mohegan Lake Motors, Inc. v. Maoli*, 559 F. Supp. 3d 323, 346 (S.D.N.Y. 2021) (citation omitted). Accordingly, summary judgment as to Defendant's mitigation defense is denied.

**2. Damages Offset from Collateral Sources and Loss Mitigation Activities**

Defendant has asserted two damages offset defenses in its Answer to the SAC. In defense 7, Defendant asserts that any damages verdict "must be reduced by any applicable collateral source or recovery and any double recovery [be] prohibited." Answer at 38. In defense 47, Defendant contends that "Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs, or the prior Certificateholders whose claims Plaintiffs purport to bring, engaged in hedging or other loss mitigation activity related to Plaintiffs' investments in the Trusts that offset their losses." *Id.* at 44.

As to the former offset defense, Plaintiffs originally argued that they have not recovered any losses on the Certificates "from sources outside of the waterfalls for the Trusts (apart from a settlement with former Defendant Bank of America in this action)." Pls. Br. at 13. Plaintiffs' statement is self-defeating, as it concedes that Plaintiffs have received recovery from the Trust waterfalls and an Article 77 settlement. New York law precludes "a plaintiff from recovering twice for the same injury." *In re Platinum Beechwood Litig.*, 694 F. Supp. 3d 304, 308 (S.D.N.Y. 2023).

In their reply brief, Plaintiffs withdraw their motion for summary judgment as to this defense. Pls. Reply at 10 n.2. Accordingly, the motion for summary judgment as to collateral source offsets is denied.

Plaintiffs maintain that they are still entitled to summary judgment with respect to Defendant's separate loss mitigation offset defense, however, because the undisputed evidence establishes that Plaintiffs did not engage in hedging. Pls. Br. at 7; *see also* ECF No. 289, ¶ 12. Defendant counters that any such motion is premature, as all expert damages discovery has been deferred until after resolution of the pending summary judgment motions. Def. Opp'n at 3-4; *see* ECF No. 215, ¶ 9(b). Yet Defendant has not submitted a declaration setting forth how expert testimony would bear on this issue or would be likely to lead to evidence with which it could contest summary judgment. *See* Fed. R. Civ. P. 56(d). Plaintiffs' properly supported summary judgment motion with respect to loss mitigation offsets is therefore granted.

**3. Laches**

The parties dispute whether the Court should apply New York law or Ohio law to Defendant's laches defense. *Compare* Pls. Br. at 10-12 (citing New York law), *with* Def. Opp'n at 8-13 (citing Ohio law). Plaintiffs argue that the Court need not resolve this issue because the standards are largely interchangeable. Pls. Reply at 4-5. There is one stark difference between them, however. New York law does not permit the equitable defense of laches in a breach of contract action. *Medinol Ltd. v. Bos. Sci. Corp.*, 346 F. Supp. 2d 575, 609-10 (S.D.N.Y. 2004); *see Ogilvy Grp.*

*Sweden, AB v. Tiger Telematics, Inc.*, No. 05-CV-08488 (DLC), 2006 WL 547785, at *2 (S.D.N.Y. Mar. 7, 2006) ("Laches is an equitable doctrine and cannot be invoked as a defense to a claim for damages."). In contrast, Ohio law does recognize laches as a defense to a breach of contract action. *Sims v. Anderson*, 38 N.E.3d 1123, 1130 (Ohio Ct. App. 2015). The Court must therefore determine which state law applies.

Since this case was transferred from Ohio, Ohio's choice-of-law rules govern. Ohio applies the forum state's procedural rules. *See, e.g.*, *Paramount Farms Int'l, LLC v. Ventilex B.V.*, 61 N.E.3d 702, 706 (Ohio Ct. App. 12th Dist. 2016); *see also Toledo Museum of Art v. Ullin*, 477 F. Supp. 2d 802, 806 (N.D. Ohio 2006) ("A federal court sitting in Ohio applies the procedural law of the forum state including the forum's statute of limitations even if the case requires application of another state's substantive law."). As laches is a procedural rule that "determines whether an action is barred by lapse of time in situations not expressly covered by a statute of limitations . . . the local law of the forum determines whether an action is barred by laches." Restatement (Second) of Conflict of Laws § 142 cmt. b; *accord Bakalar v. Vavra*, 550 F. Supp. 2d 548, 551 (S.D.N.Y. 2008). Ohio law therefore governs.

Under Ohio law, laches requires: "(1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for the delay, (3) knowledge, actual or constructive, of the injury or wrong, and (4) prejudice to the other party." *State ex rel. Syx v. Stow City Council*, 161 Ohio St. 3d 201, 203 (Ohio 2020) (citation omitted). Plaintiffs predominantly argue that Defendant cannot demonstrate prejudice. Pls. Reply at 4-5.

For purposes of laches, a defendant may be prejudiced by a plaintiff's delay in filing suit when that delay affects the defendant's ability to defend against a lawsuit. *See State ex rel. Pennington v. Bivens*, 166 Ohio St. 3d 241, 248 (Ohio 2021) ("Nonetheless, we have sometimes indicated that the element of prejudice may be satisfied when the delay . . . restricts the time a respondent has to prepare and defend the case."). Here, Defendant has pointed to evidence in the record suggesting that Plaintiffs' delay in filing suit adversely affected Defendant's ability to defend. Plaintiffs' own pleading admits that "beginning in 2009 or 2010 . . . facts . . . began to emerge publicly" indicating that the Sponsors, Originators, and U.S. Bank "had regularly included loans in securitizations that did not comply with applicable underwriting guidelines, made predatory loans and failed to meet state and federal lending guidelines." SAC, ¶ 108; *see* ECF No. 225-6 at 1-91. Whether this public reporting, combined with Plaintiffs' knowledge of trust losses and the receipt of remittance reports, *see* ECF Nos. 294-5 (RFA Nos. 133, 134), 294-26, 294-27, provided Plaintiffs with actual or constructive knowledge of U.S. Bank's breaches is an issue of fact to be resolved by a jury.

Similarly, whether Defendant suffered injury as a result of Plaintiffs' delay in filing suit is also a disputed factual question. Had Plaintiffs filed suit in 2010, Defendant arguably would have had the ability to defend against most, if not all, of Plaintiffs' repurchase enforcement claims by pursuing those claims against the alleged obligated deal parties under the governing agreements. *See* ECF No. 294-2 at 1-2. Because Plaintiffs waited to file suit until 2015, Defendant no longer had

the option to pursue repurchase enforcement because of the expiration of the statute of limitations. *Id.* The Court therefore denies Plaintiffs summary judgment as to Defendant's laches defense.

**4. Inaction-Related Defenses**

The remaining five of the nine affirmative defenses are inaction-related defenses: waiver, forfeiture, ratification, acquiescence, and estoppel. The Court grants Plaintiffs' motion for summary judgment with respect to each of these defenses.

**a. Waiver**

"To establish waiver under New York law, one must show 'intentional relinquishment of a *known* right with both knowledge of its existence and an intention to relinquish it.'" *Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, 80 F. Supp. 3d 535, 540 (S.D.N.Y. 2015) (quoting *Capitol Recs., Inc. v. Naxos of Am., Inc.*, 372 F.3d 471, 482 (2d Cir. 2004)). "The conduct constituting a waiver must be 'clear, unmistakable and without ambiguity.'" *Id.* (quoting *Civ. Serv. Emps. Ass'n, Inc. v. Newman*, 450 N.Y.S.2d 901, 903 (3d Dep't 1982)). Although "[w]aiver may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage," *Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*, 85 N.Y.2d 232, 235 (1995), waiver "may not be inferred from mere silence or inaction," *Flo & Eddie*, 80 F. Supp. 3d at 540 (quoting *Bank of Am., N.A. v. 414 Midland Ave. Assocs., LLC*, 911 N.Y.S.2d 157, 161 (2d Dep't 2010)); *see also Royal Park Invs. SA/NV*, 2016 WL 4613390, at *15 ("[M]ere silence, oversight or

thoughtlessness in failing to object is insufficient to support an inference of waiver, no matter the state of the plaintiff's knowledge at the time." (cleaned up)).

Defendant fails to present evidence from which a reasonable factfinder could find intentional relinquishment. Defendant argues that, if Plaintiffs' breach-of-contract theory is correct, then Plaintiffs knew that Defendant had failed to uphold its duty to pursue repurchase litigation since 2011. Def. Opp'n at 14. Plaintiffs, however, "never contacted [Defendant] . . . at any point before filing this lawsuit." *Id.* (citing ECF No. 294-5). In other words, Defendant relies upon Plaintiffs' silence and inaction as indicia of intent. But "[b]ecause waiver of a contract right must be . . . intentional, the defense of waiver requires a clear manifestation of an intent by plaintiff to relinquish her known right and mere silence, oversight or thoughtlessness in failing to object to a breach of the contract will not support a finding of waiver." *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey*, 448 F.3d 573, 585 (2d Cir. 2006); *see also Courtney-Clarke v. Rizzoli Int'l Publications, Inc.*, 676 N.Y.S.2d 529, 529 (1st Dep't 1998). Under the governing agreements, Plaintiffs are not required to bring a breach-of-contract claim within any specific period after becoming aware of the breach. Accordingly, even if Plaintiffs did know of Defendant's alleged breaches in 2011, waiver of the right to sue regarding those breaches cannot be inferred from Plaintiffs' mere silence or inaction.

Defendant argues in the alternative that Plaintiffs' intent can be inferred from their failure to exercise their contractual right to direct Defendant to

investigate potential breaches before Plaintiffs filed suit. Def. Opp'n at 16. It is undisputed that, as minority certificateholders, Plaintiffs lacked the unilateral right to direct Defendant to act. *See* ECF No. 301-15; *see, e.g.*, *LNC Invs., Inc. v. First Fid. Bank*, No. 92-CV-07584 (MBM), 1997 WL 528283, at *15 (S.D.N.Y. Aug. 27, 1997). Plaintiffs' motion for summary judgment as to the affirmative defense of waiver is therefore granted.

**b. Ratification and Acquiescence**

Defendant also fails to present evidence sufficient to create a genuine dispute of material fact concerning its asserted defenses of ratification and acquiescence. "Ratification is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding." *In re Adelphia Recovery Tr.*, 634 F.3d 678, 691 (2d Cir. 2011) (quoting 57 N.Y. Jur. 2d Estoppel, Ratification, and Waiver § 87). Accordingly, "[r]atification, under New York law, requires both knowledge of a defect in the act to be confirmed and the right to reject or ratify it." *Royal Park Invs.*, 2016 WL 4613390, at *16 (cleaned up). "Ratification may be express or implied, or may result from silence or inaction." *Adelphia Recovery Tr.*, 634 F.3d at 692 (cleaned up). Furthermore, "acquiescence may give rise to an implied ratification." *Id.* at 693.

Defendant argues that, because ratification can be inferred from silence, Plaintiffs' failure to direct the Trustee to enforce its repurchase rights or otherwise take action in the face of breaches of the governing agreements creates a triable issue of fact. Def. Opp'n at 15. Yet implied ratification would require Plaintiffs to

have had the "right" to reject or ratify the Trustee's course of action. As discussed above, Defendant does not present evidence that Plaintiffs had the "legal ability to direct [Defendant] to act, nor any other right to reject or ratify [Defendant's] conduct." *Royal Park Invs.*, 2016 WL 4613390, at *16 (cleaned up). Since there is not a contractual right that Plaintiffs could have unilaterally exercised before filing suit, Defendant is unable to show ratification or acquiescence by Plaintiffs.

**c. Forfeiture**

Defendant's forfeiture defense fails for substantially the same reasons as its other inaction defenses. "[F]orfeiture is the failure to make the timely assertion of a right." *United States v. Olano*, 507 U.S. 725, 733 (1993). As minority certificateholders, Plaintiffs did not have the legal right under the governing agreements to direct the Trustee to act. The only "right" Plaintiffs had was to initiate a breach of contract action. Plaintiffs thus "objected within a reasonable time by bringing suit within the applicable statute of limitations." *Royal Park Invs.*, 2016 WL 4613390, at *16 (cleaned up).

**d. Estoppel**

"Equitable estoppel is an extraordinary remedy that should be invoked sparingly and only under exceptional circumstances." *Ambac*, 632 F. Supp. 3d at 547 (cleaned up). Equitable estoppel requires "(1) an act constituting the concealment of facts or misrepresentation; (2) an intention or expectation that such acts will be relied upon; (3) actual or constructive knowledge of the true facts by the wrongdoers; and (4) reliance upon the misrepresentations which causes the

innocent party to change its position to its substantial detriment." *Id.* (citing *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 90 (2d Cir. 2013)). Furthermore, "[s]ilence operates as an assent, and creates an estoppel, only when it has the effect to mislead. . . . When a party is under a duty to speak, or when his failure to speak is inconsistent with honest dealings, and misleads another, then his silence may be deemed to be acquiescence." *Tanenbaum Textile Co. v. Schlanger*, 287 N.Y. 400, 404 (1942).

Defendant has not come close to presenting evidence sufficient to establish the elements of an equitable estoppel defense. According to Defendant, the purported "misrepresentation" upon which its estoppel defense rests is that Plaintiffs' silence "led U.S. Bank to believe that Plaintiffs agreed with U.S. Bank's view of its duties—that it was not required to pursue repurchase litigation or take other actions without direction and indemnity." Def. Opp'n at 14. Yet Defendant presents no evidence that Plaintiffs were under a duty to speak. Accordingly, Plaintiffs' silence was not inconsistent with honest dealings. *Gaia House Mezz*, 720 F.3d at 90 ("[A] party's silence does not give rise to a claim of equitable estoppel when the party has no duty to speak."); *accord Ambac*, 632 F. Supp. 3d at 548-49.

Additionally, Defendant does not identify any manner in which it supposedly was induced to change its position as a result of Plaintiffs' silence. Indeed, according to Defendant, Plaintiffs' inaction merely confirmed that its preexisting "view of its duties" was correct. *See* Def. Opp'n at 14. Plaintiffs are thus entitled to summary judgment with respect to Defendant's estoppel defense.

## CONCLUSION

For the foregoing reasons, Plaintiffs' and Defendant's cross motions for partial summary judgment are **GRANTED IN PART AND DENIED IN PART**. Specifically, and for purposes of clarity:

- Summary judgment is granted in Defendant's favor on Plaintiffs' claims concerning ARMT 2005-10, BAFC 2007-D, CMALT 2007-A4, CMALT 2007-A6, CMLTI 2005-7, CMLTI 2007-AR5, JPMMT 2005-A7, WAMU 2006-AR2, WAMU 2007-HY3, WAMU 2007-HY7, WFMBS 2006-AR1, and WMALT 2007-4 because Plaintiffs sold the associated certificates and cannot maintain these claims.

- Summary judgment is granted in Defendant's favor on Plaintiffs' claims concerning BSARM 2005-7 and CMLTI 2006-AR1—except TIA claims for those trusts—because Plaintiffs sold the associated certificates and cannot maintain these claims.

- Summary judgment is granted in Defendant's favor on Plaintiffs' claims associated with the certificates issued by JPALT 2006-S4 with the CUSIP No. 466302AK2 and issued by WAMU 2007-HY1 with the CUSIP Nos. 92925VAE0 and 92925VAK6 because Plaintiffs sold the associated certificates and cannot maintain these claims.

- Summary judgment is granted in Defendant's favor on Plaintiffs' claims that rely upon the portions of the certificates that Plaintiffs sold regarding the certificates issued by JPALT 2006-S4 with the CUSIP No. 466302AJ5 and issued by CSFB 2004-8 with the CUSIP No. 22541SW95 because Plaintiffs sold portions of the associated certificates and cannot maintain these claims.

- Summary judgment is granted in Defendant's favor on Plaintiffs' pre-EOD repurchase enforcement claims concerning BSARM 2005-7 because those claims are time-barred.

- Summary judgment is granted in Defendant's favor on all of Plaintiffs' repurchase enforcement claims concerning CSFB 2004-8 and JPMMT 2005-A7 because those claims are time-barred.

- Summary judgment is granted in Defendant's favor on Plaintiffs' pre-EOD loan-characteristic R&W repurchase enforcement claims relating to TBW 2006-6 because Plaintiffs lack evidence that the relevant deal parties had

knowledge or notice of specific mortgage loans with loan-characteristic R&W breaches.

- Summary judgment is granted in Defendant's favor on Plaintiffs' pre-EOD loan-characteristic R&W repurchase enforcement claims relating to JPALT 2006-S4 and JPMMT 2007-A4—except as to JPALT 2006-S4's mortgage loans 1742458918 and 1845715746—because Plaintiffs lack evidence of the requisite written notice.

- Summary judgment is granted in Defendant's favor on Plaintiffs' pre-EOD loan-characteristic R&W claims—except as to the 64 loans referenced in ECF No. 323-4—because Plaintiffs failed to present loan-specific evidence that Defendant discovered, had actual knowledge of, or received notice of those breaches.

- Summary judgment is granted in Defendant's favor as to the post-EOD claims for which lack of notice was asserted, except (i) post-EOD claims concerning GSR 2006-AR1; (ii) post-EOD claims regarding CFLX 2006-1, WAMU 2006-AR8, WAMU 2006-AR16, WAMU 2006-AR18, WAMU 2007-HY1, WAMU 2007-HY2, and WAMU 2007-HY4 that rely on ECF Nos. 306-345, 306-375, 306-376, and 306-377 to provide the requisite written notice; and (iii) post-EOD claims relating to JPALT 2006-S4 (unsold portion of CUSIP No. 466302AJ5), JPMMT 2005-A7, and MSM 2006-7 that are based upon Defendant's alleged actual knowledge of the master servicer's failure to ensure proper servicing of certain mortgage loans or the letters at ECF Nos. 301-161 and 301-163.

- Summary judgment is granted in Defendant's favor on Plaintiffs' tort claims because they impermissibly duplicate Plaintiffs' breach-of-contract claims.

- Summary judgment is granted in favor of Plaintiffs concerning Defendant's affirmative defense numbers 21 (advice of counsel), 34 (unclean hands), 40 (no-action clause), 41 (champerty), 44 (monoline insurance), 46 (unjust enrichment), 54 (third-party guarantee), 55 (settlements received by prior holders), 59 (assumption of risk), and 61 (economic loss) for which Defendant did not oppose summary judgment.

- Summary judgment is granted in favor of Plaintiffs on Defendant's affirmative defenses of loss mitigation offset, waiver, ratification, acquiescence, forfeiture, and estoppel.

In all other respects, Plaintiffs' and Defendant's cross motions for partial summary judgment are denied. The Clerk of Court is directed to terminate ECF Nos. 289 and 299.

SO ORDERED.

Dated: August 24, 2026
New York, New York

JEANNETTE A. VARGAS
United States District Judge